# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018

**Case Description:** Death Investigation

**Deceased:** Robert Devon Loggins

**County:** Grenada

**MBI Case Number:** M19-00000391

**MCL Case Number:** 18-018469-0001

**ME Number:** ME18-1164

**Agent:** Mark Steed

# MISSISSIPPI BUREAU OF INVESTIGATION



## TABLE OF CONTENTS

**A.** Case Synopsis

**B.** Interviews

**C.** Deceased and Witness Information

**D.** Autopsy Report

**E.** Chain of Custody and Miranda Rights Forms

**F.** Subpoenas and Hospital Medical Records

**G.** American Medical Response Report

**H.** Police Taser Report and Call Log

**I.** CD Containing Interviews, Body Cam Video, and Autopsy



# MISSISSIPPI BUREAU OF INVESTIGATION



Date: November 29, 2018

Incident Description: Death Investigation

Deceased: Robert D. Loggins

County: Grenada

MBI Case Number: M19-00000391

ME Number: ME18-1164

Agent: Mark Steed

**Details:**

    On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), was telephonically contacted by District Attorney (DA) Doug Evans (Evans), 5th Judicial District (FJD), State of Mississippi. The purpose of the call was to request investigative assistance from the MBI. Specifically, DA Evans advised that Robert D. Loggins, black male, date of birth ████████, Social Security Account number ████████, who resides at 1411 N Levee Street, Grenada, Mississippi, died this date at approximately 6:00 A.M. at the Grenada County Jail (GCJ). Specifically, Loggins died at the GCJ immediately following his arrest by officers of the Grenada Police Department (GPD). DA Evans further advised that at about 5:00 A.M. the GPD received a 911 call regarding an individual shouting in a neighborhood in the vicinity of Govan Street. After arriving in the area, GPD officers heard an individual yelling behind 60 W Govan Street. Based on the yelling, responding officers thought someone was in need of help. Then, GPD Officers Justin Gammage (Gammage), GPD Supervisor, Reggie Woodall (Woodall), Edwin Merrium (Merrium), Michael Jones (Jones), and Alber Tillie (Tillie), walked to the area of the yelling. In the meantime, Officer Gammage requested an ambulance in the event the individual needed medical attention. Shortly thereafter, Loggins was located behind 60 W Govan Street. Loggins was identified by one of the aforementioned officers. Specifically, the officer knew Loggins from prior contact. Loggins was lying face down in very thick vegetation, with his hands tucked

underneath his torso. GPD officers gave numerous verbal commands to Loggins to show his hands. Loggins failed to comply with said orders. Then, Loggins was tased two or three times to no avail. Specifically, the taser was not effective on Loggins. At this time, GPD Officers muscled Loggins' hands behind him in order to handcuff him. Specifically, the aforementioned officers struggled to subdue Loggins. One of the officers was bitten by Loggins during the arrest.

In addition to the above information, Loggins became passive, requiring officers to carry him to a patrol car. Responding medical personnel, Jennifer Howell (Howell), Emergency Medical Technician (EMT), American Medical Response (AMR), and John Watson (Watson), EMT, AMR, attempted to examine Loggins at the scene. Due to Loggins' disorderly behavior, Howell and Watson were unable to conduct a full medical assessment of Loggins. A preliminary assessment of Loggins yielded that he was medically suitable for incarceration. Loggins was then transported to the GCJ by a GPD Officer. Upon arriving at the GCJ, Loggins was physically carried into the jail by two GPD officers and two GCJ jailers. Loggins was placed on the floor adjacent to the booking counter. At this time, Loggins was moving around. Shortly thereafter, officers decide to hold Loggins down while they exchange handcuffs. Immediately, Loggins became unresponsive. Paramedics respond and attempted CPR to no avail. Loggins was then transported to the Grenada Medical Center (GMC) where he died shortly thereafter.

Upon arriving at the GMC, Agent Steed met DA Evans and William Blackmon (Blackmon), DA Investigator, FJD, State of Mississippi. The aforementioned officers then examined Loggins' body for evidentiary purposes. Agent Steed noticed several minor scratches on Loggins' knees, a minor forehead injury, and small scratches about his head. There were no injuries indicative of foul play. A preliminary toxicology report of Loggins' blood yielded positive for methamphetamine and THC. Furthermore, Agent Steed recommended Loggins' body be sent to the Mississippi Crime Lab (MCL) for an autopsy. In addition, Agent Steed viewed the officer's body cameras. Due to low light conditions, said cameras do not yield any visual misconduct from the officers. Moreover, evidence collected at the scene include one GPD flashlight, a spent taser wire, and a keychain. Said items were collected for evidentiary purposes. One officer involved in Loggins' arrest reported that Loggins was struck on this elbows with a flashlight in order to effect said arrest. Pressure point tactics were also administered. All officers and paramedics have been interviewed regarding the investigation described herein. Said interviews were recorded, transcribed, and made part of the case file.

Furthermore, during the investigation described herein, no foul play is apparent. Doctor Mark LeVaughn (LeVaughn), Chief Medical Examiner, MCL, conducted Loggins' autopsy on November 30, 2018. Said autopsy yields that the cause of death is Methamphetamine Toxicity. Agent Josh Dority (Dority), MBI, Troop D, witnessed said autopsy. If the investigation meets the approval of DA Evans, Agent Steed request to present the above captioned matter before the Grenada County Grand Jury.

*Mark Steed*

Lieutenant Mark Steed

# B

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

      **Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Justin Avery Gammage, black male, date of birth [ ], Social Security Account number [ ], who resides at 36 Snider Street, Grenada, Mississippi 38901.  Said interview was regarding the above captioned matter.  Said interview was recorded and transcribed.  The transcribed interview is attached hereto and made part of the casefile.


*Mark Steed*

Mark Steed

## RECORDED STATEMENT OF JUSTIN GAMMAGE

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:    Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, State of Mississippi, interviewing Officer Justin Gammage, Grenada Police Department. The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred on today's date in Grenada, MS.

    Mr. Gammage, will you read that Miranda form out loud, please?

JG:    "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer for advice before we ask you any questions and have that lawyer present with you during questioning. If you cannot afford a lawyer, one will be appointed to you before answering any questions if you wish. If you decide to answer any questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering questions at any time until you talk to a lawyer." The Waiver of Rights, "I have read the statement of my rights and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I'm doing. No promises, threats or pressure, coercion of any kind has been used against me."

MS:    If you would just sign it right there. Since you read it out loud, just sign it right there.

    What's your date of birth?

JG:    [redacted].

MS:    And your social number?

JG:    [redacted]

MS:    All right. Mr. Gammage, you are a police officer with the Grenada Police Department, and how long have you been an officer with them?

JG:    Eighteen years.

MS:    And you are certified through minimum standard; is that correct?

JG:    I am.

MS:    You're actually a supervisor here; is that correct?

JG:     I'm a captain over a shift.

MS:     And so you were actually on duty when the incident happened with Mr. Loggins; is that correct?

JG:     Yes, I was.

MS:     If you will, tell me how all that went down, and just start from the time and how did the department become aware that police service was needed at this address.

JG:     We received a call that a subject was yelling for help behind 50 Govan Street. I can't recall if they said East or West Govan. They said West Govan. Myself and other officers went to the area of 50 Govan. We could hear him. We made a block – I made a block around the area going from Govan Street to Adams Street to Bledsoe Street back around to Lyon Street and Fairfield back to Govan. The other officers got out on foot on Bledsoe Street. Some got out on foot on Govan Street. When I got to the area of 58, 60 Govan, somewhere right along in there, I think it might have been just a little past 60 Govan, I decided to exit my vehicle, park my truck, exit the vehicle. I could hear someone yelling. There were other officers back to the west of me, so I went back east. I ended up going behind 60 Govan, the house to the east of it. They have a dog. You could hear the dog barking back behind that house. I walked around the side of the house, walked between the cars. There was a fence. I could hear the subject yelling. I could see Officer Tillie's flashlight who was over on the other side. He was on the Bledsoe side of the block saying that he see the subject right there. Went through the gate, made my way down the little walkway back to another gate, went through that gate, made my way through the bushes. I could see a male laying there. He was facing back north, feet was facing south. He had his hands tucked up under his body. One of the other -- Office Tillie said, "Hey, Robert," he called his name. "Robert, come on and get up. Come out of here." By then he gave him the command, "Robert, show me your hands." I don't know if I said his name, but I said, "Show me your hands." I repeated it again. Officer – Sergeant Woodall was behind me. At this time, we moved forward, advanced forward. I asked him again to show me his hands. He did not. He was yelling and screaming. Officer Woodall then tased Mr. Loggins. When he tased Mr. Loggins, after about five seconds, four or five seconds, I told him again, gave him the command again to show me his hands, take his hands out from up under him. By this time, Officer Tillie was coming through. Officer Jones, who was behind Sergeant Woodall came around and was giving him commands. I told him, I said, "Go ahead and go hands on with him." They tried to – they grabbed his arms. He was struggling, keeping his arms tucked up under his body. Officer Woodall then again tased him. Officer Jones, being new, I tried to tell him don't get in between the wires of the taser because he was going to get tased. All right. Officer Woodall tased him again the third time. He seemed like he got up under him. He put his hands farther up under him. They had – was on each side of his body. I think Officer Tillie was going to be on the west side. Officer Jones was on the east side of his body. He's struggling, struggling. I then got down there – well, let me go back. The second – the third time that Sergeant Woodall tased him, Officer Tillie jumped back like most people do when they get tased, like he had caught a little bit of electricity. I then reached down and grabbed his arm because when Tillie jerked back, he rolled over on his side. His arm was exposed. I grabbed his arm, grabbed his arm, had his arm on that side. I told Tillie to

give me his taser. I got Tillie's taser from him. I removed the cartridge, put the cartridge in my pocket, drive stunned Loggins – it's going to be his right arm which was on the east side of his body. Drive stunned him to the right arm, excuse me, that's when he turned over trying to get away and I was able to grab his arm and put it behind his back. At this time Tillie grabbed the arm that I tased. Jones had that arm, and they were able to get it handcuffed. They handcuffed one arm. I had his other arm, brought it over behind him. They handcuffed that arm. He was trying to move around. He was still yelling and screaming. We were telling him to calm down. We were telling him to stop. He still didn't stop. At this time we got up – I got up off the ground, grabbed my light. My light was under him – it was under Loggins, grabbed my light, stuck it in my pocket. I told him, I said, "Move him out of these bushes up to where the EMTs can check him out because we tased him." It's more of a policy that if you tase someone, if we're going to take them to jail, that they need to be checked out by EMTs. We had already called the EMTs earlier because someone was yelling, "Hey, we need some help."

MS:     And that was because you were at middle of the night?

JG:     Middle of the morning and we don't know what could have went on. Honestly, I didn't know what had taken place or what had went on. So EMTs were staged back on Govan Street. We called them to come down to the area where we were at. They carried Mr. Loggins out of the bushes to the first fence. They stopped right there at that first fence. He was still kicking and yelling. Move him on up to where EMTs could take a look at him on up in the light because it was dark back there. They moved him on up. I walked to my truck, got me a drink of water, called – I made sure I had all my equipment. I had my phones and some other stuff I had in my pocket, made sure I had everything. I went back. The EMTs were there. He was still yelling and doing all kinds of stuff. I told him that he needed to let the EMTs remove the taser prongs from his back. Sergeant Woodall, I think he reached down to do it and I said, "They have gloves on. Let them do it." I then turned away because I had dropped, I didn't realize it but I had dropped one of my phones in the street so I went back and got it. And they had removed the prongs. I told one of the young officers, I can't remember if it was Jones or Tillie I told – it was Jones. I told him to go ahead and transport him to the jail. We're going to charge him. Tell him that we're going to charge him.

It was Officer Merriman's call because it was his zone. They called him for the call. They told him to go ahead and go up to the jail with him, help him get in the jail because he was still yelling, screaming, kicking. I told them they should go ahead and transport him as quick as they can because we didn't need him to kick out the car window. So he left. He left the area. I asked everyone who was there were they okay. Who was still there, myself, Sergeant Woodall, Corporal Merriman, I asked them were they all right. They said fine. I said, "Well, that's done. Meet me at the station. It's close to quitting time. Come on do the paperwork so we can go."

Got to the station, sat down to do – I had to, as the supervisor with Sergeant Woodall tasing someone, I was supposed to retrieve the cartridge, taser cartridge, and put it into evidence. I start filling out the evidence – the evidence sheet for the taser cartridge, the bag that I was going to put it in when Officer Tillie told me, "Hey, that guy bit me on hand." With me being the supervisor, I had to take him to the hospital. I already know I

had to do the workmen's comp paperwork, so I told him, "Hey, man, let's go ahead and go out to the hospital and get your hand looked at, and we're going to go." Well, I put him in my truck to start to the hospital, they tell me on the radio that Mr. Loggins is unresponsive and the EMTs is headed there. I make a quick stop to drop off donuts to my wife, I turn around, I go back to the jail. When I go inside the jail they're doing CPR on Loggins. He's laying at the booking desk. He's laying at the booking desk and they're doing CPR on him. I asked Tillie – I asked Officer Tillie, I said, "Tillie, was he responsive when you left?" He said, "Yes. He was still kicking and screaming because they said they wasn't going to take him." I said, "Okay." I contacted my supervisor which is Captain Merriman. I walked out of the jail and called him on the phone, came back in the jail. That's when they were, I guess, they were starting the IV I believe in his leg. I looked because it was the first time I've ever seen them screw an IV in someone's leg because they use a little gun almost, so, I looked at that. They were saying they were going to give him some -- what's that stuff – Narcan because they asked did one of the other officers that was there in the same room pulled out his Narcan and said, "Hey, give him this." And the EMT said – he was about to reach for it and he said, "No, I have some already out." He told her to give it to him and they gave him the Narcan. They were still doing CPR at this time. I told – there was nothing I could do but be in the way. I told Officer Tillie, "Come on, let's go. Let me take you to the hospital and get your hand looked at." Took him and had his hand looked at, done my workmen's comp paperwork, and that's when they told me they brought Loggins to the hospital and said he had died.

MS: Through the years as being a police officer, have you ever been on calls before where you may have had someone trespassing on somebody else's property or during the night?

JG: Yes.

MS: Okay. And during those calls, has there ever been times when you've had to arrest people for trespassing?

JG: Yes.

MS: Okay. And during the course of police duty, police have various types of equipment, and what types of equipment did you have on you last night?

JG: When we went to this call?

MS: Right.

JG: I'm dressed just like I'm dressed right now. I was going home. I had my gun on, my jacket and a flashlight.

MS: Did you have a taser?

JG: I have a taser. I didn't even have it. I didn't have my gun belt on. I was going home. I had called it a night.

MS: Okay. You were getting ready to end the shift then?

JG: Yes.

MS:     And during the course of your law enforcement career, there have been times when you have arrested people that were combative; is that correct?

JG:     Yes.

MS:     And when people are combative, what's the normal police procedures?

JG:     Well, here we have a taser procedure, a taser off procedure. We are – over the years, we have lost a lot of officers and man time to officers getting hurt "wrestling" with people, doing things like that. We have – now we try to reason with a subject, de-escalate the situation which we had done in dealing with Loggins before. He has had a very high strung personality. He has resisted before. Like I told him, early in the morning back behind somebody, I don't want to take a chance on someone having a knife or a gun underneath them that we can't see. You know, so he woke up the whole neighborhood. The lady from 42 which is across the street was standing outside saying, "What's wrong with that person?" You know, so he was disturbing the neighborhood. I made up my mind that whoever we found back there, if they wasn't hurt, we were going to arrest them.

MS:     Okay. And on this particular night, it was – was it Officer Tillie that actually identified Loggins?

JG:     Yes. He identified him. He could see him from across the fence area.

MS:     So whenever you and Officer Gammage walked into – Officer Woodall actually walked into the little grassy area where the suspect was at, was he standing up or was he laying down?

JG:     He was already laying down. He was laying down, his head was facing north.

MS:     Okay. And could you see his hands at that time?

JG:     No. They were up under him. He had on a brown, I guess, Carhart type jacket.

MS:     Did you give him verbal commands?

JG:     I did give him verbal commands to, "Let me see your hands?"

MS:     Did he comply with that?

JG:     He did not.

MS:     And then what happened?

JG:     After the third time I gave him verbal commands, I kind of motioned around because Officer Woodall was behind me, motioned around, he came around him with the taser and tased him.

MS:     And was the taser effective?

JG:     No. It was not.

MS:     So you went to – you gave your verbal commands to no avail. You gave less lethal used to deploy the taser, it was not effective. And so then the next step would be physical control, right?

JG:     Correct.

MS:     Okay. And so who tried to physically subdue Loggins?

JG:     Officer Jones and Officer Tillie. Officer Tillie had made his way across the fence to where we were at by then after he had been tased. By the end of the first five second cycle, Tillie had gone on to try to put hands on.

MS:     Okay. So during the course of the on hands, what measures was taken to subdue Loggins?

JG:     Both officers tried to grant control of his arms. Loggins, he, I don't know how to describe it, but he tucked his arms under, and they were trying to get his hands from underneath him. I also tried to get his hands from underneath him. I grabbed his arm – we grabbed his arm trying not to – I've seen people get their collarbone broke before or things. They're pulling against them, bones are easy to break. So really we're trying not to hurt him but we needed to get his hands from up under him and see what was going on with him. He was still yelling and screaming and we were able to muscle his hands from up under him. After using the taser as a pain compliance measure, we done that, and he didn't freely give his hands up but he gave his hands up.

MS:     Okay. Once y'all saw Loggins' hands, did he have a weapon?

JG:     No. He did not have a weapon.

MS:     Did he threaten to severely hurt anybody?

JG:     He was yelling and screaming and cussing. Honestly, I don't understand what was wrong with him. I don't honestly know what was wrong with him. We really were trying to get his hands back from up under him. Once we got his hands from up under him, he was still cussing. He was still yelling saying, you know, he wasn't – it wasn't like he was talking English, he was just talking, just screaming.

MS:     And in the course of your years of experience, have you ever seen people that were like this before?

JG:     Yes. I've dealt with people who were on drugs and mind altering substances, and they were doing things similar to what he was doing.

MS:     Do you know if Loggins was on any type of illegal drugs?

JG:     We didn't find anything on his person, but in my training and experience, he had to have been on some type of mind altering substance because he withstood two younger officers and myself pulling on his arms trying to get his arms from up under him. A person who – in my experience, a person who is not under a substance would have complied after seeing that we had him surrounded and we were going to take him into custody.

MS:     Were there any officers that, with the equipment that was present on the officers that night, whether it was firearm, a taser, handcuffs, flashlight and portable radio, did any officer strike Loggins with any of those type weapons that night or this morning?

JG:     I can't recall anyone striking him. I know I did try to get him to move his hands by striking him in his side when I saw the taser did not work. I did strike him in his side, but it didn't affect him so I didn't do it again.

MS:     Now was that with bare hands or was that with a taser?

JG:     No. I didn't have the taser at that time. That's why I told Tillie to give me his taser.

MS:     So it may have been with a bare hand then?

JG:     It was with a bare hand.

MS:     Okay. Was he responsive to that?

JG:     No.

MS:     He still did not comply?

JG:     No.

MS:     So once y'all got him handcuffed, how did y'all get him to the carport area?

JG:     Starting out, Sergeant Woodall and -- I believe Sergeant Woodall and Patrolman Tillie picked him up and started carrying him toward the fence. I was ahead of them. I had already went through the fence. Sergeant Woodall, Jones, Tillie grabbed him up under his arms, he was still flailing and kicking and moving around. They got him out to the carport. They stopped, took a little break, then moved him out to the road area. He was still yelling and screaming and kicking.

MS:     And when you say that they took a little break on the way, what was the reason for that? Were they exhausted?

JG:     No. He was moving around. They didn't want to drop him. They were trying not to drop him because he still wouldn't walk.

MS:     Okay. But he was alert, right? Was he yelling?

JG:     He was yelling and screaming still.

MS:     Based on your experience, do you feel that Mr. Loggins was violated in any way?

JG:     No. I don't believe he was violated in any way. As soon as we were able to take control of him, we stopped. During my years, I felt that just using the amount of force that's needed to take a person into custody is what we need to do. That's what we done.

MS:     Okay. Did you see anybody else strike Mr. Loggins

JG:     During our time there in the bushes, no.

MS:     Okay.

JG: We did drive stun him. We drive stunned him. We tried to get his hands from up under him. When Tillie told me he was bit, we did hold him down trying to keep him from biting at him again. We held him down, but no punching, no kicking or anything like that that I can recall.

MS: And you responded to the hospital; is that correct?

JG: Did I respond to the hospital?

MS: I mean, not to the hospital, to the jail whenever he was unresponsive?

JG: Yes, I did. I went to the hospital.

MS: And what did you see when you got there?

JG: When I got there, he was laying on his back at the booking desk, head kind of pointed northwest there in the jail. They were giving him CPR. I can't recall exactly who was giving him CPR, but he was already getting CPR. I believe the EMTs were already there giving him CPR.

MS: And shortly thereafter, the ambulance came; is that right?

JG: The ambulance was already there when I got there.

MS: Okay.

JG: They were already giving him CPR.

MS: And, also, speaking of ambulance, when y'all took him into custody at the residence, wasn't there an ambulance that showed up at the scene?

JG: There was an ambulance we already had staged on Govan Street. We called an ambulance to come down to in front of 60 Govan, and they looked at him. They also removed the taser prongs from his back.

MS: Did they feel that he was okay to be transported to the jail?

JG: They said he was fine to go to the jail.

MS: Okay.

WB: When you were in the back where you and the officers were trying to effect the arrest of Loggins, when you went back there or when you came in contact with Loggins, he was already on the ground?

JG: He was already prone, in a prone position.

WB: Without you having to tell him?

JG: With his arms under his body. Officer Tillie was shining the light from across the fence on him saying, "Hey, there he go." He told me he was right there. I had a flashlight, and I made — I was the first one through the fence, when I made the corner, well, we walked through the bushes and we kind of go northwest. He was right there proned out with his arms under his body.

WB:   When you effected the arrest, got his hands behind his back, did he stand up or did you stand him up and he stood on his own two feet?

JG:   Once I gathered the item that I had, once I got my flashlight – I had lost it, lost control of it, once I got a flashlight, I got up off the ground, and I said, "Y'all get him up and get him out of here." I walked – I made a bee line out of the fence back through the first fence, out the second fence to my vehicle to do a check of myself. I did a check of myself right there by the road. I walked over to my vehicle, got me some water. By this time I noticed that they wasn't right behind me. I walked back toward the carport where the cars were, and that's when I saw them at the second fence leaving, going under the carport. They were coming toward me. I turned around, walked back to see if the ambulance was coming, walked about midway of the driveway. The ambulance was coming down, shined my light. They came down in front of it. I walked on to where I was going. I got me some water out of my truck.

WB:   When the arrest was effected, you walked away and the other officers got him out of the bushes.

JG:   Once we got handcuffs on him, I got up, made my way up out of there.

WB:   So from the place where he was arrested, did you see Robert Loggins walk out of the bushes? Did you see him on his feet?

JG:   He was on his feet. I know they stood him up and tried to escort him out of there. He didn't walk because they was telling him – I could hear them say, "Hey, come on and walk out of here," something to that effect. "Come on out of here." They grabbed him under the arms and escorted him, dragging him – I ain't going to say dragging him out, but kind of escorted him out. He wouldn't walk.

WB:   So when the officers got him to the car, got Robert to the car to put him into the car, did anymore struggles happen at the car, at the patrol car to put him in the back?

JG:   Not that I can recall. He was still yelling and kicking because I told him -- I was about middle ways of the ambulance where the ambulance was parked at, I told them, "Don't let him kick the window out. Go ahead and take him to the jail. Get him to the jail as fast as you can."

WB:   So was Robert Loggins seat belted in the back seat?

JG:   I don't believe they seat belted him. They put him in the back seat, and he was still yelling and screaming and they shut the door. He was upright when they drove past me.

WB:   He was sitting upright?

JG:   I believe he was upright.

WB:   You saw a head?

JG:   I thought I saw a head. Pretty sure I saw a head, but he wasn't kicking the window. That was my concern. We're down vehicles and explaining why this guy kicked the window out is not what I want to do today.

WB: So when you went back, and I'm reverting to when the arrest was effected, so you went back to the – when you saw Loggins, you told him to show his hands.

JG: Right.

WB: Now, when the arrest happened, did you walk out of the place where the arrest happened with the same equipment you walked in with, your equipment?

JG: Yes, with my equipment. And I made sure when I got out of the bushes and got around to the concrete, I kind of patted myself down and made sure everything was find. I still had a flashlight that I came with, had a pistol, had a jacket, had three cell phones.

WB: Did you see anybody hit Loggins with a flashlight?

JG: No. I wouldn't do that. I wouldn't allow that to go on.

WB: Did any of the men hit Loggins with a flashlight?

JG: No. We tased him. I know we tased him. I know he got a strike to the ribs because I gave him a strike to the ribs trying to get his hands out from up under him. It is what we've been trained to do to try to get folks' hands from out from under their ribs. He wasn't kicked. He wasn't punched. Now when he bent toward Officer Tillie, I did put my elbow on top of this area of his neck because he was turned sideways, and I did do just like this. That's how I ended up getting across his body grabbing his hand. They grabbed his right hand which is on the east side. Those two grabbed his right. I had his left hand. I got the right hand cuffed, the left hand cuffed, grabbed my flashlight, got up out of the bushes, hopefully, you know, didn't have nothing on me, walked out, dusted myself off and went to the truck.

MS: Do you have anything else, William?

WB: No, sir.

MS: The interview ends at 3:31 p.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

    **Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Reggie Dion Woodall, black male, date of birth _____, Social Security Account number _____, who resides at 1647 Martha Drive, Grenada, Mississippi 38901. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_

Mark Steed

**RECORDED STATEMENT OF REGGIE WOODALL**

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:    Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, District Attorney's Office 5th Judicial District, State of Mississippi, interviewing Reggie Woodall, police officer of Grenada Police Department. The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred on this day in Grenada, Mississippi.

    Mr. Woodall, will you state your date of birth and social security number, please?

RW:    ☐☐☐☐☐, Social security # ☐☐☐☐☐.

MS:    And, Mr. Woodall, are you here on your own free will?

RW:    I am.

MS:    Have you been threatened or coerced to make this statement?

RW:    No, I haven't.

MS:    And you understand what the interview is about, right?

RW:    I do.

MS:    And prior to this interview, you were provided a Miranda Rights form which you read aloud yourself to me and Agent Blackmon; is that correct?

RW:    Correct.

MS:    Mr. Woodall, you're a police officer with the Grenada Police Department; is that right?

RW:    That is correct.

MS:    And how long have you been employed there?

RW:    October 1980. Fourteen years.

MS:    And you are certified through minimum standards; is that correct?

RW:    That is correct.

MS:    Earlier today you were in your official capacity as a police officer of the Grenada Police Department, and you had a call in Grenada, a disturbance call; is that correct?

RW:    Yes, sir.

MS:    Will you explain how all that went down for me, please?

RW:    At 5:41 a.m. we get a call about somebody yelling behind the house in the area of 50 West Govan Street. Officers responded to the scene, looked around, couldn't find nobody, let the windows down and heard somebody screaming. We get out of the car. I ordered two officers to go to the area of Bledsoe Street because it sounded like it was coming from that area. And I checked the area between 50 all the way up to 88 West Govan.

When I went behind one house, I don't know the house number, I heard somebody hollering, and I told my officer on Bledsoe Street to walk toward Allen Street in the backyard to see if they see anybody. Officer Tillie heard the screaming -- located the yelling, I mean, heard the yelling and located the subject that was yelling. He stated it was Robert Loggins. I said, "Shine your flashlight up so I can see," where I could walk toward the back where he was located at. Once he did that, I headed back toward – I'm thinking it was 50 West Govan, I'm not sure of the address that we was at.

I met up with Captain Gammage and Officer Jones, went to the area – no, first when I was headed there, the homeowners was looking out the window. I asked her was there any dogs in the backyard. She said, "No, no dogs in the backyard." So I relayed that to the other two officers there with me that there was no dogs in the back. Went to the back, went through some big bushes. Officer Tillie and Corporal Merriman was looking at Robert Loggins on the ground. Captain Gammage ordered Loggins to show his hands, show his hands. I repeated the command to show your hands. When he didn't show his hands, I veered around Captain Gammage and Officer Jones, pulled out my taser, yelled at him again, he still won't comply. I discharged my taser hitting him in the lower – the upper back in the lower back on his right side.

MS:    Okay. What happened at that point?

RW:    The taser worked on him. It locked him up as you could say. And we went in close to try to handcuff. By the time we got there, the five seconds had expired and he went back under – put his arm was under his arm – I mean, his arm was under his body. We asked him again to show his hands, put his arms behind his back. He refused. I gave him another juice – another shot of the taser. It didn't have no effect on him. He just hollered and pulled his arms tighter, closer.

I asked him again to show his hands, put his hands behind his back. He still didn't comply. Tried again. It didn't work on him so I said we probably got a good connection, so I hit it again and touched him on his left buttocks to make the electricity do its job but it didn't do its job.

MS:    So you're saying that one of the probes was already in him?

RW:    Yeah. One probe was in him, and he had on this thick coat. I didn't know it was that thick at the time. When I first deployed the taser, it affected him. So I'm guessing when he moved with that coat, one of the probes disconnected from his body or both of them did. So I really don't know.

MS:    So the dry stun was in order to complete the circuit so it would – yeah, okay.

RW:   Right. But when that didn't work, Captain Gammage got his taser from Officer Tillie who had jumped over the gate to try to help us get the subject – get Loggins in custody. When he got his taser, he dry stunned on the left side. That didn't work. I think I tried mine again, it didn't work.

By that time we figured out we needed to go hands on to try to get him in custody. So we went hands on with him, we was pulling on – Officer Tillie, Officer Jones and Captain Gammage were trying to get his hands away from under his body. They got the left – not the left – the right hand and handcuffed it. When Officer Tillie was fooling with the right hand, he bit Office Tillie on his left hand or right hand – one of them. He had the left arm still locked. I tried to dry stun that to make him comply with pain compliance and that didn't work. So I had to pull and pull and I applied the (inaudible) pressure point. It had no effect. So I had to get on with them and pull his arm, and he finally gave us his arm and we handcuffed him.

We called his name and tell him to get up, get up. He wouldn't get up. We picked him up. He walked about two steps and went back limp being passive aggressive, went back limp. We picked him up, toted him by his arms and his legs to the carport where I get on the radio and tell dispatch to tell EMTs to come to our location and check him out.

When they got there, we had laid him on the ground. They looked at him and said he was okay. I asked them to check him out because he was on something because I've been knowing him since he was a baby, and I done dealt with him on the criminal side. He's never acted the way he acted with us. Then if he was trying to get out of hand, I usually call his name or say his name and he'd comply with me, but this time it was no compliance. He was mumbling something like he was talking in tongues saying all kind of crazy stuff like Jesus Christ. I think he said something about Aruka or something like that. I really don't know what he was saying. By that time the EMTs came, they looked at him and said he was alright.

So we tried to get him up to walk again, he's passive aggressive, went limp. We picked him up again and took him to the sidewalk area. Once again, I still don't know the address. I didn't look back and get the address. Sat him back down because he was heavy, and we realized we didn't take the probes out of him so we tried to take the probes out of him but they was deep in his coat. So the dude with the gloves, the EMT, the bald headed dude, grabbed them and pulled them out.

And then we picked him up, put him in the car. When we got to the car, he pushed off somehow and didn't get in the car so we had to send Officer Jones to the other side, pulled him in. He was still saying whatever he was saying and took him to the jail. I told Officer Tillie and Corporal Merriman to go to the jail with him and make sure they get him out of the car, and I also notified EOC to tell the jail to get ready because we've got one coming in wild.

And we got to the jail, the jail said they wasn't going to take him. I said, "They got to take him. Take the handcuffs off and leave him." That's all I know from there. Next thing I know, we did the paperwork, fixing to take it over there and Corporal Merriman tells me that Captain Gammage tells him not to bring the paperwork over there because

he just stopped breathing and they had to rush him to the hospital. Then about five or ten minutes later, I'm not really sure of the time frame, we get a call that he passed.

MS: Okay. What I'm going to do is I'm going to kind of recap. I'm going to go back over from the beginning of the incident all the way up, okay?

RW: All right. You mean all the way down?

MS: Yeah. All the way to the end up until where we are now.

RW: All right.

MS: But before we start, before the shift -- before your police shift started last night or during your shift, did you consume any illegal drugs or alcoholic beverages?

RW: No.

MS: Okay. And throughout the course of your police service, have you gotten calls of trespassing and people – disturbance calls in the past?

RW: That's basically all we do on night shift now. Suspicious person, suspicious vehicles, folks hear noise, dogs barking, all kind of calls at night shift.

MS: And have there ever been times in the past when you've responded to suspicious persons or trespassers where you've had to arrest people before?

RW: Yes.

MS: Okay. And on this particular incident, when you responded, you were equipped with a body camera; is that right?

RW: Correct.

MS: And that was issued to you by the city; is that right?

RW: That's right.

MS: And to your knowledge, it was working properly; is that right?

RW: That is correct.

MS: Any time during the course of this incident, did you manually disengage this camera?

RW: I disengage – I took my camera off recording once he was in Officer Jones' vehicle, patrol unit, which would be P19. He had drove off. I got in my car, I realized that Officer Jones didn't tell dispatch he was 10-15 with him so I get on the radio and tell Officer Jones – well, I said, "44," that's his badge number, I said, "You need to go 10-15 with the subject you got." That's when he went 10-15. And after I did that, I turned my camera off record and drove straight to the station.

MS: Okay. And other equipment that you may have had on your person is normal police equipment like handcuffs, firearm. Do you have an impact weapon? Do you carry an impact weapon?

RW: No. I do not.

MS:    You have a flashlight, correct?

RW:    Correct.

MS:    Okay. So you make a visual contact – let me back up. You start walking up through the carport at 60 West Govan?

RW:    I'm thinking it was 50. I checked – this one woman came outside. I can't think of her name. I know her, but I don't know her name. She came out – she was outside in her nightgown, said she heard somebody running past her house hollering. So she said it went next door to her house so I went that way. I said, "Well, it couldn't have been over your house because you've got two dogs in there and they ready to get me." So I went to the side where the gate was open and I looked around, and that's when I heard some yelling west of me.

MS:    And during the course of while you heard the yelling, Officer Tillie, or Hal, they identified the person as Robert Loggins, right?

RW:    That would be Officer Tillie that identified him as Robert Loggins.

MS:    Okay. And so had you dealt with Mr. Loggins in previous police encounters before?

RW:    I've been dealing with him – I'm going to say 14 years, but it ain't been 14 years because I think he went to prison for burglary, him and Jamie Millican went to prison for burglary.

MS:    And any of these past encounters that you've had with Mr. Loggins, has he ever resisted arrest before?

RW:    He never resisted from me, but other officers say he had resisted from them. But he never resisted from me. He never ran from me or tried to fight or nothing with me. Like I said, I've been knowing him since he was a baby.

MS:    Have you ever known him to use drugs?

RW:    Yeah.

MS:    Okay. So you're walking through what is believed to be 50 Govan, and was there another officer with you at this time?

RW:    It was Captain Gammage and Officer Jones, Mike Jones – Michael Jones.

MS:    Okay. So y'all are walking through the property and you're going through the backyard, you enter an area that's kind of grown up and sort of thick grass and thick woody stem type vegetation, and so who sees Mr. Loggins first?

RW:    I think Captain Gammage made first contact with him.

MS:    And so there was orders for him to reveal his hands?

RW:    Show his hands and put your hands behind your back.

MS:    Okay. And did he comply with those orders?

RW: No, he did not.

MS: At any time did he ever brandish a weapon?

RW: No, he did not.

MS: Did he ever threaten to bodily harm or kill any officer there?

RW: No, he did not. The only thing he said was "Was y'all going to kill me?" He kept saying, "Y'all going to kill me. Y'all going to kill me." And I think Officer Tillie said, "No, Robert, we're not going to kill you. We're just trying to help you," or something like that he said.

MS: Okay. And did any officer there threaten to kill Loggins?

RW: No. Like I said, we've been knowing Loggins ever since he was a little boy.

MS: Okay. And as y'all attempted to subdue Loggins – did he have a legal right to be where he was at?

RW: No, he did not.

MS: So he was trespassing; is that right?

RW: Correct.

MS: And did he physically resist arrest?

RW: Yes, he did.

MS: Did he strike any officer there or cause any bodily injury to any officer there?

RW: Like I said before, he bit Officer Tillie on his hand or on his arm. Officer Tillie yelled, "He bit me!"

MS: Do you know if any officer struck Loggins with any type of weapon?

RW: No. We don't do PPCT anymore so we don't use impact weapons or nothing like that. We're on SGTS or some stuff like that. We're on that now.

MS: So the items that would have been present would have been a handgun, a taser, a portable radio, flashlight or handcuffs?

RW: Correct.

MS: Okay. So out of those items, was Mr. Loggins struck with any of those items?

RW: I don't think he was, but I'm not really sure. I don't think nobody hit him with no flashlight.

MS: Okay.

RW: They probably used the flashlight for a pressure point, but I don't think they hit him with no flashlight.

MS:     Okay.  So if any pressure points would have been applied, then which ones would they have been?

RW:     I applied – myself with Officer Tillie, well, Officer Tillie tried to do the (inaudible) orbit or something like that.  He tried that one, but that didn't work.

MS:     Brachial stun?

RW:     No, we didn't do the brachial stun.  We just applied pressure to this one right here, and they usually show some – Officer Tillie didn't get it right so I tried it.  It was nothing to it.

MS:     When you say there wasn't anything to it, do you mean –

RW:     He didn't show no effect to him.

MS:     Okay.  It didn't affect him?

RW:     None at all.

MS:     He was still combative; is that right?

RW:     Right.

MS:     So y'all finally got him handcuffed, right?

RW:     Correct.

MS:     And y'all handcuffed him behind his back?

RW:     Correct.

MS:     Okay.  Was his feet cuffed?

RW:     No. We didn't hog tie him.  We don't do that there.

MS:     Okay.  So y'all brought him out of the wooded area?

RW:     Correct.  We toted him out because he wouldn't walk so we toted him out.  Both arms were secure behind his back.  I had one shoulder.  Officer Tillie had the other shoulder and Officer Jones had his legs.

MS:     Okay.  And so when you got out to the street, y'all were met by medical staff, right?

RW:     No.  Medical staff met us under the carport.

MS:     Okay.  And so what did they do?

RW:     They just looked at him and say he all right.

MS:     Okay.  And how many members of that medical staff were there present?

RW:     Two.

MS:     Was that – what was the name of the medical service that was there; do you know? AMR?

RW:    They done changed their name.  I never really paid attention to the name anymore.  I talked to them once before and they said it's the second largest ambulance company in the world, so.  I don't know the name of it.

MS:    Okay.  So when they said he was okay, he was then transported to Grenada County Jail; right?

RW:    Eventually.   They met us under the – well, we had to come through a gate from the backyard.  We got him to the gate and we sat him down because in front of us was one of them motorized chairs.  We sat him down right in front of the chair and they came back and they looked at him.  We tried to tell him to get up again.  He kept saying mumble jumble stuff so we picked him up again and I told Hal, I said, "Well, Hal, you grab him and y'all tote him to the car."  Once we got to the edge of the road, there was an ambulance here, my unit here was Unit 6, and Officer Jones unit, which is Unit 19, was down the road.  Then Jones' vehicle, then Corporal Merriman's unit was down there towards the end right at the intersection of Govan and Fairground, his vehicle was too far away and Officer Tillie left his vehicle on Pecan Street and Captain Gammage's vehicle was behind the ambulance. My vehicle and Captain Gammage's vehicle don't have a cage so we're not allowed to transport.

So Officer Jones ran down to his vehicle to move it up, locked the keys in the car. It just so happened my key worked for his car.  I gave him my key to unlock the door.  Then they toted him to the car.  That's when he resisted again by pulling back, so they laid him down again.  Jones went to the other side, pulled him in.  He tried to come out of that side.  I told them to sit him up.  I remember saying "Sit him up."  They sat him up a little bit and closed the door and he just laid there talking.  He didn't kick the door.  He didn't try to bust the window out or anything.  He just kept talking loud and they took him to the station.  And, like I said, I had to remind Officer Jones to do the 10-15.

MS:    Okay.  And so when you went to put him in the car, was he still resisting getting in the car?

RW:    Yeah.  He didn't want to get in the car.

MS:    Okay.  And when somebody don't want to get in the car, you just have to physically put them in there, right?

RW:    I think they did a knee strike.  I don't know which one of them did a knee strike.

MS:    Okay.

RW:    With him on the passenger side of the car, it was Corporal Merriman and Officer Tillie.  I'm thinking Officer Tillie did the knee strike or tried to do a knee strike, but it had no effect on him either.  They pulled him back this way, laid him back down this way, because once again he went back limp.  They straightened him up, took him back on the other side, laid him in the vehicle.  Officer Jones pulled him to the other side, and he was trying to close the door.  He was coming out.  I told them to sit him up.  Sat him up good enough, slammed the door.  That's pretty much it.

MS:    And then which officer transported him to Grenada County Jail?

RW:    Officer Jones.

MS:    And was there other officers following behind Officer Jones to the jail?

RW:    I ordered Tillie and Merriman to follow Jones to the jail because he probably going to need some assist in getting him out of the car. But during that time when Officer Jones was taking him, Officer Merriman put Officer Tillie in his vehicle and took him to get his car, and they followed with him as he went through Lyon and Main Street or at Fairfield, right there at the old (inaudible) Church which would be Hughes and Son now. They caught him right there and they followed him to the jail.

MS:    Okay. So when y'all get to the jail or the sally port, there were other officers that arrived.

RW:    Right.

MS:    And then there were several officers that actually physically carried Loggins inside.

RW:    I have no knowledge of that. I didn't go to the jail. So I can't tell you about that because I didn't go to the jail. What I did, when they took him – I heard them check out at the jail with him, I went into the bay area and started doing paperwork.

MS:    During the course of your – well, let me back up. At any point was there any type of illegal contraband or substance that was taken off of Loggins that night?

RW:    We found – one of them was some lip chap and the other one, we thought it was some liquid meth, but I think it was some lotion in some grease in a container, but I'm really not sure. We did the where you pop the things on him, drug test on it and it turned purple. Lieutenant Williams said it's not drugs.

MS:    A field test kit?

RW:    Right. That's what it's called, a field test kit.

MS:    Okay. Based on your experience as a law enforcement officer, was there anything that took place during the arrest of Loggins that was unprofessional or that would have been in violation of his civil rights?

RW:    Not at all. We followed everything by the book.

MS:    Okay. He resisted arrest, and y'all basically just took the amount of force necessary to subdue him; is that correct?

RW:    That is correct.

MS:    Mr. Williams, do you have anything?

WB:    Yes.

        From the time you made the arrest when you got both of Loggins' hands behind his back

–

RW:    Correct.

WB:    -- did he walk from that point at any time?

RW: He made approximately two steps and went back in because I had to catch him before he hit the ground hard. I didn't know what was back there. It felt like kind of rocky, and I didn't want him to hurt himself so I had to catch him and I eased him on down. I don't know if I said we're going to have to tote him out of here or pick him up. I said one of them. I can't really just remember what I said. But we toted him through the gate, well, actually there were two gates. I think the part we was at – now that I think about it, I think it was like a garden or something. And it was a gate and it was like a little shed right here. We had to open the gate, get them through there and come through another gate. That's when we sat him down and the EMTs came.

WB: When Loggins – when you were getting ready to put Loggins in the patrol car, what kind of resisting did he do at the patrol car?

RW: Somehow he pushed out the door.

WB: At that point was he standing?

RW: Yes. He was standing on his own then. Then when he pushed out the door, he went back limp and tried to fall again, and they eased him down to the ground to regrip him. They flipped him back – I ain't going to say flipped, they turned him, put his head going south and his feet was north. They shoved him in there, and Officer Jones grabbed him by his coat and pulled him a little close. When he got ready to close the door, he pushed with his foot to come out the driver's side door. I told them to stand him up. He stood up a little bit. I think he said some cuss words. Yeah, he said some cuss words. They closed the door and took him to the jail.

WB: Was Loggins seat belted into the back seat of the patrol car?

RW: No. He laid back down. Before we could get the seat belt on him, he laid back down in the car.

WB: How long is the transport from your location to the jail; how long did the transport take him?

RW: They was moving pretty good so I think it probably took less than a minute. The light was green when they went through Lyon and Main or Fairfield or whatever that street is right there. Then they had to stop at the stop sign. That didn't take long. The light was green right there at Main and First. He had another stop sign. He ran the stop sign. He just ran the stop sign to get him on there to get him out of the car.

WB: Now, I want to go back a little bit to back when you were attempting to make the arrest.

RW: Right.

WB: Was any other force used besides what you told us?

RW: No. Not that I can remember.

WB: What was the lighting behind the house?

RW: It was dark. All we had were flashlights. I think it was a street light somewhere, but it wasn't – I don't think it was right where we was at. I remember going in there blind, just

shining the flashlight. I might need to look at my video. Well, I can't pull it up now, it's been over six hours. But I don't think it was – let me look – it was dark back there. It was pretty dark back there I think.

WB:   Did you have all your equipment?

RW:   Yeah, got all mine. I heard about the left flashlight. I called Jones to see if it was his flashlight. He don't have a city issued flashlight. He got his flashlight. So the only flashlight that could have been was Officer Tillie's lost his flashlight.

MS:   What's his badge number?

RW:   Tillie's? P35.

MS:   Okay.

RW:   Hal is G29. Gammage is 6 and I'm 12.

WB:   Who did you say G44 is?

RW:   Mike Jones.

MS:   And Gammage is?

RW:   G6.

MS:   Okay.

RW:   And I'm G12.

MS:   Okay.

RW:   Come to think of it, it was dark back there because when Hal finally made it back around, I told him, "Get your ass over here," and I gave him my flashlight so I can help Officer Tillie get control of his left arm. It was dark back there.

WB:   Let me ask you this: So there was four of you trying to effect an arrest on Loggins?

RW:   Right.

WB:   Did anybody – were all four of you down there or was somebody shining the light to try to light the scene because it was dark back there?

RW:   Well, at first I was shining my light. Then when I reached out and hit the dry stun on his left cheek, you lean forward to the camera, it will send out an "Officer down." So mine was going off. Couldn't hear it go off so I had to raise up to mine to make it pitch dark, and that's when Officer Merriman stung him. When he got close enough to him, I gave him my flashlight to hold, and I helped take control of the left arm.

WB:   Did that warning go off on any of the ones that was down trying to effect the arrest?

RW:   No, just mine. That was kind of strange to me, too.

MS:   Did at any point in time you or anybody strike Loggins with a flashlight?

RW:   No, not that I remember.  I don't think nobody did. If they did, I wouldn't say – let me think.

MS:   Did you strike Loggins with a flashlight?

RW:   No, I didn't. I don't think I did.  I think I – when we had his arm like this, I think I pressed down right up in here, but as far as hitting him with it, no, nobody hit him.

MS:   Okay.

RW:   Trying to get my facts together because I don't want to lie, and I don't want to leave nothing out.

MS:   I understand that.

RW:   He wasn't struck.  I don't think nobody hit him.

MS:   William, do you have anything else?

WB:   No, sir.

MS:   The interview ends at 2:41 p.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed


       **Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Albert Tilley, white male, date of birth ⬜, Social Security Account number ⬜, who resides at 1970 Tuscola Drive, Grenada, Mississippi 38901.  Said interview was regarding the above captioned matter.  Said interview was recorded and transcribed.  The transcribed interview is attached hereto and made part of the casefile.


*Mark Steed*
_____

Mark Steed

## RECORDED STATEMENT OF ALBERT TILLIE

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/30/18**

MS:    Today's date is November 30, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District interviewing Albert Dean Tillie. The interview is taking place at the Grenada District Attorney's Office and the interview is regarding the death investigation of Robert Loggins which occurred on 11/29/2018 in Grenada, MS.

Mr. Tillie, would you state your date of birth and social security number, please?

AT:    [ ]. Social is [ ].

MS:    Mr. Tillie, prior to this interview, you were provided a Miranda Rights which you read aloud, understood and signed; is that correct?

AT:    Yes, sir.

MS:    Have you been threatened or coerced to make this statement?

AT:    No, sir.

MS:    Mr. Tillie, how are you employed? Are you a police officer?

AT:    Yes, sir.

MS:    With what city?

AT:    Grenada Police Department.

MS:    And how long have you been there?

AT:    A little bit over a year.

MS:    Okay. Are you certified to the minimum standards?

AT:    Yes, sir.

MS:    Prior to working for Grenada Police Department, did you have any prior law enforcement experience?

AT:    No, sir.

MS:    Were you employed as a police officer on November 29, 2018?

AT: Yes, sir.

MS: And did you happen to be involved in the situation in the vicinity of 60 West Govan Street about 5:00 a.m. on that date?

AT: Yes, sir.

MS: Okay. Can you tell me what the nature of the call was and how you responded and what you did once you got there?

AT: We got a call in the area of 50 West Govan, caller from 50 West Govan said that she could hear somebody screaming for help. We, myself and other officers, responded. When we arrived in the area, my sergeant advised me and Corporal Merriman to go to Bledsoe because he stated that it sounded like it was coming towards Bledsoe. While going towards Bledsoe, I made contact with one of the neighbors who stated that he also believed this noise was coming from Bledsoe. Myself and Corporal Merriman got out on Bledsoe. We could hear somebody hollering. At first we couldn't really tell what they were saying, couldn't make it out. We located the noise. I don't know the exact address on Bledsoe. It was actually in the backyard of the house on Govan. We come up to a fence, I could hear him but I could not see him. I was talking to him and talking to him, and he was saying stuff that didn't make sense, just talking about – couldn't really understand what he was saying. I continued to ask him what his name was, who he was. He finally did tell me his name was Robert Loggins. I asked Mr. Loggins if he would please stand up so I could see his hands and where I could see him physically, and he stated that he was not going to, he did not want to. At that time, my sergeant, my captain and another officer were trying to find out where we were. They were trying to come off Govan and get to where we were. At this point, I'm still on the other side of the fence just talking to him on the other side of the fence. Once my captain, sergeant and another officer got into the backyard to where they could see him, I then started going over the fence. Before I made it Mr. Loggins, I heard the taser deployed. I heard Captain Gammage ask him numerous times to get his hands out from under him, and he would not. We kept on just talking stuff you couldn't understand. It didn't make sense. Once we made contact with him, he continued to keep his hands clenched – his arms clenched up underneath his body. We tried for several moments trying to get his arms out from under his body. He actually bit me while we were trying to do that. After several minutes of struggling with him, we finally got him in cuffs and we took him out of the backyard. We already had EMS standing by. EMS come over there to where we were with him, checked him out and said he was fine. They pulled the taser prongs out of his back – out of the jacket. The prongs didn't go all the way through. The taser had no effect on him. Once they did that, we put him in the police car, and he was transported to the jail.

MS: Did you have any contact with Loggins once you got to the jail?

AT: When I got there, he was already inside. We got inside, he sat there in jail for a couple of minutes. I told the jailers I needed to go get my handcuffs. We swapped cuffs, and when we left, Mr. Loggins was still sitting there hollering stuff you couldn't understand.

MS: Okay. Let's back up to the initial call, and I just kind of want to go through and ask you some questions about that, okay?

AT: Okay.

MS: First thing I want to ask you, when you go on duty every day, what is your normal equipment that you have?

AT: I have my Glock 40 caliber. I have my taser. I have my handcuffs, radio and that's pretty much about it.

MS: Okay. Do you carry an impact weapon?

AT: No, sir.

MS: Did you have all of that equipment with you on this date?

AT: Yes, sir.

MS: And it was night so I'm assuming that you had some type of lighting device; is that right?

AT: I had a flashlight that was inside the car. They keep flashlights in the car, and I grabbed it before I got out of the car.

MS: Okay. When you first made contact with Loggins, did you know who he was?

AT: He had stated to me that he was Robert Loggins. But, me, I don't ever remember having ever made contact with him before this incident. So I've only heard about him from what other officers have said when they've come in contact with him, but I don't ever remember before this making contact with him so I couldn't – I just was going by what he said. He said he was Robert Loggins.

MS: What had you been told about Robert Loggins' conduct with police officers?

AT: Just that he had – when, you know, when they would come in contact with him, sometimes he like to cause a scene sometimes. Just stuff like that. Nothing really too specific.

MS: Okay. Whenever you saw Robert Loggins, was he standing up or laying down?

AT: He was laying face down into the ground.

MS: Okay. Did he – did you see any weapons or anything?

AT: No, sir. I could not.

MS: Was he being verbally abusive or shouting out verbal threats or anything like that?

AT:     He was shouting stuff that just didn't make sense.

MS:     Like what?

AT:     Like, "Jesus, I got your power," and it was just stuff that I don't really know too much specific, but a lot of it just didn't make sense. It was just off the wall stuff.

MS:     Did you give Loggins any type of verbal commands?

AT:     Yes, sir. Before I reached him, I had asked him numerous times to please show me his hands, please stand up to where I could see him. When we got to him, I then asked him to please move his hands out from under him and put his hands behind his back and so did the other officers.

MS:     Did he comply with that?

AT:     No, sir.

MS:     So you were on one side of the fence and he was on another, and from what I understand he was inside of this little heavily grassy – it was with thick vegetation, laying down; is that right?

AT:     Yes, sir.

MS:     So while you were there looking at him, did other officers approach him from a different angle?

AT:     Yes, sir. My sergeant, captain and the other officer came in from a gate around the front side of the house while I was sitting there talking to him.

MS:     Who were those officers?

AT:     Captain Gammage, Sergeant Reggie Woodall and Officer Mike Jones.

MS:     And so when they came in the gate, what happened then?

AT:     They came in and they had trouble at first locating him and I was shining my light on what sounded like where he was at. Once they located him and Captain Gammage asked him numerous times to put his hands behind his back to show his hands and he would not, then Captain Gammage tased him once. It seemed like it had no effect. He just still had his hands clenched out under him, and that's when I went over the fence and went to go assist them.

MS:     Did Loggins threaten the officers, those three officers that were coming in, did he threaten them in any way?

AT:     I didn't hear him threaten them.

MS:     Did you see him assault them or anything?

AT: I mean, as far as just trying to fight back and kind of kicking at us with his feet and stuff, and besides him biting me.

MS: So once Officer Gammage tased him, at that point in time, you ran around the fence and came in?

AT: I jumped over the fence into the yard where they were and went and assisted them.

MS: Now how was the situation where he bit you? How did that go down?

AT: We were trying to get his arms back behind his back, and, like I say, he wouldn't do it. I went down to go reach under him to grab his arms and he bit down on my hand, and I yanked back, and I stepped back for a few minutes because I was stunned. I didn't know what it was, and then I assisted again trying to get his arms behind his back.

MS: Okay. So he was physically resisting then?

AT: Yes, sir.

MS: And so basically it just took muscling him to get his hands behind him?

AT: Yes, sir.

MS: In your law enforcement service, have you arrested people that resisted arrest before?

AT: Yes, sir. But I've never had somebody resist like that. He just seemed like, I don't know, he had some super strength or something. I don't know. I've never had somebody resist like that.

MS: In your law enforcement service, have you ever gotten calls from people in the community where there may have been somebody on their property and they wanted them removed?

AT: Yes, sir.

MS: And when you got there, did you make them leave or arrest them?

AT: It was all depending on the situation. If they wanted to file charges for trespassing, if they had already been warned, you know, you can't come over here, you're trespassing, we probably did arrest them. But if it was just something where they come to agreement, hey, just don't come back, you know, we let them go.

MS: During the course of trying to subdue Mr. Loggins, do you know if Mr. Loggins was struck by any officers on the scene?

AT: I do not. I did not strike him, and I do not remember any other officer striking him.

MS: So you're saying that you didn't hear anybody or see anybody hit him with a flashlight or hit him with a weapon or taser? Other than shooting him with the taser, you didn't see him get hit anywhere on his body?

AT:     Not with a flashlight.  He was drive stung with the taser numerous times, but I never saw anybody hit him with any flashlight or any other object for that matter.

MS:     Was he hit – was he hit – did any officers strike him with their hands or anything like that?

AT:     No, sir, not that I saw.

MS:     Was all of your equipment recovered from the scene?

AT:     The only thing, the flashlight in the car, I never got back to my car.

MS:     So you lost your light at the scene, right?

AT:     Yes, sir.

MS:     Did you strike Mr. Loggins with your flashlight at any time?

AT:     No, sir.

MS:     If you struck Mr. Loggins, I'm not saying that it's wrong, we just need to know.

AT:     I did not.  I did not.  I would tell you if I did.  I'm not going to lie.

MS:     Did anybody strike Mr. Loggins with your light?

AT:     No, sir.

MS:     Did anybody strike Mr. Loggins at all with any flashlight?

AT:     No, sir.

MS:     So if Mr. Loggins' light is processed for DNA – I mean, if your light is processed for DNA, then Mr. Loggins's DNA should not be on that light; would that be right?

AT:     Not to my recollection.  Not to me seeing anybody striking him, no, sir, I did not see anybody strike him.

MS:     As far as hitting him in the head or in the mouth, did you see any of that?

AT:     No, sir.  I saw nobody hitting him in the mouth, the head.  I was solely focused on trying to get his arm out from under him, and I did not see any other officers do any of that.

MS:     Based on what you saw, would you think that a reasonable amount of force was used to subdue Mr. Loggins?

AT:     Yes, sir.  I think we did everything that we could.

MS:     Do you think that he was abused or mistreated in any way?

AT:     No, sir.  I do not.

MS:     So once Mr. Loggins was subdued and handcuffed, he was carried out of that field to the patrol car; is that right?

AT: He was carried out of the field to a carport of the house we were behind. EMS was already on the road, on Govan, and the sergeant asked them to come up there to check him out. They came up there, and they said that he looked fine and said that he was okay for us to take him to the jail. We got down there to put him in the car, they took the prongs out of his jacket, and we put him in the patrol car.

MS: Did EMS personnel, did they look at him, kind of evaluate his status and make sure he was okay or anything?

AT: They looked at him, and they said that he was fine.

MS: Did they talk to him?

AT: They asked him how he felt, and he just gave an off the wall thing and they said he was fine.

MS: When you say gave an off the wall thing, what do you mean?

AT: He was just talking about something again about Jesus and I got the power and all kind of stuff that just didn't make sense.

MS: And so based on that, do you think that he may have been under the influence of something?

AT: Yes, sir. With my little bit of experience in law enforcement, I do believe he was under the influence of something.

MS: Okay. So at that point, once the EMTs said that he was okay, then he was transported to the Grenada County Jail; is that right?

AT: Yes, sir.

MS: And who transported him to Grenada County Jail?

AT: Officer Mike Jones.

MS: Did anybody follow Officer Jones to the jail?

AT: Officer Merriman and myself did.

MS: On the way to the jail, did y'all make any stops?

AT: No, sir.

MS: Y'all went completely straight to the jail, right?

AT: Yes, sir.

MS: Once you pulled into the sally port, who got Loggins out of the car?

AT: When I got into the jail, he was already out of the car. So I'm assuming Officer Mike Jones and I guess the jail man got him out, but I was not in the sally port when they got

him out. Myself and Officer Merriman were just pulling up, and he was already taken into the jail.

MS:   Did you see Loggins resist at any time at the jail?

AT:   We were trying to – we had to swap the cuffs. They had to put their cuffs on him, and he resisted and kept on trying to pull his arms away and stuff.

MS:   He was handcuffed, though, right?

AT:   Yes, sir.

MS:   So you're talking about once those handcuffs were removed?

AT:   Right. And we were putting the other ones on, he kept trying to pull his arms away.

MS:   At the time that the handcuffs were being removed in order to change handcuffs, did anybody strike Mr. Loggins?

AT:   No, sir.

MS:   Did anybody kick Mr. Loggins?

AT:   No, sir.

MS:   Did you see any jail staff from Grenada County Jail kick or strike Mr. Loggins?

AT:   I did not. No, sir. I did not see anybody do that.

MS:   Did anybody – where were you at during the course of changing those cuffs out?

AT:   I was trying to get the cuffs off. I was off to the side of him, and I was trying to undo the cuffs.

MS:   Were you sitting on Mr. Loggins?

AT:   No, sir.

MS:   Was your knee on his neck or his head?

AT:   Not to my recollection, no, sir. I don't believe it was.

MS:   When you say you don't believe, either you were or you were not.

AT:   No, sir. I was not. I was not on his head.

MS:   Was there anybody else on his head?

AT:   Not that I can remember. No, sir.

MS:   And you didn't see anybody kick him?

AT:   No, sir.

MS:   Did anybody roll Mr. Loggins over with their foot?

AT:    No, sir, not that I remember.

MS:    William, do you have anything?

WB:    Yes, sir.

        How did you get your hand back from Loggins when he bit you?

AT:    I yanked it back.

WB:    Can I see your hand?

AT:    Yes, sir.

WB:    So where did he bite you?

AT:    Right there.

WB:    How did you lose your flashlight in a dark area like that?

AT:    We were – when we went to go put hands on with him, I went to go put it in my back pocket, and it didn't make it to my back pocket.

WB:    It was dark out there, right?

AT:    Yes, sir.

WB:    So maybe we didn't ask you the right question.  If it was dark out there, did you hear anybody hit Loggins?  Did you hear the sounds of somebody being hit?

AT:    No, sir.  I did not.  I did not hear the sounds of anybody being hit.

WB:    How long of a transport is it from Govan Street to the jail?

AT:    Five minutes, six minutes tops.  Maybe three to five.

WB:    How long did it take you to get back?  You didn't transport him, Mike did.

AT:    Right.

WB:    How long did it take you to get back?

AT:    About four minutes, three or four minutes.

WB:    Did you help get Loggins out of the car?

AT:    No, sir.  I did not.

WB:    Let me go back on something.  When you were in the back yard and you actually got Loggins subdued, you and the other officers, was he able to walk?  Did he walk?

AT:    No, sir.  He did not walk.

WB:    How did you get him from back there?

AT:    Sergeant Woodall and Officer Mike carried him. They were each on his shoulder and carried him up there to the front when EMS checked him out.

WB:    When EMS checked him out, was he on the ground or was he standing?

AT:    He was sitting on the ground.

WB:    He was sitting on the ground?

AT:    Yes, sir.

WB:    How did he get from where EMS checked him out to the patrol car?

AT:    They carried him to the patrol car.

WB:    Did he stand at that point at any point?

AT:    I did not see him stand. No, sir.

WB:    When you put him in the patrol car, what happened then?

AT:    Mike Jones drove off and took him to the jail.

WB:    Let's say for example, a person didn't resist you and it was just a regular arrest, do you normally seatbelt people into your car when you arrest them?

AT:    No, sir.

WB:    When Loggins left the scene, was he sitting up like a regular person would or what was his position in the back seat of the car?

AT:    He was laying in the back seat.

WB:    He was laying in the back seat?

AT:    Yes, sir.

WB:    On his back, face down?

AT:    I don't know. I didn't see. I just saw that when he drove off, he was not sitting up. I did not help them put him in the car is what I'm saying.

WB:    Are you the arresting officer?

AT:    No, sir.

WB:    Who is the arresting officer?

AT:    Mike Jones was the arresting officer.

WB:    Mike Jones was the arresting officer? But it was your handcuffs that was on him?

AT:    Yes, sir, because I had my handcuffs out, and I was the only one that could get cuffs on him.

WB: Do you remember speaking to or hearing Sergeant Clark say something to you about anything about the prisoner you brought in, about Loggins? Did she tell you anything?

AT: Sergeant Clark? Who is that?

WB: Sergeant Clark from the jail.

AT: The female?

WB: Yes, sir.

AT: At first she just was talking to him, asking him why he did this and then she said that she did not want to accept him. She wanted him to get medically checked out and that she was going to call the ambulance over there to get him checked out.

WB: So when Sergeant Clark, you know, the person at the jail that's going to take the prisoner or not take the prisoner, tells you that she is not taking the prisoner, what happened then?

AT: That was up to our corporal. He said just to get my cuffs off of him and let's go. That was up to our corporal.

WB: Did you see any blood coming from Loggins' mouth? Did you see any blood coming from him from anywhere?

AT: No, sir. I did not. I did not see any blood coming from him?

WB: Did he complain of pain? Did he say, "You hurt me," or did he ever make any comments like that?

AT: No, sir. I never heard him make any comments like that.

WB: Did you fill out a report about missing equipment?

AT: No, sir. I did not.

MS: Officer Tillie, if you struck Loggins, just admit that you did or if you saw anybody else because here's the situation. We have reported injuries of Mr. Loggins that doesn't add up to the situation.

AT: Yes, sir.

MS: And it's forcing us to – we've got to know what happened to him. You as an officer, me as an officer, Officer William, you have that authority to use the amount of force necessary to effect an arrest. I understand that. And I'm not saying you're wrong if you did. I'm just saying that we have to know what exactly happened so we can justify and say, well, he had a missing tooth or he had a knot on his head because this man passed away at the jail. Now whether he had overdosed or what, you know, the general public they don't look at it quite like that. They look at it that he died in police custody, and they did something to him. And so we're not saying you're wrong. We're not saying

any of the other officers are wrong. I'm saying that -- and I am telling you this, that if you lie about anything that happened out there, now that is illegal.

AT:   Yes, sir.

MS:   That is a felony.

WB:   If you don't tell us something happened, it's the same thing.

AT:   Yes, sir.

WB:   That you know that happened.

MS:   You can be right in what you did out there even if you did hit him, but you would be wrong if you lied about it.

AT:   I did not, and I promise to you, I did not hit Mr. Robert Loggins with my flashlight, any other flashlight at all. I'm not going to lie about that. I have nothing to lie about. I did not hit him with that flashlight or with any flashlight. I lost that flashlight when I went to go put it in my back pocket because there was already light on him and I went to go grab his arm, and I went to go put the flashlight in my back pocket. I did not strike Mr. Loggins with a flashlight. I promise to y'all I did not strike that man with a flashlight.

MS:   Did any other officer strike him? Tell me the truth.

AT:   I'm trying to think.

WB:   It's dark out there so we want you to use your senses. You either heard it, you saw it.

MS:   Tell the truth.

AT:   Yes, sir. I'm trying to think because I don't want to lie because I don't want to be in any trouble because I did nothing wrong. I know that for a fact. I did nothing wrong. I did not hit him with a flashlight. I would never hit anybody with the flashlight or anything like that. We have so much other equipment to use besides hitting somebody with a flashlight or a blunt object. So that's why I'm trying to think.

MS:   Did you see anybody else hit him?

WB:   Let's be more specific about it. Okay. Did you see or hear or any of the other senses that would have notified you that Loggins was being hit when you were trying to get his arm from behind his back, from under his bottom, from under his chest, behind his back?

AT:   Yes, sir. I believe Sergeant Woodall was trying to get the nerve on his elbow to get him to release his arm from behind his back.

WB:   How many strikes did you hear?

AT:   Two or three.

MS:   And what was those strikes? Were they with a hand or were they with an object?

AT:     Honestly, I could not tell.

MS:     What do you feel that they were?

AT:     With an object.  With the flashlight.

MS:     Did you see it?

AT:     Yes, sir.  I saw him hit him in the elbow with the flashlight.  I'm not going to lie to y'all.  I have nothing to lie to y'all about.

MS:     So why has it taken this much to get you to admit it?  Are you afraid?

AT:     I just didn't want him to get in trouble.  I'm not trying to cover anything up.  I'm not trying to, you know –

WB:     A man's dead.  Don't – tell it like it is.

AT:     I know.  And I'm not lying to y'all.  I did not hit that man with the flashlight.  What I saw is Sergeant Woodall three or four times with a flashlight to get him to release his arm.

MS:     Okay.  And I appreciate your honesty.  Okay.  And like I told you, as police officers, you have to do things.  You have the authority to use the amount of force necessary to effect the arrest.  Okay.

AT:     Yes, sir.

MS:     I'm for that.  The whole thing here is like I told you, we have to be able to say, okay, well, if this man has a broke arm, how did he get a broke arm.  I'm not saying that you're wrong in doing that.  I'm just saying we've got to know exactly what happened in order for him to have sustained that particular injury.  Do you understand what I'm saying?

AT:     Yes, sir.  I understand.

MS:     And so by you being honest, you did the right thing.  But you were going down the wrong road because you were trying to keep Officer Woodall from getting in trouble.  And I'm not saying that he's in trouble for that, but we have to know, you know, exactly the amount of force that was used.  Do you see what I'm saying?

AT:     Yes, sir.  I understand.

MS:     Okay.  Is that the only, Officer Woodall striking him in the elbow with the flashlight, is that the only thing that you saw?

AT:     Yes, sir.  That is the only thing I saw.

MS:     Did you see Loggins hit in the mouth or in the head?

AT:     No, sir.  I did not.  I did not see Mr. Loggins hit in the mouth or the head.

MS:     Do you have anything else, William?

WB:   Did you see him hit in the mouth, any broken teeth?

AT:   No, sir. I did not.

WB:   The strikes Officer Woodall used on the elbow, how long after that did it take for Loggins to put his hands behind his back?

AT:   Ten seconds.

WB:   So it was three strikes within ten seconds or was it more than three?

AT:   The most I saw was three strikes and then he put his hands behind his back.

WB:   You know, ten seconds is a long time when you're fighting with this man?

AT:   Yes, sir.

WB:   You sure you only heard three?

AT:   Yes, sir. I'm positive I only heard three.

WB:   It was four officers around altogether?

AT:   Yes, sir.

WB:   Did you hear anybody else strike?

AT:   No, sir. I did not hear anybody else strike Mr. Loggins.

MS:   Okay. And I hope what you're saying is the total truth.

AT:   Yes, sir. It is.

MS:   Because if it's not, you'll be going back through this again, but it will be at a different speed next time. Okay?

AT:   Yes, sir.

MS:   And you have to understand, you're new starting out in law enforcement, that most of the time when law enforcement officers get in trouble is because they try to lie and cover up for something that they wouldn't have gotten in trouble with if they had just been honest about it. Do you see what I'm saying?

AT:   Yes, sir.

MS:   Because when you lie and try to cover up stuff, it makes it look like you had malicious intent.

AT:   Yes, sir.

MS:   You see?

AT:   Yes, sir.

MS:   Do you have any questions for us?

AT:   No, sir, not that I know of.  No, sir.  I just – I'm not lying.  Okay.

WB:   Let me ask you this:  What was the temperature out there that night?

AT:   Cold.

WB:   Were you wearing gloves?

AT:   No, sir.

WB:   Okay.

MS:   This concludes the interview.  The interview ends at 9:39 a.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

    **Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Michael Kentarus Jones, black male, date of birth [          ], [      ], Social Security Account number [              ], who resides at 2305 Grenada BLVD, Greenwood, Mississippi 38930. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

*Mark Steed*
_____
Mark Steed

**RECORDED STATEMENT OF MICHAEL JONES**

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:  Today's date is November 30, 2018.  Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, interviewing Michael Jones of Grenada Police Department.   The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred on 11/29/2018.

Officer Jones, will you state your date of birth, please?

MJ:  _____.

MS:  And, Officer Jones, prior to this interview, were you provided a Miranda Rights form?

MJ:  Yes.

MS:  Did you read it aloud?

MJ:  Yes.

MS:  And did you sign the form?

MJ:  Yes.

MS:  Have you been threatened or coerced to make this statement?

MJ:  No.

MS:  How long have you been a police officer with Grenada?

MJ:  I was hired on May 5th of this year, 2018.

MS:  Have you been to the police academy yet?

MJ:  Yes.

MS:  Do you have prior law enforcement prior to Grenada?

MJ:  I worked in corrections.

MS:  And what agency was that?

MJ:  Camp Montgomery Regional Corrections Facility.

MS:  How long was that?

MJ:  I did that for eight years on and off?

MS:    Okay.  Do you recall an incident on November 29th involving Robert Loggins?

MJ:    Yes.

MS:    And were you on duty at that time?

MJ:    Yes.

MS:    Will you tell me exactly how you became involved in that?

MJ:    I was at the station preparing to leave to go off duty and the call came across the radio.  The complainant said they heard noises like somebody was calling for help or needed some help pretty close to their house, and so that's when I jumped in my patrol unit, proceeded to the location.  When I made it to the location, I looked around and I was in the wrong spot. I was in the wrong location so I followed the other patrol units over to the correct location and we got out and looked around and we came across Mr. Loggins in the back.

MS:    When you responded, what officer did you initially respond with?

MJ:    If I'm not mistaken, I don't want to fabricate anything but I'm thinking the call belonged to Hal which is G-29.

MS:    When you initially responded, which street did you respond to?

MJ:    Pecan Street.  It was on – they said it was 45 or 50 West Pecan Street which I headed west in that area of Pecan Street west of Highway 51 which was the wrong area, and we went to the east side of 51 to the correct address.

MS:    Okay.  When you go to work every day, what type of equipment do you normally carry?

MJ:    The basic essentials for the uniform, I have my vest, Glock 40, two magazines, handcuffs, OC Spray, flashlight.

MS:    Do you have a taser?

MJ:    No, sir.

MS:    Do you have an ASP Baton?

MJ:    No, sir.

MS:    Why don't you have any – why don't you have a taser?

MJ:    I haven't been certified to carry a taser.

MS:    So on this date, you were equipped with everything that you mentioned to me?

MJ:    Yes, sir.

MS:    Since you've been employed with Grenada, have you received calls before of prowlers or somebody trespassing on other people's property?

MJ:    Yes, sir.

MS:    Did you ever or have you even known anybody to be arrested for those types of crimes?

MJ:    Yes, sir.

MS:    And since you've been with the Grenada Police Department, have you arrested anybody that resisted in the past?

MJ:    Yes, sir.

MS:    When was the first time on that day that you actually laid eyes on Mr. Loggins?

MJ:    It was after I walked or tried to cut through the couple houses in which they was fenced off in kind of like the alley way. I had to go around and make my way to the back, and that's when an officer said, "We spotted him right here," and we went over and made contact with Mr. Loggins to see what was wrong. We went and assessed the situation.

MS:    Okay. When you saw "we", who else was with you?

MJ:    Let's see, it was myself, Captain Gammage, Sergeant Woodall, Tillie and if I'm not mistaken – well, no, I'm not mistaken, Hal came, G-29, he showed up a little later.

MS:    When you – did you actually aid in subduing Mr. Loggins?

MJ:    Yes, I did,

MS:    How did you make it into the little grassy area where he was at?

MJ:    We actually had to just find the best route. I mean, it was so thick and the grass was so high till, I mean, if Tillie hadn't spotted him, we probably would have never found him because he had, you know, his clothing was blending in with the weeds. The area he was in, his voice was echoing which, you know, made it sound like it was coming from other sides of the street.

MS:    Okay. When you actually made it up to Mr. Loggins, did you actually jump the fence or did you go in from Govan Street?

MJ:    I went in from Govan Street and cut between two houses, which the lady has a second building behind her house and we was able to slide through the fence at the second house at the back.

MS:    Okay. So whenever you made it to the field, who was already there?

MJ:    I want to say Tillie was already there I want to say because there was a fence. You know, the grass is so high and they say there was a fence there, but, I mean, Tillie was the first one to, you know, was the one to spot him, so.

MS:    Okay. So what officers were present when you approached Loggins?

MJ:    Myself, Captain Gammage, Sergeant Woodall and Office Tillie.

MS:    Okay. Was Mr. Loggins resisting arrest at that point?

MJ:    When we made contact with him he was coherent. He was able to understand what we was saying, but he was not willing. We, you know, asked him to stand up, talk to us, you know, and when we, you know, tried to help him up, that's when he become, you know, it's like he wasn't hisself, you know.

MS:    Was he threatening the police?

MJ:    He had this tone, you know, and he was – it was like he was talking in tongue or something, and he was, you know, saying something about God and Allah.  He was quoting scriptures out of the Kuran, and he was, you know, he was using profanity and, you know, he was just resisting, you know, it was like, you know, it was like we wasn't an authority figure to him, you know, and, I mean, wasn't willing to cooperate.

MS:    Okay.  Was Mr. Loggins tased?

MJ:    Yes.

MS:    Okay.  And who tased Mr. Loggins?

MJ:    Now, I'm not going to lie.  I can't remember who actually hit him with the taser.  They got me, too.  At that point, I, you know, I kind of got tunnel vision, and I can't remember as far as – you know, I just can't actually just say who hit him with the taser.

MS:    Okay.  So if you say you got tased, you must have been in between the wires somehow or another.

MJ:    Well, I was on his right side, and he had his, you know, arms tucked, and we asked him, you know, several times to, you know, just show us his hands.  You know, just bring his hands, you know, show us his hands to make sure he didn't have any weapons or anything that can do bodily harm, you know, to us or his self.  So when this arm come up, this arm was still down so I was going to reach for his left arm and he snatched it away, so that's when I grabbed the right arm and, you know, Tillie grabbed for his cuffs and I had his right arm.  I told Tillie, you know, to cuff him.  He was just resisting, just struggling.  When I say strong, this guy was strong.

MS:    Okay.  So during the course of actually handcuffing or trying to handcuff Loggins, did every officer there have their hands on Mr. Loggins?

MJ:    With the adrenalin that was going, I want to say every – I had his right arm, Tillie had the left arm, Gammage was here, I want to say kind of almost straddling, Sergeant was there, so I want to say just – I want to say just me, Gammage and Tillie, I want to say.  Like I say, once I got hit with that taser, I just got tunnel vision.  You know, I'd never been hit with a taser before.

MS:    Okay.  Did you see anybody strike Mr. Loggins with a flashlight?

MJ:    No, sir.  I never seen anybody hit him with a flashlight.

MS:    Okay.  Did you hit him with a flashlight?

MJ:    No, sir.

MS:    Did you hear Mr. Loggins being struck with a flashlight?

MJ:    No, sir.  The only thing basically you could hear was us giving him commands and a bunch of grass, you know, weeds just moving.  That was pretty much it.  As far as strikes, you know, with a flashlight, no, sir.

MS:     So if you've got his right arm and somebody else has got his left arm, that means you're going to be pretty close?

MJ:     Yes, sir.

MS:     Okay. And y'all are struggling to get his hands from underneath him to behind him.

MJ:     Yes, sir.

MS:     All right. So that's two officers. So you've got two more officers doing something. One of them obviously tased him because you got tased. Okay?

MJ:     Right.

MS:     So then that means there's another officer doing something. So Mr. Loggins was struck with some object.

MJ:     As far as him being struck, I have no knowledge of him being struck. Like I said, after I got hit with the taser, I was focused on this arm and watching the wires and I was looking for the probes to make sure I didn't make contact with those no more and, you know, getting his arm behind him. Once he did get his arm behind him and we got the cuffs on him and we gave him the command to get up and he wouldn't stand up so that's when we had to tote him from the woods back, you know, to the house as far as the patrol units. And once we got him there, the ambulance came, looked at him like this, "He's okay." We put him in my patrol unit. I proceeded to the county jail with him and I – oh, that's when we had to our cuffs off, which it took me, Tillie, Hal, and a few more correction officers to swap the handcuffs out. And once we got our handcuffs out, Captain told me, you know, everybody just come on back to the station.

MS:     Okay. So if you've got his right arm, Tillie's on this left side. Okay. What's Officer Gammage doing?

MJ:     All I can say is I had been hearing Gammage giving him, you know, verbal commands to, you know, stop struggling, you know, I mean, just let us get the cuffs on you, man. We ain't trying to hurt you. Just stop resisting. You know, because give me your arm because once I got this arm pretty much in control, I want to say Tillie was kind of having trouble getting his left arm, but then he, you know, he finally gave in. Loggins finally gave in.

MS:     And there was another officer, okay?

MJ:     Right.

MS:     And what was he doing?

MJ:     The only thing I can remember Hal doing was helping me – by the time we got him halfway, we sat him down to rest. And that's when Hal came and got the left side and I continued with the right side, toted him to the ambulance – well, toted him out to the street so the ambulance, you know, the paramedics can check on him. That's the only thing I remember Hal doing because I don't even – I think Hal – I don't know if Tillie jumped the fence. Like I said, I don't know. They said it was a fence there. I don't know. I'm thinking Hal might have walked around or drove around and he came – found

the way we came in and, you know, he came and showed up later. But the only thing I know, you know, Hal did was help me tote him.

MS:     Okay. So you're telling me that you didn't see anybody strike Mr. Loggins with a flashlight even if it was just on his arms or legs?

MJ:     Oh, no, sir. I didn't, I mean, I don't even recall a strike with anything. I promise you, sir. I mean.

MS:     Okay. You understand that this is a death investigation?

MJ:     Yes, sir.

MS:     Do you understand that lying to me about this case is a felony?

MJ:     Yes, sir.

MS:     Do you understand that?

MJ:     Yes, sir.

MS:     Okay. And do you understand that if you have knowledge of acts that went on out there and that you lie about it, that that could be criminal? That is criinal.

MJ:     Yes, sir.

MS:     And you're willing to take that chance?

MJ:     I mean, I'm not taking any chances, sir.

MS:     Well, what I'm saying is is that the injuries on Mr. Loggins does not add up to the story. And the thing about is, and I'm going to tell you just like I tell everybody else, y'all didn't do anything wrong. Okay?

MJ:     Yes, sir.

MS:     You've got the right to use the amount of force necessary to effect an arrest, but when there are certain injuries to somebody and somebody dies, I need to know so I can be able to tell who I've got to report to about these injuries. Okay. And so you've been in corrections before, so I would suspect that a person that has been in corrections before, you've probably had more training and dealing with irate or combative people than the average police officer.

MJ:     Yes, sir.

MS:     So the fact that you tell me that you're on his right side, Tillie was on his left, and you don't know where the other officers are at or what they're doing, I don't buy that. I've been in law enforcement a long time and if me and you and William are struggling with somebody in here, okay, and we were trying to subdue them, I'm going to know exactly what y'all are doing. I've already been there, man. I've done it.

MJ:     Yes, sir.

MS:     Okay?  And so the fact that you tell me that you don't know where those other officers were and what they were doing, that don't add up.

MJ:     Yes, sir.  I mean, I promise you I don't know what to tell you because I was on his right side, Gammage was here –

MS:     What's here?

MJ:     Behind him, you know, like behind his legs.

MS:     Okay.

MJ:     And Tillie was here and I could hear Woodall but I just can't place him.  I promise you, I just can't place him.

MS:     Michael?

MJ:     Yes, sir.

MS:     Who struck Mr. Loggins?

MJ:     I have no idea, sir.  I promise you I have no idea, sir.

MS:     So you're telling me that you don't know who struck Mr. Loggins?

MJ:     No, sir.

MS:     I know Mr. Loggins was struck.  I've already been told that he was struck.  Okay?

MJ:     Yes, sir.

MS:     And so with you being there and you're telling me you don't know, that makes me feel like that you are hindering this investigation.

MJ:     Sir, I mean, I promise you I don't know.  I promise you I don't know, sir.

MS:     Do you understand that most police officers get in trouble because they lie?

MJ:     Right.

MS:     Okay.  Just like in the correctional facilities, I work crimes there.

MJ:     Yes, sir.

MS:     Correctional workers, they lie sometimes to get out of trouble for things that they've done.  Okay?  That's what gets you in trouble.  I'm on your side, Michael.  I'm for the police.

MJ:     Yes, sir.

MS:     I am an officer myself.  Okay?

MJ:     Yes, sir.

MS:     I've done exactly what's been done in this case here?  But when I've been asked about it, I tell the truth.

MJ:    Yes, sir.

MS:    Okay?  And that's why I'm asking you, I know that you haven't been with Grenada long.  I know what Code Blue is and what stays in the field – happens in the field stays in the field.  I know all of that.  Okay?

MJ:    Yes, sir.

MS:    But I'm telling you that the story is not adding up.  Okay?  I know that you know who struck Loggins, and I know that you don't want to say.

MJ:    No, sir.  I promise you I don't.  I don't know who, I mean, I didn't even know he was struck.  Honestly, I didn't

MS:    Okay.  All right.  So you get tased by accident?

MJ:    Right.

MS:    Okay.  So if you get tased by accident, you had to feel it?

MJ:    Right.

MS:    Being tased is not a very pleasurable sensation.  Okay?

MJ:    It hurt.

MS:    So he got your attention.  So who did the tasing?  You had to have known who tased you?  Did you not acknowledge that you got tased?

MJ:    Oh, yes, sir.  I hollered out.  I mean, I cussed.  I said, "Oh, 'S'," you know.

MS:    Okay.  So the person that tased –

MJ:    I backed up and looked at the line and I looked at the probe.

WB:    Did you look up to see who was pointing the taser?  Because it was on the five second ride at that time.

MJ:    Okay.  Sergeant Woodall tased.  I was here.  Sergeant Woodall tased.  Sergeant Woodall tased because – yes, sir, Sergeant Woodall tased because I remember, I said, "Wait."  I said, "Just let me see your baton."  I was going to take the baton and pry his arm out like they showed me in (inaudible) at the academy.  He said, "No."  He said, "Pap."  And when he said, "Pap," I guess I was too close to him and the probe hit me.

WB:    Okay.  The line hit you or the probe hit you?

MJ:    The line, the probe – I guess, I got the bruises here.  So, I mean, it didn't stick in me because I got the bruise here.  Once I felt it –

MS:    You were inside the circuit, so that's why you got shocked.

MJ:    Yes, sir.

MS:    But I appreciate you being honest about who did the tasing.  I appreciate that.  Okay?  You should have told me that to start with.

MJ:    Sergeant Woodall. Where is Gammage? Sergeant Woodall tased. Sergeant Woodall tased.

MS:    Okay. And you're certain about that?

MJ:    Yes, sir.

MS:    Okay. And that's fine. The guy needed to be tased, and that's perfectly fine. Okay. So who struck Loggins?

MJ:    I have no knowledge of no striking, sir. I have no knowledge of striking.

MS:    Well, that only leaves one other officer.

MJ:    That's Hal, which Hal hadn't even – I didn't see Hal nowhere in the picture. I didn't even hear Hal's voice nowhere until it was time to tote him.

MS:    So you're holding his arms?

MJ:    I'm holding his right arm.

MS:    His right arm? You told me you were holding his right arm. Tillie is on his left side?

MJ:    Right.

MS:    So if somebody is hitting the back of his arms to try to get him to comply, there's a pressure point on the back of the elbow. So if somebody is hitting the back of his elbow trying to get him to comply, who was doing that? They'd have been all on top of you.

MJ:    Not on the right side. Tillie was on the left side. I was on the right side. Tillie was on the left side. Gammage was almost straddled him on his back trying to, you know, help us get his arms around. Now as far as the flashlight, sir, I promise you, I don't know anything about nobody getting hit with a flashlight, sir.

MS:    Okay.

MJ:    I can walk through a thousand courtrooms and testify that I don't know anything about nobody being hit with a flashlight.

MS:    Okay. Was Loggins bleeding from the mouth?

MJ:    The only place that I know was bleeding was I think Tillie's hand from where Tillie got bit or something because I had a little blood, like just a little strip of blood on this finger right here from when me and Tillie made contact. That was it. That was the only blood I saw.

MS:    So let's fast forward till we get to the jail. Let me back up. Whenever you transported Mr. Loggins from the field to the patrol car, did you assist in carrying him out?

MJ:    Yes, sir. I was on his right side. I had him in my left arm. I was on his right side. Sergeant Woodall was on this left side with his right arm and Tillie had the legs because he was trying to kick. Tillie had the legs and we walked about halfway and sat him down to take a break, and that's when Hal – Sergeant Woodall gave Hal the command to come and get the left side, and I just went ahead and, you know, to go on and get him up there

so EMS could see him. Went on ahead – I fought through it and got him to where EMS could see him. They looked at him. "He's okay." And then one of the EMS, the lady, came over and she said, "Is that the same guy we've been having trouble with?" I said, "No, sir – I mean, no, ma'am." They said, "That's Mr. Loggins. He's the same guy." And she said, "Well, that last guy y'all brought us, you know, was on Flakka or something like that and they didn't have nothing to counteract that drug or whatever." And she said, "Well, he's fine." I got in my patrol unit and headed straight to county.

MS:    When you get to the jail, and I understand that he had the officer's cuffs on him, and they wanted to change the cuffs out so the officer could keep his own cuffs.

MJ:    Right.

MS:    Did you – at the point that – at the point that they went to change the cuffs out, did you see anybody kick Mr. Loggins?

MJ:    No, sir. I never seen anybody kick him. Tillie was in front of him. I was on this side which would have been his left side and I want to say Hal was by his right back leg and the correction officers was kind of like, you know, in the center of his body, you know, holding pressure on him to keep him from moving. Everybody kind of had his body parts trying to keep him restrained while we changed the cuffs. That's when I had to go in my pocket and get the cuff key because Tillie's key wasn't working for some reason. I got Tillie's cuffs off and we, you know, we took one side off, clamped the side, took the other side off, clamped the side like that. That's how we swapped out the cuffs.

MS:    Was anybody sitting on Mr. Loggins?

MJ:    Not from here up. It was one guy had a knee around the buttocks area kind of like right here.

MS:    Who was that?

MJ:    One of the corrections officer. I don't know his name.

MS:    Was anybody sitting on Mr. Loggins' head or neck area?

MJ:    Tillie was up like this, but he wasn't, you know, sitting on his head or his neck or anything. I want to say he kind of held pressure like right here to hold his arm while I get this one uncuffed and then switched sides. You know how I explained that we changed the cuffs out. So he was like he was going from side to side with the way I was taking the cuffs off. But he never put pressure on his neck or his head.

MS:    And at the point that everybody started going down to change those cuffs out, did you see anybody, maybe not kick Mr. Loggins, but maybe take their foot and roll him over? Like if you were laying on the floor and I just put my foot on your ribs?

MJ:    You talking about that?

MS:    Yeah. And just kind of roll them over; did you see that?

MJ:    I'm trying to play that back in my mind. I remember him rolled on his side when I was walking away, but I got distracted because the correction officer, the sergeant that was

running the shift at the moment, she was griping and complaining something about they couldn't keep him because he was under the influences of drugs or something, and, you know, steadily telling me that I was going to have to take him back with me, and I'm like, you know, my shift supervisor said, "No, y'all got to keep him." It was like a lot of commotion going on so I promise you I don't remember anybody kicking him or rolling him over or nothing like that.

MS: Okay. All right. While you're at the jail, did you notice if Loggins was bleeding from the mouth?

MJ: No, sir. I didn't notice any blood coming from his mouth.

MS: Okay.

MJ: I'm being honest with you, sir, I can't even remember his face like at all. If he come in and walked through this door right now and slapped me, I couldn't tell you that was Loggins.

MS: Okay. So do you know if he had any missing teeth from being knocked out?

MJ: No, because that would have been one of the questions that EMS would have asked, well, what happened here, you know. No, he didn't have any teeth, you know, that was kicked out or knocked out while he was in my custody, while I was with him.

MS: Do you know if EMS -- when y'all were at the arrest scene originally over off of Govan, do you know if they actually looked at his mouth?

MJ: They came and stood and looked over him. They didn't, you know, open his mouth or nothing like that. They came and stood and looked over him and said, "He's fine," and that was it.

MS: Do you have any questions, William?

WB: Yes, sir.

Did you hear somebody hit Robert Loggins with a hard object? You wouldn't have been able to see much because it was dark in that area where you were. Did you hear anything?

MJ: No, sir. No, sir. I didn't hear anything like that, sir. But I did hear, you know, how word travels on the street that it was an inmate over there that said some guards might have done something to him, you know, but that's you know, that's just street talking.

WB: On the scene where you were –

MJ: No, sir.

WB: No, sir. On the scene where you were, a person's only so wide, a foot and a half wide. If you were on the right arm, Tillie was on the left arm, Gammage in the mid-section of the leg area, Woodall around there somewhere, legs, somewhere. At what point did you get the hands behind his back and how did you get his hands behind his back?

MJ: Well, I forced this arm, the right arm. I muscled up the strength and forced this arm behind him and we got the cuff on that. And just after a period of just struggling, he just finally just, you know, kind of gave in with this side and we got this side cuffed. Tillie got this side cuffed.

WB: Tillie was having a hard time getting that hand behind his back. Was anybody else over there trying to get that hand behind his back because you had the right side?

MJ: Gammage was helping on both sides, and I want to say, I don't want to lie on nobody, but I want to say Sergeant might have helped Tillie with that side.

WB: Sergeant Woodall you're talking about?

MJ: Yes, sir. Like I said, I don't want to lie on nobody, but I want to say he might have helped Tillie, you know, with that arm thing.

WB: Now I want you to understand what I'm asking. You've got the right hand behind his back with the cuff on it?

MJ: Right.

WB: It's at most one foot from – what I'm asking you, did you see anybody – did you hear anybody hit Loggins to get that arm behind his back?

MJ: No, sir.

WB: I mean, you're right here now. So your ear was right there, too.

MJ: Yes, sir.

WB: And you didn't hear anything?

MJ: No, sir.

WB: How bad did that taser effect you?

MJ: I'm still sore. I can show you the bruise right now. I'm still sore.

WB: But when you did get Loggins handcuffed and got him out of the field, the grassy area and through the backyard area and got him in the car, you transported him, right?

MJ: Yes, sir.

WB: On the way to the jail – did you seat belt him in?

MJ: No, sir. No, sir, because the way we had to get him in, we had to put him in kind of head first because he was, you know, resisting. He didn't want to go. He didn't want to sit down. He didn't want to bend. We had to put him in head first, and so Tillie and Hal, I want to say, kind of bent him over a little bit, and I came from the driver's side and pulled him in. When I was getting ready to sit him up, you know, he was trying to kick his way because they had closed that door, he was trying to kick his way out. So I, you know, eased him up and when I eased him up I closed the door real quick, and he was back there, you know, just kicking the cage and kicking the doors, you know, just still chanting outrageous stuff from Kuran and all this stuff.

WB:    What patrol car number do you drive?

MJ:    P19.

WB:    What kind of cage is that in the car?

MJ:    Wire cage. It don't have any plexi-glass in it. It's just a cage.

WB:    On the way to the station did Loggins say anything?

MJ:    Yes, sir.

WB:    What did he say?

MJ:    It was more, like I said, he was like talking Kuran like I am king; I will rule, that kind of stuff.

WB:    But he talked from the scene all the way to the station?

MJ:    Right. Yes, sir.

WB:    When you got to the jail, that's what I'm calling the station, but when you got him to jail and you pulled him to the bay area, what happened then when you were getting Loggins out of the car?

MJ:    When I was getting Loggins out of the car, he was, you know, just started laying down, you know, grunting and moaning. I'm like this guy, something ain't right, you know what I'm saying? I'm like this guy – it's got to be more than, you know, Flakka or something. I mean, either he done swallowed something or something. I'm thinking to myself, you know, something. And when I made it there, Hal and Tillie pulled in behind me, and the correction officer, we all got him in there and, like I said, he was breathing fine, he was coherent. You know, he was still, you know, half fight resistant. When I got the news that he died, I had made it home and they was like, well, the sergeant called me and was like, "Man, you might have to come back up here." I'm like, "What?" The dude died. I'm like, "He died? How?" He said, "Man, I don't know, man," he said, "but you might have to come back up here." So between yesterday and today, I only had two hours of sleep.

WB:    When you heard Loggins, when you got him out of the car at the jail, when you heard the grunting and moaning, did you ask him if he was okay?

MJ:    Yeah, because, I mean, I don't want to say I know the guy, but I know of him because me and his mama used to be friends back in the day. Like I said, I'm from Carroll County and Carroll County is a small place. If you know somebody – if you know one person, you know everybody. And, you know, I know of him, but, you know, like I said, if he walked through this door and slapped me, I couldn't tell you that was him. And, you know, shook him, "Rob Rob, man, come on." You know, just, "Man, come on." And he never would cooperate.

MS:    So you never did see anybody hit him with a flashlight?

MJ:    No, sir.

MS:     Hit him in the head or anything?

MJ:     No, sir.

MS:     Do you have anything else, William?

WB:     When one officer got on the other side of the patrol car and one officer tried to get Robert Loggins into the car, did the other officer go in and pull him in?

MJ:     I went to the driver's side and pulled him in.

WB:     So he was on the passenger's side and you went to the driver's side to get him in?

MJ:     Right.

WB:     You had to reach and pull him in.

MJ:     Yes, sir.

WB:     How did you pull him in?

MJ:     From here.

WB:     Was his head on the seat?

MJ:     No, sir.  His head was –

WB:     Was he sitting?

MJ:     Okay.  Say like this is the door seal and this is the seat, I had him like right here, you know, pulling him in because he was still, you know, trying to kick.  And they closed the door.  When they closed the door, he was, you know, still kicking and trying to push his way out on my side.  So that's when, you know, I reversed my grip -- reversed my grip and, you know, slid him back in and kind of grabbed his leg a little bit to kind of, you know, get him up and close the door.

MS:     Do you have anything else, William?

WB:     No, sir.

MS:     The interview ends at 10:39 a.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

    **Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Frank Anthony Sanders, black male, date of birth ▭, ▭, Social Security Account number ▭, who resides at 9 North College Street, Grenada, Mississippi 38901. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
_____
Mark Steed

**RECORDED STATEMENT OF FRANK SANDERS**

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:    Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, State of Mississippi, and Mr. Frank Sanders. The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred this date in Grenada.

    Mr. Sanders, will you state your date of birth and social security number, please?

FS:    [ ] Social security is [ ].

MS:    And how long have you been employed with the Grenada County Sheriff's Office?

FS:    Approximately off and on about four years.

MS:    And what capacity do you occupy there?

FS:    As a correction officer.

MS:    Okay. Are you in a sworn position?

FS:    No, sir.

MS:    Prior to working at Grenada County Sheriff's Office as a jailer, have you worked as a jailer in any other institutions before?

FS:    No, sir, not in the state of Mississippi.

MS:    On today, you're aware of what happened to Mr. Robert Loggins, right?

FS:    Yes, sir.

MS:    Okay. When he was brought into the jail?

FS:    Yes, sir.

MS:    Were you working at that time?

FS:    I was on duty in briefing at the time and was called to the scene.

MS:    If you will, tell me what time you got on duty, and if you will, tell me about what time this incident took place and just kind of carry me through your recollection of the incident.

FS:     I came on duty at 6:09. During briefing, Sergeant Johnson of the night shift came into briefing and said they had an emergency at the booking desk. I left briefing and upon arriving at the booking desk, a black male lying on the floor face down – he was laying on his back with his hands behind his back, appeared to be handcuffed. Several police officers were in there along with other staff members. The individual appeared to have a laceration to his head, knees, also blood coming out of his mouth, and he was breathing pretty heavy.

At this time, police officers stated that they were ready to leave. I advised the supervisor not to accept the inmate because of the injuries and plus there was already blood on the floor. At that time, one of the officers stated that he needed his handcuffs. He put one pair of handcuffs on him. When he put that pair of handcuffs on him, he had a hard time dealing with the second handcuffs. The individual started kicking. I grabbed his leg, and they turned him over to be on his stomach then. One individual was on top of him – I think two individuals was on top of him. And once the handcuffs were off, I advised them to take the handcuffs from behind his back because his breathing was abnormal. At this time, they completely took the handcuffs off and that's when Ms. Clark, the supervisor, Sergeant Clark stated, "I don't believe he's breathing." We advised the officers that the individual needed medical care.

The officers turned and all three walked out of the lobby and got in their vehicles and left. I ran to the control tower to get our mouthpiece to do CPR but I couldn't find it. Sergeant Johnson came in and got the scissors and they started CPR. They started CPR, and I told Ms. Clark to go ahead and dial 911. Ambulance arrived and started CPR right away. They did CPR for I'd say almost 30 minutes. He was then taken by ambulance. Sergeant Johnson accompanied him to the hospital. After that I returned back to my post.

MS:     Okay. At any time from the time when you were made aware that Mr. Loggins was brought in, did you see Mr. Loggins combative with police officers?

FS:     He was kicking a little bit but only until they tried to take the handcuffs off.

MS:     Okay.

FS:     And, like I said, his eyes were at the top of his head and the breathing was abnormal. And, like I said, that's why I advised the supervisor not to accept the inmate at that time.

MS:     When you came out from your meeting and you saw several officers around surrounding Mr. Loggins, do you remember who those officers were?

FS:     The only one I recognized is Officer Miller. The other two I've never seen.

MS:     Did you see anybody hit or strike or kick Mr. Loggins?

FS:     No, sir.

MS:     You did not?

FS:     No, sir.

MS:     Did you kick or strike Mr. Loggins at all?

EXHIBIT A - MBI REPORT PART 1                              TILLEY 64

FS:     No, sir.

MS:     Who was the first person to grab Mr. Loggins to change the handcuffs out?

FS:     Once they started changing handcuffs, that's when I applied the leg irons to keep him from kicking and once the handcuffs came off, that's when we took the leg irons off.

MS:     Okay. So let's back up. Mr. Loggins was surrounded by jail staff?

FS:     Yes.

MS:     Okay. And on the video camera, it shows you coming up. Okay. And you kind of go in kind of in between everybody. When you get up there to Mr. Loggins, did you use your foot to turn Mr. Loggins over or did you strike Mr. Loggins in any way?

FS:     No, sir. Once I put the leg irons on him, I stepped on the leg irons to keep him from kicking me.

MS:     What was the first thing you did when you laid eyes on Mr. Loggins? Did you roll Mr. Loggins over? How did you – something was done – some physical act was done. Did you roll him over with your foot or did somebody kick him?

FS:     I don't know how he got rolled over. I know I had a hold to the chain. But I never kicked him.

MS:     Did you put your foot on him in any way?

FS:     No, just the chain.

MS:     Did you put your knee on his neck or on his face?

FS:     No, sir. I was on the lower part of his body.

MS:     Okay. Do you know who put their knee on his head?

FS:     Like I said, I don't know that officer. I don't know him by name. I've never seen him before.

MS:     Is he white or black?

FS:     White.

MS:     Okay. Was he a police officer or jail staff?

FS:     Police officer.

MS:     Okay. And did he have his knee – he had his knee on Loggins' head?

FS:     In his back. I believe in his back, yeah.

MS:     Did anybody strike Mr. Loggins at that time?

FS:     I didn't see anyone strike him.

MS:     Okay. And so you're telling me right now in an official investigation that you did not strike Mr. Loggins in any way with your hands or with your feet?

FS:     No, sir.  I don't remember striking him.  The only thing I did was stepped on the chain.

MS:     William, do you have anything?

WB:     No, sir.

MS:     Okay.  This concludes the interview with Mr. Frank Sanders.  The interview ends at 4:39 p.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Edwin Harold Merriman, white male, date of birth ▯▯▯▯▯▯, Social Security Account number ▯▯▯▯▯▯, who resides at 701 Chickasaw Drive, Grenada, Mississippi 38901. Said interview was regarding the above captioned matter. The above mentioned interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

Mark Steed

**RECORDED STATEMENT OF EDWIN MERRIUM**

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.:  M19-00000391**

**ME NO.:  ME18-1164**

**DATE:  11/29/18**

MS:  Today's date is November 30, 2018.  Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, interviewing Officer Edwin Harold Merrium of the Grenada Police Department.  The interview is taking place at the district attorney's office in Grenada, and the interview is regarding death investigation of Robert Loggins which occurred on 11/29/2018 in Grenada.

Officer Merrium, will you state your date of birth, please?

EM:  [redacted].

MS:  And, Mr. Merrium, prior to this interview were you provided a Miranda Rights form?

EM:  I was.

MS:  Did you read that aloud?

EM:  I did.

MS:  Did you understand it?

EM:  Yes, sir.

MS:  And you signed it?

EM:  Yes.

MS:  Mr. Merrium, how are you employed?

EM:  By the City of Grenada.

MS:  As what?

EM:  A corporal with the police department.

MS:  Okay.  And how long have you been employed there?

EM:  Better part of nine years.

MS:  And, so, are you a full-time officer?

EM:  Yes.

MS:  You're certified?

EM:  Yes.

MS: Prior to Grenada Police Department, do you have any previous law enforcement experience?

EM: No.

MS: Were you employed as a police officer on 11/29/2018?

EM: Yes.

MS: And on that date, did you have a situation that occurred involving a Robert Loggins?

EM: Yes.

MS: Can you tell me how you became involved in that?

EM: We received a call that some people on Govan Street called and said they could hear somebody screaming for help. I made the area and spoke to several residents in the area and they said could hear it. I could hear it. We just couldn't pinpoint it. And other officers got into the area and myself and Officer Tillie went around to Bledsoe Street which is north, and we could hear it very loud so we both got out of our cars and parked over where the noise was coming from and Tillie climbed up on top of this fence. And I don't know if he could see him, I know he made contact with him, and they were talking. I stayed on the ground on the north side of the fence and then the other officers and Jones and Captain Gammage and Sergeant Woodall approached from Govan on the other side of the fence, and that's when the altercation occurred. They tased him and whatever else happened.

MS: He was identified when he was in the grassy area?

EM: Right. Officer Tillie when he was on top of the fence identified him as Robert Loggins.

MS: And did you actually physically assist in the actual subduing of Loggins?

EM: No.

MS: Did you actually see anybody subduing Loggins?

EM: When I made my way back around to where Loggins was and the other officers, Captain Gammage – they were on the ground. Loggins was on the ground in the bushes or that's what I call them. I don't know what they were. They was thick bushes. And Captain Gammage was on top of him. They had one hand in handcuffs and they was trying to get the other one in handcuffs, and Officer Tillie and Officer Jones were also down on the ground with him, and Sergeant Woodall was standing there with the flashlight just so they could see. They were trying to get that other arm behind him and finally he gave it up.

MS: Okay. Do you know if Loggins had a weapon?

EM: Not that I'm aware of.

MS: Did you hear Loggins threaten anybody?

EM: I don't believe so.

MS:     Okay. Did you hear the police threaten Loggins?

EM:     Like what do you mean threat?

MS:     I'm going to kill you or anything like that?

EM:     No. No.

MS:     Did you hear the police give Loggins verbal commands?

EM:     Yes. I heard them tell him, "Let me see your hands. Let me see your hands. Let me see your hands." And then they tased him and then I heard them say, "Get your hands out from under you. Get your hands out from under you."

MS:     Did he comply with that?

EM:     No, not at all.

MS:     So he was resisting arrest; is that right?

EM:     Yes.

MS:     As a police officer, have you been to calls before in Grenada where people have called about prowlers and trespassers before?

EM:     Yes.

MS:     And when you responded to these calls, were these people ever arrested before?

EM:     What people?

MS:     The violators.

EM:     Sometimes. Most, yes. Oh, yes.

MS:     You've dealt with people that have resisted arrest before, right?

EM:     Yes.

MS:     All right. And some people will comply verbally and some people won't, right?

EM:     True.

MS:     Based on your experience as a law enforcement officer, was there an excessive amount of force used to subdue Loggins?

EM:     From what I saw, no. Like I said, I was on the other side of the fence during most of the altercation. But, like I said, from what I saw, I'd say no.

MS:     Okay. Did you see any officer strike Loggins with a flashlight?

EM:     No, sir.

MS:     Okay. Did you hear Loggins being struck with an object?

EM:     Not that I could tell.

MS:   Did you ever hear Loggins holler as far as being hit?

EM:   He did a lot of hollering. I mean, he was talking outside of his head. So, I mean, he was hollering but I can't specify why he was hollering.

MS:   Did he say, "Stop hitting me," or anything of that nature?

EM:   No. I didn't hear anything like that. Honestly, I couldn't make out anything he was saying really.

MS:   Okay. You stated that you saw Officer Woodall with a flashlight, holding the light while the other officers subdued him?

EM:   Yes, sir.

MS:   Did you see Officer Woodall strike Loggins with a flashlight?

EM:   No, sir.

MS:   Did you see Officer Gammage or Officer Tillie strike Loggins with a flashlight?

EM:   No, sir.

MS:   Did you strike him with a flashlight?

EM:   No.

MS:   Okay. At the point that he was actually handcuffed, was he being transported out of the field?

EM:   Yeah, the officers had to drag him out of the field because he wouldn't walk. He was still somewhat combative, so two or three drug him up to under the carport.

MS:   Were you physically involved in that?

EM:   No. Not yet.

MS:   Okay.

EM:   Then the medical folks were called, and they were supposed to check him out, and they didn't check him out.

MS:   They did or did not?

EM:   Did not. They never put their hands on him. They didn't check no vitals. They said – the male EMT said, "He's good to go. Y'all can carry him on."

MS:   Okay.

EM:   Because, you know, we have to call EMS when somebody's been tased.

MS:   At the time that EMS came up there, what was Loggins doing?

EM:   He was laying – we had drug him up there under the carport, and he was laying on the ground.

MS:   Okay. Was he breathing?

EM:   Yes.

MS:   Okay.  Was he talking or moving around?

EM:   Yes.  Moving around, still being a little belligerent.

MS:   Okay.  But the EMTs they said he was okay?

EM:   Yes.

MS:   Okay.  And then he was loaded up in the patrol car, right?

EM:   Yes.  We drug him to the vehicle.

MS:   Okay.  And did he get in the vehicle freely?

EM:   No.  We had to put him in the car.

MS:   Okay.  And when you got him in the car, was he still breathing when you got him in the car?

EM:   Yes.

MS:   And who carried him to Grenada County Jail?

EM:   Officer Jones.

MS:   Okay.  Did he go by himself?

EM:   He went in his car, and then myself and Officer Tillie went to the jail with him.

MS:   Y'all followed him?

EM:   Yes.

MS:   Did y'all stop along the way?

EM:   No.

MS:   You went straight from where you arrested him to the jail?

EM:   Yes.  To the jail.  In the sally port.

MS:   Okay.  When you get to the sally port, then what happened?

EM:   The two jailers came out and got him out of the vehicle and drug him into the jail, the booking area.  And he was still moving around, still being belligerent.

MS:   Okay.  Let's clarify something.  You're using the word "drug", did y'all actually – you drug him?

EM:   We had to physically – like one of us would grab one arm and the other guy would grab the other arm and just have to basically carry him around.  He wouldn't walk.

MS:   Okay.  So did you carry him or did you drag him?

EM:   Well, we drug him because his feet were dragging.  That's what I call dragging.

MS:  Okay.

WB:  Was he face down when you were dragging him or was he face up when you were dragging him?

EM:  He was like leaning forward.

MS:  All right. So, you get him in there; did you sit him in the floor?

EM:  The jailers got him in there.

MS:  Okay. And what happened after that?

EM:  He laid in the floor and kicked around and hollered and screamed, and then Officer – I can't remember which officer it was, either Jones or Tillie tried to take our handcuffs off of him, but that didn't work. So the jail put theirs on, and two or three of them got on top of him inside the jail so we could get our handcuffs off of him, and he was still squirming around acting a fool, cussing, just talking outside of his head. He was still breathing.

MS:  Okay.

EM:  We got our handcuffs off, and we left. He was still moving around, on the floor kicking and thrashing.

MS:  So when he was lying on the floor and the decision was made to take off the Grenada officer's cuffs so that the sheriff's office could put their cuffs on him, everybody kind of migrated around him to kind of restrain him from fighting.

EM:  Yes.

MS:  At that point in time, did you see anybody kick Mr. Loggins?

EM:  No, not that I remember.

MS:  Did you see anybody sit on his head or his neck?

EM:  I can't remember. I can't say one way or the other if they sat on his head.

MS:  Well, did they?

EM:  I'm saying I can't remember. I mean, if I could remember I would tell you. You know, I've been known to use my knee to restrain them, but, like I say, I can't say one way or the other if I saw that.

MS:  Okay. Did you sit on his head or neck?

EM:  No.

MS:  Did you sit on his back?

EM:  No. I didn't touch him in any way at the jail.

MS:  Okay. Do you know if anybody took their foot and rolled him over?

EM:  You mean like pushed him like kind of with their foot?

MS:    Yes.

EM:    I don't think so.

MS:    Was he struck or abused in any way that you could see at the jail?

EM:    No. No.

MS:    When he was at the jail, was he bleeding from the mouth?

EM:    I didn't see. Not that I saw.

MS:    Okay.

EM:    I don't remember seeing anybody blood on the floor.

MS:    Okay. All right. Did you notice if he was bleeding from the mouth when y'all were at the scene?

EM:    I don't remember, but we were out in that backyard. It was dark.

MS:    William, do you have anything?

WB:    Have you heard any of the other officers talking about what happened back there before you got back there?

EM:    No.

WB:    After it happened?

EM:    Right. No.

WB:    When – I'm talking about the backyard, you know, where the arrest was made.

EM:    Right.

WB:    Did you see Loggins on his own power stand up?

EM:    Never.

WB:    Walk out?

EM:    Walk out from the bushes?

WB:    Yes, sir, from back there, you know, where the arrest was made?

EM:    Yes.

WB:    Back around to the ambulance and patrol cars?

EM:    No.

WB:    He was carried out?

EM:    Yes.

WB    So when you get to the ambulance, the ambulance area, you know where they looked at him?

EM:    Well, they carried him from the yard through like a little fence or whatever you want to call it, a little gate, and up under the carport where there was a vehicle parked under the carport. That's where the medical folks came up from the street to the carport.

WB:    What was the condition of Robert Loggins' pants when he was carried out?

EM:    They were up. When he was laying down there under the carport, they was around his ankles.

WB:    Is that when you first saw him?

EM:    No. I saw him back there in the backyard.

WB:    Okay. Back there in the backyard, what was the condition of his pants?

EM:    They were down around probably below his waist. You could see his underwear.

WB:    And you say when he was dragged out of the back, you had him under the elbows and he was face down?

EM:    Right.

WB:    Leaned forward?

EM:    Right.

WB:    But his maybe knees and feet were dragging?

EM:    Yes. His feet were dragging for sure.

WB:    When the EMTs looked at him, how much of a look at him did they do?

EM:    Not much. I mean, they didn't –

WB:    Did they check his temperature?

EM:    They didn't check nothing. No vitals. No nothing.

WB:    So when the EMTs gave the okay that he's okay to take to jail, what did Loggins do to get into the patrol car?

EM:    We had to physically put him in the car. He wasn't getting in the car.

WB:    So was he sitting in the patrol car like a regular person does?

EM:    Well, we laid him in there and then before we shut the door, we sat him up.

WB:    On his back or was he on his face?

EM:    He was on his back. And we got him sitting up in the seat before we shut the door and drove off with him.

WB:    He was sitting up in the seat before you drove off?

EM:    Yes. Yes.

WB:    And you followed Officer Jones to the jail?

EM: I mean, I didn't follow him, but we all three went to the jail, straight from the call to the jail. I think Jones, I think his car was facing one way so I think he went towards 51 to the jail. I went down like Main Street.

WB: Did you by any chance talk to Sergeant Clark that works at the jail?

EM: I didn't really talk to her.

WB: What did she say to you?

EM: She said she wasn't taking him.

WB: Then what happened?

EM: She said she wasn't taking him, and she asked me had he – I told her that he had been checked out by the EMS, and they said that he was okay. And when she said she wasn't taking him in his condition, but then she said she wanted to give him a drug test. So I guess they were going to give him a drug test in there, and the next thing I know she said they were going to take him back around and put him in a cell. She wasn't going to leave him up front. She was going to put him in a cell, and then I didn't have my cell phone on me, it was in the car. I told Officer Jones, I asked him did he have Sergeant Woodall's number to call the sergeant to tell him that the jail ain't going to take him. And he called Sergeant Woodall. I don't know what was said between the two. I didn't get a chance to find out. The next thing I know, you know, they got the cuffs off of him. She was in there trying to find him a cell around back so we left, and he was still breathing.

WB: That's the part I'm a bit confused on. Sergeant Clark, the one in charge of accepting prisoners –

EM: Right. I know what you're talking about.

WB: -- said she was not going to accept him, but she was going around to put him in a cell?

EM: Yeah. I mean –

WB: Did she ever say she was going to accept him?

EM: Well, my thing was we got him inside the jail, you know, he's their responsibility. I told her EMS wasn't – they said he was fine. Like I said, Jones called Woodall and then after that – after they got the cuffs off of him, Sergeant Williamson, Cassidy Williamson got on the radio and told all units to come to the station. So we was just doing what we were told. Like I said, she said – one minute she said, "I'm not taking him." The next minute she's telling them to get a drug test for him, and then the next minute she's saying, "We're going to take him around back and put him in a cell. He's not staying up front." I mean, it's like she was changing. Every 10 seconds something different was coming out of her mouth. So we left. Me being the corporal, I told them, I said, "Let's go." I said, "If they don't want to take him, that's going to be on somebody higher than me to make that decision to go back over there and whatever."

WB: So at that point you left?

EM: Yes.

WB:    What happened then?

EM:    We left. We went to the station. I don't know how long, 20 minutes, 30 minutes maybe. Dispatch called and said the jail had called for another ambulance and had said that Loggins was unresponsive. And I didn't go back over there immediately. I don't know who all did. I mean, the next shift, after shift change, the other shift had come on, day shift had come on, and some of their officers went over there. I know Cassidy went over there. I think Ricky went over there. Justin went back over there. I don't know who all went back over there.

WB:    Now after you got back to the station, it was quitting time.

EM:    Right. It wasn't for me. I don't get off till 8:00.

WB:    You don't get off till 8:00?

EM:    Yes, sir. I still had two more hours.

WB:    Oh, yeah, because the shifts are staggered now?

EM:    Yes.

WB:    Do the police department still, like from one shift to the next, inspect the patrol cars before they take control of the patrol car from one shift to the next?

EM:    I mean –

WB:    It's not something done every day?

EM:    When you come on, you're expected to inspect your own vehicle.

WB:    To make sure no damage is done?

EM:    Right.

WB:    Do they have a log of those inspections?

EM:    Uh-uh.

WB:    Used to have a paper log.

EM:    I ain't never seen a log of that.

WB:    We used to have a paper log.

EM:    Okay. I believe you.

WB:    You know, just in case the glass sometimes gets broke.

EM:    I know the oncoming officer is responsible like to pull up the back seat and make sure there ain't nothing under there, and just, you know, inspect it on their own. If there's something or if they find something, they're supposed to tell the supervisor. But there's no log anymore.

MS:    Based on what you saw that night at the scene and at the jail, do you feel that Mr. Loggins was mistreated in any way?

EM:    Not that I saw.

MS:    Okay.  Do you have any more questions?

WB:    No, sir.

MS:    Interview ends at 11:32 a.m.

## RECORDED STATEMENT OF JOHN WATSON

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:    Today's date is December 6, 2018. Present today is Mark Steed, MBI; Wayne Cantrell, MBI Investigator; William Blackmon, District Attorney's Office, 5th Judicial District. Interview is taking place at the district attorney's office in Grenada, and the interview is regarding the death investigation of Mr. Loggins. Also attending the interview today is John Watson, Paramedic, AMR; Steve Peacock, senior operations supervisor, AMR out of Jackson.

And, John, as I previously told you that the interview is regarding the surrounding situation with Mr. Loggins on November 29, 2018. And I understand that AMR received a medical assistance call at about 5:00 a.m.

JW:    Correct.

MS:    By Grenada or 911 center?

JW:    Correct.

MS:    To Govan Street. Can you tell me when you got there what you saw?

JW:    When we arrived on the scene, the patient was in handcuffs. He was talking, screaming, pretty much cussing the police officers. Probably after about a minute after we looked at him, the police offices picked him up. He walked at first to the patrol car, then he dragged his legs and then when they went to put him in the patrol car, he started fighting with the police officers again. He was putting his feet on the side of the car, tried to head butt the police officers, and they finally got him in the patrol car and he was still – you could see from where I was at that he was still trying to fight his way out of the patrol car.

MS:    Okay. Whenever you – while you were there on the scene and the police brought Mr. Loggins out, did you see any blood coming from Mr. Loggins' head area?

JW:    No, sir. There was no blood nowhere on Mr. Loggins.

MS:    Did it appear that he had his teeth knocked out?

JW:    No. His teeth were intact.

MS:    Okay. Could you tell that he had any lacerations to the head?

JW:    No. There were no lacerations.

MS:   Was there any markings or impressions indicative of being hit by an object to the throat area?

JW:   No.

MS:   Okay. Did you hear Mr. Loggins say aloud that he had been assaulted by the police?

JW:   From what I remember, I do not remember hearing that.

MS:   Okay. Did you see the police assault him?

JW:   No.

MS:   Okay. Was – you already stated that Mr. Loggins was resisting the police.

JW:   Right.

MS:   And did at any time did Mr. Loggins – did he refuse medical treatment?

JW:   No, because medical treatment at that point in time was not necessary.

MS:   Okay. Would it have been hard to deal with Mr. Loggins in your capacity in his condition?

JW:   In the condition that he was in, if I had to administer any type of medical services to him, the way he was acting out and belligerent, it would have been almost impossible.

MS:   Okay. Based on your experience as a paramedic, do you think that Mr. Loggins – is that normal behavior or do you think that he may have been under the influence of something?

JW:   I honestly cannot say because I did not know him personally. I never had any kind of interactions with him, so I do not know if that was normal behavior for him.

MS:   Okay. And so I understand at that point he was put in the patrol car and transported to Grenada County Jail.

JW:   Yes, sir.

MS:   And then shortly thereafter, EMT staff was called back up there; is that right?

JW:   Yes, sir.

MS:   Or called to that location?

JW:   Yes, sir.

MS:   And did you respond to the jail?

JW:   Yes, sir. I did.

MS:   And I understand that Jennifer was with you that day?

JW:   Yes, sir. She was driving the ambulance.

MS:   And what did you see when you got to the jail?

JW: When we initially arrived at the jail, it was probably two minutes before we could actually pull up into the jail because the door was let down. We made several attempts to get in there, sirens to let them know we was out there, then they wouldn't let the door up. We pulled in. From where we stopped, you could see the patient lying supine on the ground, and there was several of the staff standing there beside him. Some were looking at him. Some were looking at us.

MS: Okay. When you went into the jail and Mr. Loggins was lying on the floor, did you see any blood?

JW: He had a small amount of blood on his teeth. There was none nowhere else. It was just a little bit on his teeth.

MS: Okay. So his teeth were intact?

JW: His teeth were intact.

MS: Okay. At that point, did you see any lacerations on his head?

JW: No. There was no lacerations because he was lying then – our initial contact it was dark, of course, it was in the morning. The second contact was very well lit and there was no lacerations, no blood nowhere on him.

MS: Okay.

JW: Other than the little bit that was in his mouth.

MS: At the jail, was Mr. Loggins responsive?

JW: No. He was not responsive.

MS: Okay. Did he ever say at any point in time that morning that he had been mistreated or abused?

JW: No.

MS: Okay. Did you see Mr. Loggins being mistreated or abused in any way?

JW: Initially, no. Then at the jail, he was unresponsive. He had no movement, nothing.

MS: Okay. And shortly y'all arrived at the jail and obviously you saw the need for urgent medical care, he was transported to the hospital; is that right?

JW: Yes.

MS: Okay. Did he say anything to you on the way to the jail – I mean, to the hospital?

JW: No. He was unresponsive. He was still unresponsive.

MS: Okay.

WB: I want to go back to the scene.

JW: Okay.

WB:  When you made contact with Loggins and the police, did they mention to you that Loggins had been tased?

JW:  Yes, they did.

WB:  Were you the one that removed the taser prongs or prong?

JW:  Right.  There was two taser prongs that was stuck in his jacket.  They didn't make any contact with the skin.  There were none nowhere else that I saw.

WB:  What was the condition of his pants?

JW:  From what I remember, he had pants on, black pants on.  I mean, they was fully intact.

WB:  Pulled up to his waist or where were they?

JW:  I want to say they was sitting below his waist line.

WB:  Sitting below the waist?

JW:  Yes.

WB:  When the officers went to put Loggins in the car, did you ever see Loggins standing on his feet?

JW:  Yes.

WB:  If you had to examine Loggins in the condition he was in, could you?

JW:  The condition he was in –

WB:  His behavior, the condition he was in?

JW:  No.  I would not feel comfortable assessing him for my safety or the safety of my partner with the condition he was in.

WB:  Okay.  So the okay was given to take him to jail?

JW:  Yes.

WB:  And the police took him to jail?

JW:  Right.

WB:  When you got to the jail, could you tell me again what you saw?

JW:  He was lying supine on the floor.  He looked like he was on his back.  There were several of the staff standing around him.  Some were looking down at him and some were looking at us when we arrived.

WB:  Did you administer anything to him?

JW:  Yes.  Initially I put him on a monitor to check his initial rhythm which was asystole, which is basically the heart is not beating, it's dead.  CPR was started.  I start an IO in his leg which is basically a drip into the bone.  The first drug I administered was Narcan because they had – the officers on the scene said they pulled a vial of what looked like

drugs from him so I immediately administered Narcan, then Epi, three Epi, and then I administered another Narcan while in route. I also intubated him while he was on the jail floor, attached BBM, CPR and we administered oxygen to him all the way to the hospital. CPR and oxygen was administered in route.

WB: How long have you been an EMTP?

JW: I have been a paramedic for four years?

WB: In your experience, have you ever seen a person go from the condition he was in on the scene you saw the first time to, I'm going to say moments because I don't know the exact time, moments later flat on his back on the floor?

JW: I have.

WB: What caused that from your experience?

JW: The one that comes to mind, we had a person that was short of breath that when we to him on the scene he was talking, alert, oriented and then probably a minute later we was doing CPR.

MS: This concludes the interview. Interview ends at 11:24 a.m.

# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

    **Details:** On December 6, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Jennifer Howell, EMT, American Medical Response. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
_____
Mark Steed

## RECORDED STATEMENT OF JENNIFER HOWELL

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS:    Today's date is December 6, 2018.  Present today is Mark Steed, MBI; William Blackmon, District Attorney's Office, 5th Judicial District, Wayne Cantrell, MBI; interviewing Jennifer Howell, EMT with AMR.

I'm Steve Peacock, the senior operations supervisor, AMR out of Jackson.

MS:    The interview today is regarding the death investigation of Mr. Loggins that occurred on 11/29/2018.

Jennifer, can you tell me on 11/29/18, were you employed as an EMT?

JH:    Yes, sir.

MS:    Okay. And you were working a shift that morning?

JH:    Uh-huh (affirmative response).

MS:    Here in Grenada County?

JH:    Yes.

MS:    Did you happen to be called to a scene by the Grenada Police Department involving – just at the Grenada Police Department's request?

JH:    Yes.

MS:    Okay. Can you tell me about that?

JH:    We were called twice.

MS:    Okay.  Let's start with the one about 5:00 a.m. that morning.

JH:    About 5:00 a.m. we were called at law enforcement's request.  I do not recall what they requested us for because normally they'll tell us this is what we need; this is what we've got; this is what we need you for.  I don't remember, but, yes, we were called.

MS:    Okay.  Was there another EMT or paramedic with you that morning?

JH:    Yes.

MS:    Okay. And who was that?

JH:    John Watson.

MS:     Okay.  When y'all were initially called, if I'm right, I believe y'all were just called to the area to stand by; is that right, in the event that the police find the person that they're looking for?

JH:     Yes, sir.

MS:     And I believe it was in the vicinity of Govan Street; is that right?

JH:     Yes, sir.

MS:     Okay.  When the police brought the suspect out, do you remember that?

JH:     Yes.

MS:     Okay.  And it was Mr. Loggins; I don't know if you remember his name or not?

JH:     I do.

MS:     You do remember that name?  Can you tell me a little bit about Mr. Loggins?  Did he look like – was he bleeding?

JH:     At the time that we – from what we could tell he was not.  We did not see any blood.  But he was acting erratically, screaming, thrashing around, cussing, but we did not see any blood.

MS:     Okay.  Was he acting like he was resisting arrest?  He was already arrested, but was he disobeying the officers?

JH:     Yes, sir.

MS:     Could you tell if his teeth had been knocked out?

JH:     I could not tell at that time.

MS:     Okay.  Could you tell if he had any, for lack of a better word, contusions to the head or lacerations to the forehead area?

JH:     No, sir.  There was nothing that we could see.

MS:     Okay.  Did he have anything that was visible to his throat that would have been indicative of assault?

JH:     Not that we could tell.  No, sir.

MS:     Based on what you saw, did it look like that he had been beat up or assaulted by the police?

JH:     No, sir, not that we could tell, but it was very dark.

MS:     Okay.

JH:     And the only light was just a few flashlights?

MS:     Okay.  Did Mr. Loggins ever make any statements to you that he had been assaulted or beat up by the police?

JH:     No, sir.

MS:     Okay.  So at that point in time, he was transported on to the jail, and then later I understand that the ambulance service was called back to the jail; is that correct?

JH:     Yes, sir.

MS:     And you and your same partner responded?

JH:     Yes, sir.

MS:     Okay.  Did y'all go inside the jail?

JH:     We did.

MS:     What did you see?

JH:     After we gained access and pulled in to the bay, my partner jumped out and went in.  I was having to go around the front because I couldn't get past a patrol car that had pulled in with us.  I said, "What have we got?" And he said, "Start compressions."  And I did.

MS:     Okay.  Was Mr. Loggins, we he responsive at that time?

JH:     No, sir.

MS:     Could you tell if he was breathing?

JH:     Not from what I could tell.

MS:     Okay.  At that point in time, was he bleeding from the mouth or did he have any lacerations on the forehead?

JH:     Not that I recall.  I never really made it as far as scanning him.  Once I came in and my hands went to his chest, I didn't look at his face.

MS:     Okay.  So as far as his outward appearance, did he look any different than when you saw him, I guess, maybe 20 minutes prior to that at Govan Street?

JH:     Not really.

MS:     So did he say anything to you at that point or to anybody else that he had been assaulted?

JH:     No, sir.

MS:     Based on your experience as an EMT, do you feel that the police were treating him accordingly or treating him in a professional manner?

JH:     Are you asking opinion?

MS:     Yes.  I mean, as far as did you see him being assaulted?

JH:     I did not.

MS:     And, I'm sorry, that question was kind of broad.  I know that when people are being irate and disorderly, they have to be handled in a different manner.  But I guess my direct question would be did you see Mr. Loggins assaulted or mistreated in any way?

JH:     No, sir.

MS:     Do you have any questions?

WB:     Yes.

When you examined Mr. Loggins in the driveway on Govan Street, did you notice his pants down to his knees?

JH:     Yes.

WB:     Did you notice anything about his knees?

JH:     I did not.

WB:     Did Mr. Loggins ask for – did he refuse care?  A patient can refuse care.  Did he refuse your care?

JH:     He was yelling  a lot of things as far as, "Don't touch me." "Get off me."  With the way that he was acting, we could not get in to examine.  We couldn't assess him.

WB:     I understand that a taser was used on Mr. Loggins.  Do you remember assisting taking a prong or two prongs out of Mr. Loggins?

JH:     I did not assist.  No, sir.

WB:     And you say you didn't notice any bruises on him?

JH:     No, sir.

WB:     Since you didn't transport him, were you still sitting in the parking lot when they put him in the car?

JH:     Yes, sir.

WB:     What did you see?

JH:     I saw they were trying to get Mr. Loggins into the car.  He resisted profusely.  He put his feet up on the side of the car.  He had one foot on the side of the car and like one right by the floorboard – I don't know what it's called.  Anyway, he had his feet up there, and then when they got his feet down and they went to put their hand on his head to put him in the car, he arched his back and threw his head back and just locked, like he wasn't –

WB:     So at that point you saw him on his feet; he was standing?

JH:     Yes, sir.

WB:     Then what happened?

JH:     They were putting him in the car.  John said, "They're good.  Let's go."  So we made our way back to the ambulance, and we headed back to our station.

WB:     Did you see the officers use any excessive force on him to get him into the car?

JH:     Only by necessity.

WB:     What did they do?

JH:     They only used the force that was necessary in my opinion. I didn't see anything that I would consider – they had to get him in the car, and that was the only way that he was going, was for them to have to force him.

WB:     How much time from the time that the patrol car left the scene to the time you were called back to the jail, about how much time?

JH:     I don't know.

WB:     Was it still on your same shift?

JH:     Yes.

SP:     I printed and brought all of our documents if y'all need those or copies of them, the original call, their original report, the second call, everything's time stamped on a computer, and the paramedic's report of everything. I brought both of those if y'all need them. John's got them.

JH:     It was between an hour and a hour-and-a-half maybe.

WB:     Let's go back before the transport when the officers brought Robert Loggins from behind the house. Did they bring him from behind the house and then call the ambulance or were you already sitting there? Did you see them bring him from behind the house?

JH:     When we pulled up, they had him under the carport handcuffed.

WB:     Okay. So from the carport to the ambulance where you checked him out, how did they get him there?

JH:     They carried him. They had him one under each arm. We assessed what little we could under the carport, but he was acting erratically.

WB:     So two officers under his arms. Any officers under his legs?

JH:     I don't recall.

WB:     That's all I have.

MS:     At any time, if Mr. Loggins would have said, "I needed medical care," then y'all would have transported him to the hospital; is that right?

JH:     Absolutely.

MS:     Okay. Did at any time that the police say or tell EMTs Mr. Loggins doesn't need any medical care or insinuate or minimize the situation or his medical state?

JH:     I never heard anybody say anything.

WB:     But because of his demeanor, you couldn't examine him?

JH:     No, sir. We could not with the way that he was thrashing around and kicking. It would have put myself and my partner in danger to try to do anything to put our hands on him to assess him.

WB:     Did Robert ever complain of pain to you, "I'm hurt, help me."

JH:     Not that I recall.

WB:     Anything along those lines?

JH:     No.

MS:     This concludes the interview on December 6, 2018.