# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Justin Avery Gammage, black male, date of birth ▇▇▇▇ Social Security Account number ▇▇▇▇▇▇▇, who resides at ▇▇▇▇▇▇▇▇▇▇▇. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
Mark Steed

**Exhibit I**

RL00028

## RECORDED STATEMENT OF JUSTIN GAMMAGE

### ROBERT DEVON LOGGINS DEATH INVESTIGATION

**MBI CASE NO.:** M19-00000391

**ME NO.:** ME18-1164

**DATE:** 11/29/18

MS: Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, State of Mississippi, interviewing Officer Justin Gammage, Grenada Police Department. The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred on today's date in Grenada, MS.

Mr. Gammage, will you read that Miranda form out loud, please?

JG: "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer for advice before we ask you any questions and have that lawyer present with you during questioning. If you cannot afford a lawyer, one will be appointed to you before answering any questions if you wish. If you decide to answer any questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering questions at any time until you talk to a lawyer." The Waiver of Rights, "I have read the statement of my rights and I understand what my rights are. I'm willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I'm doing. No promises, threats or pressure, coercion of any kind has been used against me."

MS: If you would just sign it right there. Since you read it out loud, just sign it right there.

What's your date of birth?

JG: ▮

MS: And your social number?

JG: ▮

MS: All right. Mr. Gammage, you are a police officer with the Grenada Police Department, and how long have you been an officer with them?

JG: Eighteen years.

MS: And you are certified through minimum standard; is that correct?

JG: I am.

MS: You're actually a supervisor here; is that correct?

JG: I'm a captain over a shift.

MS: And so you were actually on duty when the incident happened with Mr. Loggins; is that correct?

JG: Yes, I was.

MS: If you will, tell me how all that went down, and just start from the time and how did the department become aware that police service was needed at this address.

JG: We received a call that a subject was yelling for help behind 50 Govan Street. I can't recall if they said East or West Govan. They said West Govan. Myself and other officers went to the area of 50 Govan. We could hear him. We made a block – I made a block around the area going from Govan Street to Adams Street to Bledsoe Street back around to Lyon Street and Fairfield back to Govan. The other officers got out on foot on Bledsoe Street. Some got out on foot on Govan Street. When I got to the area of 58, 60 Govan, somewhere right along in there, I think it might have been just a little past 60 Govan, I decided to exit my vehicle, park my truck, exit the vehicle. I could hear someone yelling. There were other officers back to the west of me, so I went back east. I ended up going behind 60 Govan, the house to the east of it. They have a dog. You could hear the dog barking back behind that house. I walked around the side of the house, walked between the cars. There was a fence. I could hear the subject yelling. I could see Officer Tillie's flashlight who was over on the other side. He was on the Bledsoe side of the block saying that he see the subject right there. Went through the gate, made my way down the little walkway back to another gate, went through that gate, made my way through the bushes. I could see a male laying there. He was facing back north, feet was facing south. He had his hands tucked up under his body. One of the other -- Office Tillie said, "Hey, Robert," he called his name. "Robert, come on and get up. Come out of here." By then he gave him the command, "Robert, show me your hands." I don't know if I said his name, but I said, "Show me your hands." I repeated it again. Officer – Sergeant Woodall was behind me. At this time, we moved forward, advanced forward. I asked him again to show me his hands. He did not. He was yelling and screaming. Officer Woodall then tased Mr. Loggins. When he tased Mr. Loggins, after about five seconds, four or five seconds, I told him again, gave him the command again to show me his hands, take his hands out from up under him. By this time, Officer Tillie was coming through. Officer Jones, who was behind Sergeant Woodall came around and was giving him commands. I told him, I said, "Go ahead and go hands on with him." They tried to – they grabbed his arms. He was struggling, keeping his arms tucked up under his body. Officer Woodall then again tased him. Officer Jones, being new, I tried to tell him don't get in between the wires of the taser because he was going to get tased. All right. Officer Woodall tased him again the third time. He seemed like he got up under him. He put his hands farther up under him. They had – was on each side of his body. I think Officer Tillie was going to be on the west side. Officer Jones was on the east side of his body. He's struggling, struggling. I then got down there – well, let me go back. The second – the third time that Sergeant Woodall tased him, Officer Tillie jumped back like most people do when they get tased, like he had caught a little bit of electricity. I then reached down and grabbed his arm because when Tillie jerked back, he rolled over on his side. His arm was exposed. I grabbed his arm, grabbed his arm, had his arm on that side. I told Tillie to

**RL00030**

give me his taser. I got Tillie's taser from him. I removed the cartridge, put the cartridge in my pocket, drive stunned Loggins – it's going to be his right arm which was on the east side of his body. Drive stunned him to the right arm, excuse me, that's when he turned over trying to get away and I was able to grab his arm and put it behind his back. At this time Tillie grabbed the arm that I tased. Jones had that arm, and they were able to get it handcuffed. They handcuffed one arm. I had his other arm, brought it over behind him. They handcuffed that arm. He was trying to move around. He was still yelling and screaming. We were telling him to calm down. We were telling him to stop. He still didn't stop. At this time we got up – I got up off the ground, grabbed my light. My light was under him – it was under Loggins, grabbed my light, stuck it in my pocket. I told him, I said, "Move him out of these bushes up to where the EMTs can check him out because we tased him." It's more of a policy that if you tase someone, if we're going to take them to jail, that they need to be checked out by EMTs. We had already called the EMTs earlier because someone was yelling, "Hey, we need some help."

MS: And that was because you were at middle of the night?

JG: Middle of the morning and we don't know what could have went on. Honestly, I didn't know what had taken place or what had went on. So EMTs were staged back on Govan Street. We called them to come down to the area where we were at. They carried Mr. Loggins out of the bushes to the first fence. They stopped right there at that first fence. He was still kicking and yelling. Move him on up to where EMTs could take a look at him on up in the light because it was dark back there. They moved him on up. I walked to my truck, got me a drink of water, called – I made sure I had all my equipment. I had my phones and some other stuff I had in my pocket, made sure I had everything. I went back. The EMTs were there. He was still yelling and doing all kinds of stuff. I told him that he needed to let the EMTs remove the taser prongs from his back. Sergeant Woodall, I think he reached down to do it and I said, "They have gloves on. Let them do it." I then turned away because I had dropped, I didn't realize it but I had dropped one of my phones in the street so I went back and got it. And they had removed the prongs. I told one of the young officers, I can't remember if it was Jones or Tillie I told – it was Jones. I told him to go ahead and transport him to the jail. We're going to charge him. Tell him that we're going to charge him.

It was Officer Merriman's call because it was his zone. They called him for the call. They told him to go ahead and go up to the jail with him, help him get in the jail because he was still yelling, screaming, kicking. I told them they should go ahead and transport him as quick as they can because we didn't need him to kick out the car window. So he left. He left the area. I asked everyone who was there were they okay. Who was still there, myself, Sergeant Woodall, Corporal Merriman, I asked them were they all right. They said fine. I said, "Well, that's done. Meet me at the station. It's close to quitting time. Come on do the paperwork so we can go."

Got to the station, sat down to do – I had to, as the supervisor with Sergeant Woodall tasing someone, I was supposed to retrieve the cartridge, taser cartridge, and put it into evidence. I start filling out the evidence – the evidence sheet for the taser cartridge, the bag that I was going to put it in when Officer Tillie told me, "Hey, that guy bit me on hand." With me being the supervisor, I had to take him to the hospital. I already know I

had to do the workmen's comp paperwork, so I told him, "Hey, man, let's go ahead and go out to the hospital and get your hand looked at, and we're going to go." Well, I put him in my truck to start to the hospital, they tell me on the radio that Mr. Loggins is unresponsive and the EMTs is headed there. I make a quick stop to drop off donuts to my wife, I turn around, I go back to the jail. When I go inside the jail they're doing CPR on Loggins. He's laying at the booking desk. He's laying at the booking desk and they're doing CPR on him. I asked Tillie – I asked Officer Tillie, I said, "Tillie, was he responsive when you left?" He said, "Yes. He was still kicking and screaming because they said they wasn't going to take him." I said, "Okay." I contacted my supervisor which is Captain Merriman. I walked out of the jail and called him on the phone, came back in the jail. That's when they were, I guess, they were starting the IV I believe in his leg. I looked because it was the first time I've ever seen them screw an IV in someone's leg because they use a little gun almost, so, I looked at that. They were saying they were going to give him some – what's that stuff – Narcan because they asked did one of the other officers that was there in the same room pulled out his Narcan and said, "Hey, give him this." And the EMT said – he was about to reach for it and he said, "No, I have some already out." He told her to give it to him and they gave him the Narcan. They were still doing CPR at this time. I told – there was nothing I could do but be in the way. I told Officer Tillie, "Come on, let's go. Let me take you to the hospital and get your hand looked at." Took him and had his hand looked at, done my workmen's comp paperwork, and that's when they told me they brought Loggins to the hospital and said he had died.

MS: Through the years as being a police officer, have you ever been on calls before where you may have had someone trespassing on somebody else's property or during the night?

JG: Yes.

MS: Okay. And during those calls, has there ever been times when you've had to arrest people for trespassing?

JG: Yes.

MS: Okay. And during the course of police duty, police have various types of equipment, and what types of equipment did you have on you last night?

JG: When we went to this call?

MS: Right.

JG: I'm dressed just like I'm dressed right now. I was going home. I had my gun on, my jacket and a flashlight.

MS: Did you have a taser?

JG: I have a taser. I didn't even have it. I didn't have my gun belt on. I was going home. I had called it a night.

MS: Okay. You were getting ready to end the shift then?

JG: Yes.

RL00032

MS: And during the course of your law enforcement career, there have been times when you have arrested people that were combative; is that correct?

JG: Yes.

MS: And when people are combative, what's the normal police procedures?

JG: Well, here we have a taser procedure, a taser off procedure. We are – over the years, we have lost a lot of officers and man time to officers getting hurt "wrestling" with people, doing things like that. We have – now we try to reason with a subject, de-escalate the situation which we had done in dealing with Loggins before. He has had a very high strung personality. He has resisted before. Like I told him, early in the morning back behind somebody, I don't want to take a chance on someone having a knife or a gun underneath them that we can't see. You know, so he woke up the whole neighborhood. The lady from 42 which is across the street was standing outside saying, "What's wrong with that person?" You know, so he was disturbing the neighborhood. I made up my mind that whoever we found back there, if they weren't hurt, we were going to arrest them.

MS: Okay. And on this particular night, it was – was it Officer Tillie that actually identified Loggins?

JG: Yes. He identified him. He could see him from across the fence area.

MS: So whenever you and Officer Gammage walked into – Officer Woodall actually walked into the little grassy area where the suspect was at, was he standing up or was he laying down?

JG: He was already laying down. He was laying down, his head was facing north.

MS: Okay. And could you see his hands at that time?

JG: No. They were up under him. He had on a brown, I guess, Carhart type jacket.

MS: Did you give him verbal commands?

JG: I did give him verbal commands to, "Let me see your hands?"

MS: Did he comply with that?

JG: He did not.

MS: And then what happened?

JG: After the third time I gave him verbal commands, I kind of motioned around because Officer Woodall was behind me, motioned around, he came around him with the taser and tased him.

MS: And was the taser effective?

JG: No. It was not.

RL00033

MS: So you went to – you gave your verbal commands to no avail. You gave less lethal used to deploy the taser, it was not effective. And so then the next step would be physical control, right?

JG: Correct.

MS: Okay. And so who tried to physically subdue Loggins?

JG: Officer Jones and Officer Tillie. Officer Tillie had made his way across the fence to where we were at by then after he had been tased. By the end of the first five second cycle, Tillie had gone on to try to put hands on.

MS: Okay. So during the course of the on hands, what measures was taken to subdue Loggins?

JG: Both officers tried to grant control of his arms. Loggins, he, I don't know how to describe it, but he tucked his arms under, and they were trying to get his hands from underneath him. I also tried to get his hands from underneath him. I grabbed his arm – we grabbed his arm trying not to – I've seen people get their collarbone broke before or things. They're pulling against them, bones are easy to break. So really we're trying not to hurt him but we needed to get his hands from up under him and see what was going on with him. He was still yelling and screaming and we were able to muscle his hands from up under him. After using the taser as a pain compliance measure, we done that, and he didn't freely give his hands up but he gave his hands up.

MS: Okay. Once y'all saw Loggins' hands, did he have a weapon?

JG: No. He did not have a weapon.

MS: Did he threaten to severely hurt anybody?

JG: He was yelling and screaming and cussing. Honestly, I don't understand what was wrong with him. I don't honestly know what was wrong with him. We really were trying to get his hands back from up under him. Once we got his hands from up under him, he was still cussing. He was still yelling saying, you know, he wasn't – it wasn't like he was talking English, he was just talking, just screaming.

MS: And in the course of your years of experience, have you ever seen people that were like this before?

JG: Yes. I've dealt with people who were on drugs and mind altering substances, and they were doing things similar to what he was doing.

MS: Do you know if Loggins was on any type of illegal drugs?

JG: We didn't find anything on his person, but in my training and experience, he had to have been on some type of mind altering substance because he withstood two younger officers and myself pulling on his arms trying to get his arms from up under him. A person who – in my experience, a person who is not under a substance would have complied after seeing that we had him surrounded and we were going to take him into custody.

RL00034

MS: Were there any officers that, with the equipment that was present on the officers that night, whether it was firearm, a taser, handcuffs, flashlight and portable radio, did any officer strike Loggins with any of those type weapons that night or this morning?

JG: I can't recall anyone striking him. I know I did try to get him to move his hands by striking him in his side when I saw the taser did not work. I did strike him in his side, but it didn't affect him so I didn't do it again.

MS: Now was that with bare hands or was that with a taser?

JG: No. I didn't have the taser at that time. That's why I told Tillie to give me his taser.

MS: So it may have been with a bare hand then?

JG: It was with a bare hand.

MS: Okay. Was he responsive to that?

JG: No.

MS: He still did not comply?

JG: No.

MS: So once y'all got him handcuffed, how did y'all get him to the carport area?

JG: Starting out, Sergeant Woodall and -- I believe Sergeant Woodall and Patrolman Tillie picked him up and started carrying him toward the fence. I was ahead of them. I had already went through the fence. Sergeant Woodall, Jones, Tillie grabbed him up under his arms, he was still flailing and kicking and moving around. They got him out to the carport. They stopped, took a little break, then moved him out to the road area. He was still yelling and screaming and kicking.

MS: And when you say that they took a little break on the way, what was the reason for that? Were they exhausted?

JG: No. He was moving around. They didn't want to drop him. They were trying not to drop him because he still wouldn't walk.

MS: Okay. But he was alert, right? Was he yelling?

JG: He was yelling and screaming still.

MS: Based on your experience, do you feel that Mr. Loggins was violated in any way?

JG: No. I don't believe he was violated in any way. As soon as we were able to take control of him, we stopped. During my years, I felt that just using the amount of force that's needed to take a person into custody is what we need to do. That's what we done.

MS: Okay. Did you see anybody else strike Mr. Loggins

JG: During our time there in the bushes, no.

MS: Okay.

RL00035

JG: We did drive stun him. We drive stunned him. We tried to get his hands from up under him. When Tillie told me he was bit, we did hold him down trying to keep him from biting at him again. We held him down, but no punching, no kicking or anything like that that I can recall.

MS: And you responded to the hospital; is that correct?

JG: Did I respond to the hospital?

MS: I mean, not to the hospital, to the jail whenever he was unresponsive?

JG: Yes, I did. I went to the hospital.

MS: And what did you see when you got there?

JG: When I got there, he was laying on his back at the booking desk, head kind of pointed northwest there in the jail. They were giving him CPR. I can't recall exactly who was giving him CPR, but he was already getting CPR. I believe the EMTs were already there giving him CPR.

MS: And shortly thereafter, the ambulance came; is that right?

JG: The ambulance was already there when I got there.

MS: Okay.

JG: They were already giving him CPR.

MS: And, also, speaking of ambulance, when y'all took him into custody at the residence, wasn't there an ambulance that showed up at the scene?

JG: There was an ambulance we already had staged on Govan Street. We called an ambulance to come down to in front of 60 Govan, and they looked at him. They also removed the taser prongs from his back.

MS: Did they feel that he was okay to be transported to the jail?

JG: They said he was fine to go to the jail.

MS: Okay.

WB: When you were in the back where you and the officers were trying to effect the arrest of Loggins, when you went back there or when you came in contact with Loggins, he was already on the ground?

JG: He was already prone, in a prone position.

WB: Without you having to tell him?

JG: With his arms under his body. Officer Tillie was shining the light from across the fence on him saying, "Hey, there he go." He told me he was right there. I had a flashlight, and I made – I was the first one through the fence, when I made the corner, well, we walked through the bushes and we kind of go northwest. He was right there proned out with his arms under his body.

WB: When you effected the arrest, got his hands behind his back, did he stand up or did you stand him up and he stood on his own two feet?

JG: Once I gathered the item that I had, once I got my flashlight – I had lost it, lost control of it, once I got a flashlight, I got up off the ground, and I said, "Y'all get him up and get him out of here." I walked – I made a bee line out of the fence back through the first fence, out the second fence to my vehicle to do a check of myself. I did a check of myself right there by the road. I walked over to my vehicle, got me some water. By this time I noticed that they wasn't right behind me. I walked back toward the carport where the cars were, and that's when I saw them at the second fence leaving, going under the carport. They were coming toward me. I turned around, walked back to see if the ambulance was coming, walked about midway of the driveway. The ambulance was coming down, shined my light. They came down in front of it. I walked on to where I was going. I got me some water out of my truck.

WB: When the arrest was effected, you walked away and the other officers got him out of the bushes.

JG: Once we got handcuffs on him, I got up, made my way up out of there.

WB: So from the place where he was arrested, did you see Robert Loggins walk out of the bushes? Did you see him on his feet?

JG: He was on his feet. I know they stood him up and tried to escort him out of there. He didn't walk because they was telling him – I could hear them say, "Hey, come on and walk out of here," something to that effect. "Come on out of here." They grabbed him under the arms and escorted him, dragging him – I ain't going to say dragging him out, but kind of escorted him out. He wouldn't walk.

WB: So when the officers got him to the car, got Robert to the car to put him into the car, did anymore struggles happen at the car, at the patrol car to put him in the back?

JG: Not that I can recall. He was still yelling and kicking because I told him -- I was about middle ways of the ambulance where the ambulance was parked at, I told them, "Don't let him kick the window out. Go ahead and take him to the jail. Get him to the jail as fast as you can."

WB: So was Robert Loggins seat belted in the back seat?

JG: I don't believe they seat belted him. They put him in the back seat, and he was still yelling and screaming and they shut the door. He was upright when they drove past me.

WB: He was sitting upright?

JG: I believe he was upright.

WB: You saw a head?

JG: I thought I saw a head. Pretty sure I saw a head, but he wasn't kicking the window. That was my concern. We're down vehicles and explaining why this guy kicked the window out is not what I want to do today.

**RL00037**

WB: So when you went back, and I'm reverting to when the arrest was effected, so you went back to the – when you saw Loggins, you told him to show his hands.

JG: Right.

WB: Now, when the arrest happened, did you walk out of the place where the arrest happened with the same equipment you walked in with, your equipment?

JG: Yes, with my equipment. And I made sure when I got out of the bushes and got around to the concrete, I kind of patted myself down and made sure everything was find. I still had a flashlight that I came with, had a pistol, had a jacket, had three cell phones.

WB: Did you see anybody hit Loggins with a flashlight?

JG: No. I wouldn't do that. I wouldn't allow that to go on.

WB: Did any of the men hit Loggins with a flashlight?

JG: No. We tased him. I know we tased him. I know he got a strike to the ribs because I gave him a strike to the ribs trying to get his hands out from up under him. It is what we've been trained to do to try to get folks' hands from out from under their ribs. He wasn't kicked. He wasn't punched. Now when he bent toward Officer Tillie, I did put my elbow on top of this area of his neck because he was turned sideways, and I did do just like this. That's how I ended up getting across his body grabbing his hand. They grabbed his right hand which is on the east side. Those two grabbed his right. I had his left hand. I got the right hand cuffed, the left hand cuffed, grabbed my flashlight, got up out of the bushes, hopefully, you know, didn't have nothing on me, walked out, dusted myself off and went to the truck.

MS: Do you have anything else, William?

WB: No, sir.

MS: The interview ends at 3:31 p.m.

RL00038