# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Edwin Harold Merriman, white male, date of birth ▮▮▮▮▮▮▮, Social Security Account number ▮▮▮▮▮▮ who resides at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Said interview was regarding the above captioned matter. The above mentioned interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
Mark Steed

**Exhibit N**

RL00088

## RECORDED STATEMENT OF EDWIN MERRIUM

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS: Today's date is November 30, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, interviewing Officer Edwin Harold Merrium of the Grenada Police Department. The interview is taking place at the district attorney's office in Grenada, and the interview is regarding death investigation of Robert Loggins which occurred on 11/29/2018 in Grenada.

Officer Merrium, will you state your date of birth, please?

EM: [redacted].

MS: And, Mr. Merrium, prior to this interview were you provided a Miranda Rights form?

EM: I was.

MS: Did you read that aloud?

EM: I did.

MS: Did you understand it?

EM: Yes, sir.

MS: And you signed it?

EM: Yes.

MS: Mr. Merrium, how are you employed?

EM: By the City of Grenada.

MS: As what?

EM: A corporal with the police department.

MS: Okay. And how long have you been employed there?

EM: Better part of nine years.

MS: And, so, are you a full-time officer?

EM: Yes.

MS: You're certified?

EM: Yes.

MS: Prior to Grenada Police Department, do you have any previous law enforcement experience?

EM: No.

MS: Were you employed as a police officer on 11/29/2018?

EM: Yes.

MS: And on that date, did you have a situation that occurred involving a Robert Loggins?

EM: Yes.

MS: Can you tell me how you became involved in that?

EM: We received a call that some people on Govan Street called and said they could hear somebody screaming for help. I made the area and spoke to several residents in the area and they said could hear it. I could hear it. We just couldn't pinpoint it. And other officers got into the area and myself and Officer Tillie went around to Bledsoe Street which is north, and we could hear it very loud so we both got out of our cars and parked over where the noise was coming from and Tillie climbed up on top of this fence. And I don't know if he could see him, I know he made contact with him, and they were talking. I stayed on the ground on the north side of the fence and then the other officers and Jones and Captain Gammage and Sergeant Woodall approached from Govan on the other side of the fence, and that's when the altercation occurred. They tased him and whatever else happened.

MS: He was identified when he was in the grassy area?

EM: Right. Officer Tillie when he was on top of the fence identified him as Robert Loggins.

MS: And did you actually physically assist in the actual subduing of Loggins?

EM: No.

MS: Did you actually see anybody subduing Loggins?

EM: When I made my way back around to where Loggins was and the other officers, Captain Gammage – they were on the ground. Loggins was on the ground in the bushes or that's what I call them. I don't know what they were. They was thick bushes. And Captain Gammage was on top of him. They had one hand in handcuffs and they was trying to get the other one in handcuffs, and Officer Tillie and Officer Jones were also down on the ground with him, and Sergeant Woodall was standing there with the flashlight just so they could see. They were trying to get that other arm behind him and finally he gave it up.

MS: Okay. Do you know if Loggins had a weapon?

EM: Not that I'm aware of.

MS: Did you hear Loggins threaten anybody?

EM: I don't believe so.

RL00090

MS: Okay. Did you hear the police threaten Loggins?

EM: Like what do you mean threat?

MS: I'm going to kill you or anything like that?

EM: No. No.

MS: Did you hear the police give Loggins verbal commands?

EM: Yes. I heard them tell him, "Let me see your hands. Let me see your hands. Let me see your hands." And then they tased him and then I heard them say, "Get your hands out from under you. Get your hands out from under you."

MS: Did he comply with that?

EM: No, not at all.

MS: So he was resisting arrest; is that right?

EM: Yes.

MS: As a police officer, have you been to calls before in Grenada where people have called about prowlers and trespassers before?

EM: Yes.

MS: And when you responded to these calls, were these people ever arrested before?

EM: What people?

MS: The violators.

EM: Sometimes. Most, yes. Oh, yes.

MS: You've dealt with people that have resisted arrest before, right?

EM: Yes.

MS: All right. And some people will comply verbally and some people won't, right?

EM: True.

MS: Based on your experience as a law enforcement officer, was there an excessive amount of force used to subdue Loggins?

EM: From what I saw, no. Like I said, I was on the other side of the fence during most of the altercation. But, like I said, from what I saw, I'd say no.

MS: Okay. Did you see any officer strike Loggins with a flashlight?

EM: No, sir.

MS: Okay. Did you hear Loggins being struck with an object?

EM: Not that I could tell.

RL00091

MS: Did you ever hear Loggins holler as far as being hit?

EM: He did a lot of hollering. I mean, he was talking outside of his head. So, I mean, he was hollering but I can't specify why he was hollering.

MS: Did he say, "Stop hitting me," or anything of that nature?

EM: No. I didn't hear anything like that. Honestly, I couldn't make out anything he was saying really.

MS: Okay. You stated that you saw Officer Woodall with a flashlight, holding the light while the other officers subdued him?

EM: Yes, sir.

MS: Did you see Officer Woodall strike Loggins with a flashlight?

EM: No, sir.

MS: Did you see Officer Gammage or Officer Tillie strike Loggins with a flashlight?

EM: No, sir.

MS: Did you strike him with a flashlight?

EM: No.

MS: Okay. At the point that he was actually handcuffed, was he being transported out of the field?

EM: Yeah, the officers had to drag him out of the field because he wouldn't walk. He was still somewhat combative, so two or three drug him up to under the carport.

MS: Were you physically involved in that?

EM: No. Not yet.

MS: Okay.

EM: Then the medical folks were called, and they were supposed to check him out, and they didn't check him out.

MS: They did or did not?

EM: Did not. They never put their hands on him. They didn't check no vitals. They said – the male EMT said, "He's good to go. Y'all can carry him on."

MS: Okay.

EM: Because, you know, we have to call EMS when somebody's been tased.

MS: At the time that EMS came up there, what was Loggins doing?

EM: He was laying – we had drug him up there under the carport, and he was laying on the ground.

MS: Okay. Was he breathing?

RL00092

EM: Yes.

MS: Okay. Was he talking or moving around?

EM: Yes. Moving around, still being a little belligerent.

MS: Okay. But the EMTs they said he was okay?

EM: Yes.

MS: Okay. And then he was loaded up in the patrol car, right?

EM: Yes. We drug him to the vehicle.

MS: Okay. And did he get in the vehicle freely?

EM: No. We had to put him in the car.

MS: Okay. And when you got him in the car, was he still breathing when you got him in the car?

EM: Yes.

MS: And who carried him to Grenada County Jail?

EM: Officer Jones.

MS: Okay. Did he go by himself?

EM: He went in his car, and then myself and Officer Tillie went to the jail with him.

MS: Y'all followed him?

EM: Yes.

MS: Did y'all stop along the way?

EM: No.

MS: You went straight from where you arrested him to the jail?

EM: Yes. To the jail. In the sally port.

MS: Okay. When you get to the sally port, then what happened?

EM: The two jailers came out and got him out of the vehicle and drug him into the jail, the booking area. And he was still moving around, still being belligerent.

MS: Okay. Let's clarify something. You're using the word "drug", did y'all actually – you drug him?

EM: We had to physically – like one of us would grab one arm and the other guy would grab the other arm and just have to basically carry him around. He wouldn't walk.

MS: Okay. So did you carry him or did you drag him?

EM: Well, we drug him because his feet were dragging. That's what I call dragging.

MS: Okay.

WB: Was he face down when you were dragging him or was he face up when you were dragging him?

EM: He was like leaning forward.

MS: All right. So, you get him in there; did you sit him in the floor?

EM: The jailers got him in there.

MS: Okay. And what happened after that?

EM: He laid in the floor and kicked around and hollered and screamed, and then Officer – I can't remember which officer it was, either Jones or Tillie tried to take our handcuffs off of him, but that didn't work. So the jail put theirs on, and two or three of them got on top of him inside the jail so we could get our handcuffs off of him, and he was still squirming around acting a fool, cussing, just talking outside of his head. He was still breathing.

MS: Okay.

EM: We got our handcuffs off, and we left. He was still moving around, on the floor kicking and thrashing.

MS: So when he was lying on the floor and the decision was made to take off the Grenada officer's cuffs so that the sheriff's office could put their cuffs on him, everybody kind of migrated around him to kind of restrain him from fighting.

EM: Yes.

MS: At that point in time, did you see anybody kick Mr. Loggins?

EM: No, not that I remember.

MS: Did you see anybody sit on his head or his neck?

EM: I can't remember. I can't say one way or the other if they sat on his head.

MS: Well, did they?

EM: I'm saying I can't remember. I mean, if I could remember I would tell you. You know, I've been known to use my knee to restrain them, but, like I say, I can't say one way or the other if I saw that.

MS: Okay. Did you sit on his head or neck?

EM: No.

MS: Did you sit on his back?

EM: No. I didn't touch him in any way at the jail.

MS: Okay. Do you know if anybody took their foot and rolled him over?

EM: You mean like pushed him like kind of with their foot?

RL00094

MS: Yes.

EM: I don't think so.

MS: Was he struck or abused in any way that you could see at the jail?

EM: No. No.

MS: When he was at the jail, was he bleeding from the mouth?

EM: I didn't see. Not that I saw.

MS: Okay.

EM: I don't remember seeing anybody blood on the floor.

MS: Okay. All right. Did you notice if he was bleeding from the mouth when y'all were at the scene?

EM: I don't remember, but we were out in that backyard. It was dark.

MS: William, do you have anything?

WB: Have you heard any of the other officers talking about what happened back there before you got back there?

EM: No.

WB: After it happened?

EM: Right. No.

WB: When – I'm talking about the backyard, you know, where the arrest was made.

EM: Right.

WB: Did you see Loggins on his own power stand up?

EM: Never.

WB: Walk out?

EM: Walk out from the bushes?

WB: Yes, sir, from back there, you know, where the arrest was made?

EM: Yes.

WB: Back around to the ambulance and patrol cars?

EM: No.

WB: He was carried out?

EM: Yes.

WB So when you get to the ambulance, the ambulance area, you know where they looked at him?

RL00095

EM: Well, they carried him from the yard through like a little fence or whatever you want to call it, a little gate, and up under the carport where there was a vehicle parked under the carport. That's where the medical folks came up from the street to the carport.

WB: What was the condition of Robert Loggins' pants when he was carried out?

EM: They were up. When he was laying down there under the carport, they was around his ankles.

WB: Is that when you first saw him?

EM: No. I saw him back there in the backyard.

WB: Okay. Back there in the backyard, what was the condition of his pants?

EM: They were down around probably below his waist. You could see his underwear.

WB: And you say when he was dragged out of the back, you had him under the elbows and he was face down?

EM: Right.

WB: Leaned forward?

EM: Right.

WB: But his maybe knees and feet were dragging?

EM: Yes. His feet were dragging for sure.

WB: When the EMTs looked at him, how much of a look at him did they do?

EM: Not much. I mean, they didn't –

WB: Did they check his temperature?

EM: They didn't check nothing. No vitals. No nothing.

WB: So when the EMTs gave the okay that he's okay to take to jail, what did Loggins do to get into the patrol car?

EM: We had to physically put him in the car. He wasn't getting in the car.

WB: So was he sitting in the patrol car like a regular person does?

EM: Well, we laid him in there and then before we shut the door, we sat him up.

WB: On his back or was he on his face?

EM: He was on his back. And we got him sitting up in the seat before we shut the door and drove off with him.

WB: He was sitting up in the seat before you drove off?

EM: Yes. Yes.

WB: And you followed Officer Jones to the jail?

EM: I mean, I didn't follow him, but we all three went to the jail, straight from the call to the jail. I think Jones, I think his car was facing one way so I think he went towards 51 to the jail. I went down like Main Street.

WB: Did you by any chance talk to Sergeant Clark that works at the jail?

EM: I didn't really talk to her.

WB: What did she say to you?

EM: She said she wasn't taking him.

WB: Then what happened?

EM: She said she wasn't taking him, and she asked me had he – I told her that he had been checked out by the EMS, and they said that he was okay. And when she said she wasn't taking him in his condition, but then she said she wanted to give him a drug test. So I guess they were going to give him a drug test in there, and the next thing I know she said they were going to take him back around and put him in a cell. She wasn't going to leave him up front. She was going to put him in a cell, and then I didn't have my cell phone on me, it was in the car. I told Officer Jones, I asked him did he have Sergeant Woodall's number to call the sergeant to tell him that the jail ain't going to take him. And he called Sergeant Woodall. I don't know what was said between the two. I didn't get a chance to find out. The next thing I know, you know, they got the cuffs off of him. She was in there trying to find him a cell around back so we left, and he was still breathing.

WB: That's the part I'm a bit confused on. Sergeant Clark, the one in charge of accepting prisoners –

EM: Right. I know what you're talking about.

WB: -- said she was not going to accept him, but she was going around to put him in a cell?

EM: Yeah. I mean –

WB: Did she ever say she was going to accept him?

EM: Well, my thing was we got him inside the jail, you know, he's their responsibility. I told her EMS wasn't – they said he was fine. Like I said, Jones called Woodall and then after that – after they got the cuffs off of him, Sergeant Williamson, Cassidy Williamson got on the radio and told all units to come to the station. So we was just doing what we were told. Like I said, she said – one minute she said, "I'm not taking him." The next minute she's telling them to get a drug test for him, and then the next minute she's saying, "We're going to take him around back and put him in a cell. He's not staying up front." I mean, it's like she was changing. Every 10 seconds something different was coming out of her mouth. So we left. Me being the corporal, I told them, I said, "Let's go." I said, "If they don't want to take him, that's going to be on somebody higher than me to make that decision to go back over there and whatever."

WB: So at that point you left?

EM: Yes.

WB: What happened then?

EM: We left. We went to the station. I don't know how long, 20 minutes, 30 minutes maybe. Dispatch called and said the jail had called for another ambulance and had said that Loggins was unresponsive. And I didn't go back over there immediately. I don't know who all did. I mean, the next shift, after shift change, the other shift had come on, day shift had come on, and some of their officers went over there. I know Cassidy went over there. I think Ricky went over there. Justin went back over there. I don't know who all went back over there.

WB: Now after you got back to the station, it was quitting time.

EM: Right. It wasn't for me. I don't get off till 8:00.

WB: You don't get off till 8:00?

EM: Yes, sir. I still had two more hours.

WB: Oh, yeah, because the shifts are staggered now?

EM: Yes.

WB: Do the police department still, like from one shift to the next, inspect the patrol cars before they take control of the patrol car from one shift to the next?

EM: I mean –

WB: It's not something done every day?

EM: When you come on, you're expected to inspect your own vehicle.

WB: To make sure no damage is done?

EM: Right.

WB: Do they have a log of those inspections?

EM: Uh-uh.

WB: Used to have a paper log.

EM: I ain't never seen a log of that.

WB: We used to have a paper log.

EM: Okay. I believe you.

WB: You know, just in case the glass sometimes gets broke.

EM: I know the oncoming officer is responsible like to pull up the back seat and make sure there ain't nothing under there, and just, you know, inspect it on their own. If there's something or if they find something, they're supposed to tell the supervisor. But there's no log anymore.

MS: Based on what you saw that night at the scene and at the jail, do you feel that Mr. Loggins was mistreated in any way?

EM: Not that I saw.

MS: Okay. Do you have any more questions?

WB: No, sir.

MS: Interview ends at 11:32 a.m.

RL00099