IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

RIKA JONES, As Administratrix of the Estate of
ROBERT LOGGINS; RIKA JONES, Individually
and on Behalf of the Wrongful Death Beneficiaries
of ROBERT LOGGINS, Deceased; and RIKA JONES,
As Mother and Next Friend of R.D.L, a Minor.                    PLAINTIFFS

VERSUS                                               No. 4:20cv220-SA-JMV

JUSTIN GAMMAGE, REGGIE WOODALL,
EDWIN MERRIMAN, MICHAEL JONES, and
ALBERT DEANE TILLEY, In Their Individual Capacities;
CITY OF GRENADA; MOBILE MEDIC AMBULANCE
SERVICE, INC. D/B/A AMR and AMERICAN MEDICAL
RESPONSE; JOHN WATSON; JENNIFER HOWELL;
AND CORRECTIONS MANAGEMENT SERVICES, INC.                       DEFENDANTS

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE MOTION FOR SUMMARY
JUDGMENT OF ALBERT DEAN**

---

COME NOW THE PLAINTIFFS, by and through counsel of record, and file this, their

memorandum in opposition to the motion for summary judgment of Defendant Albert Deane

Tilley. [Docket #49-50]. Plaintiffs provide as follows:

## I. INTRODUCTION

This matter begins with an unarmed man screaming for help in the early morning hours of

November 29, 2018, and ends a short time later with his death under the body weight of Albert

Dean Tilley, who knelt on his neck and sat on his head for more than three minutes, suffocating

this handcuffed man to death on the jail room floor after a jailer implored Defendant Tilley to take

him to the hospital. Defendant Tilley misrepresented these events to MBI investigators. At the

scene of his arrest, officers tased the decedent, Robert Loggins, no less than nine times, struck him

with a flashlight up to nine times, tussled with him in a state of medical distress, and then

Defendant Tilley also misrepresented these events to investigators. Defendant Tilley now

maintains that he is due protection under the doctrine of qualified immunity. He is not. The motion is due to be denied.

## II. FACTS

In the early morning hours of November 29, 2018, a resident of 50 West Govan Street called 911 to report the presence of someone in her back yard screaming for help. The caller stated that, "Somebody's in the back of my house calling for help…. Please hurry. Send someone." [Exhibit A, 911 Call]. The responding officers heard the call, and understood that they were responding to a call in which someone had been screaming for help. [Ex. I, Gammage Statement, RL30; Ex. K, Tilley Statement, RL54; Ex. L, Jones Statement, RL70; Ex. N, Merriman Interview, RL90; Ex. O Edna Clark Statement, RL126].

Defendant Albert Deane Tilley, Defendant Michael Jones, and Defendant Corporal Edwin Merriman were the first officers on the scene. These officers originally had difficulty locating the source of the screaming due to the darkness, fenced-in back yards, and ground cover. Ultimately the defendant officers located Robert Loggins lying face down on the ground, with his hands tucked underneath him in tall, bristly vegetation. Officer Tilly identified himself as the Grenada Police Department and stated that, "We're here to make sure you're ok." [Ex. B, Merriman Video at 00:35]. Meanwhile, Defendant Sergeant Reggie Woodall, believing the noise was coming from Bledsoe Street, tried to find his fellow officers and the location of the person hollering for help. A neighbor believed to be the initial 911 caller and visibly unafraid of Robert Loggins, the person she witnessed screaming for help, assisted Defendant Woodall in the search. [Ex. C, Woodall Video at 5:15].

As Defendant Woodall continued looking for the source of the hollering, Defendant Merriman radioed Defendant Woodall and stated, "We're speaking with him, but they're on the other side of this fence. So I guess they're going to be on Govan [Street]." [Ex. C, Woodall Video at 7:42; Ex. B, Merriman Video at 1:11]. A minute later, Defendant Tilley radioed that the person

shouting had been identified as Robert Loggins. [Ex. B, Merriman Video at 2:10]. A defendant officer then radioed to the other Defendants, "He's on something." It is undisputed the defendants knew from Mr. Loggins' erratic and incoherent behavior that he must have been on drugs of some kind. [Ex. B, Merriman Video at 2:16; Ex. I, Gammage Statement, RL33; Ex. K, Tilley Statement, RL59; Ex. L, Jones Statement, RL81].

As Mr. Loggins hollered and questioned whether the defendants were going to kill him, Defendant Tilley told Mr. Loggins, "Nobody's gonna kill you Mr. Loggins. I need you to stick your hands straight up where I can see em', because I can't see em' right now…. We're here to help you. Nobody's gonna kill you Mr. Loggins. We're here to help." [Ex. B, Merriman Video at 3:32]. It is thus patent, particularly drawing all inferences in Plaintiff's favor, that from the outset until his untimely death, no officer throughout this episode suspected that Mr. Loggins posed a threat to their safety. Indeed, even to this day, no officer alleges that Mr. Loggins posed a threat. In fact, at no point during the entire morning did he show or possess a dangerous weapon or threaten anyone. [Ex. J, Woodall Statement, RL45; Ex. K, Tilley Statement, RL 55-56; Ex. L, Jones Statement, RL72; Ex. N, Merriman Statement, RL90; Ex. P Jerome Johnson Statement, RL131].

All of the defendants described Mr. Loggins' behavior on the scene as, speaking in tongues, quoting scripture, screaming, not making sense, and, "it wasn't like he was speaking English." [Ex. J, Woodall Statement, RL 42; Ex. K, Tilley Statement, RL 55; Ex. L, Jones Statement, RL 73; Ex. I, Ex. I, Gammage Statement at, RL 34]. Not surprisingly then, notably absent from any of the communications, including several minutes between initial contact and the arrival of Defendant Woodall, is any suggestion that this drug-addled and incoherent individual was either armed or dangerous.

Within seconds of arriving where Mr. Loggins lay face down on the ground, two of the defendant officers, Gammage and Wooddall, discharged their TASER weapons against an

unarmed, incoherent, and passively resisting Mr. Loggins. [Ex, C, Woodall Video at 11:45]. Defendant Tilley directly participated in this excessive force as will be shown below.

Defendant Woodall approached Robert Loggins' location as Defendant Gammage can be heard to tell an incoherent Mr. Loggins to remove his hands from underneath him. Mr. Loggins grunted incoherently in response. [Ex. C, Woodall Video at 11:27]. Unconcerned by Mr. Loggins' incoherence and lack of a weapon, Defendant Woodall stepped around Defendant Gammage and immediately discharged his TASER, which caused Mr. Loggins to grunt loudly.[1] As Robert Loggins grunted incoherently in pain and recited scriptural and religious phrases, the defendant officers gratuitously applied TASER blows to him several times. Defendants Gammage, Jones, and others continued to shout verbal commands to the incoherent Mr. Loggins *while they were discharging electricity into him*. The application of the electric shock from the TASER resumed for five more seconds, and caused Mr. Loggins to audibly grunt again. [Ex. C, Woodall Video at 12:23]. While Defendant Tilley and Jones tried to grab Mr. Loggins' arms, they continued to tase him. [Ex. C, Woodall Video, 12:30]. During this use of the TASER against the passively resisting Mr. Loggins, it appeared Defendants Jones and Tilley were also shocked, as Jones screamed, "Oh shit." [Ex. L, Michael Jones Statement, RL 72; Ex. N, Merriman Interview, RL 33; Ex. C, Woodall Video at 12:38]. Hearing this, Defendant Gammage asked, "What did he do?" Defendant Tilley replied "got me," and another officer said, "bit you." [Ex. B, Merriman Video at 4:51; Ex. C, Woodall Video, *Id*.].[2] Jones later admitted when offering his statement regarding the death of Mr.

---

[1] The tasing can be detected in the bodycam videos by the sound of a repetitive crackling noise. The officers directed two types of TASER discharges into Mr. Loggins. The first type is where two prongs are shot into Mr. Loggins' body. The second type is "drive-stun" mode, where a handheld TASER is pressed against Mr. Loggins' body and discharged into Mr. Loggins' right side.

[2] This appears to be the moment in which Defendant Tilley alleges that Mr. Loggins bit him on the hand. *See* Gammage Statement, RL00030 ("The third time that Sergeant Woodall tased him, Officer Tilley jumped back like most people do when they get tased, like he had caught a little bit of electricity."). However, the video shows Defendant Tilley's hands are not near Mr. Loggins' head, and it appears that he was shocked by the TASER and not bitten. Tilley's own testimony is more consistent with tasing than biting: "I went down to go reach under him to grab his arms and he bit down on my hand, and I yanked back, and I stepped back for a few minutes *because I was stunned. I didn't know what it was*…." [Ex. K, Tilley Statement, RL57][Emphasis Added].

Loggins that he had been jolted with the electricity from the TASER, which hurt and bruised him, while he was engaged in attempting to force Mr. Loggins' arms and hands from underneath him. [Ex. L, Jones Statement, RL 72, 76].

During a short break from the use of the TASER to force this passively resistant and incoherent Mr. Loggins to move his arms from underneath himself, Defendant Gammage asked for Defendant Tilley's TASER. Defendant Tilley unlawfully obliged. Mr. Loggins said, "My soul belong to Jesus Christ. He's my savior. My protector." [Ex. C, Woodall Video 12:57]. Defendant Gammage responded, "Your ass belongs to us now. Take your hands from up under you." [*Id*. at 13:01]. Defendant Gammage then immediately discharged Defendant Tilley's TASER on drive-stun mode several times for prolonged durations. [Ex. C, Woodall Body Cam Video at 13:22]. Sergeant Woodall stated that the taser originally worked to get his hands from underneath him, but by the time they went to handcuff him, the five second taser had expired, and Robert put his hands back underneath his body. He also stated that subsequent tasings were ineffective in gaining compliance but caused Mr. Loggins audible and visible pain. [Ex. J, Wooddall Statement, at RL 41]. During this use of force against Mr. Loggins, the defendant officers continued to shout unsuccessful orders to remove his hands from under his body, although Mr. Loggins was visibly suffering from an altered mental state and was totally incoherent. *Id*.

Failing to force the terrified Mr. Loggins (he feared the defendant officers meant to kill him) to move his hands from underneath his body, the defendant officers intently discussed doing it "the old fashioned way." A defendant officer asked for a baton, and stated, "He [Mr. Loggins] sho' sho' gonna hate it." [Ex. C, Woodall Video at 13:40].

The "old fashioned way" started with Defendant Woodall beating Mr. Loggins' arm and elbow with his flashlight approximately nine times, and also struck him in the chest. [Ex. C, Woodall Video at 15:08]. Defendant Woodall used the TASER on drive-stun mode against Mr. Loggins again. [Ex. C, Woodall Video at 15:33]. The defendant officers again discussed with one

another their belief that Mr. Loggins was "on something" that might be meth. [Ex. C, Woodall Video at 15:41; Ex. B, Merriman Video at 9:10]. After Mr. Loggins' death, the defendant officers described Mr. Loggins as being very strong due to their belief he was on a mind-altering substance. [Ex. L, Jones Statement RL72, Ex. I, Gammage Statement at RL33]. Officers tased him on his arm, buttocks, and arms. [Ex. C, Woodall Video at 18:59].

In sum, it appears Defendant Woodall and Defendant Gammage struck Mr. Loggins with the TASER a minimum of nine times and Defendant Woodall struck Mr. Loggins nine times with an impact weapon. [Ex. V, Taser Report]. The taser printouts indicate that one taser was discharged 9 times for a duration of five seconds each, and that the other taser was deployed twice for a duration of 5 seconds each on November 29, 2018, which suggests a total of eleven taser strikes. [Ex. Z, Tilley Taser Report].

The TASERs used by the defendant officers in this action carried the following warning:

> "Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death."

[Exhibit Y, Taser Manufacturer Warnings]. It cannot be disputed based on the video and the defendant officers' statements that they knew Mr. Loggins exhibited clear signs of excited delirium, profound agitation, severe exhaustion, drug intoxication and over-exertion from physical struggle. Despite this knowledge, Defendant Tilley provided his taser and participated in subjecting a passively resisting Mr. Loggins to excessive and objectively unreasonable force. Unsurprisingly then, Mr. Loggins never stood up "on his own power" that night. [Ex. N, Merriman Statement, RL95; Ex. L, Jones Statement, RL73].

Of note and relevance to this Court's inquiry, when questioned about their apprehension of

and use of physical force against Mr. Loggins at the scene of his arrest, the defendant officers, including Defendant Tilley, exhibited obvious mendacity when answering questions posed to them by an investigator with the Mississippi Bureau of Investigation who was clearly sympathetic to them.[3]  [Ex. I, Gammage Statement at RL 35, RL 38; Ex. J, Woodall Statement, RL50-51l; Ex. K, Tilley Statement, RL 58, 63-65; Ex. L, Jones Statement, RL 74-75; Ex. N, Merriman Statement, RL 0091].

Defendant Gammage stated that none of the officers used a flashlight to strike Mr. Loggins, because he "wouldn't do that. I wouldn't allow that to go on."  [Ex. I, Gammage Statement at RL 38].  We know from video evidence that this statement is false.  Defendant Gammage also admitted that he struck Mr. Loggins' ribs and put his elbow on Mr. Loggins' neck but stopped striking him because it "it didn't affect him."  [Ex. I, Gammage Statement, RL 33, 35, 38]. Despite Defendant Gammage discontinuing physical blows because they were ineffective, Defendant Gammage then used Defendant Tilley's TASER to gratuitously tase Robert Loggins after he witnessed Defendant Woodall strike Mr. Loggins with a flashlight approximately seven to nine times. [*Id*.].

In addition to his excessive force against Robert Loggins, Defendant Woodall perpetrated deceit to the MBI investigators.  Defendant Woodall, who struck the decedent nine times with a flashlight, told the MBI investigator that "I don't think nobody hit him with no flashlight," and that they no longer used "impact weapons."  [Ex. J, Woodall Statement, RL 45-46]. When asked again whether he struck him with a flashlight, he stated, "No, I didn't. I don't think I did… but as far as hitting him with it, no, nobody hit him." [*Id*. at RL 51].  This statement is provably false with video evidence.

For his part, Defendant Tilley as much as admitted a deliberate effort to mislead

---

[3]In questioning Jones regarding the use of force against Mr. Loggins while effectuating his initial arrest, the investigator stated, "I'm on your side Michael [Jones].  I'm for the police."  Despite this MBI investigator receiving multiple material misstatements of fact from every defendant officer he interviewed regarding the circumstances of Mr. Loggins' death, the District Attorney's Office has not charged these officers for their untruthful statements (nor, for that matter, the deadly assault of Robert Loggins).

investigators. However, only under threat of prosecution for giving a false statement did he relent from saying that no one struck Mr. Loggins. [Ex. K, Tilley Statement at RL 65]. Defendant Tilley admitted that he misled the investigator to keep Defendant Woodall from getting into trouble. [*Id.*] Even then, however, Defendant Tilley affirmatively misrepresented the number of strikes (nine) that occurred directly in front of his eyes, as is demonstrated by video. [Ex. C, Woodall Video at 15:08]. He stated, "I'm positive I only heard three." [Ex. K, Tilley Statement at RL 66].

Defendant Jones, despite receiving the same warning about hindering an investigation, did not relent in falsely claiming that nobody struck Mr. Loggins with a flashlight or other weapon. [Ex. L, Jones Statement at 72, 74-76].

After the defendant officers dragged the incoherent and assaulted Mr. Loggins to the carport of a nearby house, first-responders employed by Defendant Mobile Medic Ambulance Service, Inc. (hereinafter "AMR"), Defendants John Watson and Jennifer Howell, made contact with Mr. Loggins. Despite Defendants Watson and Howell failing to assess, examine, or treat Mr. Loggins, the Defendant Watson told the defendant officers, "He looks fine to me."  In response, Defendant Woodall stated out loud that Mr. Loggins is on something. [Ex. C, Woodall Video at 19:07].

The Defendant officers, including Tilley, knew the paramedics did not examine Mr. Loggins properly. Defendant Merriman described it as, "Not much. They didn't check nothing. No vitals. No nothing." [Ex. N, Merriman Statement  RL 96]. Defendant Tilley stated, "they looked at him…. and they asked him how he felt, and he just gave an off the wall thing."[4]  [Exhibit K, Tilley Statement at RL59]. Defendant Jones stated that "They came and stood and looked over him. They didn't, you know, open his mouth or nothing like that. They came and stood and looked over him and said, 'he's fine,' and that was it." [Ex. L, Jones Statement, RL 79].

---

[4] The Defendants AMR, Watson, and Howell admitted at ¶ 43 of their Answer & Affirmative Defenses to the Third Amended Complaint that no history or vital signs were taken from Mr. Loggins at the scene of his arrest.

AMR's medical records for Mr. Loggins prepared by the Defendant Watson and the Defendant Howell state: "NO CONTACT MADE WITH PATIENT." [Ex. W, AMR Records, RL 210].[5]

After the AMR defendants failed to assess Mr. Loggins (despite their knowledge of his mental status and TASER strikes) in the carport, the defendant officers dragged Mr. Loggins to the driveway where he lay on the ground and continued to grunt incoherently. Defendants Jones and Tilley then dragged Mr. Loggins into Jones' patrol car for transport to the Grenada County Jail. Mr. Loggins began shouting incoherently again and struggled to keep from being put in the patrol car, but was ultimately forced into the back seat. Officer Tilley applied a knee strike to get the decedent in the car. [Ex. J, Woodall Statement at RL47, Ex. D, Jones Body Cam]. Defendant Woodall told Jones to "try to set him up." [Ex. D, Jones Body Cam, Ex. C, Woodall Body Cam at 23:32]. An exhausted Defendant Jones screamed, "Sit your punkass up! Tired of fucking with you." [*Id*.]. Defendant Woodall told Defendant Jones, "Drive fast and move hard." Defendant Merriman can be heard to say, "Yep." [Ex. D, Jones Body Cam at 00:12, Ex. C, Woodall Body Cam at 23:43].

Prior to Defendant Jones driving off with Mr. Loggins, Defendant Howell concernedly rushed over to him and asked, "Is this the same dude that was out of the hospital not too long ago cranked out on this mess?" Jones, responded, "No. Different Guy." The Defendant Howell then stated, "Different guy? Acting the same. On the same stuff. Dude was on Flakka."[6] [Ex. D, Jones Body Cam, Ex. C, Woodall Body Cam at 23:41]. Jones then transported the subdued and silent Mr. Loggins to the jail, only part of which is captured on Defendant Jones' body cam. [Ex. D,

---

[5] The same reports contradict the earlier claim that no contact was made with Mr. Loggins by noting that a handcuffed Mr. Loggins was fighting with the police and could not be assessed. [*Id.*] As already noted, the statement that Mr. Loggins could not be assessed at the scene of his arrest by the Defendant Watson is contradicted by the defendant officers and the fact that Defendant Watson removed the TASER prongs from Mr. Loggins' body at the scene.
[6] Defendant Jones untruthfully stated to investigators that Ms. Howell, at the end of this exchange, said "Well, he's fine." [Michael Ex. L, Jones Statement RL 78]. The video evidence conclusively disproves this contention.

Jones Body Cam; Ex. C, Woodall Body Cam at 23:41]. Later, Defendant Woodall stated, "when he got that first juice, it was over with." Defendant Gammage replied, "I told em' to grab his arm," and then seems to mention something about paperwork. [Ex. C, Woodall Body Cam at 24:50]. He concluded his involvement by radioing the other defendants, "Good way to end the morning…. Y'all need to step up… [inaudible] at the jail." [Ex. C, Woodall Body Cam at 24:50].

Upon arriving at the sally-port of the Grenada County Jail, Jones and two jailers carried a limp Mr. Loggins "like a sack of potatoes" into the booking area of the jail and placed him face-down on the floor in front of the booking desk. [Ex. E, Sally Port Jail Video, Ex. O, Clark Statement at RL127]. Upon arriving at the jail after his conversation with Defendant Howell about Mr. Loggins' drug ingestion, Defendant Jones entertained doubts about Mr. Loggins' medical condition. [Ex. L, Jones Statement at RL81]. Jones stated, "When I was getting Loggins out of the car, he was, you know, just started laying down, you know, grunting and moaning. I'm like this guy, something ain't right, you know what I'm saying? I'm like this guy – it's got to be more than, you know, flakka or something. I mean, either he done swallowed something or something." [*Id.*].

Jailer Frank Sanders described Mr. Loggins as having lacerations on his head and knees, blood coming out of his mouth, and breathing heavily at some point after he arrived to the booking area. [Sanders Statement at RL85]. Jailer Jerome Johnson described Mr. Loggins as "shaking and wiggling" when he brought him in the jail. [Ex. P, Johnson Statement at RL 131]. Jailer Raphael Harvey also helped bring Mr. Loggins into the jail and described him as bleeding from his head, mouth, and knees. [Ex. Q, Harvey Statement RL120]. Supervising Sergeant Clark told investigators that Mr. Loggins had busted teeth and was bleeding from his mouth. [Ex. Q, Clark Statement, RL 127; Ex. R Clark Report]. According to Sergeant Clark and based on previous encounters, Mr. Loggins had beautiful teeth and was proud of them. [Ex. Q, Clark Statement RL127]. According to Jailer Harvey, Sergeant Clark told the officers to take Robert Loggins to the

hospital before the officers tried to remove the handcuffs. [Ex. Q, Harvey Statement, RL122].

They immediately placed Mr. Loggins prone on the floor of the booking area with his hands cuffed behind his back. This prone position, particularly in individuals subjected to physical struggles during their arrest, has been known by law enforcement officials for decades to create an inordinate risk of death from positional asphyxia, and officers are instructed to immediately place the arrestee in a seated position to allow them to breathe. [Ex., AA, Department of Justice National Law Enforcement Technology Center "Positional Asphyxia - Sudden Death June 1995; Ex. BB, Mississippi Law Enforcement Officer Training Academy Training Materials].[7] As already noted, signs of Mr. Loggins' obvious medical distress, bleeding from head, mouth, and knees, broken teeth, labored breathing, physical injuries, drug reaction, and altered mental status, were visible to every defendant standing in the booking area.

Jail staff described Mr. Loggins inside the jail as follows, "He never said anything threatening even when he was laid in the floor talking, he never threatened nobody. He was just talking, you know, off the wall stuff…. He was quoting Bible passages. I don't know which ones." [Ex. P, Jerome Johnson Statement, RL131]. "He was just rolling back and forth, back and forth, back and forth and according to what the officers said to me, when they found him he was saying, 'Somebody help me, please. Somebody, help me, please.'" [Ex. O, Clark Statement, RL126]. Sergeant Clark noted that, "[W]e've had problems with him in the past but he didn't seem like that combative to me because he was just going from side to side, side to side. He wasn't screaming. He wasn't hollering like he used to do. I mean, he wasn't doing anything. He was flouncing around, just going from back to side to side like he was trying to roll over." [Ex. O, Clark Statement, RL

---

[7] This document was received through a public records request. Defendant Tilley would have received this training for completion of his certificate as required by Mississippi law. *See* § 45-5-1, *et seq.*

[8] *See Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021)("St. Louis instructs its officers that pressing down on the back of a prone subject can cause suffocation. The evidentiary record also includes well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk."

127]. Sergeant Clark also observed that Mr. Loggins was "rolling from side to side, flopping and trying to – *to me he was trying to gasp for breath because he couldn't breathe*." [Ex. O, Clark Statement, RL126].

Upon seeing Mr. Loggins' appearance, Sergeant Clark told the defendant officers that she would not accept Mr. Loggins at the jail and that he needed to be transported to the hospital. [Ex. O, Clark Statement, RL 126]. The Defendant told Sergeant Clark that Mr. Loggins had been cleared despite knowing the emergency medical personnel never actually assessed or examined Mr. Loggins. [Ex. O, Clark Statement, RL126]. During this discussion, a visibly injured Mr. Loggins struggled to breathe and rocked on his stomach from side to side in an unsuccessful and increasingly desperate effort to turn over and breathe. [*Id*.]. Sergeant Clark again told the defendant officers that she could not accept the injured Mr. Loggins at the jail and that he needed to be transported to the hospital. [Ex. F, Jail Video at 6:01 a.m.; Ex. O, Edna Clark Statement, RL126; Ex. Q, Raphael Harvey Statement, RL 120, 122; Ex. X, Jail Log, RL258]. Jailer Harvey recalled Sergeant Clark telling the defendant officers immediately that she could not accept him at the jail. [Ex. Q, Harvey Statement, RL122]. Jailer Sanders observed Mr. Loggins with his eyes rolled to the top of his head and breathing abnormally and urged Sergeant Clark not to accept him at the jail in his condition. [Ex. M, Sanders Statement, RL85].

The defendant officers collectively ignored the obvious signs of Mr. Loggins' medical distress at the jail. Defendants Jones, Merriman, and Tilley also defied Sergeant Clark's admonitions to take Robert Loggins to a hospital. At 6:01 a.m. on the video, and as well at 6:03 a.m. according to jail logs, Sergeant Edna Clark, the jail supervisor, tells the officers that she would not accept Robert Loggins and that he needed to be taken to the hospital. [Ex. F, Jail Video at 6:01 a.m.; Ex. O, Edna Clark Statement, RL 126; Ex. Q, Raphael Harvey Interview, RL 120, 122l Ex. X, Jail Log RL 258]. Michael Jones, for his part, having already acknowledged Mr Loggins' compromised condition, stated that "she was griping and complaining something about they

couldn't keep him because he was under the influence of drugs or something, and, you know, steadily telling me that I was going to have to take him back with me…." [Ex. L, Jones Statement, RL79]. Sergeant Clark stated to investigators that "one of the other young officers waived me off like he was dismissing me. That young man's name was Michael Jones." [Ex. O, Clark Statement RL126; Ex. R, Edna Clark Report]. At 6:03:31, Michael Jones can be seen in the video waiving off Sergeant Clark's admonitions. Officer Tilley, too, stated that "She did not want to accept him. She wanted him to get medically checked out and that she was going to call the ambulance over there to get him checked out." [Ex. K, Tilley Statement at RL62]. These officers had subjective awareness of Robert Loggins' distress.

At this point, a subdued, physically injured and bleeding, drug-addled, mentally incoherent, Mr. Loggins continued to try to roll over to breathe. Defendant Tilley whose cuffs restrained the prone and struggling Mr. Loggins behind his back touched the handcuffs and Mr. Loggins attempted to roll over again. [Ex. F, Jail Video at 6:02:50].

Almost two minutes later, while Mr. Loggins struggled to breathe, Defendant Tilley lodged his knee on the prone and subdued Mr. Loggins' neck as Jailer Sanders applied leg irons to shackle Mr. Loggins' ankles and weigh them down with his body weight. [Ex. F, Jail Video at 6:04:33; Ex. M, Sanders Statement, RL86; Ex. P, Johnson Statement, RL132; Ex. T, Johnson Report, RL192]. Jailer Sanders stated that "One individual was on top of him. I think two individuals were on top of him." [Ex. M, Sanders Statement, RL 85].  Two witnesses gave statements saying that Defendant Tilley put his knee on Mr. Loggins' neck.  [Ex. O Edna Clark Statement RL124; Ex. Q, Harvey Statement at RL120-21]. A total of at least four officers applied weight to Mr. Loggins by holding down his legs, arms, and back, which further restricted and compromised Mr. Loggins' breathing.  [Ex. F, Jail Video; H, Arnall Declaration].

Sergeant Clark described this needless use of force against Mr. Loggins as follows:

> And my officers got on each side of him and was holding his

13

> shoulders because Mr. Loggins was, you know… *trying to gasp for breath because he couldn't breathe*. At that point, Mr. Dean Tilley, the officer, *put his knee right here on the back of Mr. Loggins' head*. He was on his stomach and he put his knee right here, but the position that Mr. Tilley was in, he couldn't get the restraints off. *So he actually stood up, turned around and sat down on his head to take the restraints off*.

[Ex. O, Clark Statement, RL126][Emphasis Added]. Defendant Tilley can be observed clearly on the video to shift from kneeling on Mr. Loggins' neck to sitting on Mr. Loggins' head facing backwards to remove his handcuffs. [Ex. F, Jail Video at 06:05:36.; Ex. G, Zoomed in Jail Video].

Jailer Raphael Harvey explained the excessive use of force against Mr. Loggins this way:

> Then some little short – one of them on the Grenada Police Department sat right here on his shoulders. He sat right here on his shoulders and like put his legs right here behind his *shoulders and sat right here on the back of his neck*…. At that point in time, he was already detained so it wasn't no sense for him to actually go over there and do that to get handcuffs when he was already – basically, we had him already down…. Then they left. Right after Sergeant Clark already told them that he cannot stay here because he was already bleeding [out of his mouth].
>
> ***
>
> "I don't know his name, but as I explained earlier it was a little short one of the officers that sat right here. We already had him down on his stomach. He sat and put his legs right here, like all this right here, he put all this right here and just sat right there. He couldn't move already because we already had his arms and his legs. There wasn't no sense in him standing right there."

[Ex. Q, Harvey Statement, RL120-121).

After over three minutes of exerting this force on Mr. Loggins' back, body, neck, and head, jailers picked up the limp and lifeless Mr. Loggins, and the video shows blood coming out of Robert Loggins' mouth onto the floor. [Ex. F, Jail Video at 6:07:51]. Immediately after the officers got off Mr. Loggins, Sergeant Clark described his condition, "[H]e was limp. He couldn't stand up…. And when they picked him up, he couldn't get his legs under him and he was just limp." [Ex. O, Clark Statement, RL126-127]. Sergeant Johnson stated that Mr. Loggins was responsive

before the dogpile, and "when they [the handcuffs] came off, he was unresponsive." [Ex. P, Johnson Statement, RL134] According to Jailer Sanders, he told the officers once the handcuffs first came off to cuff Mr. Loggins in front of his body because he was concerned about the abnormal breathing, and that "they completely took the handcuffs off and that's when Ms. Clark, the supervisor, Sergeant Clark stated, 'I don't believe he's breathing.' We advised the officers that the individual needed medical care." [Ex. M, Sanders Statement, RL85-86; Ex. S, Sanders Report RL191]. Jailer Raphael Harvey observed, "So then when they left, we tried to pick him up and put him in the room, he was unresponsive. *Like his legs were not moving, nothing was going on*." [Ex. Q, Harvey Statement, RL120]. Mr. Harvey stated the officers left in a hurry while Sergeant Clark told them to take Mr. Loggins to the hospital. [Ex. Q, Harvey Statement, RL122].

In obvious contradiction of the video evidence, the other witnesses' testimony, and their own eyes, all of the defendant officers misled the investigators who questioned them about the circumstances of Mr. Loggins' death, much like they misled investigators about the circumstances of Mr. Loggins' arrest. Defendant Tilley, who put his knee into Mr. Loggins' neck and sat on his head can be seen to look back at the lifeless Loggins for a prolonged period before leaving the jail. [Ex. F, Jail Video at 06:08:04]. Defendant Tilley told investigators quite a different story than the truth: "We swapped the cuffs, and when we left, Mr. Loggins was still sitting there hollering stuff you couldn't understand." [Ex. K, Tilley Statement, RL55]. Defendant Tilley also told investigators and in effect tells this Court that, "I was off to the side of him, and I was trying to undo the cuffs." [Ex. K, Tilley Statement, RL60]. When asked directly if he sat on Mr. Loggins, Defendant Tilley responded, "No sir." [Ex. K, Tilley statement, RL60]. Defendant Tilley essentially denied exerting any physical pressure on Mr. Loggins. [*Id*.]

Defendant Merriman, a supervisory officer, paltered about whether he saw anyone sitting on Mr. Loggins' head by stating that he himself "has been known to use my knee to restrain them, but, like I say, I can't say one way or the other if I saw that." [Ex. N, Merriman Statement, RL94].

Defendant Merriman also dissembled by stating that Mr. Loggins was kicking and thrashing when the officers got off of him, and that "*the jail* put their [handcuffs] on, and two or three *of them* were on top of him," apparently content to leave out the fact that his own officer sat on Mr. Loggins' head and neck. [Ex. N, Merriman Statement, RL94][Emphasis Added]. Defendant Merriman also prevaricated about Mr. Loggins' condition when they left the jail, stating that Mr. Loggins, "was still squirming around acting a fool, cussing, just taking outside of his head. He was still breathing." [Ex. N, RL94].

Thus, it is apparent that these defendants, whether discussing the force exerted on Mr. Loggins' arrest or at the scene of his demise, declined critical opportunities to be truthful. They followed a Code Blue, which MBI investigators acknowledged during their questioning of these defendants: "I know what Code Blue is and what… happens in the field stays in the field. I know all of that. Okay?... But I'm telling you that the story is not adding up. Okay?" [Ex. L, Jones Statement, RL76].

Dr. Michael Arnall, a board certified forensic pathologist noted that "broken teeth, lacerated lip, abrasions on the face, and multidirectional contusions of the muscles on the head and back of the upper neck correlated with the jail video of suffocation." [Ex. H, Arnall Decl.]. Though expert testimony is not required in this case, it is nonetheless available. According to Dr. Arnall, the cause of Mr. Loggins' death was suffocation and the manner of death was homicide. [*Id*.].

### III. SUMMARY JUDGMENT STANDARD

The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case." *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Federal Rule of Civil Procedure 56 permits summary judgment only where the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury

to return a verdict for the non-moving party. A fact issue is 'material' if its resolution could affect the outcome of the action." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

"On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. . . . [T]he court must therefore refrain from making credibility determinations or weighing the evidence." *Coury v. Moss,* 529 F.3d 579, 584 (5th Cir. 2008). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Tig Insurance Company v. Sedwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002).

Once a defendant asserts the qualified immunity defense, "[t]he plaintiff bears the burden of negating qualified immunity." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Despite this burden-shifting, all reasonable inferences must be drawn in the non-movant plaintiff's favor. *Brown*, 623 F.3d at 253. A "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 151 (2000).

"[E]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) This Court has relied upon this standard in multiple cases. *See Geiger v. Monroe Cty., Mississippi*, No. 1:16-CV-95-SA-DAS, 2018 WL 3025951, at *3 (N.D. Miss. June 18, 2018), aff'd sub nom. *Keeton Geiger v. Sloan*, 780 F. App'x 150 (5th Cir. 2019)(involving excessive force claims); *Wheat v. Strickland*, No. 3:13-CV-00087-SA-DAS, 2015 WL 1000299, at *5 (N.D. Miss. Mar. 6, 2015)(negligent entrustment claims);

*Lenoir v. SGS N. Am., Inc.*, No. 1:16-CV-58-SA-DAS, 2017 WL 4158625, at \*10 (N.D. Miss. Sept. 18, 2017)(employment discrimination claims); *Friar v. Syntron Material Handling, LLC*, No. 1:17-CV-101-SA-DAS, 2018 WL 3650257, at \*4 (N.D. Miss. Aug. 1, 2018).

## IV. ARGUMENT

42 U.S.C. §1983 provides a remedy against any person acting under color of law who subjects an individual like Robert Loggins "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983. Notably, this federal statute provides a remedy for "any" constitutional depravation, not just clearly-established depravations or for deliberately indifferent deprivations. The doctrine of qualified immunity has no textual grounding in this statute and should have no application in the consideration of the merits of this case.

Because the acts and omissions of Defendant Tilley render unavailable even the most rigid application of qualified immunity, Plaintiffs proceed to an analysis of his multiple constitutional violations as follows. First, Defendant Tilley was an active participant in muscling Mr. Loggins and providing his TASER for the gratuitous and excessive infliction of pain during Mr. Loggins' initial arrest. Second, Defendant Tilley is liable for his gratuitous and excessive force used against a prone, handcuffed, and non-resisting Mr. Loggins at the GCJ which resulted in Mr. Loggins' death from asphyxia. Third, Defendant Tilley is liable for failing to render or provide medical care to an obviously medically compromised Mr. Loggins. After setting forth the qualified immunity standard, Plaintiffs turn first to the excessive force claims both at the scene of Mr. Loggins' arrest and then at the jail. Plaintiffs will then address the failure to render medical care.

### A.       QUALIFIED IMMUNITY STANDARD

Qualified immunity purports to protect public officials acting within the scope of their official duties from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982). In order to overcome Defendant Tilley's assertion of qualified immunity in this case, "the plaintiff[s] must satisfy a two-prong test." *Melton v. Phillips*, 875 F.3d 256, 257 (5th Cir. 2017)(en banc)(citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)(en banc)). "First, the plaintiff must show 'that the official violated a statutory or constitutional right.'" *Melton*, 875 F.3d at 257 (quoting *Morgan*, 659 F.3d at 371). "Second, the plaintiff must show that 'the right was 'clearly established' at the time of the challenged conduct.'" *Id*.

Where factual disputes exist regarding the assertion of qualified immunity during summary judgment, the Plaintiffs' version of the facts must be accepted as true. *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004). Furthermore, "[t]he jury's role has not been entirely abolished in qualified immunity cases." *Jordan v. Wayne County*, No. 2:16CV70-KS-MTP (S.D. Miss. May 17, 2017)(citing *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)). "Rule 56 still has vitality in qualified immunity cases if the underlying historical facts in dispute . . . are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." *Jordan*, No. 2:16CV70-KS-MTP (quoting *Lampkin*, 7 F.3d at 435). "In other words, '[a] finding of objective reasonableness is not appropriate . . . if the material facts are in dispute . . . .'" *Id*. (quoting *Rogers v. Lee County*, 684 Fed. Appx. 380 (5th Cir. 2017)(citing *Lampkin*, 7 F.3d at 435; *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)).

Defendant Tilley overstates the specificity required by the non-textual "clearly established" qualified immunity analysis. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Kinney v. Weaver*, 367 F.3d 337, 371 (5th Cir. 2004). "Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be 'fundamentally similar.' Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not

necessary to such a finding. The same is true of cases with 'materially similar' facts." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002). In fact, even cases providing "notable factual distinctions" can still provide fair notice to law enforcement. *Id.*

Controlling authority, or a "robust consensus of persuasive authority," create "clearly established" law. *Turner v. Driver*, 848 F.3d 678, 687 (5th Cir. 2017). "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012)(internal citations omitted).

### B.     EXCESSIVE FORCE CLAIMS

"To prevail on an excessive-force claim, a plaintiff must show (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018)(internal punctuation omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Id.* at 728. (Punctuation and citations omitted). Determining excessiveness involves consideration of the totality of the circumstances, including, but not limited to application of the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 728-729 (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

The Supreme Court called for consideration of additional, non-exhaustive factors in excessive force cases:  "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S.

389, 397 (2015).

In this case, each one of these factors weighs in favor of the Plaintiffs. Furthermore, "[a]s one of our sister circuits has observed, since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'" *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005)(citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

1. **Defendant Tilley exerted excessive force at the scene of Mr. Loggins' arrest under clearly established law.**

In response to the drug-addled, incoherent, prone, and non-threatening Mr. Loggins who was screaming for help and telling Defendant Tilley that the defendant officers were there to kill him, Defendant Tilley told him at first that the defendant officers were there to help him.

After learning that Mr. Loggins was screaming for help, incoherently grunting and shouting, failing to comprehend police commands, and under the influence of drugs, Defendant Tilley stood by while the TASER was repeatedly used against Mr. Loggins, then provided his TASER to Defendant Gammage for continued infliction of pain, tussled at length with Mr. Loggins while trying to force his hands from underneath his body, struck Mr. Loggins, and then watched while Defendant Woodall struck nine blows with a flashlight to Mr. Loggins' arm and elbow, the same arm and elbow Defendant Tilley was pulling out from under Mr. Loggins' body. Tasing nonetheless resumed after the flashlight strikes. In total, Mr. Loggins was struck with the TASER nine to eleven times. [Ex. V, Taser Report; Ex. Z, Tilley Taser Reports].

Clearly established law demonstrates that qualified immunity is inapplicable to such actions and inactions. The Fifth Circuit has "repeatedly held in the past that a taser is a force that, deployed when not warranted, can result in a constitutional deprivation." *Samples v. Vadzemnieks*, 900 F.3d 655, 661 (5th Cir. 2018). In fact, the Fifth Circuit "previously suggested that a

constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." *Darden*, 880 F.3d at 731. "Our case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Id*. Furthermore, "a police officer who is standing over a suspect who is on the ground has a position of advantage over that subject, meaning the officer can control the subject's body movement and that the subject will offer less resistance." *Carroll v. Ellington*, 800 F.3d 154, 175 (5th Cir. 2015)(internal punctuation omitted). Similarly, "Force must be reduced once a suspect has been subdued. Notably, 'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020).

It is significant at the outset that pursuant to *Carroll* and *Joseph*, Robert Loggins was *already subdued*, lacked any means of evading custody, and was screaming for help before any force was exerted.

In *Darden*, qualified immunity was denied to an officer who threw a suspect to the ground and tased him twice while another officer was applying physical force. *Darden*, 880 F. 3d at 731. The taser was applied after Darden's body appeared to come off the ground for a moment. Then, Darden rolled over onto his stomach and appeared to push himself up on his hands, at which point officers tased him a second time. Witnesses and Darden told the officers that he could not breathe, and Darden pulled his arm away when the officer attempted cuffing his hands. *Id*. The court found that a serious offense, dealing drugs, weighed in favor of the officers, but that, despite the presence of lookouts across the street and the inherent dangers of executing a narcotics warrant, these factors nonetheless weighed in Darden's favor because he "was not suspected of committing a violent offense." *Id*. at 729. These two taser strikes and one throw to the ground formed the basis for denying qualified immunity to that defendant.

Another officer placed Darden in a chokehold, kicked him, punched him, and forced him

to a prone position for handcuffing. *Id.* at 732. He, too, was denied qualified immunity, in part because it "was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision.... Officer Romero saw whether Darden was resisting and saw how much force had already been used on Darden. He needed to take those perceptions into account in assessing how much additional force, if any, was necessary. *Id.*; *See Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009)("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."). Here, by contrast, the Grenada PD defendants were never presented with a "split-second decision," and nor were they responding to a dangerous drug bust situation with lookouts across the street. This man, Mr. Loggins, simply needed help.

Defendant Tilley, for his part, observed Mr. Loggins lying on the ground for a matter of minutes, not a split second, before joining "hands on" after multiple TASER blows against the passively resisting Mr. Loggins. As they prepared to go hands on, Defendant Tilley handed his TASER over to Defendant Gammage to further inflict unnecessary force on Mr. Loggins. Defendant Tilley went "hands on" after Defendant Woodall demonstrated an intent to inflict pain by colloquially saying that Mr. Loggins was "sho' going to hate" what the defendant officers intended to do to him next for simply failing to show them his hands while literally out of his mind and convinced the defendant officers were trying to kill him. As Mr. Loggins was subjected to multiple TASER blows, Defendant Jones put the handcuffs on one of Mr. Loggins' wrists while Defendant Tilley attempted to force his other arm behind his back, and watching Defendant Woodall strike Mr. Loggins on the arm and elbow with an impact weapon multiple times.

There is no evidence of active resistance, except possibly for Defendant Tilley's allegation that Mr. Loggins bit him while the officers were engaged in using unlawful, unnecessary, excessive, and unreasonable force against him at the outset. At the time the defendant officers applied force against Mr. Loggins he was a medical emergency call and was not suspected of

committing a violent, nor even serious crime, only perhaps disturbing the peace. Though Plaintiff disputes whether Loggins bit Officer Tilly, such a bite, if established as being true, occurred after multiple unlawful tasings, which is akin to a suspect during a traffic stop pushing himself off of a vehicle and into officers after they inflicted physical blows, which under clearly established law at the time of Robert Loggins' arrest was and is considered passive resistence. *See Joseph v. Bartlett*, 981 F.3d 319, 338-339 (5th Cir. 2020)("even if Newman struggled by pushing himself off from the car and back into the officers, after being struck ten times, this type of struggle did not rise to the level of active resistance.")(citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012))(internal citations omitted).

In *Joseph*, a school principle noticed an unmedicated schizophrenic "strange guy" who was staring, shaking his legs, biting his nails, not walking straight, talking to himself, and saying things she could not understand. *Id*. at 326. The suspect fled into a convenience store in defiance of shouted commands to walk towards police, where an officer aimed his gun at Joseph, who at this point was screaming, much like Mr. Loggins, "Help me from the police…. Help me, help me somebody call the cops…. They're trying to kill me." *Joseph*, 981 F.3d at 326. Instead of following police commands to get on the ground, Joseph jumped over the checkout counter, covered his face with his hands, and lay on the floor in a fetal position. *Id*. Officers got on top of him, ordered him to put his hands behind his back, and tased him for eleven seconds. *Id*. Officers noted his behavior was erratic, odd, and emotionally disturbed. *Id*. He continued to shout and yell. *Id*. Officers tased him twice (eleven seconds) and caused twenty-six blunt-force injuries. *Id*. 326-328. Relying on a string of cases, including *Newman* and *Ramirez*, the Fifth Circuit in *Joseph* found that the tasing and beatings were unconstitutional pursuant to clearly established law as of February 7, 2017. *Joseph*, 981 F.3d at 338. The actions of Defendant Tilley having occurred in late 2018, the law was clearly established that the blunt force injuries and no fewer than *nine* taser strikes are unconstitutional as clearly established by previous caselaw.

Any resistance Loggins exhibited was passive and did not warrant ongoing force. "[S]truggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021). The Fifth Circuit determined no threat to officer safety and only passive resistance to exist when a suspect remained on his feet for about twenty seconds after the officer first order him to kneel. *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017). Similarly in *Newman*, officers alleged that their use of force was appropriate because the suspect defied orders to stay in the car, struggled, reached for his waistband, and was noncompliant by pushing himself off from the car and back into the officers after multiple baton strikes, at which point he was tased three times. *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012) . The Fifth Circuit held that "[e]ven on the officers' version of events, Newman's behavior did not rise to the level of active resistance." *Newman*, 703 F.3d at 763.

As in the case of Robert Loggins, *arguendo*, even if an arrestee "failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely." *Id*. "Failure to comply still requires the degree of force to be reasonable. Officers may consider a suspect's refusal to comply with instructions… in assessing whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)(internal citations and punctuation omitted). In *Deville*, the Court took note of how quickly force was used to arrest someone who refused to get out of her car, and found that breaking the vehicle's window to gain compliance was unreasonable. *Deville*, 567 F.3d at 168. Here too, the defendant officers Woodall and Gammage almost immediately escalated to repeated tasing upon their arrival, then using physical force including the use of an impact weapon and more TASER blows against a medically compromised Mr. Loggins.

Similarly, in *Ramirez*, the Fifth Circuit held that "officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back, and pulling his arm away when an officer grabbed his hand. We concluded that he posed so little threat that tasing him before he was handcuffed was excessive…." *Joseph*, 981 F.3d at 333, 339 (citing *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013))("As to a passively resisting suspect, an officer does not take measured and ascending action by immediately resorting to taser and nightstick without attempting to use physical skill, negotiation, or even commands.")(internal punctuation omitted). *See also Joseph*, 981 F.3d at 340(discussion regarding *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), where defendant lacked any means of escape and the Court described clearly established law of tasing based on police canine force); *Samples*, 900 F.3d at 661–62 (on accounts of "possible disturbance" of man calling for help, officer "had little reason to believe [he] was in the process of perpetrating a crime," and failure to heed officer requests and tensing up was "not active resistance or flight" where no "immediate threat to the safety of officers" was evident, and a single taser strike was thus excessive); *Hanks*, 853 F.3d at 746, *supra*.

These cases, any one of which alone provides fair notice to Officer Tilley, underscores the unconstitutionality of the Defendants use of force against Mr. Loggins who was subdued and on the ground. To go further beyond the fair warnings already provided by previous cases, of course, the product warnings themselves for the very taser Tilley provided for use against Mr. Loggins expressly warn against tasing someone in the exact physical and emotional distress Mr. Loggins exhibited. The legal parameters of the unconstitutionality of the Defendant Loggins' use of force were clearly established before November, 2018 and issues of material fact preclude qualified immunity. It is therefore apparent that Officer Tilley is liable for active participation at the scene of the arrest by providing the taser for senseless infliction of pain, and piling on top of him to muscle him into handcuffs as seen in the videos.

It also bears mention that to the extent these defendant officers maintain that they could not see Robert Loggins' hands, it cannot be disputed that Loggins never threatened anyone, was never armed, and that the tasing and blows with the flashlight occurred even after the officers knew he did not have a weapon.

The Defendants forge disingenuous contentions to the extent that they rest their basis for qualified immunity on the assertion that Mr. Loggins failed to obey police commands. Their conduct made clear that they did not expect their commands to be obeyed. For example, they continued to shout for Mr. Loggins to show his hands while they were shooting electricity through his body. It was not that Robert Loggins failed to *obey* their commands, it was that he was obviously *incapable* of comprehending or responding to them. Furthermore, it was apparent from the outset and as exhibited in the videos that neither the neighbor who assisted Defendant Woodall in finding Mr. Loggins, nor the officers themselves felt fear for their safety or suspicion of a weapon.

Defendant Tilley joined in a related motion by his fellow defendants, in which they cite *Cloud v. Stone*, 993 F.3d 379, 382 (5th Cir. 2021), which is inapposite to this case. There, Cloud was pulled over for speeding. He argued with the officer as to whether he was speeding, refused to sign his ticket, and when he was asked to exit the vehicle with his hands behind his back, he turned around to face the officer after one of his wrists was cuffed. After one taser strike, Cloud removed the prongs and moved toward his open car door *where he brandished a revolver*. *Id.* at 382. Additional glaring distinctions exist, namely that the *Cloud* suspect was coherent and knowingly resistant, and he was standing and surrounded by a single officer, unlike Mr. Loggins, who was incoherent and already subdued on the ground where he was surrounded by five police officers in a small, fenced-in yard.

Similarly, or in the alternative, Defendant Tilley is liable for failing to intervene in the continued tasing, muscling, and flashlight strikes of his fellow officers. *See Carroll v. Ellington*,

800 F.3d 154, 177 (5th Cir. 2015)("The law as of 2006 was clearly established that 'an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.'")(citations omitted). Bystander liability attaches to anyone who "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

2. **Defendant Tilley exerted excessive force at the Grenada County Jail pursuant to clearly established law and common sense.**

Notwithstanding the force exerted at the scene of Mr. Loggins' arrest, the force escalated to deadly force at the jail, where Mr. Loggins lay prone, gasping for breath with his hands cuffed behind his back. Officer Tilley maintains that he required notice under law that it was unlawful to place a knee on the neck of and to grind a medically-compromised and handcuffed man's face into the ground with his body weight for longer than three minutes. This use of force, of course, shocks the conscience and triggers the relaxed "clearly established" standard. *See Taylor v. Riojas*, 141 S. Ct. 52, 53, (2020); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful....")(punctuation and citations omitted).

While it is not necessary to point to a specific case on all fours with this action, cases with obvious applicability exist. Any one of at least seven binding cases, to say nothing of the consensus of persuasive authority, is enough to provide, or to at minimum explain to Officer Tilley the preexisting and clearly established law. The cases, *infra*, include *Simpson*, *Lombardo*, *Kitchen*, *Goode*, *Wagner*, *Darden*, and *Aguirre*. First, in *Simpson*, jail officers were denied qualified immunity in a jail asphyxiation death when they subdued a violently resistant pretrial detainee, sat

28

"astraddle him," and applied pressure to his chest while his arms and legs were cuffed. *Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990).[9]

Furthermore, this force inflicted upon Mr. Loggins at the jail occurred *after* he was handcuffed, foreclosing any argument that he was subject to any use of force at all. *See Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015). "The issue, then, is whether a reasonable jury could conclude that continued force applied after a suspect has been restrained and after the suspect stops resisting may be clearly excessive and objectively unreasonable. The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll*, 800 F.3d at 177. Similarly, *arguendo*, to the extent Robert Loggins can be said to have resisted while handcuffed on the jail floor (and according to jailer statements, he was trying to breathe, not resisting), "[a] jury could conclude that all reasonable officers on the scene would have believed that [Mr. Loggins] was merely trying to get into a position where he could breathe and was not resisting arrest." *Darden*, 880 F.3d at 730.

Of course, the entire notion of removing handcuffs was senseless and unnecessary at the outset. First, Loggins should have been taken to a hospital before the dogpile. Secondly, as Jailer Harvey told investigators, the policy for removing handcuffs from an arrestee is to do so inside a cell because in a cell, handcuffs can be removed without having to use a second set of handcuffs. [Ex. Q, Harvey Statement, RL122]. Sergeant Clark communicated this to the officers, who again ignored her and proceeded to suffocate him, apparently for the purpose of needlessly switching handcuffs since the jail would not accept a medically-compromised person. [*Id*.].

This year, the Supreme Court reversed the grant of qualified immunity to Officers in a 2015 case in which a violent offender kicked and evaded efforts by jail officials ostensibly to prevent

---

[9] Notably, the Fifth Circuit's ruling in *Simpson* proceeded under the exacting "shocks the conscience" standard because the conduct occurred prior to the balancing test enunciated in *Graham v. Connor*, 490 U.S. 386, 396 (1989).

him from committing suicide. The detainee continued to resist, slam his head on a bench, and then kicked one officer in the groin, at which point his arms were handcuffed and his feet shackled. Officers moved him to a prone position, in which three officers held his "limbs down at the shoulders, biceps, and legs. At least one other placed pressure on [his] back and torso." *Lombardo*, 141 S. Ct. at 2240. As previously mentioned, *Lombardo* stated that struggles of a prone arrestee can evince a desire to breathe, not an intent to disobey commands, and it further noted the well-known police guidance and training requiring officers to both relieve suspects from a prone position immediately to avoid suffocation and to avoid placing pressure on their back and torso. *Id*. at 2241.

Yet another Fifth Circuit case, standing alone, addressed similar facts and provides fair notice to Defendant Tilley in *Kitchen v. Dallas County, Texas*, 759 F.3d 468 (5th Cir. 2014). In *Kitchen*, officers pulled a delusional pretrial detainee from his cell who had grabbed a nurse, urinated on the floor, raised his middle finger at officers, and who was "banging his head against the bars," and they put him in a restraint chair since he seemed suicidal. *Id*. at 474-475. When officers entered the cell, the inmate "turned around abruptly and raised his hands" as if to fight, and the officers "physically brought the deceased down onto the floor" before restraining him in handcuffs and leg-irons, at which point certain officers also stomped and kicked him. *Id*. While still lying on the floor shortly after being restrained, the deceased became unresponsive, stopped breathing, and died. According to the autopsy report, the death was a homicide caused by 'complications of physical restraint including mechanical asphyxia' due to 'neck restraint during struggle' and the fact that 'one officer was kneeling on the decedent's back during restraint. Other factors included 'physiologic stress,' and 'morbid obesity and cardiomegaly.' *Id*. The officers' grant of qualified immunity was reversed and remanded. *Id. See also Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993)(officers not entitled to summary judgment when using a "choke hold" during a cell extraction that "render[ed] [the detainee] momentarily unconscious" after

detainee refused to stop "singing and making noise").

Mr. Loggins' case is also comparable to the Fifth Circuit's decision in *Goode*, *supra*, in which an officer pinned down a suspect known to be experiencing a disturbing LSD trip. Officers hogtied him, a position he stayed in for ninety minutes until he suffocated under *his own* weight, not an officer's weight. "Unless justified by a threat of serious harm, hog-tying a drug-affected person in a state of drug-induced psychosis and placing him face down in a prone position for an extended period constitutes excessive force." *Goode v. Baggett*, 811 F. App'x 227, 235 (5th Cir. 2020)(citing clearly established law enunciated in *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998)).[10] *Goode*, again citing *Guitierrez* further notes that suspects in a state of "excited delirium" are particularly vulnerable.[11] The Fifth Circuit cites multiple cases from other jurisdictions that further compose the consensus of law available to provide fair warning to Defendant Tilley that the application of force on Mr. Loggins at the jail was unconstitutional. *Goode v. Baggett*, 811 F. App'x 227, 236 fn 8. Of particular note is *Weigel v. Broad*, where officers restrained a detainee by applying pressure "for about three minutes" to a prone detainee's upper body while also straddling his upper thighs and buttocks and holding his arms in place. The officers were not entitled to qualified immunity pursuant to clearly established law under *Gutierrez*. *Weigel v. Broad*, 544 F.3d 1143, 1148 & 1152 (10th Cir. 2008).

Defendant Tilley argues that his use of excessive force was not the direct and only cause of death because of the presence of methamphetamine in Mr. Loggins' system and the findings of

---

[10] Should the Defendants assert that Loggins was not hogtied to allege that *Goode* is not sufficient to provide fair notice to this defendant Tilley, such would be a red herring. Mr. Loggins' hands were cuffed behind his back and his legs were shackled with grown men on top of him, and as previously stated, the facts do not have to be exact to impart fair warning. *See Salcido as Next Friend of K.L. v. Harris Cty., Texas*, No. CV H-15-2155, 2018 WL 6618407, at *6 (S.D. Tex. Dec. 18, 2018)("The dispositive issues on the plaintiffs' excessive use of force claims are not whether Lucas was hogtied.... Harris County's contention that death was not reasonably foreseeable from restraint that impaired Lucas' ability to breathe strains credulity and is foreclosed by Fifth Circuit precedent.")(citing *Darden*)(citations omitted).

[11] In legal jurisprudence, "Excited delirium is generally described as a state of agitation, excitability, and paranoia. Symptoms include bizarre behavior, confusion, delusions, hyperactivity, incoherent yelling, and sweating. It's often associated with drug use, most commonly cocaine, and is sometimes referred to as 'cocaine-psychosis' for that reason." *Goode*, 811 F. App'x at 234, n.6.

the Mississippi Medical Examiner. Such is an incorrect interpretation of the "directly and only" causation element of an excessive force claim. The "direct and only language was merely 'intended to distinguish between injuries caused by excessive force, which are actionable, and those caused by reasonable force, which are not.' Notwithstanding the language of this element, [Plaintiff] need not prove that the Officers' excessive force was the sole cause of Troy's death." *Goode*, 811 F. App'x at 231.

Thus, a Plaintiff need not present countervailing medical testimony in a clearly established case such as this one. *See Wagner v. Bay City*, 227 F.3d 316, 320 n. 3 (5th Cir. 2000)("A reasonable jury could conclude that the use of pepper spray, combined with the fact that the officers repeatedly pushed [the detainee] face-first to the ground, could have resulted in [the detainee] stopping breathing. … [C]ommon sense compels the conclusion that [the detainee's] injuries resulted from his altercation with the police, and there is no requirement that medical testimony be presented to establish causation."). Similarly, up to eleven taser strikes, nine flashlight strikes, multiple physical struggles, including the grounding and occlusion of Mr. Loggins' face into the floor under Defendant Tilley's and other defendant officers' weight for over three minutes, all pose a clearly established matter of common sense and legal consensus westablishing excessive force.

To the extent Defendant Tilley contends that other factors, such as drug use, contributed to Mr. Loggins' death and absolve him from any responsibility for the injuries to and death of Mr. Loggins, this contention is not sustainable. Contributing factors existed in *Darden*, a case posing similar facts in which the Fifth Circuit rejected the same argument raised by Defendant Tilley. In *Darden*, the Fifth Circuit found as follows:

> According to the plaintiff's medical expert, "Darden died as a result of the application of restraint (physical struggle, 4 taser dart strikes, prone position with the weight of police officers on top of Mr. Darden) and consequential hypoxia and increased cardiac demand." But the medical expert went on to explain that "the application of restraint was a contributing causal factor along with natural disease." The other contributing factors were focal coronary artery

disease, "which can increase the likelihood of developing an arrhythmia during a struggle," and chronic lung disease, which "can impede air exchange causing hypoxia (low oxygen) and increase the risk of cardiac arrhythmia during exertion such as a struggle." Thus, the district court's conclusion that the injury did not result directly and only from the use of force was essentially based on the fact that Darden had preexisting medical conditions that increased his risk of death during the incident.

The district court erred in reaching this conclusion. According to the eggshell skull rule, "a tortfeasor takes his victim as he finds him." The eggshell skull rule is applicable in § 1983 excessive force cases. Darden's preexisting medical conditions increased his risk of death during a struggle, and in that way, they contributed to his death. However, the evidence suggests that Darden would not have suffered a heart attack and died if the officers had not tased him, forced him onto his stomach, and applied pressure to his back. Indeed, the medical expert ultimately concluded that "Darden's manner of death should not have been ruled as Natural." Accordingly, the plaintiff can show that the use of force was the direct and only cause of Darden's death.

*Darden*, 880 F.3d 722 at 728. In this case, even to the extent, if any, Robert Loggins may have been more vulnerable to death as a result of his state of tasing, drug use, or excited delirium, he can nonetheless establish that the use of force was without peradventure a contributing cause of his death if not the sole cause.

Prior to the filing of the Complaint Plaintiffs produced to opposing counsel a medical opinion from a forensic pathologist stating that Mr. Loggins experienced an emergent medical condition and ultimately died of asphyxia resulting from Defendant Tilley's actions and inactions. To the extent a question of material fact exists regarding Mr. Loggins' death, any such dispute of material fact must be resolved in Mr. Loggins' favor at this juncture.

Fair notice is again provided to this Defendant Tilley by the 2021 case of *Aguirre v. City of San Antonio*, 995 F.3d 395, 419 (5th Cir. 2021), where officers knew an arrestee was under the influence of drugs, but cuffed him behind his back and applied pressure to his legs, which were crossed up to his buttocks and his body in excess of five minutes. The Court held that "a reasonable jury could conclude that the maximal prone restraint position was tantamount to and as dangerous

as a hog-tie." The Court stated that "[i]t has long been clearly established that, when a suspect is not resisting, it is unreasonable for an officer to apply unnecessary, injurious force against a restrained individual, even if the person had previously not followed commands or initially resisted the seizure." *Aguirre*, 995 F.3d at 416 (citing *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015)). The Court again enunciated the law that "[i]n an obvious case, the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law." *Id.* at 415.

The robust consensus of law available to provide notice to this defendant, Officer Tilley, continues and is almost unrelenting. It includes, but is not not limited to the following: *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001)("officers may not apply this technique when an individual's diminished mental capacity is apparent"); *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016)("it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position … constitutes excessive force"); *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007)(hogtying "an individual after he had ceased resisting arrest could be objectively unreasonable" as is "[f]ailing to place [a detainee] in the proper position" – on his side – "after [hogtying] him"); *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005)(Officer knelt on shoulder or back for 30-40 seconds while prone on the ground and suspect died two minutes later); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903-04 (6th Cir. 2004)("putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued … constitutes excessive force"); *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008)(Posner, J.)(denying courtroom deputy qualified immunity because "a reasonably trained police officer would know that compressing the lungs of a morbidly obese person can kill the person").

Similarly, in *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003) excessive force was clearly established "even absent a… case presenting the same set of facts. The

34

officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance." *Drummond* cited multiple cases as well that "in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals *in an agitated state* have suffocated under the weight of restraining officer." *Id*. at 1056-1057 (emphasis added). *See also Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999); *Flores-Zelaya v. Las Vegas Metro. Police Dept*., 2016 WL 697782, *5 (D. Nev. Feb. 19, 2016); *Swans v. City of Lansing*, 65 F.Supp.2d 625 (W.D. Mich. 1998); *Rachel v. City of Mobile*, 112 F.Supp.3d 1263, 1291 (S.D. Ala. 2015); *Jones v. City of Sacramento*, 2011 WL 3163307 (E.D. Cal. July 25, 2011); *Watkins v. New Castle County*, 374 F.Supp.2d 379, 390 (D. Del. 2005); *Hanson v. Best*, 2017 WL 5891697, *8 (D. Minn. Nov. 28, 2017).

Of course, a cuffed and shackled Loggins can offer no meaningful resistance. *See Abdullahi*, 423 F.3d at 771 (7th Cir. 2005)(reversing district court order granting summary judgment when detainee's "undisputed attempts to squirm or arch his back upward while he was being restrained may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress"); *Darden*, 880 F.3d at 726 n.3 (denying police officers qualified immunity when obese detainee pushed face down into the floor "pushed himself up on his hands because he was trying to get into a position where he could breathe"); *Lombardo*, *supra*.

The overwhelming consensus of Fifth Circuit and national legal authority condemned exactly what Defendant Tilley subjected Mr. Loggins to at the jail.  A defendant officer who lacks the moral decency or professional competence, or both, to avoid putting his knee into the neck of a man and then turn around to sit on the head of a defenseless and medically compromised man cannot expect their lack of scruple to protect them from the consequences of their actions.  At least insofar as the Fifth Circuit is concerned, the actions taken by Defendant Tilley that day make him accountable in a court of law for causing needless injury and contributing to the death of Mr.

Loggins.

Against this mountain of clearly established law, Defendant Tilley relies almost exclusively on the district court case of *Pratt v. Harris County*. Factual distinctions abound. First, *Pratt* was on his feet, walking away from the scene of a car wreck in defiance of officers' orders. *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 178 (5th Cir. 2016). Second, unlike the Defendant Dean Tilley, who was aware of Mr. Loggins' drug addled and altered mental state, "the officers who hog-tied Pratt were unaware of his use of drugs." *Id*. at 184 (5th Cir. 2016). Furthermore, *Pratt*, unlike Loggins, "broke free from the officers' grips, and kicked at officers attempting to restrain him (eventually kicking one officer in the groin twice)." *Id*. Unlike Loggins, "Pratt was only restrained for a very brief period." *Id*.  A knee was placed in Pratt's back briefly before the hogtie restraints arrived, and Pratt clearly survived this encounter by stating, "Ok I quit. I'm done." The *Pratt* officers did not kneel on his neck or sit on his head over the course of more than three minutes.

> **3.    Defendant Tilley failed to provide or render necessary medical care to an obviously and medically compromised arrestee.**

Defendant Tilley asserts that he is entitled to qualified immunity because he did not violate Mr. Loggins' constitutional right to receive adequate medical attention as an arrestee or as a pretrial detainee; and because any claimed right to receive adequate medical attention was not clearly established in November 2019.  Neither of Defendant Tilley's assertions are correct and he is not entitled to qualified immunity.

In *Estelle v. Gamble*, the Supreme Court recognized that the Eighth Amendment requires the government to provide medical care to inmates because the failure to do so "may actually produce physical 'torture or a lingering death'" or unnecessary "pain and suffering."  *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)(quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)).  The Fifth Circuit has held the Fourteenth Amendment confers the same right to pretrial detainees, who have

36

a well-established constitutional right to be free from pain, suffering, and death due to the denial of adequate medical care while they are incarcerated. *See Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996)(en banc). Consequently, an officer may be held liable for their acts or failure to act affecting pretrial detainees that deprives them of basic human needs, including adequate medical care, if the official knew of a substantial risk of harm to detainees but responded with deliberate indifference to that risk.[12] *Hare*, 74 F.3d at 649.

To prevail under § 1983, a "claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "[I]t does not matter whether . . . a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. We do "not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault," or, as here, a death, "before obtaining relief." *Id*. at 845 (citation, quotation marks, and alterations omitted).

---

[12]Based on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Plaintiffs pleaded in their Third Amended Complaint and assert in this response that the proper legal standard for adjudicating their Fourteenth Amendment denial of medical care claim must be an objective deliberate indifference standard, not a subjective deliberate indifference standard. In *Kingsley*, the Court rejected the subjective deliberate indifference standard used by the Fifth Circuit for excessive force claims brought by pretrial detainees in favor of an objective standard. *Kingsley*, 576 at 396-97. The Plaintiffs acknowledge the Fifth Circuit, post-*Kingsley,* continues to adhere amongst a broad circuit split to the subjective deliberate indifference standard set forth in *Hare*. *See Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017); *Joyner v. Grenada County*, 458 F. Supp. 3d. 486, 490-91 (N.D. Miss. 2020).

As of today and based on *Kingsley*, the Second, Seventh, and Ninth Circuits have adopted an objective deliberate indifference standard to address pretrial detainee claims for the denial of medical care. *See Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018); *Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018); *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). The Third, Fifth, Eighth and Eleventh Circuits persist in using the subjective deliberate indifference standard. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (applying subjective deliberate indifference to inadequate medical care claims for treatment of hepatitis C and noting that the circuit has not extended *Kingsley* and its application would not change the outcome of the case because the officials were not more than negligent); *Alderson*, 848 F.3d at 419 n.4; *Ryan v. Armstrong*, 850 F.3d 419, 425 n.3, 426 (8th Cir. 2017)(applying subjective deliberate indifference to inadequate medical care claims and noting that the court need not address *Kingsley* because district court erred in granting summary judgment to defendants under the subjective standard); *Dang v. Sheriff of Seminole County*, 871 F.3d 1272, 1279 n.2, 1280–83 (11th Cir. 2017)(applying subjective deliberate indifference test to pretrial detainee's inadequate medical care claim for untreated meningitis that lasted several days and resulted in multiple strokes and noting that *Kingsley* does not directly address inadequate medical care claims).

Without waiving their assertion that the proper legal standard to adjudicate this claim is one of objective deliberate indifference, the Plaintiffs argue in this memorandum from the subjective deliberate indifference standard and aver Defendant Tilley acted with the requisite state of mind to deny him qualified immunity based on that standard.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. at 842 (citations omitted); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). In other words, "a trier of fact may infer knowledge from the obvious[.]" *Farmer*, 511 U.S. at 844. For instance, a defendant could "not escape liability if the evidence showed that he... refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist . . . ." *Id*. at 843, n.8. The jail official's subjective knowledge is thus a question for the jury. *Id*. "Often … there will be no evidence of the detention facility officer's subjective intent, and the trier of fact must base its determination on objective factors suggestive of intent." *Valencia*, 981 F.2d at 1446.

Applying this standard to Defendant Tilley in this case highlights that his conduct was objectively unreasonable based on his subjective knowledge of a substantial risk of harm to Mr. Loggins, arising from multiple observed and known serious health conditions, and the complete absence of any action on his part to ameliorate that known risk of harm by assisting medically, calling for medical assistance, or transporting Mr. Loggins to a hospital moments away from the jail where Mr. Loggins perished. In effect, Defendant Tilley saw an obviously compromised Mr. Loggins before he suffocated him, then suffocated him instead of taking him to a hospital, as the supervising jailer implored him to do, and then left the jail. Before he left, however, Defendant Tilley stopped at the door and looked back at the lifeless Loggins for a prolonged period, opting yet again to deny this man medical attention. Then he made material misrepresentations to MBI officers about his involvement and Mr. Loggins' condition, and now seeks to simply walk away from any accountability for his violation of clearly established law.

In assessing Defendant Tilley's claim that he is entitled to qualified immunity, as an initial proposition, it is indisputable that Mr. Loggins Fourteenth Amendment right as a pretrial detainee

38

to adequate medical care for his serious medical conditions has been clearly established in the Fifth Circuit for decades. *See Hare*, 74 F.3d at 649. Knowing the Fourteenth Amendment right implicated in this case has been clearly established for decades, Defendant Tilley resorts to a fanciful recitation of the material facts and the denial of contradictory facts readily apparent from the video evidence. In effect, Defendant Tilley doubles-down on the mendacity he engaged in when interviewed by MBI investigators, shortly after Mr. Loggins' death, by relying on these multiple misrepresentations in this proceeding.

In assessing Defendant Tilley's claimed entitlement to qualified immunity, Mr. Loggins' claim against him arises from his denial of any medical attention from the moment Mr. Loggins arrived at the Grenada County Jail until he walked out of the jail leaving a lifeless Mr. Loggins on the floor of the jail to die. At the moment Defendant Tilley arrived at the jail, he was subjectively aware based on his close contact with Mr. Loggins at the scene of the arrest that Mr. Loggins suffered from a drug-induced psychosis; engaged in a prolonged physical struggle with accompanying visible physical injuries; suffered multiple TASER strikes; and was struck with an impact weapon multiple times. Defendant Tilley was also subjectively aware that the emergency medical personnel did not assess, examine, or treat Mr. Loggins at the scene but stated, "they looked at him.... and they asked him how he felt, and he just gave an off the wall thing."[13] [Exhibit K, Tilley Statement, RL59].

Once inside the jail, Mr. Loggins was immediately put on the concrete floor in a prone position with his hands cuffed behind his back and his pants wrapped around his ankles in obvious contravention of well-known police training and guidance.[14] [Ex. F at ~ 5:59:00] With Defendant Tilley and several other officers standing around him, Mr. Loggins spent approximately five

---

[13]The Defendants AMR, Watson, and Howell admitted at ¶ 43 of their Answer & Affirmative Defenses to the Third Amended Complaint that no history or vital signs were taken from Mr. Loggins at the scene of his arrest.
[14]Defendant Tilley also stated, falsely, that once inside the jail Mr. Loggins, "sat there in jail for a couple of minutes." (Id. at 55.)

minutes prone on the floor attempting to roll himself over to catch his breath without any medical intervention or assistance. [Ex. O, Edna Clark Statement]. During this time Defendant Tilley was further subjectively aware based on the testimony of numerous witnesses that: (1) Mr. Loggins was grunting and moaning and something was wrong with him [Ex. L.]; (2) Mr. Loggins had lacerations to his head and knees, had blood coming from his mouth, labored to breathe and had his eyes rolled to the back of his head [Ex. M, RL85]; (3) the jail would not accept Mr. Loggins because of his physical condition [Ex. O.]; and (4) the jail would not accept Mr. Loggins because of his drug-addled condition [Ex. L.].

Despite all of the information Defendant Tilley possessed regarding Mr. Loggins medically compromised and serious condition since his arrival at the jail, he reacted to it with deliberate indifference by compounding Mr. Loggins' medical distress by applying deadly force instead of getting him to a hospital. *See Aguirre*, *supra* (use of maximal- restraint prone position with officers exerting force on the back of a non-resisting, non-threatening arrestee suffering from drug-induced psychosis may constitute deadly force.) After Defendant Merriman told Defendant Tilley to get his cuffs so that they could leave, Defendant Tilley, Jones, and several jailers piled on the medically compromised Mr. Loggins to get his handcuffs. [Ex. D at ~ 6:04:37 to 6:07:50]. With his hands cuffed behind his back and his pants around his ankles restricting any leg movement, the defendant officers and jailers applied leg irons to Mr. Loggins. [*Id*. at 6:04:37]. Defendant Tilley then put his knee onto Mr. Loggins' neck. [*Id*.] Allegedly unable to get the cuffs off of Mr. Loggins, Defendant Tilley then sat on Mr. Loggins head, forcing his face into the concrete floor. [*Id*.] Meanwhile Jones and several jailers put their body weight on Mr. Loggins' back, shoulders, arms, and legs. [*Id*.]

When the defendant officers got off of Mr. Loggins after changing out the handcuffs he was unresponsive. [Ex. P, Johnson Statement, RL134]. According to jailer Sanders, he told the defendant officers to remove the cuffs from behind Mr. Loggins because he was breathing

abnormally. [Ex. M, Sanders Statement, RL85]. After the cuffs were exchanged, Mr. Sanders heard Ms. Clark tell the defendant officers that Mr. Loggins was not breathing and that he needed medical care. [*Id*.]. Defendant Tilley and the other defendant officers just turned around and walked out of the jail. [*Id*.]. Jailer Raphael Harvey told investigators that Mr. Loggins was unresponsive and the defendant officers just left. [Ex. Q, Harvey Statement, RL120]. As Sergeant Clark repeatedly told the defendant officers to take Mr. Loggins to the hospital and was dismissed by the officers, she observed that as her jailers picked up Mr. Loggins after the exchange of the handcuffs he had gone limp and could not walk. [Ex. O, Edna Clark Statement, RL126-27].

This summary judgment record demonstrates Defendant Tilley when presented with a pretrial detainee showing obvious signs of severe medical distress including: drug-induced psychosis, bleeding from the head, mouth, and knees, labored breathing, asphyxiation, eyes rolled to the back of the head, and lack of consciousness, simply looked back at the lifeless Mr. Loggins and walked out of the jail. [Ex. F, 06:07:50 to 06:08:20]. Further diminishing any claim that his actions were anything approaching objective reasonableness, Defendant Tilley walked out of the jail while being told repeatedly by a supervisory officer at the jail to take Mr. Loggins to get medical attention. The metaphorical nail in Mr. Tilley's coffin is the fact that he and the other defendant officers made repeated material misrepresentations to investigators when questioned about Mr. Loggins' death.

The law in the Fifth Circuit is established that, "[a] serious medical condition is one . . . for which the need is so apparent that even a layman would recognize that care is required. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006)(citation omitted). A pretrial detainee manifesting clear signs of psychological and physiological injury and distress, drug-psychosis, labored or no breathing, bleeding, and who goes limp or lifeless is the most obvious example of a pretrial detainee in need of immediate medical intervention. Multiple layman, including Defendant Jones,

Sergeant Edna Clark, and Defendant Jennifer Howell[15] recognized that something was wrong and that this man needed help. Faced with this situation Defendant Tilley did nothing to help Mr. Loggins, then misled investigators about what he did and saw. This factual situation regarding Defendant Tilley's subjective knowledge and intent can only be resolved by the trier of fact. *Farmer*, 511 U.S. at 842 (citations omitted); *Gates*, 376 F.3d at 333. Consequently, Defendant Tilley's request for qualified immunity with respect to the Plaintiffs' medical care claim is bound to be overruled.[16]

In *Salcido as Next Friend of K.L. v. Harris Cty., Texas*, No. CV H-15-2155, 2018 WL 4690276, at *38 (S.D. Tex. Sept. 28, 2018), law enforcement was denied qualified immunity for failure to render care simply because certain officers heard the suspect say "I can't breathe" and because another officer saw him start to foam at the mouth and saw his eyes roll back. Here, Loggins exhibited drug intoxication, bleeding, eyes rolled back, and an inability to breathe.

### 4. Additional factors applicable to each claim against Defendant Tilley dictate against qualified immunity for each claim.

Plaintiffs maintain that qualified immunity is due to be denied as previously stated. However, three additional considerations beyond the non-exhaustive list of factors enunciated in *Graham* and *Kingsley*, bolster the inapplicability of qualified immunity for all three claims.

First, Mr. Loggins was clearly unable to comprehend police commands and was mentally incapacitated. According to the statements of every individual who interacted with Mr. Loggins that morning, he was psychotic and on drugs. The only coherent thing he could be heard to say is, "Y'all gon' kill me?" and "Help me please."

The Defendant Loggins' failure to act upon, much less acknowledge, Mr. Loggins' mental

---

[15] Defendant Howell acknowledged that it appeared that Mr. Loggins was exhibiting the same symptoms as another person hospitalized for being on "flakka."

[16] Nor can Defendant Tilley rely on the first-responder defendants' failure to assess and examine Mr. Loggins before "clearing him" for transport to the jail based on what he observed and was made aware of at the jail. *See Taylor v. Hughes*, 920 F.3d 729, 733-34 (11th Cir. 2019)(finding genuine issues of material fact in dispute whether jailers should have known Taylor needed medical care regarding plaintiff's injuries despite the state troopers' statement that the plaintiff had been "medically cleared" for admission to the jail, contrary to his painful moans and pleas for help).

incapacity augurs against qualified immunity. *See Joseph*, 981 F.3d at 334 fn.56 (citing *Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016)("[O]fficers who encounter an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is mentally unstable must de-escalate the situation and adjust the application of force downward.")(internal punctuation omitted); *Perea v. Baca*, 817 F.3d 1198, 1204 fn (10th Cir. 2016)("It is not reasonable for an officer to repeatedly use a taser against a subdued arrestee they know to be mentally ill, whose crime is minor, and who poses no threat to the officers or others."); [*Id*. at fn 4]("But disproportionate use of a taser, and repeated use of a taser against an effectively subdued individual, are clearly established constitutional violations."); *Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018)("[W]hether the suspect has exhibited signs of mental illness is one of the factors the court will consider in assessing the reasonableness of the force used, in addition to the *Graham* factors, the availability of less intrusive force, and whether proper warnings were given. Although this Court has refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals, our precedent establishes that if officers believe a suspect is mentally ill, they should ... make a greater effort to take control of the situation through less intrusive means.")(citations, brackets, punctuation omitted); *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010)("To the contrary: if Officer MacPherson believed Bryan was mentally disturbed he should have made greater effort to take control of the situation through less intrusive means. As we have held, '[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense.").

In addition to the aforementioned non-exhaustive list of factors, the Defendants' mendacity should also be considered. Defendant Tilley's misrepresentations raise credibility issues regarding his subjective awareness that what he was doing to Mr. Loggins was wrong that should deprive

him of qualified immunity. First, Defendant Tilley (and other defendant officers) attempted to mislead investigators about the flashlight strikes to Mr. Loggins' arm and elbow. Defendant Tilley finally admitted to the investigator that he was dishonest about the flashlight strikes in order to protect an officer, and then misled them yet again about the number of strikes he witnessed. Tilley repeated other material untruths to investigators about his use of force at the jail and Mr. Loggins' state after the dogpile. While the Court cannot make credibility determinations at this stage, it may acknowledge the existence of credibility issues for the jury to resolve. *See Linden v. Washtenaw County,* 167 Fed.Appx. 410, 426-427 (6th Cir. 2006)("In addition to the argument outlined above, substantial inconsistencies in [jailer's] testimony erode his credibility and leave open numerous factual disputes that also prohibit the Court from granting him qualified immunity. . . . The presence in the record of these half-truths, evasive responses, and unanswered factual questions necessitates that this Court REVERSE the district court and strip [defendant] of qualified immunity.").

To the extent Defendant Tilley argues that his actions were pursuant to a supervisory officer's command is of no moment. In the first instance, Defendant Tilley maintains that he was instructed to provide his TASER. In the second instance, he was allegedly ordered to retrieve his cuffs. However, he was not ordered to condone, acquiesce in, or participate in needless and excessive constitutional violations, nor to suffocate Mr. Loggins. Following orders is not a defense to constitutional violations. "[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010)(denying qualified immunity to police officer "following orders" when he excluded citizen from public swimming pools without due process). "[T]hough [defendants] [were] not the mastermind[s] behind the violation of constitutional rights that occurred here, [they] must take responsibility for [their] actions, and may

44

be held accountable in a court of law." *O'Rourke v. Hayes*, 378 F.3d 1201, 1210 (11th Cir. 2004);

*See also Gonzalez v. Cecil County*, 221 F.Supp.2d 611, 616 (D. Md. 2002); *Mial v. Sherin*, No.

1:11-cv-921, 2012 WL 2838424, *10 (E.D. Va. July 9, 2012).

## CONCLUSION

No officer in a position of such public trust can evade accountability when they violate the

constitution and uniformly riddle a subsequent investigation with dishonesty. The motion should

be denied.

It is respectfully submitted, this the 3rd day of September, 2021.

> RIKA JONES, As Administratrix of the Estate of
> ROBERT LOGGINS; RIKA JONES, Individually
> and on Behalf of the Wrongful Death Beneficiaries
> of ROBERT LOGGINS, Deceased; and RIKA JONES,
> As Mother and Next Friend of R.D.L, a Minor
>
> By and through their counsel,
>
> /s/ *Jacob B. Jordan*
> Jacob B. Jordan, MSB #104230
> J. Rhea Tannehill, Jr., MSB #10449
> TANNEHILL, CARMEAN & McKENZIE, PLLC
> 829 North Lamar Blvd. Suite #1
> Oxford, Mississippi 38655
> Telephone: (662)236-9996
> Facsimile: (662)234-3949
> E-mail: jacob@tannehillcarmean.com
> E-mail: jrt@tannehillcarmean.com
>
>
> Victor I. Fleitas, MSB #10259
> fleitasv@bellsouth.net
> VICTOR I. FLEITAS, P.A.
> 452 North Spring Street
> Tupelo, Mississippi 38804
> (662) 840-0270 / Telephone
> (662) 840-1047 / Facsimile
>
> *Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, Jacob B. Jordan, counsel for Plaintiff, hereby certify that I have this day served the above and foregoing to the following counsel for Defendants pursuant to the Federal Rules of Civil Procedure.

Steven J. Griffin, Esq.
Daniel Coker Horton & Bell, P.A.
Post Office Box 1084
Jackson, Mississippi 39215-1084
sgriffin@danielcoker.com
*Attorney for Corrections Management Services, Inc.*

Thomas R. Julian, Esq.
Daniel Coker Horton & Bell, P.A.
Post Office Box 1084
Jackson, Mississippi 39215-1084
Tjulian@danielcoker.com
*Attorney for Mobile Medical Ambulance Service, Inc. D/B/A AMR and American Medical Response, John Watson, and Jennifer Howell*

G. Todd Butler, Esq.
Phelps Dunbar, LLP
4270 I-55 North
Jackson, Mississippi 39211-6391
Todd.Butler@phelps.com
*Attorney for Justin Gammage, Edwin Merriman, Reggie Woodall, Albert Deane Tilley, Michael Jones, and City of Grenada*

This the 3rd day of September, 2021.

/s/ *Jacob B. Jordan*
JACOB B. JORDAN
*Counsel for Plaintiffs*