IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

RIKA JONES, ET AL.                                               PLAINTIFFS

VERSUS                                            NO. 4:20CV220-SA-JMV

JUSTIN GAMMAGE, ET AL.                                          DEFENDANTS

MEMORANDUM IN OPPOSITION TO MUNICIPAL DEFENDANTS'
MOTION [DOC. 55] FOR JUDGMENT ON THE PLEADINGS OR,
ALTERNATIVELY, FOR SUMMARY JUDGMENT

COME NOW THE PLAINTIFFS, by and through counsel of record, and file this, their

Memorandum in Opposition to Municipal Defendants' [Doc. 55] Motion for Judgment on the

Pleadings or, Alternatively, for Summary Judgment. Plaintiffs provide as follows:

I.     STATEMENT OF FACTS

In the early morning hours of November 29, 2018, a resident of 50 West Govan Street

called 911 to report the presence of someone in her back yard screaming for help. The caller

stated that, "Somebody's in the back of my house calling for help…. Please hurry. Send

someone." (Exhibit A, 911 Call). The responding officers heard the call, and understood that

they were responding to a call in which someone had been screaming for help. (Ex. I, Gammage

Statement, RL30; Ex. K, Tilley Statement, RL54; Ex. L, Jones Statement, RL70; Ex. N,

Merriman Interview, RL90; Ex. O Edna Clark Statement,  RL126).

Defendant Albert Deane Tilley, Defendant Michael Jones, and Defendant Corporal

Edwin Merriman were the first officers on the scene. These officers originally had difficulty

locating the source of the screaming due to the darkness, fenced-in back yards, and ground

cover. Ultimately the defendant officers located Robert Loggins lying face down on the ground,

with his hands tucked underneath him in tall, bristly vegetation. Officer Tilly identified himself

as the Grenada Police Department and stated that, "We're here to make sure you're ok." (Ex. B, Merriman Video at 00:35). Meanwhile, Defendant Sergeant Reggie Woodall, believing the noise was coming from Bledsoe Street, tried to find his fellow officers and the location of the person hollering for help. A neighbor believed to be the initial 911 caller and visibly unafraid of Robert Loggins, the person she witnessed screaming for help, assisted Defendant Woodall in the search. (Ex. C, Woodall Video at 5:15).

As Defendant Woodall continued looking for the source of the hollering, Defendant Merriman radioed Defendant Woodall and stated, "We're speaking with him, but they're on the other side of this fence. So I guess they're going to be on Govan [Street]." (Ex. C, Woodall Video at 7:42; Ex. B, Merriman Video at 1:11). A minute later, Defendant Tilley radioed that the person shouting had been identified as Robert Loggins. (Ex. B, Merriman Video at 2:10). A defendant officer then radioed to the other Defendants, "He's on something." It is undisputed the defendants knew from Mr. Loggins' erratic and incoherent behavior that he must have been on drugs of some kind. (Ex. B, Merriman Video at 2:16; Ex. I, Gammage Statement, RL33; Ex. K, Tilley Statement, RL59; Ex. L, Jones Statement, RL81).

As Mr. Loggins hollered and questioned whether the defendants were going to kill him, Defendant Tilley told Mr. Loggins, "Nobody's gonna kill you Mr. Loggins. I need you to stick your hands straight up where I can see em', because I can't see em' right now…. We're here to help you. Nobody's gonna kill you Mr. Loggins. We're here to help." (Ex. B, Merriman Video at 3:32). It is thus patent, particularly drawing all inferences in Plaintiff's favor, that from the outset until his untimely death, no officer throughout this episode suspected that Mr. Loggins posed a threat to their safety. Indeed, even to this day, no officer alleges that Mr. Loggins posed a threat.

2

In fact, at no point during the entire morning did he show or possess a dangerous weapon or threaten anyone. (Ex. J, Woodall Statement, RL45; Ex. K, Tilley Statement, RL 55-56; Ex. L, Jones Statement, RL72; Ex. N, Merriman Statement, RL90; Ex. P Jerome Johnson Statement, RL131; Ex. I, Gammage Statement RL 34).

Defendant Gammage, in apparent acknowledgment that the officer did not attempt to de-escalate, stated to the MBI that "we try to reason with a subject, de-escalate the situation which we had done in dealing with Loggins before…. He has resisted before." (Gammage Statement, RL33).

All of the defendants described Mr. Loggins' behavior on the scene as, speaking in tongues, quoting scripture, screaming, not making sense, and, "it wasn't like he was speaking English." (Ex. J, Woodall Statement, RL 42; Ex. K, Tilley Statement, RL 55; Ex. L, Jones Statement, RL 73; Ex. I, Ex. I, Gammage Statement at, RL 34). Not surprisingly then, notably absent from any of the communications, including several minutes between initial contact and the arrival of Defendant Woodall, is any suggestion that this drug-addled and incoherent individual was either armed or dangerous. The Defendant Gammage stated that he gave three verbal commands, and then motioned for Defendant Woodall to tase Mr. Loggins. (Ex. I, Gammage Statement RL 33).

Prior to reaching Mr. Loggins' location, Defendant Woodall, in far from a split-second decision, already planned to use his taser: "We might have to tase him." (Ex. C, Woodall Video at 11:15). Defendant Gammage began shouting orders to the face-down Mr. Loggins to show his hands, instead of using de-escalation techniques, and within a moment Defendant Gammage and Defendant Woodall getting to Mr. Loggins, they discharged their TASER weapons against an

unarmed, incoherent, and passively resisting Mr. Loggins. (Ex, C, Woodall Video at 11:45).

Defendant Woodall approached Robert Loggins' location as Defendant Gammage could be heard telling an incoherent Mr. Loggins to remove his hands from underneath him. Mr. Loggins grunted incoherently in response. (Ex. C, Woodall Video at 11:27). Unconcerned by Mr. Loggins' incoherence and lack of a weapon, Defendant Woodall stepped around Defendant Gammage and immediately discharged his TASER, which caused Mr. Loggins to grunt loudly.[1] As Robert Loggins grunted incoherently in pain and recited scriptural and religious phrases, the defendant officers gratuitously applied TASER blows to him several times. Defendants Gammage, Jones, and others continued to shout verbal commands to the incoherent Mr. Loggins while they were discharging electricity into him. The application of the electric shock from the TASER resumed for five more seconds, and caused Mr. Loggins to audibly grunt again. (Ex. C, Woodall Video at 12:23). While Defendant Tilley and Jones tried to grab Mr. Loggins' arms, they continued to tase him. (Ex. C, Woodall Video, 12:30). During this use of the TASER against the passively resisting Mr. Loggins, it appeared Defendants Jones and Tilley were also shocked, as Jones screamed, "Oh shit." (Ex. L, Michael Jones Statement, RL 72; Ex. N, Merriman Interview, RL 33; Ex. C, Woodall Video at 12:38). Hearing this, Defendant Gammage asked, "What did he do?" Defendant Tilley replied "got me," and another officer said, "bit you." (Ex. B, Merriman Video at 4:51; Ex. C, Woodall Video, Id.).[2] Jones later admitted

---

1. The tasing can be detected in the bodycam videos by the sound of a repetitive crackling noise. The officers directed two types of TASER discharges into Mr. Loggins. The first type is where two prongs are shot into Mr. Loggins' body. The second type is "drive-stun" mode, where a handheld TASER is pressed against Mr. Loggins' body and discharged into Mr. Loggins' right side.

2. This appears to be the moment when Defendant Tilley alleges that Mr. Loggins bit him on the hand. *See* (Gammage Statement, RL00030 "The third time that Sergeant Woodall tased him, Officer Tilley jumped back like most people do when they get tased, like he had caught a little bit of electricity."). However, the video shows Defendant Tilley's

4

when offering his statement regarding the death of Mr. Loggins that he had been jolted with the electricity from the TASER, which hurt and bruised him, while he was engaged in attempting to force Mr. Loggins' arms and hands from underneath him. (Ex. L, Jones Statement, RL 72, 76).

During a short break from the use of the TASER to force this passively resistant and incoherent Mr. Loggins to move his arms from underneath himself, Defendant Gammage asked for Defendant Tilley's TASER. Mr. Loggins said, "My soul belong to Jesus Christ. He's my savior. My protector." (Ex. C, Woodall Video 12:57). Defendant Gammage responded, "Your ass belongs to us now. Take your hands from up under you." (*Id.* at 13:01). Defendant Gammage then immediately discharged Defendant Tilley's TASER on drive-stun mode several times for prolonged durations. (Ex. C, Woodall Body Cam Video at 13:22). Sergeant Woodall stated that the taser originally worked to get his hands from underneath him, but by the time they went to handcuff him, the five second taser had expired, and Robert put his hands back underneath his body. He also stated that subsequent tasings were ineffective in gaining compliance but caused Mr. Loggins audible and visible pain. (Ex. J, Wooddall Statement, at RL 41). During this use of force against Mr. Loggins, the defendant officers continued to shout unsuccessful orders to remove his hands from under his body, although Mr. Loggins was visibly suffering from an altered mental state and was totally incoherent. (*Id.*)

Failing to force the terrified Mr. Loggins (he feared the defendant officers meant to kill him) to move his hands from underneath his body, the defendant Gammage intently discussed

---

hands are not near Mr. Loggins' head, and it appears that he was shocked by the TASER and not bitten. Tilley's own testimony is more consistent with tasing than biting: "I went down to go reach under him to grab his arms and he bit down on my hand, and I yanked back, and I stepped back for a few minutes *because I was stunned. I didn't know what it was*…." (Ex. K, Tilley Statement, RL57) (emphasis added).

doing it, "the old fashioned way." Defendant Gammage stated, "He [Mr. Loggins] sho' sho' gonna hate it." (Ex. C, Woodall Video at 13:35). Defendant Jones asked for a baton. (*Id.*; Exh. L Jones Statement at RL76).nnThe "old fashioned way" started with Defendant Woodall beating Mr. Loggins' arm and elbow with his flashlight approximately nine times. (Ex. C, Woodall Video at 15:08). Defendant Woodall used the TASER on drive-stun mode against Mr. Loggins again. (Ex. C, Woodall Video at 15:33). The defendant officers again discussed with one another their belief that Mr. Loggins was "on something" that might be meth. (Ex. C, Woodall Video at 15:41; Ex. B, Merriman Video at 9:10). After Mr. Loggins' death, the defendant officers described Mr. Loggins as being very strong due to their belief he was on a mind-altering substance. (Ex. L, Jones Statement RL72, Ex. I, Gammage Statement at RL33). Officers tased him on his arm, buttocks, and arms. (Ex. C, Woodall Video at 18:59).

In sum, it appears Defendant Woodall and Defendant Gammage struck Mr. Loggins with the TASER a minimum of nine times and Defendant Woodall struck Mr. Loggins nine times with an impact weapon. (Ex. V, Taser Report). The taser printouts indicate that one taser was discharged 9 times for a duration of five seconds each, and that the other taser was deployed twice for a duration of 5 seconds each on November 29, 2018, which suggests a total of eleven taser strikes. (Ex. Z, Tilley Taser Report).

The TASERs used by the defendant officers in this action carried the following warning:

"Some individuals may be particularly susceptible to the effects of CEW use. These susceptible individuals include the elderly, those with heart conditions, asthma or other pulmonary conditions, and people suffering from excited delirium, profound agitation, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle. In a physiologically or metabolically compromised person, any physiologic or metabolic change may cause or contribute to sudden death."

(Exhibit Y, Taser Manufacturer Warnings). It cannot be disputed based on the video and the defendant officers' statements that they knew Mr. Loggins exhibited clear signs of excited delirium, profound agitation, severe exhaustion, drug intoxication and over-exertion from physical struggle. Unsurprisingly then, Mr. Loggins never stood up "on his own power" that night. (Ex. N, Merriman Statement, RL95; Ex. L, Jones Statement, RL73).

Of note and relevance to this Court's inquiry, when questioned about their apprehension of and use of physical force against Mr. Loggins at the scene of his arrest, the defendant officers, including Defendant Tilley, exhibited obvious mendacity when answering questions posed to them by an investigator with the Mississippi Bureau of Investigation who was clearly sympathetic to them.[3] (Ex. I, Gammage Statement at RL 35, RL 38; Ex. J, Woodall Statement, RL50-51l; Ex. K, Tilley Statement, RL 58, 63-65; Ex. L, Jones Statement, RL 74-75; Ex. N, Merriman Statement, RL 0091).

Defendant Gammage stated that none of the officers used a flashlight to strike Mr. Loggins, because he "wouldn't do that. I wouldn't allow that to go on." (Ex. I, Gammage Statement at RL 38). We know from video evidence that this statement is false. Defendant Gammage also admitted that he struck Mr. Loggins' ribs and put his elbow on Mr. Loggins' neck but stopped striking him because it "it didn't affect him." (Ex. I, Gammage Statement, RL 33, 35, 38). Despite Defendant Gammage discontinuing physical blows because they were

---

3.In questioning Jones regarding the use of force against Mr. Loggins while effectuating his initial arrest, the investigator stated, "I'm on your side Michael [Jones]. I'm for the police." Despite this MBI investigator receiving multiple material misstatements of fact from every defendant officer he interviewed regarding the circumstances of Mr. Loggins' death, the District Attorney's Office has not charged these officers for their untruthful statements (nor, for that matter, the deadly assault of Robert Loggins).

ineffective, Defendant Gammage gratuitously tased Robert Loggins after he witnessed

Defendant Woodall strike Mr. Loggins with a flashlight approximately seven to nine times. (*Id.*)

Defendant Gammage also "straddled" Mr. Loggins. (Jones Statement, RL 72, 77).

In addition to his excessive force against Robert Loggins, Defendant Woodall perpetrated

deceit to the MBI investigators. Defendant Woodall, who struck the decedent nine times with a

flashlight, told the MBI investigator that "I don't think nobody hit him with no flashlight," and

that they no longer used "impact weapons." (Ex. J, Woodall Statement, RL 45-46). When asked

again whether he struck him with a flashlight, he stated, "No, I didn't. I don't think I did… but as

far as hitting him with it, no, nobody hit him." (Id. at RL 51). This statement is provably false

with video evidence.

Defendant Jones, despite receiving the same warning about hindering an investigation,

did not relent in falsely claiming that nobody struck Mr. Loggins with a flashlight or other

weapon. (Ex. L, Jones Statement at 72, 74-76). He maintained, to the consternation of MBI

officers that no one struck Mr. Loggins with a flashlight. (Jones Statement RL77, 80, 81). He

stated that Officer Tilley simply put pressure on one of Mr. Loggins' arms at the jail, but not his

head or neck. (Jones Statement, RL 78).

After the defendant officers dragged the incoherent and assaulted Mr. Loggins to the

carport of a nearby house, first-responders employed by Defendant Mobile Medic Ambulance

Service, Inc. (hereinafter "AMR"), Defendants John Watson and Jennifer Howell, made contact

with Mr. Loggins. Despite Defendants Watson and Howell failing to assess, examine, or treat

Mr. Loggins, the Defendant Watson told the defendant officers, "He looks fine to me." In

response, Defendant Woodall stated out loud, "Gotta give him something." Defendant Watson

8

responded, "We ain't got nothing to reverse what he's on." (Ex. C, Woodall Video at 19:07). The defendants officers did not find a weapon nor an illegal substance on Mr. Loggins. Sergeant Woodall originally believed he had recovered liquid meth, but according to a field test kit, it was just lotion. (Woodall Statement, RL 48).

The Defendant officers knew the paramedics did not examine Mr. Loggins properly. Defendant Merriman described it as, "Not much. They didn't check nothing. No vitals. No nothing." (Ex. N, Merriman Statement RL 96). Defendant Tilley stated, "they looked at him…. and they asked him how he felt, and he just gave an off the wall thing."[4] (Exhibit K, Tilley Statement at RL59). Defendant Jones stated that "They came and stood and looked over him. They didn't, you know, open his mouth or nothing like that. They came and stood and looked over him and said, 'he's fine,' and that was it." (Ex. L, Jones Statement, RL 79). AMR's medical records for Mr. Loggins prepared by the Defendant Watson and the Defendant Howell state: "NO CONTACT MADE WITH PATIENT."[5] (Ex. W, AMR Records, RL 210).

After the AMR defendants failed to assess Mr. Loggins (despite their knowledge of his mental status, the physical struggle, and TASER strikes) in the carport, the defendant officers dragged Mr. Loggins to the driveway where he lay on the ground and continued to grunt incoherently. Defendants Jones and Tilley then dragged Mr. Loggins into Jones' patrol car for transport to the Grenada County Jail. Mr. Loggins began shouting incoherently again and

---

4. The Defendants AMR, Watson, and Howell admitted at ¶ 43 of their Answer & Affirmative Defenses to the Third Amended Complaint that no history or vital signs were taken from Mr. Loggins at the scene of his arrest.

5. The same reports contradicts the earlier claim that no contact was made with Mr. Loggins by noting that a handcuffed Mr. Loggins was fighting with the police and could not be assessed. (Exh. W at 210). As already noted, the statement that Mr. Loggins could not be assessed at the scene of his arrest by the Defendant Watson is contradicted by the defendant officers and the fact that Defendant Watson removed the TASER prongs from Mr. Loggins' coat and body at the scene.

struggled to keep from being put in the patrol car, but was ultimately forced into the back seat. Officer Tilley applied a knee strike to get the decedent in the car. (Ex. J, Woodall Statement at RL47, Ex. D, Jones Body Cam). Defendant Woodall told Jones to "try to set him up."  (Ex. D, Jones Body Cam, Ex. C, Woodall Body Cam at 23:32). An exhausted Defendant Jones screamed, "Sit your punkass up! Tired of fucking with you." (*Id.*) Defendant Woodall told Defendant Jones, "Drive fast and move hard." Defendant Merriman can be heard to say, "Yep." (Ex. D, Jones Body Cam at 00:12, Ex. C, Woodall Body Cam at 23:43). Before Defendant Merriman turned off his bodycam in his vehicle, he made clear what little regard he had for Robert Loggins: "That's some bullshit man, for five o'clock in the fucking morning. **** Stupid bastard." (Ex. B, Merriman Video; 18:05, 18:35).

There is a dispute among the defendants as to whether Loggins was sitting up in the back of the car. Defendant Jones and Defendant Tilley maintain that he was unbelted and laying down across the seat, while Defendant Merriman maintains that he was sitting up. (Jones Statement, RL80,  Tilley Statement RL62, Merriman Statement, RL96).

Prior to Defendant Jones driving off with Mr. Loggins, Defendant Howell concernedly rushed over to him and asked, "Is this the same dude that was out of the hospital not too long ago cranked out on this mess?" Jones, responded, "No. Different Guy." The Defendant Howell then stated, "Different guy? Acting the same. On the same stuff. Dude was on Flakka."[6] (Ex. D, Jones Body Cam, Ex. C, Woodall Body Cam at 23:41). Jones then transported the subdued and silent Mr. Loggins to the jail, only part of which is captured on Defendant Jones' body cam. (Ex. D,

---

6.Defendant Jones untruthfully stated to investigators that Ms. Howell, at the end of this exchange, said "Well, he's fine." (Michael Ex. L, Jones Statement RL 78). The video evidence conclusively disproves this contention.

Jones Body Cam; Ex. C, Woodall Body Cam at 23:41). Then, Defendant Woodall stated, "when he got that first juice, it was over with." Defendant Gammage replied, "I told em' to grab his arm," and "that's all it's gonna say in the paperwork." (Ex. C, Woodall Body Cam at 24:50). He concluded his involvement by radioing the other defendants, "Good way to end the morning…. Y'all need to step up… [inaudible] at the jail." (Ex. C, Woodall Body Cam at 24:50).

Upon arriving at the sally-port of the Grenada County Jail, Jones and two jailers carried a limp Mr. Loggins "like a sack of potatoes" into the booking area of the jail and placed him face-down on the floor in front of the booking desk. (Ex. E, Sally Port Jail Video, Ex. O, Clark Statement at RL127).  Upon arriving at the jail after his conversation with Defendant Howell about Mr. Loggins' drug ingestion, Defendant Jones entertained doubts about Mr. Loggins' medical condition.  (Ex. L, Jones Statement at RL81). Jones stated, "When I was getting Loggins out of the car, he was, you know, just started laying down, you know, grunting and moaning. I'm like this guy, something ain't right, you know what I'm saying? I'm like this guy – it's got to be more than, you know, flakka or something. I mean, either he done swallowed something or something."  (*Id.*)

Jailer Frank Sanders described Mr. Loggins as having lacerations on his head and knees, blood coming out of his mouth, and breathing heavily at some point after he arrived to the booking area.  (Sanders Statement at RL85).  Jailer Jerome Johnson described Mr. Loggins as "shaking and wiggling" when he brought him in the jail.  (Ex. P, Johnson Statement at RL 131). Jailer Raphael Harvey also helped bring Mr. Loggins into the jail and described him as bleeding from his head, mouth, and knees. (Ex. Q, Harvey Statement RL120). Supervising Sergeant Clark told investigators that Mr. Loggins had busted teeth and was bleeding from his mouth. (Ex. Q,

11

Clark Statement, RL 127; Ex. R Clark Report). According to Sergeant Clark and based on previous encounters, Mr. Loggins had beautiful teeth and was proud of them. (Ex. Q, Clark Statement RL127). According to Jailer Harvey, Sergeant Clark told the officers to take Robert Loggins to the hospital before the officers tried to remove the handcuffs. (Ex. Q, Harvey Statement, RL122).

They immediately placed Mr. Loggins prone on the floor of the booking area with his hands cuffed behind his back. This prone position, particularly in individuals subjected to physical struggles during their arrest, has been known by law enforcement officials for decades to create an inordinate risk of death from positional asphyxia, and officers are instructed to immediately place the arrestee in a seated position to allow them to breathe.[78] (Ex., AA, Department of Justice National Law Enforcement Technology Center "Positional Asphyxia - Sudden Death June 1995; Ex. BB, Mississippi Law Enforcement Officer Training Academy Training Materials). As already noted, signs of Mr. Loggins' obvious medical distress, bleeding from head, mouth, and knees, broken teeth, labored breathing, physical injuries, drug reaction, and altered mental status, were visible to every defendant standing in the booking area.

Jail staff described Mr. Loggins inside the jail as follows, "He never said anything threatening even when he was laid in the floor talking, he never threatened nobody. He was just talking, you know, off the wall stuff…. He was quoting Bible passages. I don't know which ones." (Ex. P, Jerome Johnson Statement, RL131). "He was just rolling back and forth, back and

---

7. This document was received through a public records request. Defendant Tilley would have received this training for completion of his certificate as required by Mississippi law. *See* § 45-5-1, *et seq*.

8. *See Lombardo v. City of St. Louis*, 141 S. Ct. 2239, 2241 (2021)("St. Louis instructs its officers that pressing down on the back of a prone subject can cause suffocation. The evidentiary record also includes well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of that risk."

forth, back and forth and according to what the officers said to me, when they found him he was saying, 'Somebody help me, please. Somebody, help me, please.'" (Ex. O, Clark Statement, RL126). Sergeant Clark noted that, "[W]e've had problems with him in the past but he didn't seem like that combative to me because he was just going from side to side, side to side. He wasn't screaming. He wasn't hollering like he used to do. I mean, he wasn't doing anything. He was flouncing around, just going from back to side to side like he was trying to roll over." (Ex. O, Clark Statement, RL 127). Sergeant Clark also observed that Mr. Loggins was "rolling from side to side, flopping and trying to – to me he was trying to gasp for breath because he couldn't breathe." (Ex. O, Clark Statement, RL126).

Upon seeing Mr. Loggins' appearance, Sergeant Clark told the defendant officers that she would not accept Mr. Loggins at the jail and that he needed to be transported to the hospital. (Ex. O, Clark Statement, RL 126). The Defendant told Sergeant Clark that Mr. Loggins had been cleared despite knowing the emergency medical personnel never actually assessed or examined Mr. Loggins. (Ex. O, Clark Statement, RL126). During this discussion, a visibly injured Mr. Loggins struggled to breathe and rocked on his stomach from side to side in an unsuccessful and increasingly desperate effort to turn over and breathe. (*Id.*) Sergeant Clark again told the defendant officers that she could not accept the injured Mr. Loggins at the jail and that he needed to be transported to the hospital. (Ex. F, Jail Video at 6:01 a.m.; Ex. O, Edna Clark Statement, RL126; Ex. Q, Raphael Harvey Statement, RL 120, 122; Ex. X, Jail Log, RL258). Jailer Harvey recalled Sergeant Clark telling the defendant officers immediately that she could not accept him at the jail. (Ex. Q, Harvey Statement, RL122). Jailer Sanders observed Mr. Loggins with his eyes rolled to the top of his head and breathing abnormally and urged

13

Sergeant Clark not to accept him at the jail in his condition. (Ex. M, Sanders Statement, RL85).

The defendant officers collectively ignored these known and obvious signs of Mr. Loggins' medical distress at the jail. Defendants Jones, Merriman, and Tilley also defied Sergeant Clark's admonitions to take Robert Loggins to a hospital. At 6:01 a.m. on the video, and as well at 6:03 a.m. according to jail logs, Sergeant Edna Clark, the jail supervisor, tells the officers that she would not accept Robert Loggins and that he needed to be taken to the hospital. (Ex. F, Jail Video at 6:01 a.m.; Ex. O, Edna Clark Statement, RL 126; Ex. Q, Raphael Harvey Interview, RL 120, 122l Ex. X, Jail Log RL 258). Michael Jones, for his part, having already acknowledged Mr Loggins' compromised condition, stated that "she was griping and complaining something about they couldn't keep him because he was under the influence of drugs or something, and, you know, steadily telling me that I was going to have to take him back with me…." (Ex. L, Jones Statement, RL79). Sergeant Clark stated to investigators that "one of the other young officers waived me off like he was dismissing me. That young man's name was Michael Jones." (Ex. O, Clark Statement RL126; Ex. R, Edna Clark Report). At 6:03:31, Defendant Jones can be seen in the video waving off Sergeant Clark's admonitions. Defendant Tilley, too, stated that "She did not want to accept him. She wanted him to get medically checked out and that she was going to call the ambulance over there to get him checked out." (Ex. K, Tilley Statement at RL62). These officers had subjective awareness of Robert Loggins' medical distress.

At this point, a subdued, physically injured and bleeding, drug-addled, mentally

14

incoherent, Mr. Loggins continued to try to roll over to breathe.[9] Defendant Tilley whose cuffs restrained the prone and struggling Mr. Loggins behind his back touched the handcuffs and Mr. Loggins attempted to roll over again. (Ex. F, Jail Video at 6:02:50).

Almost two minutes later, while Mr. Loggins struggled to breathe, Defendant Tilley lodged his knee on the prone and subdued Mr. Loggins' neck as Jailer Sanders applied leg irons to shackle Mr. Loggins' ankles and weigh them down with his body weight. (Ex. F, Jail Video at 6:04:33; Ex. M, Sanders Statement, RL86; Ex. P, Johnson Statement, RL132; Ex. T, Johnson Report, RL192). Jailer Sanders stated that "One individual was on top of him. I think two individuals were on top of him." (Ex. M, Sanders Statement, RL 85). Two witnesses gave statements saying that Defendant Tilley put his knee on Mr. Loggins' neck. (Ex. O Edna Clark Statement RL124; Ex. Q, Harvey Statement at RL120-21). A total of at least four officers, including Defendant Jones on the side of Mr. Loggins' body, applied weight to Mr. Loggins to keep him in the prone position (notwithstanding training to the contrary) by holding down his legs, arms, and back, which further restricted and compromised Mr. Loggins' breathing. (Ex. F, Jail Video; H, Arnall Declaration; Jones Statement, RL78; Harvey Statement, RL120-121; Jerome Johnson Statement, RL132-133).

Sergeant Clark described this needless use of force against Mr. Loggins as follows:

And my officers got on each side of him and was holding his shoulders because

---

8. Though Loggins was visibly struggling to breathe, the defendant officers suggest that it is a mitigating factor, somehow, that Loggins did not "say" that he could not breathe, and that his claims are therefore not actionable. *See* Docket #57, Pg. 16 ("But it has not been alleged that Loggins ever stated that he could not breathe. Evidence shows that he was rolling around, moving, talking, and behaving similarly to the earlier encounter.") How the defendants make this suggestion in light of a record which shows that jailers told them that Mr. Loggins was struggling to breathe and eventually stopped breathing beggars the imagination.

> Mr. Loggins was, you know… trying to gasp for breath because he couldn't breathe. At that point, Mr. Dean Tilley, the officer, put his knee right here on the back of Mr. Loggins' head. He was on his stomach and he put his knee right here, but the position that Mr. Tilley was in, he couldn't get the restraints off. So he actually stood up, turned around and sat down on his head to take the restraints off.

(Ex. O, Clark Statement, RL126) (emphasis added). Defendant Tilley can be observed clearly on the video to shift from kneeling on Mr. Loggins' neck to sitting on Mr. Loggins' head facing backwards to remove his handcuffs. (Ex. F, Jail Video at 06:05:36; Ex. G, Zoomed in Jail Video).

Jailer Raphael Harvey explained the excessive use of force against Mr. Loggins this way:

> Then some little short – one of them on the Grenada Police Department sat right here on his shoulders. He sat right here on his shoulders and like put his legs right here behind his shoulders and sat right here on the back of his neck…. At that point in time, he was already detained so it wasn't no sense for him to actually go over there and do that to get handcuffs when he was already – basically, we had him already down…. Then they left. Right after Sergeant Clark already told them that he cannot stay here because he was already bleeding [out of his mouth].

> ***

> "I don't know his name, but as I explained earlier it was a little short one of the officers that sat right here. We already had him down on his stomach. He sat and put his legs right here, like all this right here, he put all this right here and just sat right there. He couldn't move already because we already had his arms and his legs. There wasn't no sense in him standing right there.

(Ex. Q, Harvey Statement, RL120-121).

After over three minutes of exerting this force on Mr. Loggins' back, body, neck, and head, jailers picked up the limp and lifeless Mr. Loggins, and the video shows blood coming out of Robert Loggins' mouth onto the floor. (Ex. F, Jail Video at 6:07:51). Immediately after the officers got off Mr. Loggins, Sergeant Clark described his condition, "[H]e was limp. He couldn't

16

stand up…. And when they picked him up, he couldn't get his legs under him and he was just limp." (Ex. O, Clark Statement, RL126-127). Sergeant Johnson stated that Mr. Loggins was responsive before the dogpile, and "when they [the handcuffs] came off, he was unresponsive." (Ex. P, Johnson Statement, RL134). According to Jailer Sanders, he told the officers once the handcuffs first came off to cuff Mr. Loggins in front of his body because he was concerned about the abnormal breathing, and that "they completely took the handcuffs off and that's when Ms. Clark, the supervisor, Sergeant Clark stated, 'I don't believe he's breathing.' We advised the officers that the individual needed medical care." (Ex. M, Sanders Statement, RL85-86; Ex. S, Sanders Report RL191).

Defendant Merriman can be seen standing by doing nothing while he observes his subordinate officers accost Robert Loggins for more than three minutes. Jailer Raphael Harvey observed, "So then when they left, we tried to pick him up and put him in the room, he was unresponsive. Like his legs were not moving, nothing was going on." (Ex. Q, Harvey Statement, RL120). Mr. Harvey stated the officers left in a hurry while Sergeant Clark told them to take Mr. Loggins to the hospital. (Ex. Q, Harvey Statement, RL122).

In obvious contradiction of the video evidence, the other witnesses' testimony, and their own eyes, all of the defendant officers misled the investigators who questioned them about the circumstances of Mr. Loggins' death, much like they misled investigators about the circumstances of Mr. Loggins' arrest. Defendant Tilley, who put his knee into Mr. Loggins' neck and sat on his head can be seen to look back at the lifeless Loggins for a prolonged period before leaving the jail. (Ex. F, Jail Video at 06:08:04). Defendant Tilley saw Mr. Loggins' lifeless body and made a conscious decision to do nothing to help him. Defendant Tilley told investigators

17

quite a different story than the truth: "We swapped the cuffs, and when we left, Mr. Loggins was still sitting there hollering stuff you couldn't understand." (Ex. K, Tilley Statement, RL55). Defendant Tilley also told investigators and in effect tells this Court that, "I was off to the side of him, and I was trying to undo the cuffs." (Ex. K, Tilley Statement, RL60). When asked directly if he sat on Mr. Loggins, Defendant Tilley responded, "No sir." (Ex. K, Tilley statement, RL60). Defendant Tilley essentially denied exerting any physical force on Mr. Loggins. (*Id.*)

Defendant Merriman, a supervisory officer, paltered about whether he saw anyone sitting on Mr. Loggins' head by stating that he, "has been known to use my knee to restrain them, but, like I say, I can't say one way or the other if I saw that." (Ex. N, Merriman Statement, RL94). Defendant Merriman also dissembled by stating that Mr. Loggins was kicking and thrashing when the officers got off of him, and that "the jail put their [handcuffs] on, and two or three of them were on top of him," apparently content to leave out the fact that his own officer sat on Mr. Loggins' head and neck. (Ex. N, Merriman Statement, RL94) (emphasis added). Defendant Merriman also prevaricated about Mr. Loggins' condition when they left the jail, stating that Mr. Loggins, "was still squirming around acting a fool, cussing, just talking outside of his head. He was still breathing." (Ex. N, RL94).

Thus, it is apparent that these defendants, whether discussing the force exerted on Mr. Loggins' arrest or at the scene of his demise, declined critical opportunities to be truthful. They followed a Code Blue, which MBI investigators acknowledged during their questioning of these defendants: "I know what Code Blue is and what… happens in the field stays in the field. I know all of that. Okay?... But I'm telling you that the story is not adding up. Okay?" (Ex. L, Jones Statement, RL76).

Dr. Michael Arnall, a board certified forensic pathologist noted that "broken teeth, lacerated lip, abrasions on the face, and multidirectional contusions of the muscles on the head and back of the upper neck correlated with the jail video of suffocation." (Ex. H, Arnall Decl.). Though expert testimony is not required in this case, it is nonetheless available. According to Dr. Arnall, the cause of Mr. Loggins' death was suffocation and the manner of death was homicide. (*Id.*)

III.     MOTION FOR JUDGMENT ON THE PLEADINGS AND SUMMARY JUDGMENT STANDARD

In assessing a motion to dismiss pursuant to Fed. R. Civ. P. 12(c), the Court must accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). To survive a motion to dismiss, a plaintiff is not required to adhere to a standard of heightened fact pleading of specifics, but is only required to provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 553, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the nonmovant's case." *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Federal Rule of Civil Procedure 56 permits summary judgment only where the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(a). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. A fact issue is 'material' if its resolution could affect the outcome of the action." *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).

"On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. . . . [T]he court must therefore refrain from making credibility determinations or weighing the evidence." *Coury v. Moss*, 529 F.3d 579, 584 (5th Cir. 2008). "Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Tig Ins. Co. v. Sedwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "[E]ven if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.'" *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). This Court has relied upon this standard in multiple cases. *See Geiger v. Monroe County*, No. 1:16-CV-95-SA-DAS, 2018 WL 3025951, at *3 (N.D. Miss. June 18, 2018), *aff'd sub nom. Geiger v. Sloan*, 780 F. App'x 150 (5th Cir. 2019) (involving excessive force claims); *Wheat v. Strickland*, No. 3:13-CV-00087-SA-DAS, 2015 WL 1000299, at *5 (N.D. Miss. Mar. 6, 2015) (negligent entrustment claims); *Lenoir v. SGS N. Am., Inc.*, No. 1:16-CV-58-SA-DAS, 2017 WL 4158625, at *10 (N.D. Miss. Sept. 18, 2017) (employment discrimination claims); *Friar v. Syntron Material Handling, LLC*, No. 1:17-CV-101-SA-DAS, 2018 WL 3650257, at *4 (N.D. Miss. Aug. 1, 2018).

20

IV. ARGUMENT AND AUTHORITIES

42 U.S.C. §1983 provides a remedy against any person acting under color of law who subjects an individual like Robert Loggins "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. §1983. Notably, this federal statute provides a remedy for "any" constitutional depravation, not just clearly-established depravations or for deliberately indifferent deprivations. Qualified immunity has no textual grounding in this statute and should have no application in the consideration of the merits of this case.  *See Baxter v. Bracey*, 140 S. Ct. 1862, 207 L. Ed. 2d 1069 (2020) (Thomas, J., dissenting from denial of certiorari) ("Because our § 1983 qualified immunity doctrine appears to stray from the statutory text, I would grant this petition."); *Ramirez v. Guadarrama*, 2 F.4th 506, 524 (5th Cir. 2021) (Willet, J., dissenting) ("Nonetheless, the atextual, judge-created doctrine of qualified immunity shields lawbreaking officials from accountability, even for patently unconstitutional abuses, thus largely nullifying § 1983.")

Because the acts and omissions of these defendants render unavailable even the most rigid application of qualified immunity, Plaintiffs proceed to an analysis of the multiple constitutional violations as follows. First, the Defendant Gammage and the Defendant Woodall actively participated in tasing and beating a passively resisting Mr. Loggins who was suffering with known excited delirium during Mr. Loggins' initial arrest.  Second, Defendant Merriman and Jones are liable for the gratuitous and excessive force used against a prone, handcuffed, and non-resisting Mr. Loggins at the GCJ which resulted in severe injury and death to Mr. Loggins from asphyxia.  Third, the Defendant Merriman and the Defendant Jones are liable for failing to render or provide medical care to an obviously medically compromised Mr. Loggins at the GCJ.

21

After setting forth the qualified immunity standard, Plaintiffs turn first to the excessive force claims both at the scene of Mr. Loggins' arrest and then at the jail. Plaintiffs will then address the failure to render medical care at the GCJ.

      A.     QUALIFIED IMMUNITY STANDARD

Qualified immunity purports to protect public officials acting within the scope of their official duties from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In order to overcome Defendants' assertion of qualified immunity in this case, "the plaintiff[s] must satisfy a two-prong test." *Melton v. Phillips*, 875 F.3d 256, 257 (5th Cir. 2017) (en banc) (citing *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)(en banc)). "First, the plaintiff must show 'that the official violated a statutory or constitutional right.'" *Melton*, 875 F.3d at 257 (quoting *Morgan*, 659 F.3d at 371). "Second, the plaintiff must show that 'the right was 'clearly established' at the time of the challenged conduct.'" *Id.*

Where factual disputes exist regarding the assertion of qualified immunity during summary judgment, the Plaintiffs' version of the facts must be accepted as true. *Kinney v. Weaver*, 367 F.3d 337, 348 (5th Cir. 2004). Furthermore, "[t]he jury's role has not been entirely abolished in qualified immunity cases." *Jordan v. Wayne County*, No. 2:16CV70-KS-MTP (S.D. Miss. May 17, 2017)(citing *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)). "Rule 56 still has vitality in qualified immunity cases if the underlying historical facts in dispute . . . are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." *Jordan*, No.

22

2:16CV70-KS-MTP (quoting Lampkin, 7 F.3d at 435). "In other words, '[a] finding of objective reasonableness is not appropriate . . . if the material facts are in dispute . . . .'" *Id.* (quoting *Rogers v. Lee County*, 684 Fed. Appx. 380 (5th Cir. 2017) (citing *Lampkin*, 7 F.3d at 435; *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994)).

Defendants overstate the specificity required by the non-textual "clearly established" qualified immunity analysis. The clearly established prong exists to protect officers from violating "extremely abstract rights." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017)(citing *Anderson*, 483 U.S. at 639). Denial of medical care and excessive force are not "extremely abstract rights." "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Kinney*, 367 F.3d at 371 (5th Cir. 2004). "Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be 'fundamentally similar.' Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with 'materially similar' facts." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). In fact, even cases providing "notable factual distinctions" can still provide fair notice to law enforcement. *Id.*

Controlling authority, or a "robust consensus of persuasive authority," create "clearly established" law. *Turner v. Driver*, 848 F.3d 678, 687 (5th Cir. 2017). "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012) (internal citations omitted).

23

B.    EXCESSIVE FORCE CLAIMS

"To prevail on an excessive-force claim, a plaintiff must show (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (internal punctuation omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Id.* at 728. (Punctuation and citations omitted). Determining excessiveness involves consideration of the totality of the circumstances, including, but not limited to application of the *Graham* factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 728-729 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Supreme Court called for consideration of additional, non-exhaustive factors in excessive force cases:  "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

In this case, each one of these factors weighs in favor of the Plaintiffs. Furthermore, "[a]s one of our sister circuits has observed, since the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in

24

excessive force cases should be granted sparingly.'" *Abdullahi v. City of Madison*, 423 F.3d 763,

773 (7th Cir. 2005) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

>    1.    <u>Defendants Gammage and Woodall exerted excessive force at the scene of
>           Mr. Loggins' arrest under clearly established law.</u>

In response to the drug-addled, incoherent, prone, and non-threatening Mr. Loggins who

was screaming for help and telling Defendants that the defendant officers were there to kill him,

the defendant officers used excessive force.  The Defendant Woodall struck Mr. Loggins with

the TASER twice which failed to get Mr. Loggins to take his arms from underneath his body.

Defendant Gammage stated that they would have to do it the "old fashioned way" and that he

[Loggins] "sho' sho' gonna hate it." Then, Defendant Woodall struck Loggins nine times with a

flashlight. Tasing nonetheless resumed after the flashlight strikes. In total, Mr. Loggins was

struck with the TASER eleven times.  (Ex. V, Taser Report; Ex. Z, Tilley Taser Reports).

Defendant Gammage also resorted to striking Mr. Loggins in the side of his body "when [he] saw

the taser did not work. I did strike him in his side, but it didn't affect him so I didn't do it again."

(Gammage Statement at RL34). Defendant Gammage also put his elbow on top of Mr. Loggins'

neck at the scene of the arrest. (*Id.* at RL38).

Then, Officer Woodall instructed Defendant Jones to "Drive fast and move hard," and

later said, "Good way to end the morning." When Defendant Woodall said that it was over with

"when he got that first juice," Defendant Gammage replied, "I told em' to grab his arm," and

"that's all it's gonna say in the paperwork." (Ex. C, Woodall Body Cam at 24:50).

These Defendants attempt to mitigate their liability by alleging that "the officers

reasonably believed that the taser had no effect on Loggins." (Docket 57, Pg. 19). They seem to

argue that the tasers were inoperable, malfunctioning, incorrectly used, or otherwise not painful. It is true that the tasers were ineffective in forcing Mr. Loggins' hands from underneath him, and it is true that the tasers were used in violation of "sudden death" warnings of the manufacturer, but the tasers were clearly inflicting pain on Robert Loggins, who tensed up and grunted when tased. The point is the Defendant Woodall and the Defendant Gammage should have never used the TASER to inflict pain on the passively resisiting Mr. Loggins. Furthermore, it is obvious from Defendant Gammage's statement that "affect" means "secure arrest."

Defendant Gammage, for example, struck Mr. Loggins in the side of his body "when [he] saw the taser did not work. I did strike him in his side, but it didn't affect him so I didn't do it again." (Gammage Statement at RL34). When Defendant Gammage stated that his punch to Mr. Loggins' side "didn't affect him," he did not mean that he did not make contact with Mr. Loggins, he means that he did not accomplish anything other than hurting Mr. Loggins. So too, then, when the tasers allegedly did not "affect" him or have "no effect," their reference is to effectuating an arrest, not that Mr. Loggins did not have electricity flowing through his body to inflict pain as they clearly intended. The latter interpretation is, at minimum, a reasonable if not obvious inference that is due to be drawn in Plaintiffs' favor at this juncture. Furthermore, the taser prongs clearly lodged into Mr. Loggins, because the paramedics had difficulty removing them at first.[10]

Clearly established law demonstrates that qualified immunity is inapplicable to such actions and inactions. The Fifth Circuit has "repeatedly held in the past that a taser is a force

---

10. *See* Woodall Video at 21:39 where the paramedics and Woodall discuss using wire plies to remove the taser prongs from Mr. Loggins.

that, deployed when not warranted, can result in a constitutional deprivation." *Samples v. Vadzemnieks*, 900 F.3d 655, 661 (5th Cir. 2018). In fact, the Fifth Circuit "previously suggested that a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." *Darden*, 880 F.3d at 731. "Our case law makes clear that when an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced." *Id.* Furthermore, "a police officer who is standing over a suspect who is on the ground has a position of advantage over that subject, meaning the officer can control the subject's body movement and that the subject will offer less resistance." *Carroll v. Ellington*, 800 F.3d 154, 175 (5th Cir. 2015) (internal punctuation omitted). Similarly, "Force must be reduced once a suspect has been subdued. Notably, 'subdued' does not mean 'handcuffed.' If the suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Joseph v. Bartlett*, 981 F.3d 319, 335 (5th Cir. 2020). It is significant at the outset that pursuant to *Carroll* and *Joseph*, Mr. Loggins was already subdued, lacked any means of evading custody, and was screaming for help before any force was exerted.

In *Darden*, qualified immunity was denied to an officer who threw a suspect to the ground and tased him twice while another officer was applying physical force. *Darden*, 880 F.3d at 731. The taser was applied after Darden's body appeared to come off the ground for a moment. Then, *Darden* rolled over onto his stomach and appeared to push himself up on his hands, at which point officers tased him a second time. Witnesses and Darden told the officers that he could not breathe, and Darden pulled his arm away when the officer attempted cuffing his hands. *Id.* The court found that a serious offense, dealing drugs, weighed in favor of the

officers, but that, despite the presence of lookouts across the street and the inherent dangers of executing a narcotics warrant, these factors nonetheless weighed in Darden's favor because he "was not suspected of committing a violent offense." *Id.* at 729. These two taser strikes and one throw to the ground formed the basis for denying qualified immunity to that defendant.

Another officer placed Darden in a chokehold, kicked him, punched him, and forced him to a prone position for handcuffing. *Id.* at 732. He, too, was denied qualified immunity, in part because it "was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision.... Officer Romero saw whether Darden was resisting and saw how much force had already been used on Darden. He needed to take those perceptions into account in assessing how much additional force, if any, was necessary. *Id.*; *See Lytle v. Bexar County*, 560 F.3d 404, 413 (5th Cir. 2009) ("[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.").

Here, by contrast, the individual defendants were never presented with a "split-second decision," nor were they responding to a dangerous drug bust situation with lookouts across the street. Mr. Loggins, simply needed help. Far from a split-second decision, Defendant Woodall, before even reaching Robert Loggins' location, stated "We might have to tase him." (Woodall Video at 11:15). Then, Defendant Gammage shouted orders, instead of employing de-escalation techniques, for a matter of seconds before tasing Mr. Loggins. Loggins was "sho' going to hate" what the defendant officers intended to do to him next for simply failing to show them his hands while literally out of his mind and convinced the defendant officers were trying to kill him.

There is no evidence of active resistance, except possibly for Defendant Tilley's

28

allegation that Mr. Loggins bit him while the officers were engaged in using unlawful, unnecessary, excessive, and unreasonable force against him at the outset. At the time the defendant officers applied force against Mr. Loggins he was a medical emergency call and was not suspected of committing a violent, nor even serious crime, only perhaps disturbing the peace. Though Plaintiff disputes whether Loggins bit the Defendant Tilly, such a bite, if established as being true, occurred after multiple unlawful tasings, which is akin to a suspect during a traffic stop pushing himself off of a vehicle and into officers after they inflicted physical blows, which under clearly established law at the time of Mr. Loggins' arrest was and is considered passive resistence. *See Joseph*, 981 F.3d at 338-339 (5th Cir. 2020) ("even if Newman struggled by pushing himself off from the car and back into the officers, after being struck ten times, this type of struggle did not rise to the level of active resistance.") (citing *Newman v. Guedry*, 703 F.3d 757, 763 (5th Cir. 2012)) (internal citations omitted).

In *Joseph*, a school principal noticed an unmedicated schizophrenic "strange guy" who was staring, shaking his legs, biting his nails, not walking straight, talking to himself, and saying things she could not understand. *Id.* at 326. The suspect fled into a convenience store in defiance of shouted commands to walk towards police, where an officer aimed his gun at Joseph, who at this point was screaming, much like Mr. Loggins, "Help me from the police…. Help me, help me somebody call the cops…. They're trying to kill me." *Id.* Instead of following police commands to get on the ground, Joseph jumped over the checkout counter, covered his face with his hands, and lay on the floor in a fetal position. *Id.* Officers got on top of him, ordered him to put his hands behind his back, and tased him for eleven seconds. *Id.* Officers noted his behavior was erratic, odd, and emotionally disturbed. *Joseph*, 981 F.3d at 326. He continued to shout and yell.

29

*Id.* Officers tased him twice (eleven seconds) and caused twenty-six blunt-force injuries. *Id.* at 326-328. Relying on a string of cases, including *Newman* and *Ramirez*, the Fifth Circuit in *Joseph* found that the tasing and beatings were unconstitutional pursuant to clearly established law as of February 7, 2017. *Id.* at 338. The actions of Defendant Tilley having occurred in late 2018, the law was clearly established that the blunt force injuries and no fewer than nine taser strikes against the passively resisting Mr. Loggins were unconstitutional as clearly established by previous caselaw.

As noted, any resistance Loggins exhibited was passive and did not warrant ongoing force. "[S]truggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *Lombardo*, 141 S. Ct. at 2241. The Fifth Circuit determined no threat to officer safety and only passive resistance to exist when a suspect remained on his feet for about twenty seconds after the officer first order him to kneel. *Hanks v. Rogers*, 853 F.3d 738, 746 (5th Cir. 2017). Similarly in *Newman*, officers alleged that their use of force was appropriate because the suspect defied orders to stay in the car, struggled, reached for his waistband, and was noncompliant by pushing himself off from the car and back into the officers after multiple baton strikes, at which point he was tased three times. *Newman*, 703 F.3d at 763. The Fifth Circuit held that "[e]ven on the officers' version of events, Newman's behavior did not rise to the level of active resistance." *Id.*

As in the case of Robert Loggins, arguendo, even if an arrestee "failed to comply and struggled against the officers at certain points throughout the encounter, that resistance did not justify force indefinitely." *Id.* "Failure to comply still requires the degree of force to be reasonable. Officers may consider a suspect's refusal to comply with instructions… in assessing

30

whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (internal citations and punctuation omitted). In *Deville*, the Court took note of how quickly force was used to arrest someone who refused to get out of her car, and found that breaking the vehicle's window to gain compliance was unreasonable. *Deville*, 567 F.3d at 168. Here too, the defendant officers Woodall and Gammage almost immediately escalated to repeated tasing upon their arrival, then using physical force including the use of an impact weapon and more TASER blows against a medically compromised Mr. Loggins.

Similarly, in *Ramirez*, the Fifth Circuit held that "officers exerted force in violation of the Fourth Amendment by immediately tasing and forcing to the ground a person whose only resistance was merely failing to comply with orders to put his hands behind his back, and pulling his arm away when an officer grabbed his hand. We concluded that he posed so little threat that tasing him before he was handcuffed was excessive…." *Joseph*, 981 F.3d at 333, 339 (citing *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013)) ("As to a passively resisting suspect, an officer does not take measured and ascending action by immediately resorting to taser and nightstick without attempting to use physical skill, negotiation, or even commands.") (internal punctuation omitted). *See also Joseph*, 981 F.3d at 340 (discussion regarding *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), where defendant lacked any means of escape and the Court described clearly established law of tasing based on police canine force)[11]; *Samples*, 900 F.3d at

---

11.Though *Cooper* involved use of a K9, *Joseph* noted that the "lawfulness of force ... does not depend on the precise instrument used to apply it." *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 340 (5th Cir. 2020)(citations and punctuation omitted).

661–62 (on accounts of "possible disturbance" of man calling for help, officer "had little reason to believe [he] was in the process of perpetrating a crime," and failure to heed officer requests and tensing up was "not active resistance or flight" where no "immediate threat to the safety of officers" was evident, and a single taser strike was thus excessive); *Hanks*, 853 F.3d at 746.

These cases, any one of which alone provides fair notice to Officers Woodall and Gammage, underscore the unconstitutionality of the Defendants use of force against Mr. Loggins who was subdued and on the ground. To go further beyond the fair warnings already provided by previous cases, of course, the product warnings for the very taser these Defendants used against expressly warn against tasing someone in the exact physical and emotional distress Mr. Loggins exhibited, because same can cause "sudden death." The legal parameters of the unconstitutionality of the Defendants' use of force were clearly established before November, 2018 and issues of material fact preclude qualified immunity. It is therefore apparent that Officers Woodall and Gammage are liable for active participation at the scene of the arrest by tasing him eleven times, discussing their intent to inflict pain the "old fashioned way" and striking Mr. Loggins up to nine times with a flashlight.

To the extent these defendant officers maintain that they could not see Robert Loggins' hands, it cannot be disputed that Loggins never threatened anyone, was never armed, and that the tasing and blows with the flashlight occurred even after the officers knew he did not have a weapon. The Defendants forge disingenuous contentions to the extent that they rest their basis for qualified immunity on the assertion that Mr. Loggins failed to obey police commands. Defendant Gammage seems to acknowledge that he knew Mr. Loggins could not comprehend

---

commands while influenced by drugs, and tased him anyway.[12] Their conduct made clear that they did not expect their commands to be obeyed. First, Defendant Woodall anticipated tasing him before even reaching the scene where Robert Loggins lay. Within seconds of his arrival, the Defendant officers continued to shout for Mr. Loggins to show his hands while they were shooting electricity through his body. It was not that Robert Loggins failed to obey their commands, it was that he was obviously incapable of comprehending or responding to them. Furthermore, it was apparent from the outset and as exhibited in the videos that neither the neighbor who assisted Defendant Woodall in finding Mr. Loggins, nor the officers themselves felt fear for their safety or suspicion of a weapon.

Defendants cite *Cloud v. Stone*, 993 F.3d 379, 382 (5th Cir. 2021), which is inapposite to this case. There, Cloud was pulled over for speeding. He argued with the officer as to whether he was speeding, refused to sign his ticket, and when he was asked to exit the vehicle with his hands behind his back, he turned around to face the officer after one of his wrists was cuffed. After one taser strike, Cloud removed the prongs and moved toward his open car door where he brandished a revolver. *Cloud*, 993 F.3d at 382. Additional glaring distinctions exist, namely that the suspect in *Cloud* was coherent and knowingly resistant, and he was standing and surrounded by a single officer, unlike Mr. Loggins, who was not standing, incoherent and already subdued on the ground where he was surrounded by five police officers in a small, fenced-in yard.

Defendants then cite a case involving a man by the name of Poole, who was driving, throwing things out the window to get an unmarked police officer off his tail, exited the vehicle

---

12. "[I]n my experience, a person who is not under a substance would have complied after seeing that we had him surrounded and we were going to take him into custody." (Gammage Statement, RL 34).

when ordered to do so, passed a field sobriety test, raised his arms and invited the officer to hit

him, spoke coherently, and then laid down on the trunk of the semi in defiance of officer

commands and kicked the officers. *Poole v. City of Shreveport*, 691 F.3d 624, 625 (5th Cir.

2012). Robert Loggins, by contrast, was screaming for help, exhibiting excited deliberately, and,

notably, "never" even stood on his own two feet. (Merriman Statement, 95).

The defendants also cite an unpublished Fifth Circuit opinion, <u>Buchanan v. City of</u>

<u>Gulfport</u>, for the contention that failure to follow commands gives rise to lawful tasing. In some

instances, this failure may be true. Of course, excessive force claims are fact intensive, and

Buchanan involved a man standing and swinging a baseball bat. After dropping the bat, the

suspect disobeyed police commands to step away from the bat, and instead leaned over to pick it

up, giving rise to the first two taser strikes, after both of which, the suspect pulled the prongs out

of his body, then picked the bat up, held it above his head, and started charging towards the

officers. *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 309 (5th Cir. 2013). To reiterate,

Robert Loggins, on the other hand, was unarmed, subdued on the ground, could not stand or

comprehend orders, and was out of his mind, as each and every Defendant Officer on the scene

acknowledged.

Similarly, or in the alternative, the Defendant Jones and the Defendant Tilley are liable

for failing to intervene in the continued tasing, muscling, and flashlight strikes of their fellow

officers. *See Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) ("The law as of 2006 was

clearly established that 'an officer who is present at the scene and does not take reasonable

measures to protect a suspect from another officer's use of excessive force may be liable under

section 1983.'") (citations omitted). Bystander liability attaches to anyone who "(1) knows that a

34

fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013). The Defendant Jones and the Defendant Tilley engaged with their fellow defendants Gammage and Woodall and failed to take any measures to abate the unlawful use of force against Mr. Rogers despite abundant law showing the force used was unconstitutional.

   2. <u>Defendants Jones and Merriman exerted excessive force at the Grenada County Jail in violation of clearly established law and common sense.</u>

  Notwithstanding the force exerted at the scene of Mr. Loggins' arrest, the force escalated to deadly force at the jail, where Mr. Loggins lay prone, gasping for breath with his hands cuffed behind his back. Defendant Jones participated in the dogpile, and Officer Merriman is liable under both supervisory and bystander theories of liability. The use of force at the jail, of course, shocks the conscience and triggers the relaxed "clearly established" standard. *See Taylor v. Riojas*, 141 S. Ct. 52, 53, (2020); *Hope*, 536 U.S. at 741) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has not previously been held unlawful….") (punctuation and citations omitted).

  While it is not necessary to point to a specific case on all fours with this action, cases with obvious applicability exist. Any one of at least seven binding cases, to say nothing of the consensus of persuasive authority, is enough to provide, or to at minimum explain to the Defendant Merriman and the Defendant Jones the preexisting and clearly established law and the unlawfulness of the conduct. The relevant cases include, *Simpson*, *Lombardo*, *Kitchen*,

35

*Goode*, *Wagner*, *Darden*, and *Aguirre*.

First, in *Simpson*, jail officers were denied qualified immunity in a jail asphyxiation death when they subdued a violently resistant pretrial detainee, sat "astraddle him," and applied pressure to his chest while his arms and legs were cuffed. *Simpson v. Hines*,[13] 903 F.2d 400, 403 (5th Cir. 1990). To make matters worse for these defendants the force inflicted upon Mr. Loggins at the jail occurred after he was handcuffed, foreclosing any argument that he was subject to any use of force at all. *See Carroll*, 800 F.3d at 177. "The issue, then, is whether a reasonable jury could conclude that continued force applied after a suspect has been restrained and after the suspect stops resisting may be clearly excessive and objectively unreasonable. The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Id.* Similarly, arguendo, to the extent Robert Loggins can be said to have resisted while handcuffed on the jail floor (and according to jailer statements, he was struggling to breathe, not resisting), "[a] jury could conclude that all reasonable officers on the scene would have believed that [Mr. Loggins] was merely trying to get into a position where he could breathe and was not resisting arrest." *Darden*, 880 F.3d at 730.

Of course, the entire act of removing handcuffs was senseless and unnecessary at the outset. Loggins should have been taken directly to a hospital from the GCJ before the dogpile. Secondly, as Jailer Harvey told investigators, the policy for removing handcuffs from an arrestee is to do so inside a cell because in a cell, handcuffs can be removed without having to use a

---

13. Notably, the Fifth Circuit's ruling in *Simpson* proceeded under the exacting "shocks the conscience" standard because the conduct occurred prior to the balancing test enunciated in *Graham v. Connor*, 490 U.S. 386, 396 (1989).

second set of handcuffs. (Ex. Q, Harvey Statement, RL122). Sergeant Clark communicated this policy to the defendants Merriman, Tilley, and Jones, who again ignored her and proceeded to suffocate him, apparently for the purpose of needlessly switching handcuffs since the jail would not accept a medically-compromised person. (*Id.*)

Recently, the Supreme Court reversed the grant of qualified immunity to officers in a case arising in 2015 in which a violent offender kicked and evaded efforts by jail officials ostensibly to prevent him from committing suicide. The detainee continued to resist, slam his head on a bench, and then kicked one officer in the groin, at which point his arms were handcuffed and his feet shackled. Officers moved him to a prone position, during which three officers held his "limbs down at the shoulders, biceps, and legs. At least one other placed pressure on [his] back and torso." *Lombardo*, 141 S. Ct. at 2240. As previously mentioned, *Lombardo* stated that struggles of a prone arrestee can evince a desire to breathe, not an intent to disobey commands, and it further noted the well-known police guidance and training requiring officers to both relieve suspects from a prone position immediately to avoid suffocation and to avoid placing pressure on their back and torso. *Id.* at 2241.

Yet another Fifth Circuit case, standing alone, addressed similar facts and provided fair notice to the Defendant Merriman and the Defendant Jones. In *Kitchen v. Dallas County*, 759 F.3d 468, 474-75 (5th Cir. 2014), officers pulled a delusional pretrial detainee from his cell who had grabbed a nurse, urinated on the floor, raised his middle finger at officers, and who was "banging his head against the bars," and they put him in a restraint chair since he seemed suicidal. When officers entered the cell, the inmate "turned around abruptly and raised his hands" as if to fight, and the officers "physically brought the deceased down onto the floor"

37

before restraining him in handcuffs and leg-irons, at which point certain officers also stomped and kicked him. *Kitchen*, 759 F.3d at 474-75. While still lying on the floor shortly after being restrained, the deceased became unresponsive, stopped breathing, and died. According to the autopsy report, the death was a homicide caused by "complications of physical restraint including mechanical asphyxia' due to 'neck restraint during struggle' and the fact that 'one officer was kneeling on the decedent's back during restraint. Other factors included 'physiologic stress,' and 'morbid obesity and cardiomegaly.," *Id.* The officers' grant of qualified immunity was reversed and remanded. *Id.*; *See also Valencia v. Wiggins*, 981 F.2d 1440, 1447 (5th Cir. 1993) (officers not entitled to summary judgment when using a "choke hold" during a cell extraction that "render[ed] [the detainee] momentarily unconscious" after detainee refused to stop "singing and making noise").

Mr. Loggins' case is also comparable to the Fifth Circuit's decision in *Goode v. Baggett*, 811 F. App'x 227, 235 (5th Cir. 2020), in which an officer pinned down a suspect known to be experiencing a disturbing LSD trip. Officers hogtied him, a position he stayed in for ninety minutes until he suffocated under his own weight, not an officer's weight. "Unless justified by a threat of serious harm, hog-tying a drug-affected person in a state of drug-induced psychosis and placing him face down in a prone position for an extended period constitutes excessive force."[14] *Goode*, 811 F. App'x at 235 (citing clearly established law enunciated in *Gutierrez v. City of San*

---

[14]. Should the Defendants assert that Loggins was not hogtied to allege that *Goode* is not sufficient to provide fair notice to this defendant Tilley, such an assertion would be unavailing. Mr. Loggins' hands were cuffed behind his back and his legs were shackled with grown men on top of him, and as previously stated, the facts do not have to be exact to impart fair warning. *See Salcido v. Harris County*, No. CV H-15-2155, 2018 WL 6618407, at *6 (S.D. Tex. Dec. 18, 2018) ("The dispositive issues on the plaintiffs' excessive use of force claims are not whether Lucas was hogtied…. Harris County's contention that death was not reasonably foreseeable from restraint that impaired Lucas' ability to breathe strains credulity and is foreclosed by Fifth Circuit precedent.") (citations omitted).

*Antonio*, 139 F.3d 441 (5th Cir. 1998)). *Goode*, again citing *Guitierrez*, further notes that

suspects such as Mr. Loggins in a state of "excited delirium" are particularly vulnerable.[15] The

Fifth Circuit cites multiple cases from other jurisdictions that further bolster the consensus of

law available to provide fair warning to Defendants Jones and Defendant Merriman that the

application of force on Mr. Loggins at the jail was unconstitutional. Goode, 811 F. App'x at 236

n.8.

      Of particular note is *Weigel v. Broad*, 544 F.3d 1143, 1148 & 1152 (10th Cir. 2008),

where officers restrained a detainee by applying pressure "for about three minutes" to a prone

detainee's upper body while also straddling his upper thighs and buttocks and holding his arms in

place. The officers were not entitled to qualified immunity pursuant to clearly established law

under *Gutierrez*.

      Defendants argue that their use of excessive force was not the direct and only cause of

death because of the presence of methamphetamine in Mr. Loggins' system and the findings of

the Mississippi Medical Examiner. Such is an incorrect interpretation of the "directly and only"

causation element of an excessive force claim. The "direct and only language was merely

'intended to distinguish between injuries caused by excessive force, which are actionable, and

those caused by reasonable force, which are not.' Notwithstanding the language of this element,

[Plaintiff] need not prove that the Officers' excessive force was the sole cause of [Mr. Loggins']

death." *Goode*, 811 F. App'x at 231. Thus, a Plaintiff need not present countervailing medical

---

15.In legal jurisprudence, "Excited delirium is generally described as a state of agitation, excitability, and paranoia. Symptoms include bizarre behavior, confusion, delusions, hyperactivity, incoherent yelling, and sweating. It's often associated with drug use, most commonly cocaine, and is sometimes referred to as 'cocaine-psychosis' for that reason." *Goode*, 811 F. App'x at 234, n.6.

testimony in a case such as this one. *See Wagner v. Bay City*, 227 F.3d 316, 320 n.3 (5th Cir. 2000) ("A reasonable jury could conclude that the use of pepper spray, combined with the fact that the officers repeatedly pushed [the detainee] face-first to the ground, could have resulted in [the detainee] stopping breathing. … [C]ommon sense compels the conclusion that [the detainee's] injuries resulted from his altercation with the police, and there is no requirement that medical testimony be presented to establish causation."). Similarly, up to eleven taser strikes, nine flashlight strikes, multiple physical struggles, including the grounding and occlusion of Mr. Loggins' face into the floor under the weight of Defendants Tilley and Defendant Jones and several jailers for over three minutes, all pose a clearly established matter of common sense and legal consensus establishing excessive force.

To the extent Defendants contend that other factors, such as drug use, contributed to Mr. Loggins' death and absolve him from any responsibility for the injuries to and death of Mr. Loggins, this contention is not sustainable. Similar contributing factors existed in *Darden*, a case posing similar facts in which the Fifth Circuit rejected the same argument raised these defendants. In *Darden*, the Fifth Circuit found as follows:

> According to the plaintiff's medical expert, "Darden died as a result of the application of restraint (physical struggle, 4 taser dart strikes, prone position with the weight of police officers on top of Mr. Darden) and consequential hypoxia and increased cardiac demand." But the medical expert went on to explain that "the application of restraint was a contributing causal factor along with natural disease." The other contributing factors were focal coronary artery disease, "which can increase the likelihood of developing an arrhythmia during a struggle," and chronic lung disease, which "can impede air exchange causing hypoxia (low oxygen) and increase the risk of cardiac arrhythmia during exertion such as a struggle." Thus, the district court's conclusion that the injury did not result directly and only from the use of force was essentially based on the fact that Darden had preexisting medical conditions that increased his risk of death during the incident.

40

The district court erred in reaching this conclusion. According to the eggshell skull rule, "a tortfeasor takes his victim as he finds him." The eggshell skull rule is applicable in § 1983 excessive force cases. Darden's preexisting medical conditions increased his risk of death during a struggle, and in that way, they contributed to his death. However, the evidence suggests that Darden would not have suffered a heart attack and died if the officers had not tased him, forced him onto his stomach, and applied pressure to his back. Indeed, the medical expert ultimately concluded that "Darden's manner of death should not have been ruled as Natural." Accordingly, the plaintiff can show that the use of force was the direct and only cause of Darden's death.

*Darden*, 880 F.3d at 728. In this case, even to the extent, if any, Robert Loggins may have been more vulnerable to death as a result of his state of tasing, drug use, or excited delirium, he can nonetheless establish that the use of force was without peradventure a contributing cause of his death if not the sole cause.

Prior to the filing of the Complaint Plaintiffs produced to opposing counsel a medical opinion from a forensic pathologist stating that Mr. Loggins experienced an emergent medical condition and ultimately died of asphyxia resulting from the pressure applied to Mr. Loggins' neck and back, including the Defendants Tilley and Defendant Jones. To the extent a question of material fact exists regarding Mr. Loggins' death, any such dispute of material fact must be resolved in Mr. Loggins' favor at this juncture.

Fair notice is again provided to these defendants by the 2021 case of *Aguirre v. City of San Antonio*, 995 F.3d 395, 419 (5th Cir. 2021), where officers knew an arrestee was under the influence of drugs, but cuffed him behind his back and applied pressure to his legs, which were crossed up to his buttocks and his body in excess of five minutes. The Court held that "a reasonable jury could conclude that the maximal prone restraint position was tantamount to and as dangerous as a hog-tie." The Court stated that "[i]t has long been clearly established that,

41

when a suspect is not resisting, it is unreasonable for an officer to apply unnecessary, injurious force against a restrained individual, even if the person had previously not followed commands or initially resisted the seizure." *Aguirre*, 995 F.3d at 416 (citing *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015)). The Court again enunciated the law that "[i]n an obvious case, the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law." *Id.* at 415.

The robust consensus of law available to provide notice to Defendants Jones and Merriman continue and is unrelenting. It includes, but is not not limited to the following: *Cruz v. City of Laramie*, 239 F.3d 1183, 1188 (10th Cir. 2001) ("officers may not apply this technique when an individual's diminished mental capacity is apparent"); *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) ("it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position … constitutes excessive force"); *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007) (hogtying "an individual after he had ceased resisting arrest could be objectively unreasonable" as is "[f]ailing to place [a detainee] in the proper position" – on his side – "after [hogtying] him"); *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) (Officer knelt on shoulder or back for 30-40 seconds while prone on the ground and suspect died two minutes later); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903-04 (6th Cir. 2004) ("putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued … constitutes excessive force"); *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008) (Posner, J.) (denying courtroom deputy qualified immunity because "a reasonably trained police officer would know that compressing the lungs of a morbidly obese

42

person can kill the person").

Similarly, in *Drummond v. City of Anaheim*, 343 F.3d 1052, 1061-62 (9th Cir. 2003) excessive force was clearly established "even absent a… case presenting the same set of facts. The officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance." *Drummond* cited multiple cases as well that "in what has come to be known as 'compression asphyxia,' prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officer." *Drummond*, 343 F.3d at 1056-1057; *See also Johnson v. City of Cincinnati*, 39 F.Supp.2d 1013 (S.D. Ohio 1999); *Flores-Zelaya v. Las Vegas Metro. Police Dep't*, 2016 WL 697782, *5 (D. Nev. Feb. 19, 2016); *Swans v. City of Lansing*, 65 F.Supp.2d 625 (W.D. Mich. 1998); *Rachel v. City of Mobile*, 112 F.Supp.3d 1263, 1291 (S.D. Ala. 2015); *Jones v. City of Sacramento*, 2011 WL 3163307 (E.D. Cal. July 25, 2011); *Watkins v. New Castle County*, 374 F.Supp.2d 379, 390 (D. Del. 2005); *Hanson v. Best*, 2017 WL 5891697, *8 (D. Minn. Nov. 28, 2017).

Of course, a cuffed and shackled Loggins could offer no meaningful resistance. *See Abdullahi*, 423 F.3d at 771 (7th Cir. 2005) (reversing district court order granting summary judgment when detainee's "undisputed attempts to squirm or arch his back upward while he was being restrained may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress"); *Darden*, 880 F.3d at 726 n.3 (denying police officers qualified immunity when obese detainee pushed face down into the floor "pushed himself up on his hands because he was trying to get into a position where he could breathe")

43

The overwhelming consensus of Fifth Circuit and national legal authority condemned exactly what Defendant Merriman, Defendant Jones, and Defendant Tilley subjected Mr. Loggins to at the jail. Against this mountain of clearly established law, the defendants rely on a district court case of *Pratt v. Harris County*. Factual distinctions abound. First, as discussed in the case on appeal to the Fifth Circuit, Pratt was on his feet, walking away from the scene of a car wreck in defiance of officers' orders. *Pratt v. Harris County,*822 F.3d 174, 178 (5th Cir. 2016). Second, unlike these Defendants, who were acutely aware of Mr. Loggins' drug addled and altered mental state, "the officers who hog-tied Pratt were unaware of his use of drugs." *Pratt*, 822 F.3d at 184. Furthermore, Pratt, unlike Loggins, "broke free from the officers' grips, and kicked at officers attempting to restrain him (eventually kicking one officer in the groin twice)." *Id.* Unlike Loggins, "Pratt was only restrained for a very brief period." *Id.* A knee was placed in Pratt's back briefly before the hogtie restraints arrived, and Pratt clearly survived this encounter by stating, "Ok I quit. I'm done." The Pratt officers did not kneel on his neck or sit on his head over the course of more than three minutes or leave him writhing on the ground on his stomach for over fifteen minutes.

Defendant Jones' participation in the dog-pile renders this claim actionable. He exerted force on the body of Robert Loggins. For Merriman's part, it is conceded that he did not exert force at the jail. Rather, he stood by, as a supervisor to Defendant Tilley and Defendant Jones, and he did nothing. His liability is for failure to render medical care and for failing to intervene.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Whitley*, 726 F.3d at 647, n.11 (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d

44

Cir.1994)). Defendant Merriman, can be seen casually observing each and every moment of the needless dogpile, had every opportunity to intervene in his subordinates' depravation of constitutional rights and life, and he satisfies each element of bystander liability: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 646. Additionally, or in the alternative, if it is shown that Defendant Jones did not participate in the dogpile to the extent suggested by witness statements and video evidence, this analysis of bystander liability is viable against him as well.

Furthermore, as Defendant Merriman was the supervising and highest ranking officer at the jail, he is liable for supervisory liability for his deliberate indifference in watching the dogpile escalate over the course of more than three minutes. He furthermore ordered the officers to unnecessarily exchange the handcuffs. *See Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018) ("In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates.").

C.     FAILURE TO RENDER AND DENIAL OF MEDICAL CARE CLAIMS

The individual defendants assert that they are entitled to qualified immunity because they did not violate Mr. Loggins' constitutional right to receive adequate or any medical attention as an arrestee or pretrial detainee; and because any claimed right to receive adequate medical attention was not clearly established in November 2018.  Neither of these defendants are correct in that the Defendant Merriman and the Defendant Jones, along with the Defendant Tilley,

45

violated Mr. Loggins' constitutional right to have his medical needs met with something other than flagrant disregard. Consequently, neither the Defendant Merriman nor the Defendant Jones are entitled to summary judgment nor qualified immunity based on their contemptible conduct on the morning of Mr. Loggins' death.

In *Estelle v. Gamble*, the Supreme Court recognized that the Eighth Amendment requires the government to provide medical care to inmates because the failure to do so "may actually produce physical 'torture or a lingering death'" or unnecessary " pain and suffering." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (quoting *In re Kemmler*, 136 U.S. 436, 447 (1890)). The Fifth Circuit has held the Fourteenth Amendment confers the same right to pretrial detainees, who have a well-established constitutional right to be free from pain, suffering, and death due to the denial of adequate medical care while they are incarcerated. See Hare v. City of Corinth, 74 F.3d 633, 649 (5th Cir. 1996) (*en banc*). Consequently, an officer may be held liable for their acts or failure to act affecting pretrial detainees that deprives them of basic human needs, including adequate medical care, if the official knew of a substantial risk of harm to detainees but responded with deliberate indifference to that risk.[16] *Hare*, 74 F.3d at 649.

---

16. Based on *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Plaintiffs pleaded in their Third Amended Complaint and assert in this response the proper legal standard for adjudicating their Fourteenth Amendment denial of medical care claim must be an objective deliberate indifference standard not a subjective deliberate indifference standard. In *Kingsley*, the Court rejected the Eighth Amendment based subjective deliberate indifference standard used by the Fifth Circuit for excessive force claims brought by pretrial detainees in favor of a Fourth Amendment based objective standard. *Kingsley*, 576 at 396-97. The Plaintiffs acknowledge the Fifth Circuit post-*Kingsley* continues to adhere to the subjective deliberate indifference standard set forth in *Hare*. *See Alderson v. Concordia Parish Correctional Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017); *Joyner v. Grenada County*, 458 F. Supp. 3d. 486, 490-91 (N.D. Miss. 2020). As of today and based on *Kingsley*, the Second, Seventh, and Ninth Circuits adopted an objective deliberate indifference standard to address pretrial detainee claims for the denial of medical care. *See Bruno v. City of Schenectady*, 727 F. App'x 717, 720 (2d Cir. 2018) (holding that objective standard governs pretrial detainee's inadequate medical care claim); *Miranda v. County of Lake*, 900 F.3d 335, 354 (7th Cir. 2018) (remanding to district court for new trial with instructions to use the objective, not subjective, standard to measure pretrial detainee's inadequate medical care claims); *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018) (holding the proper standard for measuring pretrial detainee's claim of inadequate medical care to treat his opiate withdrawal is an

To prevail, a § 1983 " claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "[I]t does not matter whether . . . a prisoner faces an excessive risk of [harm] for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. We do "not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault," or, as here, a death, "before obtaining relief." *Id.* at 845 (citation, quotation marks and alterations omitted).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citations omitted); *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004). In other words, "a trier of fact may infer knowledge from the obvious[.]" *Farmer*, 511 U.S. at 844. For instance, a defendant could " not escape liability if the evidence showed that he . . . refused to verify underlying facts that he strongly suspected to be true, or

---

objective, rather than subjective, one). The Third, Fifth, Eighth and Eleventh Circuits persist in using the subjective deliberate indifference standard. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (applying subjective deliberate indifference to inadequate medical care claims for treatment of hepatitis C and noting that the circuit has not extended *Kingsley* and its application would not change the outcome of the case because the officials were not more than negligent); *Alderson*, 848 F.3d at 419 n.4 (applying subjective deliberate indifference standard to failure to protect claim); *Ryan v. Armstrong*, 850 F.3d 419, 425 n.3, 426 (8th Cir. 2017) (applying subjective deliberate indifference to inadequate medical care claims and noting that the court need not address *Kingsley* because district court erred in granting summary judgment to defendants under the subjective standard); *Dang v. Sheriff of Seminole County*, 871 F.3d 1272, 1279 n.2, 1280–83 (11th Cir. 2017) (applying subjective deliberate indifference test to pretrial detainee's inadequate medical care claim for untreated meningitis that lasted several days and resulted in multiple strokes and noting that *Kingsley* does not directly address inadequate medical care claims). Without waiving their assertion the proper legal standard to adjudicate this claim is one of objective deliberate indifference, the Plaintiffs argue in this memorandum from the existing and controlling subjective deliberate indifference standard and aver the Defendant Merriman and the Defendant Jones acted with the requisite state of mind to deny them qualified immunity based on that standard.

declined to confirm inferences of risk that he strongly suspected to exist . . . . *Id.* at 843 n.8.
The jail official's subjective knowledge is thus a question for the jury. *Id.*

Applying this standard to the Defendant Merriman and the Defendant Jones in this case
highlights that their conduct was deliberately indifferent based on their subjective knowledge of
a substantial risk of harm to Mr. Loggins, arising from multiple observed and known serious
health conditions, and the complete absence of any action on their part to ameliorate those
known risks of harm by assisting medically, calling for medical assistance, or transporting Mr.
Loggins to a hospital only moments away. In effect, the Defendant Merriman and the Defendant
Jones saw a gravely medically compromised Mr. Loggins and simply watched as he died and
walked away while ignoring the calls of a fellow law enforcement officer to take Mr. Loggins to
the hospital. Through their claim to an entitlement to qualified immunity, the Defendant
Merriman and the Defendant Jones now seek to simply walk away from any accountability for
their callous violations of clearly established civil rights of which they were or should have been
quite aware.

In assessing these defendants' claims that they are entitled to qualified immunity, as an
initial proposition it is indisputable that Mr. Loggins Fourteenth Amendment right as a pretrial
detainee to adequate medical care for his serious medical conditions has been clearly established
in the Fifth Circuit for decades. See Hare, 74 F.3d at 649. Knowing the Fourteenth Amendment
right implicated in this case has been clearly established for decades, the Defendant Merriman
and the Defendant Jones resort to a fanciful recitation of the material facts, and the denial of
facts contradictory to their fanciful narrative as readily apparent from the video evidence to
argue that no constitutional right was violated when they denied Mr. Loggins any medical

48

treatment on the morning he died. In effect, these defendants double-down on the mendacity they engaged in when interviewed by an MBI investigator, shortly after Mr. Loggins' death, and hope this Court will not see through it.

According to these defendants their alleged lack of subjective awareness about Mr. Loggins' seriously medically compromised situation, in the face of ample evidence they knew exactly what they were doing in dumping him off at the jail, triggers a legal analysis which miraculously absolves them from facing the trier of fact in favor of a summary disposition. In effect, the success of the argument made by the Defendant Merriman and the Defendant Jones depends entirely upon the fervent hope this Court draws favorable factual inferences for them regarding their subjective awareness of Mr. Loggins medically compromised circumstances despite overwhelming evidence they watched a man in the act of dying and instead of taking him to a hospital or summoning an ambulance did *nothing*!

In assessing these defendants' claimed entitlement to qualified immunity it must be noted that Mr. Loggins' claim against them arises from their knowing refusal to provide or secure *any* medical attention from the moment Mr. Loggins arrived at the Grenada County Jail until they walked out of the jail leaving a lifeless Mr. Loggins on the floor of the jail to die. Almost immediately upon Mr. Loggins' arrival at the sally port of the jail, in the Defendant Jones' patrol car, he is met by two jailers, the Defendant Tilley, and the Defendant Merriman.[17] (Exh. E at ~ 5:58:24 to 5:59:00.) At the moment the Defendant Merriman and the Defendant Jones arrived at the jail, they were subjectively aware based on their close contact with Mr.

---

17.The Defendant Tilley falsely stated that Mr. Loggins was "already inside" when he arrived at the jail. (Exh. K at 55, 59-60.)

49

Loggins at the scene of the arrest that Mr. Loggins suffered from a drug-induced psychosis; engaged in a prolonged and exhausting physical struggle with accompanying physical injuries; suffered almost a dozen TASER strikes; and was struck with an impact weapon approximately nine times. (Exh. L; Exh. N.)

The Defendant Merriman was also subjectively aware the emergency medical personnel at the scene did not assess, examine, or treat Mr. Loggins noting that the, "medical folks were called . . . and they didn't check him out.[18] (Exh. N. at 92). According to the Defendant Jones' statement, the emergency medical personnel just looked at Mr. Loggins and said he was okay. (Exh. L at 78.) Furthermore, the Defendant Jones admitted that he was aware that something was seriously wrong with Mr. Loggins when he was getting Mr. Loggins out of the patrol car at the jail:

> [H]e was, you know, just started laying down, you know, grunting and moaning. I'm like this guy, something ain't right, you know what I'm saying? I'm like this guy - it's got to be more than, you know Flakka or something. I mean either he done swallowed something or something. I'm thinking to myself, you know, something.

(Exh. L at 81). When asked if he asked Mr. Loggins if he was okay after observing him grunting and moaning, the Defendant Jones stated, "Yeah, . . . . And you know, shook him, 'Rob Rob, man, come on.' You know, just, 'Man, come on.'" And he never would cooperate." (*Id.*)

Once inside the jail, Mr. Loggins was immediately put on the concrete floor in a prone position with his hands cuffed behind his back and his pants wrapped around his ankles.[19] (Exh.

---

18. The Defendants AMR, Watson, and Howell admitted at ¶ 43 of their Answer & Affirmative Defenses to the Third Amended Complaint that no history or vital signs were taken from Mr. Loggins at the scene of his arrest.

19. The Defendant Tilley falsely stated that once inside the jail Mr. Loggins, "sat there in jail for a couple of minutes." (Exh. K at 55.)

F at ~ 5:59:00.)  Along with the Defendant Merriman, the Defendant Jones, and the Defendant

Tilley, several other officers stood around Mr. Loggins, while he spent approximately five

minutes in the prone position with hands cuffed behind his back on a concrete floor attempting

to roll himself over to catch his breath without any medical intervention or assistance.  (Id. at ~

5:59:00 to 6:05:00).  During this time the Defendant Merriman and the Defendant Jones were

further subjectively aware based on the testimony of numerous witnesses that: (1) Mr. Loggins

was grunting and moaning and something was wrong with him (Exh. L); (2) Mr. Loggins had

lacerations to his head, and knees, had blood coming from his mouth, labored to breathe and had

his eyes rolled to the back of his head (Exh. M at 85); (3) Mr. Loggins would not be accepted by

the jail because of his physical appearance and condition, and the defendant officers needed to

take him to the hospital (Exh. O); (4) Mr. Loggins would not be accepted by the jail because of

his drug-addled condition (Exh. L); Mr. Loggins needed to go to a hospital because he was in

medical distress.  (Exh. R).

Despite all of the information these defendants possessed regarding Mr. Loggins'

medically compromised and serious medical needs from his arrival at the jail, they reacted to it

with deliberate indifference by compounding Mr. Loggins' medical distress by applying deadly

force to him instead of getting him to a hospital.  *See Aguirre*, 995 F.3d at 419-20 (holding use

of maximal- restraint prone position with officers exerting force on the back of a non-resisting,

non-threatening arrestee suffering from drug-induced psychosis may constitute deadly force.)

After the Defendant Merriman told the Defendant Tilley to get his cuffs so that they

could leave, the Defendant Tilley, the Defendant Jones, and several jailers piled on the

medically compromised Mr. Loggins to get a pair of  handcuffs.  (Exh. D at ~ 6:04:37 to

51

6:07:50).  With his hands cuffed behind his back and his pants around his ankles restricting any leg movement, the defendant officers and jailers still applied leg irons to Mr. Loggins ankles. (*Id.*)  The Defendant Tilley then put his knee onto Mr. Loggins' neck.[20]  (*Id.*)  Unable to get the cuffs off of Mr. Loggins, the Defendant Tilley then sat on Mr. Loggins head, forcing his head into the concrete floor.  (*Id.*)  Meanwhile the Defendant Jones and several jailers put their body weight on Mr. Loggins' back, shoulders, arms, and legs.  (*Id.*)  The Defendant Merriman who initiated the unconstitutional use of force by telling the Defendant Tilley to get his cuffs and leave Mr. Loggins at the jail, against the instructions of Sergeant Clark to take Mr. Loggins to the hospital, watched this medically compromised arrestee suffering from excited delirium in the maximal prone restraint position from the front row.  (Exh. D. at ~ 6:04:37 to 6:07:50).

When the defendant officers got off of Mr. Loggins after changing out the handcuffs he was immediately totally unresponsive.  (Exh. P at 134.)  According to jailer Frank Sanders he told the defendant officers to remove the cuffs from behind Mr. Loggins because he was breathing abnormally.  (Exh. M at 85.)  After the cuffs were exchanged, Mr. Sanders heard Ms. Clark tell the defendant officers that Mr. Loggins was not breathing and that he needed medical care.  (*Id.*)  The Defendant Merriman, the Defendant Jones, and the Defendant Tilley just turned around and walked out of the jail.  (*Id.*)  Jailer Raphael Harvey told investigators that Mr. Loggins was unresponsive and the defendant officers just left.  (Exh. Q at 120.)  As Sergeant

_____

20.The Defendant Tilley falsely stated to investigators that he did not put his knee on Mr. Loggins' neck or sit on his head.  (Exh. K at 60.)  Aside from the booking area jail video putting the lie to this statement two witnesses gave statements saying the Defendant Tilley put his knee on Mr. Loggins' neck and at on his head.  (Exh. O at 124; Exh. Q at 120-21.)  The Defendant Merriman stated to MBI investigators that he could not say that anyone sat on Mr. Loggins' head.  (Exh. N at )  Given his vantage point during the dogpile, the Defendant Merriman's statement to the investigators was knowingly false.  The Defendant Jones also falsely stated to investigators that Defendant Tille never sat on Mr. Loggins head or neck and also stated that no pressure was placed on Mr. Loggins' head or neck in removing the handcuffs.  (Exh. L at 78).

Clark repeatedly told the defendant officers to take Mr. Loggins to the hospital and was dismissed by the officers she observed that as her jailers picked up Mr. Loggins after the exchange of the handcuffs he went limp and could not walk.  (Exh. O at 126-27.)

This summary judgment record demonstrates these defendants when presented with a pretrial detainee showing obvious signs of severe medical distress including: drug-induced psychosis (excited delirium), bleeding from the head, mouth, and knees, labored breathing, asphyxiation, eyes rolled to the back of the head, and lack of consciousness simply looked back at the lifeless Mr. Loggins and walked out of the jail.  (Exh. F at 06:07:50 to 06:08:20.)  Further diminishing any claim that his actions were anything approaching reasonableness, these defendants dumped their arrestee on the staff of the jail and casually walked out of the jail while being told repeatedly by a supervisory officer at the jail to take Mr. Loggins to get medical attention.  The metaphorical nail in these defendants coffins are the repeated material misrepresentations to investigators when questioned shortly after Mr. Loggins' death.[21]

The law in the Fifth Circuit is established that, "[a] serious medical condition is one . . . for which the need is so apparent that even a layman would recognize that care is required. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006) (citation omitted).  A pretrial detainee manifesting obvious signs of psychological and physiological injury and distress, drug-psychosis, labored or no breathing, bleeding, and who goes limp or lifeless is the most obvious example of a pretrial detainee in need of immediate medical intervention.  Faced with this

---

21.For example, the Defendant Tilley told investigators when the cuffs were exchanged and he left the jail Mr. Loggins, "was still sitting there hollering stuff you couldn't understand."  (Exh. K at 55.)  The Defendant Merriman a supervisory officer misled investigators about Mr. Loggins' condition when they left the jail stating that Mr. Loggins, "was still squirming around acting a fool, cussing, just taking outside of his head.  He was still breathing."  (Exh. N at 94.)  Actually, as already noted according to the booking area video, Mr. Loggins was actually lifeless at that time. (Exh. F at 06:07:50 to 06:08:20.)

situation the defendants did nothing to help Mr. Loggins then purposely misled investigators about what they did and saw at the jail. Clearly established law in this Circuit makes unlawful what these defendants did to Mr. Loggins and failed to do for Mr. Loggins. See Baldwin v. Dorsey, 955 F.3d 320, 328 & n.5 (5th Cir. 2020) (Jones, J.) (Stating "Easter might clearly establish the unreasonableness of the conduct toward the drug-tripping, self-harming arrestee in *Dyer*, *where officers never sought medical attention*, 955 F.3d at 508.") (emphasis added)

In *Dyer v. Houston*, 955 F.3d 501, 508, the Fifth Circuit found that a reasonable jury could infer deliberate indifference to a substantial risk of harm in failing to provide any medical attention to an 18 year old in the grip of drug induced psychosis who struck his head violently against the interior of the patrol car over 40 times en route to jail and thereby sustained severe head trauma. The *Dyer* court also found the law was clearly established to give the officers fair warning that their denial of any medical care to the 18 year old was objectively unreasonable. Dyer, 955 F.3d at 510-511 (citing *Thompson v. Upshur County*, 245 F.3d 447, 457-58 (5th Cir. 2001) (holding ignoring dangers of alcohol withdrawal clearly established)). According to the *Dyer* court, the officers' failure to secure medical help for the delusional self harming detainee despite observing his dire medical condition provided a clear case for deliberate indifference. *Id. Dyer* and *Thompson* control this case and compel the rejection of qualified immunity for these defendants.[22]

In addition, as noted by Judge Jones in *Baldwin*, *Easter v. Powell*, 467 F.3d 459 (5th Cir.

---

22. The *Dyer* court distinguished and expressly rejected cases (including at least one case cited by these defendants) where officers had no reason to suspect a detainee's underlying medical condition. *Dyer*, 955 F.3d at 510-11 n.5 (citing Tamez v. Manthey, 589 F.3d 764, 770-71 (5th Cir. 2009); *Simmons v. City of Columbus*, 425 F. App'x 282, 283-84 (5th Cir. 2011) (unpublished); *Arshad v. Congemi*, 2009 WL 585633, at *7-*8 (5th Cir. 2009) (unpublished).

2006) defined clearly established law sufficiently to have apprized these defendants they could not treat Mr. Loggins' observable dire medical circumstances and simply turn their backs and walk away.  In *Easter*, a nurse offered  no treatment options to a prisoner who had suffered severe chest pain for twenty minutes and had a history of serious heart problems, including chest pain and vomiting two days earlier.  *Easter*, 467 F.3d at 463-64.  In rejecting qualified immunity for the nurse, the Fifth Circuit held the law was clearly established that refusing treatment for a patient with a known cardiac condition met the deliberate indifference threshold.  *Id.* at 464.  Importantly, with respect to qualified immunity, the court stated that:

> A law is "clearly established" if it is "sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right."  However, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights."

*Id.* at 465 (citations omitted).  Further informing the analysis and rejection of qualified immunity in this case, the *Easter* court also identified numerous factual scenarios centered on the outright denial of medical care where qualified immunity was rejected.  *Id.* at 464 n.25. (citing *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (holding that a defendant's failure to call an ambulance for almost two hours while plaintiff lay unconscious and vomiting rises to the level of deliberate indifference); *Harris v. Hegmann*, 198 F.3d 153, 159-60 (5th Cir. 1999) (concluding that ignoring an inmate's repeated requests for medical treatment and complaints of excruciating pain satisfied the deliberate indifference standard); *see also, Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (concluding that a prison official's refusal to drive an

inmate to the hospital when he had been informed that the inmate might be having a heart attack and witnessed the inmate displaying symptoms consistent with a heart attack met the deliberate indifference standard); *Hudson v. McHugh*, 148 F.3d 859, 863-64 (7th Cir. 1998) (stating that "an inmate with a potentially serious problem repeatedly requesting medical aid, receiving none, and then suffering a serious injury" is "the prototypical case of deliberate indifference"); *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) ("If [the inmate]'s chart had page after page documenting a heart condition, and he came in with a set of symptoms consistent with a heart attack, it is possible that the *Farmer* standard might be met."); *see also*, *Nerren v. Livingston Police Dept.*, 86 F.3d 469, 473 (5th Cir. 1996) (deliberate indifference shown when detainee's "face and chest were marred with abrasions, he was in pain, and he informed the Arresting Officers that he needed medical attention," especially because "police had subjective knowledge that [detainee] had recently been involved in a multiple vehicle injury accident").

In light of the material facts in the record and clearly established law making it unlawful for officers to refuse to render or secure medical treatment for an arrestee in obvious medical distress, the determination of these defendants' subjective knowledge and intent can only be resolved by the trier of fact. *Farmer*, 511 U.S. at 842 (citations omitted); *Gates*, 376 F.3d at 333. Consequently, Defendant Merriman's, Defendant Jones', and Defendant Tilley's requests for qualified immunity and summary judgment with respect to the Plaintiffs' medical care claim is bound to be overruled.[23]

---

23. Nor can these defendants rely on the first-responder defendants' failure to assess and examine Mr. Loggins before "clearing him" for transport to the jail based on what they observed and were made aware of at the jail. See *Taylor v. Hughes*, 920 F.3d 729, 733-34 (11th Cir. 2019) (finding genuine issues of material fact in dispute regarding plaintiff's injuries and the state troopers' statement that the plaintiff had been "medically cleared" for admission to the jail, contrary to his painful moans and pleas for help, conflicted to the extent that a reasonable jury could conclude the jailers should have known Taylor needed medical care.

D.     ADDITIONAL FACTORS APPLICABLE TO PLAINTIFFS' CLAIMS DICTATE
       AGAINST QUALIFIED IMMUNITY FOR THESE DEFENDANTS

Plaintiffs maintain that qualified immunity is due to be denied as previously stated.

However, three additional considerations beyond the non-exhaustive list of factors enunciated in

*Graham* and *Kingsley*, bolster the inapplicability of qualified immunity for these defendants.

First, These defendants' failure to act upon, much less acknowledge, Mr. Loggins' mental

incapacity augurs against qualified immunity. *See Joseph*, 981 F.3d at 334 fn.56 (citing

*Armstrong v. Village of Pinehurst*, 810 F.3d 892, 900 (4th Cir. 2016) ("[O]fficers who encounter

an unarmed and minimally threatening individual who is exhibiting conspicuous signs that he is

mentally unstable must de-escalate the situation and adjust the application of force downward.")

(internal punctuation omitted); *Perea v. Baca*, 817 F.3d 1198, 1204 n.4 (10th Cir. 2016)

(unreasonable for officer to repeatedly use taser against subdued arrestee they know to be

mentally ill, whose crime is minor, and who poses no threat to the officers or others. *Vos v. City

of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018). Although this Court has refused to

create two tracks of excessive force analysis, one for the mentally ill and one for serious

criminals, our precedent establishes that if officers believe a suspect is mentally ill, they should

... make a greater effort to take control of the situation through less intrusive means.") (citations,

brackets, punctuation omitted); *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cir. 2010) ("As

we have held, '[t]he problems posed by, and thus the tactics to be employed against, an unarmed,

emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily

different from those involved in law enforcement efforts to subdue an armed and dangerous

criminal who has recently committed a serious offense.")

In addition to the aforementioned non-exhaustive list of factors, the defendants' mendacity should also be considered as discussed, *supra*. The defendants' misrepresentations to the MBI investigator regarding material facts at the scene of arrest and the jail which they rely on here to support their claim for qualified immunity raise credibility issues regarding their subjective awareness that what they did to Mr. Loggins was wrong and should deprive them of qualified immunity. While the Court cannot make credibility determinations at this stage, it may acknowledge the existence of credibility issues for the jury to resolve. *See Linden v. Washtenaw County*, 167 Fed.Appx. 410, 426-427 (6th Cir. 2006) ("The presence in the record of these half-truths, evasive responses, and unanswered factual questions necessitates that this Court REVERSE the district court and strip [defendant] of qualified immunity.")

To the extent these defendants argue their actions were pursuant to a supervisory officer's command, such commands are of no moment to the subordinate officers. "[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence, and officers in such cases may be held liable under § 1983 if there is a reason why any of them should question the validity of that order." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010); *See also*, O'Rourke v. Hayes, 378 F.3d1201, 1210 (11th Cir. 2004); *Gonzalez v. Cecil County*, 221 F.Supp.2d 611, 616 (D. Md. 2002); *Mial v. Sherin*, No. 1:11-cv-921, 2012 WL 2838424, *10 (E.D. Va. July 9, 2012).

E.    MUNICIPAL LIABILITY

Defendant Grenada submits matters outside the pleadings and asks the Court for summary judgment in the alternative. Defendant generally relies on the training certificates of the individual defendants including evidence these defendants had received some training as to

use of the TASAER; and a self-supporting claim that there is not a policy, practice, custom or usage, or pattern of similar incidents which would allow municipal liability. Defendant Grenada argues that the individual defendants were all certified law enforcement officer and had received training in the use of the TASER and other forms of training. Defendant even submits a certificate purporting some of the individual defendants TASER training. (Exhibit I).

Defendant Grenada attempts to lead the Court to believe these individual defendants were certified to operate the TASER pursuant to State standards. This is not true. For example, the Defendant Woodall's certificate provides that he: "[h]as passed the requirements of the **Grenada Police Department** TASER X26 training program under the supervision of a Certified Instructor." (*Id.* at 39) (emphasis in original).

The Defendant Grenada may be liable under *Monell v. Department of Soc. Serv.*, 436 U.S. 658 (1978) if its training was inadequate. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). Discovery may reveal that the Defendant Grenada's training requirements, whatever they may be, are constitutionally inadequate. This would be no surprise considering the severity of the misconduct of one of the individual defendants in this case. It must be noted that even if training "meets State standards" the municipality may be liable if the training was inadequate. *O'Neal v. City of San Antonio*, 2009 WL 2734735, *2 (5th Cir. Aug. 31, 2009); *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992); *Abshure v. Prator*, 2010 WL 3278256,*2 (5th Cir. Aug. 16, 2010). In this case, the documents submitted by Defendant Grenada show that at least the Defendant Woodall's training was based on the Grenada Police Department's training program, not any State standard. In any event, Plaintiff is entitled to conduct discovery as to the adequacy of whatever training the individual defendants underwent.

59

The Plaintiffs are entitled to discovery in this regard. The Court is not obliged to grant summary judgment merely because Defendant assures the Court that it is not liable. Defendant can point to no authority which allows the grant of summary judgment before discovery begins with Plaintiff never afforded an opportunity to investigate an officer's training or a municipality's policies. Defendant Grenada's grossly premature request for summary judgment should be denied pursuant to Fed. R. Civ. P. 56(d).

Rule 56(d) provides as follows:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

The Plaintiffs cannot present facts essential to their opposition to summary judgment in this case because discovery has not yet begun. Pursuant to the affidavit of one of the Plaintiffs' attorneys, submitted pursuant to Rule 56(d), discovery is necessary into the following general areas:

a. The Defendant Grenada's formal and informal polices and practices regarding use of a TASER and impact weapons;

b. The individual defendants' training regarding use of a TASER and impact weapons;

c. Other instances of the individual defendants' and other officers' use of excessive force involving a TASER or impact weapon;

d. The Defendant Grenada's formal and informal polices and practices regarding

60

the application of force to the neck, head, or back of arrestees, and the placement of arrestees in the maximal prone position;

e. The individual defendants' training regarding the application of force to the neck, head, or back of arrestees;

f. Other instances of the individual defendants' and other officers' use of excessive force in the application of force to the neck, head, and back of arrestees;

g. The Defendant Grenada's formal and informal polices and practices regarding providing any or adequate medical care to arrestees;

h. The individual defendants' training regarding providing any or adequate medical care to arrestees;

i. Other instances of the individual defendants' and other officers' faiure to provide any or adequate medical care to arrestees;

j. Whether the Defendant Grenada disciplined any of the individual defendants for violation of any policy; and

k. Whether the Defendant Grenada condoned and/or ratified the unconstitutional conduct of the individual defendants or other officers.

(Decl. of Victor Fleitas, attached to Pl.'s Resp. in Op. as Exhibit "CC").

This case has only just begun. Discovery in this case has not even commenced.

Plaintiffs should be allowed to engage in discovery to support their claims. Of course, discovery in this case may well show that the individual defendants' actions the morning Mr. Loggins died were pursuant to a policy or custom. For these reasons, the Plaintiffs should be allowed to conduct discovery as to their claims against the Defendant Grenada and the request for summary judgment should be denied without prejudice or held in abeyance until discovery is concluded.

F.     STATE LAW CLAIMS

1.     <u>The Plaintiffs perfected notice pursuant to the Mississippi Tort Claims Act.</u>

Defendants misconstrue the plain meaning of the Mississippi Tort Claims Act. "No action whatsoever may be maintained by the claimant until the claimant receives a notice of denial of claim or the tolling period expires, whichever comes first, after which the claimant has an additional ninety (90) days to file suit[.]" Miss. Code. Ann. §11-46-11(3)(b). To begin with, Plaintiffs herein were not MTCA claimants until the Second Amended Complaint. Under a plain reading of the text, §11-46-11 is not triggered unless and until the Plaintiff becomes a claimant under §11-46-1. "Claimant" is defined as "any person seeking compensation under the provisions of this chapter, whether by administrative remedy or through the courts." Miss. Code. Ann. §11-46-1(b). Here, neither the Complaint, nor the First Amended Complaint, involved claims for which Plaintiffs sought compensation "under the provisions of this chapter… through the courts." Rather, they were federal claims against these defendants and state medical malpractice claims against the paramedics, a private entity not subject to the Mississippi Tort Claims Act. These MTCA claims were brought in the Second Amended complaint after the 90-day waiting period expired.

Assuming, arguendo, that the complaint were to be dismissed, the issue is moot or otherwise resolved simply. The filing of the complaint tolled the statute of limitations, and any dismissal based on failure to perfect notice is without prejudice. Therefore, even if the Court were to dismiss the action, Plaintiffs could still refile their complaint through amendment. Miss. Code §11-46-11(3)(a)-(b). *See also, Greenwood Leflore Hosp. v. Watson*, No.

62

2020-IA-00037-SCT, 2021 WL 4097743, at *4 (Miss. Sept. 9, 2021) (Plaintiff filed initial complaint before the 90-day waiting period expired. Statute of limitations tolled, complaint was dismissed without prejudice, and second filed complaint was proper based off of the initial notice).

### 2. The statute of limitations has not expired on Plaintiff R.D.L.'s state law claims.

Defendants are correct to point out that certain claims are asserted only on behalf of R.D.L. pursuant to the savings clause. Mississippi's savings statute is codified in Miss. Code. § 15-1-59. Defendants maintain that these claims should be dismissed because Rika Jones is the administratrix of the Estate of Robert Loggins and therefore authorized to bring suit on her son's behalf. IN so maintaining the defendants misapply *Irby*, which states that where a "*guardian or conservator*" has been appointed for the minor, then the equitable and logical bases of the savings statute are frustrated. However, neither a guardian nor a conservator has been appointed to act on R.D.L.'s behalf, and there is no court that has held that the appointment of a representative of an Estate forecloses application of a minor's savings clause.

At one point, the Supreme Court of Mississippi held that "the provisions in the wrongful death statute and the minors savings statute are at irreconcilable odds with one another where there exists a person qualified under the wrongful death statute to bring suit. This conclusion is reinforced by the wrongful death statute's requirement that one suit be brought for damages from wrongful death." *Curry v. Turner*, 832 So. 2d 508, 517 (Miss. 2002), overruled by *Pioneer Cmty. Hosp. of Newton v. Roberts*, 214 So. 3d 259 (Miss. 2017). In Pioneer, the mere existence of a person qualified to bring suit did not preclude a minor from tolling the statute of limitations.

There, an attorney sent a notice-of-claim letter to the defendant. *Roberts*, 214 So. 3d at 261. Then, the decedent's sister filed two petitions for guardianship, for which the Chancery Court specifically authorized her to pursue a wrongful death action on behalf of the minor children of the decedent, but decedent's sister never took the oath of guardianship, and thus letters of guardianship were never issued by the court. *Id.* at 262. One of the minor children then reached the age of majority, sent a second notice-of-claim letter, and six months later filed suit on behalf of her and her minor sister's behalf, said suit being filed four years (outside the statute of limitations without application of the savings statute) after their mother's death. *Id.* Despite these actions taken on the minor beneficiaries' behalf, the Supreme Court held that "only when someone who is qualified to bring a wrongful-death suit actually files a wrongful-death suit on the minor beneficiaries' behalf will the minors savings clause not apply, because, once the suit is filed, the running of the statute of limitations is immaterial." *Id.* at 261.

A similar result was reached in *Irby*. "Collins did not appear as Graham's court-appointed guardian. Rather, she appeared as his mother and next friend. As Graham's mother, Collins had standing to file suit on his behalf. However, our decision hinges on whether Collins's status as his mother and next friend bestowed on her the duty to file suit within the statute of limitations. Black's Law Dictionary (10th ed. 2014) defines 'next friend' as someone who appears in a lawsuit to act for the benefit of an incompetent or minor plaintiff, but who is not a party to the lawsuit and is not appointed as a guardian." *Irby v. Madakasira*, 252 So. 3d 614, 620 (Miss. Ct. App. 2018). Similarly, here, Rika Jones appears as next friend of R.D.L. because no guardianship action was commenced.

Furthermore, R.D.L. asserts his own individual claim of loss of love, society, and

companionship, which is his own individual claim, not a claim of the Estate. Similarly, he brings

his case as a wrongful death beneficiary to recover any claims Robert Loggins could have

brought if death had not ensued, such as Robert Loggins' pain and suffering, mental and

emotional anguish, resulting from these defendants unlawful acts. *See Long v. McKinney*, 897

So. 2d 160, 169 (Miss. 2004)("[T]he estate is entitled to recover funeral costs and final medical

expenses. The beneficiaries are entitled to recover for their respective claims of loss of society

and companionship."); *Caves v. Yarbrough*, 991 So. 2d 142, 148–49 (Miss. 2008) ("[I]n addition

to claims the decedent could have brought if death had not ensued [recoverable only by the

wrongful-death beneficiaries], there may be individual claims of loss of consortium, society and

companionship, estate claims, and insurance subrogation claims.") (emphasis added) (internal

quotations omitted) (footnote 8 language added inside brackets). There is no legal authority

supporting the defendants' contention that the appointment of the representative of a separate

legal entity, an estate, forecloses the application of the savings statute for claims that belong to a

minor and not the estate.  The claims of R.D.L. were timely filed and the defendants' motion to

dismiss those claims must be denied.

> 3.   <u>Genuine issues of material fact prevent the Municipal Defendants from
> having their cake and eating it too with respect to the Plaintiff R.D.L.'s
> state law claims against them.</u>

Not surprisingly, the Municipal Defendants, Defendant Grenada, Defendant Gammage,

Defendant Woodall, Defendant Merriman, and Defendant Jones allege that none of them are

liable under Mississippi law for anything they did the morning Mr. Loggins died.  Suggesting the

"plaintiffs appear to misunderstand the MTCA" these defendants claim the plaintiffs' seek to

hold both the Defendant Grenada and the defendant officers simultaneously liable.  The

Municipal Defendants go as far as to call R.D.L.'s ("Minor Plaintiff's) state law claims "incoherent." Nothing could be further from the truth. The Minor Plaintiff's state law claims are properly pleaded, in accordance with existing Mississippi law, and the Municipal Defendants misstate plaintiffs' claims and feign confusion to denigrate the very claims which this Court should conclude cannot be dismissed due to the existence of disputed issues of material fact.

The operative parts of the Minor Plaintiff's state law claims can be found in Count Six and Count Seven of the Third Amended Complaint which state:

> 100. The Defendant, City of Grenada, through the acts and omissions of its employees Captain Gammage, Sergeant Woodall, Corporal Merriman, Officer Tilley, and Officer Jones, acting within the course and scope of their employment, owed a duty to do what a reasonable, prudent person and/or law enforcement officer would have done under the circumstances. The Defendant breached this and other duties by failing to render medical care to Mr. Loggins which proximately caused Robert Loggins' injuries.

> 101. These Defendants further violated various provisions of the Mississippi Code, including, inter alia: Miss. Code § 47-1-27 (Maltreatment Forbidden) and Miss. Code § 97-3-7 (Simple and/or Aggravated Assault). These statutory violations are a proximate cause of the injuries Robert Loggins sustained, and constitute negligence per se. These statutes were at all relevant times in full force and effect, the purpose of which is to protect from harm the class of persons of which Mr. Loggins was a member on the day of his injuries.

> 102. Robert Loggins was not engaged in criminal activity at the time of his injuries, and these Defendants' actions and omissions constituted a reckless disregard for the safety and well-being of Robert Loggins.

> 103. In the alternative, should it be determined the Defendant Officers were not acting within the course and scope of their employment with the Defendant City of Grenada with respect to their acts and omissions, Plaintiff R.D.L. brings this claim against the Defendant Officers, Captain Gammage, Sergeant Woodall, Corporal Merriman, Officer Tilley, and Officer Jones, individually.

> . . . .

> 106. The Defendants, Captain Gammage, Sergeant Woodall, Corporal Merriman,

Officer Tilley, and Officer Jones are liable to R.D.L. for the torts of assault and battery arising from the exertion of force used against Robert Loggins at the scene of his arrest and at the Grenada County Jail.

107. These Defendants furthermore committed acts intending to cause a harmful or offensive contact with the person of Robert Loggins and placed him in imminent apprehension of such offensive contact.

108. The actions of these defendants constituting assault and battery consisted of, inter alia, the use of tasers, physical beating with a flashlight, verbal abuse, and suffocating Mr. Loggins at the Grenada County Jail.

109. Robert Loggins was not engaged in criminal activity at the time of his injuries, and these Defendants' actions and omissions constituted a reckless disregard for the safety and well-being of Robert Loggins.

(Third Am. Compl. ¶¶ 100-103, 106-09).

A review of these averments demonstrate the Minor Plaintiff alleges a coherent claim against the Defendant Grenada for the acts of the defendant officers for negligently, grossly negligently, negligently *per se*, and with reckless disregard failing to provide medical attention to Mr. Loggins the morning he died. The Third Amended Complaint then pleads, *in the alternative*, that should it be determined the defendant officers were not acting within the course and scope of their employment the claim for the failure to provide medical care was taken against the defendant officers.[24] The Third Amended Complaint then simply alleges a coherent claim for assault and battery *only* against the defendant officers for their use of force against Mr. Loggins the morning he died.[25] Having set forth the scope of the Minor Plaintiff's state law

---

24. Like plaintiffs' federal claims against the individual defendant officers for failure to provide medical attention, the Minor Plaintiff's state law claim is brought against the Defendant Merriman, the Defendant Jones, and the Defendant Tilley for their acts and omissions from and after their arrival at the jail.

25. Again, like plaintiffs' federal claims against the individual defendant officers for excessive force, the Minor Plaintiff's state law claims for assault & battery are brought against the Defendant Gammage, the Defendant Woodall, and the Defendant Tilley for their acts at the scene of Mr. Loggins' arrest, and against the Defendant Merriman, the Defendant Jones, and the Defendant Tilley at the jail.

claims against the Municipal Defendants, an examination of the law and the summary judgment record makes clear that one or the other the Defendant Grenada or the defendant officers are liable for the injuries to and death of Mr. Loggins.

The Minor Plaintiff agrees with the Municipal Defendants that, "[t]he MTCA is the exclusive remedy for filing a lawsuit against [a] governmental entit[y] and its *employees*. See City of Jackson v. Jackson, 200 So. 3d 1141, 1144 (Miss. 2016) (emphasis added). "When the MTCA controls, an employee may not be 'held personally liable for acts or omissions occurring within the course and scope of the employee's duties.'" *Ellis v. Lowndes County*, No. 1:16CV177-DMB-DAS 1, 12 (N.D. Miss. Dec. 6, 2017) (quoting Miss. Code Ann. § 11-46-7(2)). "However, 'not all claims against a governmental entity and their employees are covered by the MTCA.'" *Ellis*, No. 1:16CV177-DMB-DAS at 12 (quoting *University of Miss. Med. Ctr. v. Oliver*, 235 So. 3d 75, 81 (Miss. 2017). "Rather, torts based on conduct outside the course and scope of an employee's employment fall outside the MTCA's scope and provisions." *Id.* (citing *Oliver*, 235 So. 3d at 82). "Thus, these torts fall outside the scope of the MTCA's waiver of immunity . . . . and any legal action against a governmental employee for these intentional torts must necessarily proceed against him or her as an individual." *Oliver*, 235 F.3d at 82 (quoting *Zumwalt v. Jones County Bd. of Supervisors*, 19 So.3d 672, 688 (Miss. 2009)). If the government employee's conduct is determined to be outside of the course and scope of their employment they cannot rely on the immunity provisions of the MTCA and the action proceeds as one at common law. *See Ellis*, 1:16CV177-DMB-DAS at 14 (where plaintiff properly pleaded in the alternative both course and scope and malice based claim the malice based claim proceeds against the government employee in their individual capacity without the personal

liability protections of the MTCA).  With the proper legal footing before the Court it becomes abundantly clear the Municipal Defendants seek to have things both ways, not the Minor Plaintiff.

a.   <u>Negligence, Gross Negligence, Negligence Per Se, and Reckless<br>Disregard Claims for Denying Medical Attention.</u>

The Minor Plaintif alleges that the Defendant Grenada, Defendant Merriman, Defendant Jones, and Defendant Tilley are liable for failing to get medical attention for the obviously medically distressed Mr. Loggins when he was transported to the jail.  The Minor Plaintiff avers and the summary judgment record, as set forth previously in this memorandum in the plaintiffs' discussion of their federal denial of medical care claim and incorporated herein by reference, raises a genuine issue of material fact not only as to the individual defendants' deliberate indifference but also their negligence, gross, negligence, and reckless disregard for Mr. Loggins obvious need for medical attention.

With regard to this claim the Defendant Grenada makes three arguments.  First, the Defendant Grenada asserts that Mr. Loggins was an inmate and it is immune from this claim. Second, the Defendant Grenada asserts that Mr. Loggins was committing an illegal act and that it showed no reckless disregard.  Third, the Defendant Grenada asserts that the Minor Plaintiff's claim based on negligence *per se* based upon the violation of statutory duties are outside of its officers' course and scope of employment.  None of these assertions avail it.

Relying on the immunity from liability found in § 11-46-9(1)(m), the Defendant Grenada with an utter absence of shame argues that Mr. Loggins was an inmate.  One wonders whether the Defendant Grenada would still not argue that Mr. Loggins was an inmate even if its officers

69

had thrown Mr. Loggins from a moving patrol car in the jail parking lot and sped off. Regardless of this thought exercise, the fatal flaw in the Defendant Grenada's argument is that Mr. Loggins was never an inmate of the jail.

From the time that Mr. Loggins arrived at the jail until the defendant officers dumped him there, he was never accepted as an inmate by the jail. The record is replete with evidence that the officers at the jail refused to accept Mr. Loggins as an inmate and insisted the defendant officers take him to the hospital. An inmate is defined as "a person confined to a prison, penitentiary or the like." *Wallace v. Town of Raleigh*, 815 So. 2d 1203, 1207 (Miss. 2002). At the time the Defendant Grenada, through the acts and omissions of the defendant officers, failed to secure medical treatment for Mr. Loggins, he had not been booked into the jail. Furthermore, the Defendant Grenada has failed to produce the jail docket required by Mississippi law to establish that Mr. Loggins was an inmate pursuant to Mississippi law. *See* Miss. Code Ann. § 19-25-63 (requiring "sheriff to keep a record, to be called the "Jail docket," in which he shall note each warrant or mittimus by which any person shall be received into or placed in the jail of his county, entering the nature of the writ or warrant, by whom issued, the name of the prisoner, when received, the date of the arrest and commitment, for what crime or other cause the party is imprisoned, and on what authority, how long the prisoner was so imprisoned, how released or discharged, and the warrant therefor or the receipt of the officer of the penitentiary when sent there . . . .")

Controlling authority requires this Court to assess whether or not the plaintiff was actually confined at the time his claim arose. *See Fleming v. Tunica County*, 497 F. App'x 381, 389-90 (5th Cir. 2012). In *Brooks v. Pennington*, 995 So. 2d 733, 737 (Miss. App. 2007), the

70

court refused to apply § 11-46-9(1)(m) to an individual who was unlawfully detained based on a surrender by his bondsman. Although the court rejected the plaintiff's assertion that his unlawful confinement made the application of § 11-46-9(1)(m) inappropriate, the court held that because his claim accrued when he was brought to the jail and surrendered by the bondsman before he was admitted to the jail as an inmate § 11-46-9(1)(m) did not bar his claim. *Brooks*, 995 So. 2d at 737.

Similarly, Mr. Loggins' claim against Defendant Grenada accrued while he lay on the floor of the booking area of the jail injured and struggling to breathe while the jail staff and the defendant officers dickered about taking him to a hospital for medical attention. At no time on this record, does the Defendant Grenada produce one *iota* of proof that Mr. Loggins was accepted as an inmate at the jail, booked, or entered on the jail docket. In the absence of such evidence Mr. Loggins could not be considered an inmate as a matter of law and the Defendant Grenada's reliance on § 11-46-9(1)(m) is entirely misplaced.

The Defendant Grenada also argues that it is immune from liability for the Minor Plaintiff's claim for a denial of medical attention based on the "fact" that Mr. Loggins was committing a criminal act at the time of the events giving rise to this claim. This argument is factually and legally specious. Factually, from the moment Mr. Loggins arrived at the jail the summary judgment evidence is undisputed that he committed no illegal acts, crimes, or did anything remotely improper, unless trying to rollover onto his back to breathe while bleeding and seriously injured is a crime. Legally, Mississippi law requires that for § 11-46-9(1)(c) to apply the alleged criminal activity must occur *at the time of injury*. *See City of Jackson v. Powell*, 917 So. 2d 58 (Miss. 2005) (citing *City of Jackson v. Calcote*, 910 So.2d 1103, 1111-12

(Miss. App. 2005). Both factually and legally, with regard to the Minor Plaintiff's claim the Defendant Grenada was negligent, grossly negligent, and acted with reckless disregard in failing to secure medical care for Mr. Loggins, the application of § 11-46-9(1)(c) is inapplicable and summary judgment must be denied.

Finally, with respect to Mr. Loggins' claim based on negligence *per se* and reckless disregard, the Defendant Grenada asserts that it is immune from such a claim because the underlying duty to provide Mr. Loggins with proper medical attention derives from Miss. Code Ann. § 47-1-27 a criminal statute prohibiting the maltreatment of individuals in custody. As an initial proposition the use of a criminal statute to define a ministerial duty or standard of care does not make the underlying breach of that duty a criminal act putting the defendant officers outside the scope of their employment. Consequently, the Defendant Grenada is not entitled to summary judgment as to this claim.

Alternatively, should this Court determine that the invocation of § 47-1-27 makes the defendant officers' acts and omissions in failing to secure medical care for Mr. Loggins a criminal act, the Minor Plaintiffs' claims may still be maintained against the Defendant Merriman, Defendant Jones, and Defendant Tilley under Mississippi tort law with no personal or other MTCA immunity available to these defendants.

b.     <u>Excessive Force, Assault and Battery Claim.</u>

Commensurate with the plaintiffs' federal claims for excessive force against the Municipal Defendants, the Minor Plaintiff brought claims for assault and batter against Defendant Gammage, Defendant Woodall, and Defendant Tilley for their unlawful use of force against Mr. Loggins at the scene of his arrest, and against Defendant Merriman, Defendant

Jones, and Defendant Tilley for their unlawful use of force at the jail. The Minor Plaintiff made no claim against the Defendant Grenada under the MTCA for assault and battery in the Third Amended Complaint.

As already noted, the Minor Plaintiff's claims against these defendants for assault and battery fall outside of the personal immunity granted by the MTCA and deny these defendants the various immunities granted by the MTCA. *Ellis*, 1:16CV177-DMB-DAS at 14. Proceeding as a straightforward common law action against these defendants for assault and battery, the Minor Plaintiff relies on and incorporates the facts stated previously in this memorandum and incorporated here by reference and avers that genuine issues of material fact preclude summary judgment for the defendant officers for their assault and battery of Mr. Loggins at the scene of his arrest and at the jail.

V.     CONCLUSION

For the reasons stated above, the plaintiffs request the Court overrule the Municipal Defedants' Motion for Judgment on the Pleadings or, Alternatively, for Summary Judgment, except to the extent the plaintiffs have expressly stated the absence of a claim as to a particular defendant or confessed a claim.

Respectfully submitted, this the 1st day of October, 2021.

/s/ Victor Israel Fleitas

Jacob B. Jordan, MSB #104230
J. Rhea Tannehill, Jr., MSB #10449
TANNEHILL, CARMEAN & McKENZIE, PLLC
829 North Lamar Blvd. Suite #1
Oxford, Mississippi 38655
Telephone: (662)236-9996
Facsimile: (662)234-3949
E-mail: jacob@tannehillcarmean.com
E-mail: jrt@tannehillcarmean.com

Victor I. Fleitas, MSB #10259
fleitasv@bellsouth.net
VICTOR I. FLEITAS, P.A.
452 North Spring Street
Tupelo, Mississippi 38804
(662) 840-0270 / Telephone
(662) 840-1047 / Facsimile

Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2021 I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to the following:

G. Todd Butler, Esq.
Mallory Kaye Bland, Esq.
Phelps Dunbar, LLP
4270 I-55 North
Jackson, Mississippi 39211-6391
Todd.Butler@phelps.com
Mallory.Bland@phelps.com

Thomas R. Julian, Esq.
Daniel Coker Horton & Bell, P.A.
Post Office Box 1084
Jackson, Mississippi 39215-1084
tjulian@danielcoker.com

74

Steven J. Griffin, Esq.
Daniel Coker Horton & Bell, P.A.
Post Office Box 1084
Jackson, Mississippi 39215-1084
sgriffin@danielcoker.com

Daniel J. Griffith, Esq.
Bethany A. Tarpley, Esq.
Jacks| Griffith| Luciano, P.A.
Post Office Box 1209
Cleveland, Mississippi 38732-1209
dgriffith@jlpalaw.com
btarpley@jlpalaw.com

Michael S. Carr, Esq.
Carr Law Firm
Post Office Box 1749
Cleveland, Mississippi 38732-1749
mcarr@carrlawpllc.com

This the 1st day of October, 2021.

/s/ Victor Israel Fleitas

VICTOR I. FLEITAS