# MISSISSIPPI BUREAU OF INVESTIGATION




**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Jerome Cordarius Johnson, black male, date of birth July 30, 1993, Social Security Account number 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, who resides at 375 South Levee, Grenada, Mississippi 38901. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

Mark Steed

Mark Steed

EXHIBIT "N"

# RECORDED STATEMENT OF JEROME C. JOHNSON

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS: Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District, interviewing Jerome C. Johnson.

Mr. Johnson, what's your date of birth?

JJ: 7/30/93.

MS: And your social security number?

JJ: 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.

MS: Are you here on your own free will?

JJ: Yes, sir.

MS: Have you been threatened or coerced to make this statement?

JJ: No, sir.

MS: And you understand what you're here for, right?

JJ: Yes, sir.

MS: And it's about an investigation, a death investigation, with Mr. Robert Loggins; is that correct?

JJ: Yes, sir.Yes, sir.

MS: Mr. Johnson, how are you employed?

JJ: Through the Grenada County Jail, I'm a shift supervisor.

MS: How long have you been employed there?

JJ: This will be going on my second year.

MS: And were you working at about 6:00 this morning at the jail?

JJ: Yes, sir.

MS: Were you there when an incident occurred involving Mr. Robert Loggins?

JJ: Yes, sir.

MS: Can you tell me how that happened?

JJ: Me and my shift was preparing to get ready to leave, and we got a call from EOC My main patrol officer took the call, and she informed me that they had an offender coming in that was violent. So I called for my other male officer from the back, and when they arrived we went out to assist them in bringing him in. And the officer was pulling him out of the car, he was shaking and wiggling, struggling with them. So we helped pick him up, and we carried him into the building and placed him on the floor. I went to the front to get the new oncoming shift supervisor and her employees to help us out. And upon changing, we was changing out the handcuffs at this point. We got to where we was fixing to – so the officers detained him and we was switching out the handcuffs and putting the leg irons on.

Once the officers released him, he was laying on his stomach and the oncoming supervisor, she saw that he was, you know, bleeding out the mouth. So she informed the police officers that we're not going to keep him because he was bleeding out the mouth like that. So upon her going to call our warden and the deputy warden, the officers left. So she called the deputy warden, she called the warden and she called the ambulance because they gave her permission to call the ambulance because of the situation. So upon waiting on the ambulance, she went over and she tried to talk to him because, you know, he comes in often. We know who he is. But he wasn't responding to her. So when she notifies everybody that was standing there that, you know, he wasn't responding, we proceeded to prepare to perform CPR.

By the time we got ready to start performing CPR, the EMTs had came through the back door. And they had took over the situation or the scene until they decided they was going to take him on off to the hospital till they got him stable enough to move. And I followed along as security in the back of the ambulance and they performed CPR and stuff all the way to the hospital. And once we got there, somewhere around 7:03 they said they had just pronounced him dead.

MS: Whenever the police officer brought Mr. Loggins in to the jail and he was in the sally port and you and another officer went out to assist and bring Mr. Loggins in; is that correct?

JJ: Yes, sir.

MS: Was Mr. Loggins being combative at that time?

JJ: In the car he was, but once we got him out – when he was reaching in to grab him, he was pulling from them and rolling over, but once we got him out he was just – he wiggled a little bit but he wasn't really fighting as much as he was in the car.

MS: Did he say anything threatening?

JJ: No, sir. He never said anything threatening even when he was laid in the floor talking, he never threatened nobody. He was just talking, you know, off the wall stuff.

MS: Do you remember anything that he may have been saying?

JJ: He was quoting Bible passages. I don't know which ones.

MS: Bible passages?

JJ: Yes, sir. He got into it the last time he was there, but, you know, he'd quote some of them. He'll talk about a can't stop won't stop nation and what he be trying to do. He just talks off the wall sometime.

MS: Okay. So you have had prior dealings with Mr. Loggins?

JJ: Yes, sir.

MS: Did he act like this before?

JJ: Yes, sir. Usually when he come in off of drugs, he'll be a bit combative, but he mostly sometimes he'll calm down and you'll be able to talk to him or, you know, he'll be alright.

MS: Whenever it was determined that the handcuffs needed to be removed off Mr. Loggins where the jail could put their own handcuffs on him and there were several officers that surrounded Mr. Loggins; do you remember that?

JJ: Yes, sir.

MS: Where were you at during the course of that?

JJ: I was over by his head. The way it was, Officer Sanders got his legs. Officer Harvey had one of his arms around his back. Officer Tillie, the police officer, was up on his shoulders. He had one of his knees in his shoulders holding him down, and the young officer was on the other side. And me and the older police officer was standing right there.

MS: At any time during that procedure, did you kick or hit Mr. Loggins?

JJ: No, sir.

MS: Did you see anybody else kick Mr. Loggins?

JJ: No, sir.

MS: At the point that Mr. Loggins was laying down, he was laying on his hands, right?

JJ: At first he was on his hands. We had to roll him.

MS: Okay. And who was the first person that put their hands on Mr. Loggins?

JJ: I would believe it was Mr. Sanders when he grabbed him by the leg to put the leg irons on him.

MS: Okay. Did Mr. Sanders kick Mr. Loggins?

JJ: No, sir.

MS: Are you sure about that? Did anybody kick Mr. Loggins?

JJ: From the best of my knowledge, no, sir. Nobody kicked him.

MS: Okay. Did anybody roll him over with their foot or anything like that?

JJ: No, sir. When they rolled him over, they used their hands.

MS: Okay. Did anybody have their knee in Mr. Loggins' neck or on the side of his head?

JJ: No, sir. Mr. Tillie had it right up here in his back above – I'd say right along the shoulder blade.

MS: Okay. William, do you have anything?

WB: Yes. How long have you been the sergeant on the night – the 6:00 p.m. to 6:00 a.m.?

JJ: It's been a year.

WB: It's been a year. And you say you've dealt with Loggins?

JJ: Yes, sir. We've dealt with him before.

WB: Can you describe to me again when the officer said he needed his handcuffs back, can you describe to me again who did what and where were they?

JJ: Okay. Officer Sanders was at his legs because he was putting the leg irons on him. Officer Harvey had his arms. He was on the side on his arm. He had his arm holding it behind his back. The police officer, Mr. Tillie, had his knee, like I said, up in his shoulder blade. The other officer was on the side – on the other side of him and had the other arm and me and –

WB: The other two officers, do you know them by name?

JJ: I know one of them is Dale Tillie. That is the one that had his knee in his shoulder. And Mike Jones I think is the other one that was helping detain him.

WB: Are you familiar with what a restraint chair is?

JJ: Yes, sir.

WB: Is the Grenada County Jail equipped with a restraint chair?

JJ: No, sir.

WB: When a person comes in behaving like Mr. Loggins, do you normally leave them on the floor?

JJ: No, sir. But, like I said, he was in the floor, and he was responsive at the first moment. So, like I said, the moment we was trying to figure out what we was going to do with him because at first we was going to put him in 15, but he had went unresponsive.

WB: When everybody was around him, you know, the part I'm talking about where Mr. Sanders was on his feet, Mr. Tillie was on his shoulders, Mr. Harvey was at his mid-way to take the handcuffs off.

JJ: Yes, sir.

WB: And the other officers that were around, you said Mr. Jones was where?

JJ: Mr. Jones was on the other side with his other arm and on his mid-section.

WB: Did anybody have a knee, a foot, a leg on Mr. Loggins' back?

JJ: No, sir. The only person that had a knee on him was Officer Tillie and he had it up on his shoulder.

WB: So when you walked up to him to take the handcuffs off, he was still moving around?

JJ: Yes, sir.

WB: When you got the officer's handcuffs off and your handcuffs on, he was unresponsive?

JJ: When they was unlocking them, he was struggling with them. And then they finally maneuvered him around and got the other ones on him and took the other ones off. When they came off, he was unresponsive.

WB: Did he make any noise or complain of pain or say, "I'm hurt," "I need help."

JJ: No, sir.

WB: And you were right there so you would have heard?

JJ: Yes, sir.

MS: I don't have anything else. This concludes the interview with Jerome Johnson. The interview ends at 4:58 p.m.