# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Reggie Dion Woodall, black male, date of birth ███████ Social Security Account number ███████, who resides at ███████ ███████. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
Mark Steed

**Exhibit J**

RL00039

## RECORDED STATEMENT OF REGGIE WOODALL

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.: M19-00000391**

**ME NO.: ME18-1164**

**DATE: 11/29/18**

MS: Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, District Attorney's Office 5th Judicial District, State of Mississippi, interviewing Reggie Woodall, police officer of Grenada Police Department. The interview is taking place at the district attorney's office in Grenada, Mississippi, and the interview is regarding the death investigation of Robert Loggins that occurred on this day in Grenada, Mississippi.

Mr. Woodall, will you state your date of birth and social security number, please?

RW: [redacted]

MS: And, Mr. Woodall, are you here on your own free will?

RW: I am.

MS: Have you been threatened or coerced to make this statement?

RW: No, I haven't.

MS: And you understand what the interview is about, right?

RW: I do.

MS: And prior to this interview, you were provided a Miranda Rights form which you read aloud yourself to me and Agent Blackmon; is that correct?

RW: Correct.

MS: Mr. Woodall, you're a police officer with the Grenada Police Department; is that right?

RW: That is correct.

MS: And how long have you been employed there?

RW: October 1980. Fourteen years.

MS: And you are certified through minimum standards; is that correct?

RW: That is correct.

MS: Earlier today you were in your official capacity as a police officer of the Grenada Police Department, and you had a call in Grenada, a disturbance call; is that correct?

RW: Yes, sir.

RL00040

MS: Will you explain how all that went down for me, please?

RW: At 5:41 a.m. we get a call about somebody yelling behind the house in the area of 50 West Govan Street. Officers responded to the scene, looked around, couldn't find nobody, let the windows down and heard somebody screaming. We get out of the car. I ordered two officers to go to the area of Bledsoe Street because it sounded like it was coming from that area. And I checked the area between 50 all the way up to 88 West Govan.

When I went behind one house, I don't know the house number, I heard somebody hollering, and I told my officer on Bledsoe Street to walk toward Allen Street in the backyard to see if they see anybody. Officer Tillie heard the screaming -- located the yelling, I mean, heard the yelling and located the subject that was yelling. He stated it was Robert Loggins. I said, "Shine your flashlight up so I can see," where I could walk toward the back where he was located at. Once he did that, I headed back toward – I'm thinking it was 50 West Govan, I'm not sure of the address that we was at.

I met up with Captain Gammage and Officer Jones, went to the area – no, first when I was headed there, the homeowners was looking out the window. I asked her was there any dogs in the backyard. She said, "No, no dogs in the backyard." So I relayed that to the other two officers there with me that there was no dogs in the back. Went to the back, went through some big bushes. Officer Tillie and Corporal Merriman was looking at Robert Loggins on the ground. Captain Gammage ordered Loggins to show his hands, show his hands. I repeated the command to show your hands. When he didn't show his hands, I veered around Captain Gammage and Officer Jones, pulled out my taser, yelled at him again, he still won't comply. I discharged my taser hitting him in the lower – the upper back in the lower back on his right side.

MS: Okay. What happened at that point?

RW: The taser worked on him. It locked him up as you could say. And we went in close to try to handcuff. By the time we got there, the five seconds had expired and he went back under – put his arm was under his arm – I mean, his arm was under his body. We asked him again to show his hands, put his arms behind his back. He refused. I gave him another juice – another shot of the taser. It didn't have no effect on him. He just hollered and pulled his arms tighter, closer.

I asked him again to show his hands, put his hands behind his back. He still didn't comply. Tried again. It didn't work on him so I said we probably got a good connection, so I hit it again and touched him on his left buttocks to make the electricity do its job but it didn't do its job.

MS: So you're saying that one of the probes was already in him?

RW: Yeah. One probe was in him, and he had on this thick coat. I didn't know it was that thick at the time. When I first deployed the taser, it affected him. So I'm guessing when he moved with that coat, one of the probes disconnected from his body or both of them did. So I really don't know.

MS: So the dry stun was in order to complete the circuit so it would – yeah, okay.

RW: Right. But when that didn't work, Captain Gammage got his taser from Officer Tillie who had jumped over the gate to try to help us get the subject – get Loggins in custody. When he got his taser, he dry stunned on the left side. That didn't work. I think I tried mine again, it didn't work.

By that time we figured out we needed to go hands on to try to get him in custody. So we went hands on with him, we was pulling on – Officer Tillie, Officer Jones and Captain Gammage were trying to get his hands away from under his body. They got the left – not the left – the right hand and handcuffed it. When Officer Tillie was fooling with the right hand, he bit Office Tillie on his left hand or right hand – one of them. He had the left arm still locked. I tried to dry stun that to make him comply with pain compliance and that didn't work. So I had to pull and pull and I applied the (inaudible) pressure point. It had no effect. So I had to get on with them and pull his arm, and he finally gave us his arm and we handcuffed him.

We called his name and tell him to get up, get up. He wouldn't get up. We picked him up. He walked about two steps and went back limp being passive aggressive, went back limp. We picked him up, toted him by his arms and his legs to the carport where I get on the radio and tell dispatch to tell EMTs to come to our location and check him out.

When they got there, we had laid him on the ground. They looked at him and said he was okay. I asked them to check him out because he was on something because I've been knowing him since he was a baby, and I done dealt with him on the criminal side. He's never acted the way he acted with us. Then if he was trying to get out of hand, I usually call his name or say his name and he'd comply with me, but this time it was no compliance. He was mumbling something like he was talking in tongues saying all kind of crazy stuff like Jesus Christ. I think he said something about Aruka or something like that. I really don't know what he was saying. By that time the EMTs came, they looked at him and said he was alright.

So we tried to get him up to walk again, he's passive aggressive, went limp. We picked him up again and took him to the sidewalk area. Once again, I still don't know the address. I didn't look back and get the address. Sat him back down because he was heavy, and we realized we didn't take the probes out of him so we tried to take the probes out of him but they was deep in his coat. So the dude with the gloves, the EMT, the bald headed dude, grabbed them and pulled them out.

And then we picked him up, put him in the car. When we got to the car, he pushed off somehow and didn't get in the car so we had to send Officer Jones to the other side, pulled him in. He was still saying whatever he was saying and took him to the jail. I told Officer Tillie and Corporal Merriman to go to the jail with him and make sure they get him out of the car, and I also notified EOC to tell the jail to get ready because we've got one coming in wild.

And we got to the jail, the jail said they wasn't going to take him. I said, "They got to take him. Take the handcuffs off and leave him." That's all I know from there. Next thing I know, we did the paperwork, fixing to take it over there and Corporal Merriman tells me that Captain Gammage tells him not to bring the paperwork over there because

he just stopped breathing and they had to rush him to the hospital. Then about five or ten minutes later, I'm not really sure of the time frame, we get a call that he passed.

MS: Okay. What I'm going to do is I'm going to kind of recap. I'm going to go back over from the beginning of the incident all the way up, okay?

RW: All right. You mean all the way down?

MS: Yeah. All the way to the end up until where we are now.

RW: All right.

MS: But before we start, before the shift -- before your police shift started last night or during your shift, did you consume any illegal drugs or alcoholic beverages?

RW: No.

MS: Okay. And throughout the course of your police service, have you gotten calls of trespassing and people – disturbance calls in the past?

RW: That's basically all we do on night shift now. Suspicious person, suspicious vehicles, folks hear noise, dogs barking, all kind of calls at night shift.

MS: And have there ever been times in the past when you've responded to suspicious persons or trespassers where you've had to arrest people before?

RW: Yes.

MS: Okay. And on this particular incident, when you responded, you were equipped with a body camera; is that right?

RW: Correct.

MS: And that was issued to you by the city; is that right?

RW: That's right.

MS: And to your knowledge, it was working properly; is that right?

RW: That is correct.

MS: Any time during the course of this incident, did you manually disengage this camera?

RW: I disengage – I took my camera off recording once he was in Officer Jones' vehicle, patrol unit, which would be P19. He had drove off. I got in my car, I realized that Officer Jones didn't tell dispatch he was 10-15 with him so I get on the radio and tell Officer Jones – well, I said, "44," that's his badge number, I said, "You need to go 10-15 with the subject you got." That's when he went 10-15. And after I did that, I turned my camera off record and drove straight to the station.

MS: Okay. And other equipment that you may have had on your person is normal police equipment like handcuffs, firearm. Do you have an impact weapon? Do you carry an impact weapon?

RW: No. I do not.

MS: You have a flashlight, correct?

RW: Correct.

MS: Okay. So you make a visual contact – let me back up. You start walking up through the carport at 60 West Govan?

RW: I'm thinking it was 50. I checked – this one woman came outside. I can't think of her name. I know her, but I don't know her name. She came out – she was outside in her nightgown, said she heard somebody running past her house hollering. So she said it went next door to her house so I went that way. I said, "Well, it couldn't have been over your house because you've got two dogs in there and they ready to get me." So I went to the side where the gate was open and I looked around, and that's when I heard some yelling west of me.

MS: And during the course of while you heard the yelling, Officer Tillie, or Hal, they identified the person as Robert Loggins, right?

RW: That would be Officer Tillie that identified him as Robert Loggins.

MS: Okay. And so had you dealt with Mr. Loggins in previous police encounters before?

RW: I've been dealing with him – I'm going to say 14 years, but it ain't been 14 years because I think he went to prison for burglary, him and Jamie Millican went to prison for burglary.

MS: And any of these past encounters that you've had with Mr. Loggins, has he ever resisted arrest before?

RW: He never resisted from me, but other officers say he had resisted from them. But he never resisted from me. He never ran from me or tried to fight or nothing with me. Like I said, I've been knowing him since he was a baby.

MS: Have you ever known him to use drugs?

RW: Yeah.

MS: Okay. So you're walking through what is believed to be 50 Govan, and was there another officer with you at this time?

RW: It was Captain Gammage and Officer Jones, Mike Jones – Michael Jones.

MS: Okay. So y'all are walking through the property and you're going through the backyard, you enter an area that's kind of grown up and sort of thick grass and thick woody stem type vegetation, and so who sees Mr. Loggins first?

RW: I think Captain Gammage made first contact with him.

MS: And so there was orders for him to reveal his hands?

RW: Show his hands and put your hands behind your back.

MS: Okay. And did he comply with those orders?

**RL00044**

RW: No, he did not.

MS: At any time did he ever brandish a weapon?

RW: No, he did not.

MS: Did he ever threaten to bodily harm or kill any officer there?

RW: No, he did not. The only thing he said was "Was y'all going to kill me?" He kept saying, "Y'all going to kill me. Y'all going to kill me." And I think Officer Tillie said, "No, Robert, we're not going to kill you. We're just trying to help you," or something like that he said.

MS: Okay. And did any officer there threaten to kill Loggins?

RW: No. Like I said, we've been knowing Loggins ever since he was a little boy.

MS: Okay. And as y'all attempted to subdue Loggins – did he have a legal right to be where he was at?

RW: No, he did not.

MS: So he was trespassing; is that right?

RW: Correct.

MS: And did he physically resist arrest?

RW: Yes, he did.

MS: Did he strike any officer there or cause any bodily injury to any officer there?

RW: Like I said before, he bit Officer Tillie on his hand or on his arm. Officer Tillie yelled, "He bit me!"

MS: Do you know if any officer struck Loggins with any type of weapon?

RW: No. We don't do PPCT anymore so we don't use impact weapons or nothing like that. We're on SGTS or some stuff like that. We're on that now.

MS: So the items that would have been present would have been a handgun, a taser, a portable radio, flashlight or handcuffs?

RW: Correct.

MS: Okay. So out of those items, was Mr. Loggins struck with any of those items?

RW: I don't think he was, but I'm not really sure. I don't think nobody hit him with no flashlight.

MS: Okay.

RW: They probably used the flashlight for a pressure point, but I don't think they hit him with no flashlight.

**RL00045**

MS: Okay. So if any pressure points would have been applied, then which ones would they have been?

RW: I applied – myself with Officer Tillie, well, Officer Tillie tried to do the (inaudible) orbit or something like that. He tried that one, but that didn't work.

MS: Brachial stun?

RW: No, we didn't do the brachial stun. We just applied pressure to this one right here, and they usually show some – Officer Tillie didn't get it right so I tried it. It was nothing to it.

MS: When you say there wasn't anything to it, do you mean –

RW: He didn't show no effect to him.

MS: Okay. It didn't affect him?

RW: None at all.

MS: He was still combative; is that right?

RW: Right.

MS: So y'all finally got him handcuffed, right?

RW: Correct.

MS: And y'all handcuffed him behind his back?

RW: Correct.

MS: Okay. Was his feet cuffed?

RW: No. We didn't hog tie him. We don't do that there.

MS: Okay. So y'all brought him out of the wooded area?

RW: Correct. We toted him out because he wouldn't walk so we toted him out. Both arms were secure behind his back. I had one shoulder. Officer Tillie had the other shoulder and Officer Jones had his legs.

MS: Okay. And so when you got out to the street, y'all were met by medical staff, right?

RW: No. Medical staff met us under the carport.

MS: Okay. And so what did they do?

RW: They just looked at him and say he all right.

MS: Okay. And how many members of that medical staff were there present?

RW: Two.

MS: Was that – what was the name of the medical service that was there; do you know? AMR?

RL00046

RW: They done changed their name. I never really paid attention to the name anymore. I talked to them once before and they said it's the second largest ambulance company in the world, so. I don't know the name of it.

MS: Okay. So when they said he was okay, he was then transported to Grenada County Jail; right?

RW: Eventually. They met us under the – well, we had to come through a gate from the backyard. We got him to the gate and we sat him down because in front of us was one of them motorized chairs. We sat him down right in front of the chair and they came back and they looked at him. We tried to tell him to get up again. He kept saying mumble jumble stuff so we picked him up again and I told Hal, I said, "Well, Hal, you grab him and y'all tote him to the car." Once we got to the edge of the road, there was an ambulance here, my unit here was Unit 6, and Officer Jones unit, which is Unit 19, was down the road. Then Jones' vehicle, then Corporal Merriman's unit was down there towards the end right at the intersection of Govan and Fairground, his vehicle was too far away and Officer Tillie left his vehicle on Pecan Street and Captain Gammage's vehicle was behind the ambulance. My vehicle and Captain Gammage's vehicle don't have a cage so we're not allowed to transport.

So Officer Jones ran down to his vehicle to move it up, locked the keys in the car. It just so happened my key worked for his car. I gave him my key to unlock the door. Then they toted him to the car. That's when he resisted again by pulling back, so they laid him down again. Jones went to the other side, pulled him in. He tried to come out of that side. I told them to sit him up. I remember saying "Sit him up." They sat him up a little bit and closed the door and he just laid there talking. He didn't kick the door. He didn't try to bust the window out or anything. He just kept talking loud and they took him to the station. And, like I said, I had to remind Officer Jones to do the 10-15.

MS: Okay. And so when you went to put him in the car, was he still resisting getting in the car?

RW: Yeah. He didn't want to get in the car.

MS: Okay. And when somebody don't want to get in the car, you just have to physically put them in there, right?

RW: I think they did a knee strike. I don't know which one of them did a knee strike.

MS: Okay.

RW: With him on the passenger side of the car, it was Corporal Merriman and Officer Tillie. I'm thinking Officer Tillie did the knee strike or tried to do a knee strike, but it had no effect on him either. They pulled him back this way, laid him back down this way, because once again he went back limp. They straightened him up, took him back on the other side, laid him in the vehicle. Officer Jones pulled him to the other side, and he was trying to close the door. He was coming out. I told them to sit him up. Sat him up good enough, slammed the door. That's pretty much it.

MS: And then which officer transported him to Grenada County Jail?

**RL00047**

RW: Officer Jones.

MS: And was there other officers following behind Officer Jones to the jail?

RW: I ordered Tillie and Merriman to follow Jones to the jail because he probably going to need some assist in getting him out of the car. But during that time when Officer Jones was taking him, Officer Merriman put Officer Tillie in his vehicle and took him to get his car, and they followed with him as he went through Lyon and Main Street or at Fairfield, right there at the old (inaudible) Church which would be Hughes and Son now. They caught him right there and they followed him to the jail.

MS: Okay. So when y'all get to the jail or the sally port, there were other officers that arrived.

RW: Right.

MS: And then there were several officers that actually physically carried Loggins inside.

RW: I have no knowledge of that. I didn't go to the jail. So I can't tell you about that because I didn't go to the jail. What I did, when they took him – I heard them check out at the jail with him, I went into the bay area and started doing paperwork.

MS: During the course of your – well, let me back up. At any point was there any type of illegal contraband or substance that was taken off of Loggins that night?

RW: We found – one of them was some lip chap and the other one, we thought it was some liquid meth, but I think it was some lotion in some grease in a container, but I'm really not sure. We did the where you pop the things on him, drug test on it and it turned purple. Lieutenant Williams said it's not drugs.

MS: A field test kit?

RW: Right. That's what it's called, a field test kit.

MS: Okay. Based on your experience as a law enforcement officer, was there anything that took place during the arrest of Loggins that was unprofessional or that would have been in violation of his civil rights?

RW: Not at all. We followed everything by the book.

MS: Okay. He resisted arrest, and y'all basically just took the amount of force necessary to subdue him; is that correct?

RW: That is correct.

MS: Mr. Williams, do you have anything?

WB: Yes.

From the time you made the arrest when you got both of Loggins' hands behind his back –

RW: Correct.

WB: -- did he walk from that point at any time?

RL00048

RW: He made approximately two steps and went back in because I had to catch him before he hit the ground hard. I didn't know what was back there. It felt like kind of rocky, and I didn't want him to hurt himself so I had to catch him and I eased him on down. I don't know if I said we're going to have to tote him out of here or pick him up. I said one of them. I can't really just remember what I said. But we toted him through the gate, well, actually there were two gates. I think the part we was at – now that I think about it, I think it was like a garden or something. And it was a gate and it was like a little shed right here. We had to open the gate, get them through there and come through another gate. That's when we sat him down and the EMTs came.

WB: When Loggins – when you were getting ready to put Loggins in the patrol car, what kind of resisting did he do at the patrol car?

RW: Somehow he pushed out the door.

WB: At that point was he standing?

RW: Yes. He was standing on his own then. Then when he pushed out the door, he went back limp and tried to fall again, and they eased him down to the ground to regrip him. They flipped him back – I ain't going to say flipped, they turned him, put his head going south and his feet was north. They shoved him in there, and Officer Jones grabbed him by his coat and pulled him a little close. When he got ready to close the door, he pushed with his foot to come out the driver's side door. I told them to stand him up. He stood up a little bit. I think he said some cuss words. Yeah, he said some cuss words. They closed the door and took him to the jail.

WB: Was Loggins seat belted into the back seat of the patrol car?

RW: No. He laid back down. Before we could get the seat belt on him, he laid back down in the car.

WB: How long is the transport from your location to the jail; how long did the transport take him?

RW: They was moving pretty good so I think it probably took less than a minute. The light was green when they went through Lyon and Main or Fairfield or whatever that street is right there. Then they had to stop at the stop sign. That didn't take long. The light was green right there at Main and First. He had another stop sign. He ran the stop sign. He just ran the stop sign to get him on there to get him out of the car.

WB: Now, I want to go back a little bit to back when you were attempting to make the arrest.

RW: Right.

WB: Was any other force used besides what you told us?

RW: No. Not that I can remember.

WB: What was the lighting behind the house?

RW: It was dark. All we had were flashlights. I think it was a street light somewhere, but it wasn't – I don't think it was right where we was at. I remember going in there blind, just

shining the flashlight. I might need to look at my video. Well, I can't pull it up now, it's been over six hours. But I don't think it was – let me look – it was dark back there. It was pretty dark back there I think.

WB: Did you have all your equipment?

RW: Yeah, got all mine. I heard about the left flashlight. I called Jones to see if it was his flashlight. He don't have a city issued flashlight. He got his flashlight. So the only flashlight that could have been was Officer Tillie's lost his flashlight.

MS: What's his badge number?

RW: Tillie's? P35.

MS: Okay.

RW: Hal is G29. Gammage is 6 and I'm 12.

WB: Who did you say G44 is?

RW: Mike Jones.

MS: And Gammage is?

RW: G6.

MS: Okay.

RW: And I'm G12.

MS: Okay.

RW: Come to think of it, it was dark back there because when Hal finally made it back around, I told him, "Get your ass over here," and I gave him my flashlight so I can help Officer Tillie get control of his left arm. It was dark back there.

WB: Let me ask you this: So there was four of you trying to effect an arrest on Loggins?

RW: Right.

WB: Did anybody – were all four of you down there or was somebody shining the light to try to light the scene because it was dark back there?

RW: Well, at first I was shining my light. Then when I reached out and hit the dry stun on his left cheek, you lean forward to the camera, it will send out an "Officer down." So mine was going off. Couldn't hear it go off so I had to raise up to mine to make it pitch dark, and that's when Officer Merriman stung him. When he got close enough to him, I gave him my flashlight to hold, and I helped take control of the left arm.

WB: Did that warning go off on any of the ones that was down trying to effect the arrest?

RW: No, just mine. That was kind of strange to me, too.

MS: Did at any point in time you or anybody strike Loggins with a flashlight?

RL00050

RW: No, not that I remember. I don't think nobody did. If they did, I wouldn't say – let me think.

MS: Did you strike Loggins with a flashlight?

RW: No, I didn't. I don't think I did. I think I – when we had his arm like this, I think I pressed down right up in here, but as far as hitting him with it, no, nobody hit him.

MS: Okay.

RW: Trying to get my facts together because I don't want to lie, and I don't want to leave nothing out.

MS: I understand that.

RW: He wasn't struck. I don't think nobody hit him.

MS: William, do you have anything else?

WB: No, sir.

MS: The interview ends at 2:41 p.m.

RL00051