# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Albert Tilley, white male, date of birth ███████, Social Security Account number ███████ who resides at ███████████████████████. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

*Mark Steed*
Mark Steed

**Exhibit K**

RL00052

## RECORDED STATEMENT OF ALBERT TILLIE

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.:** M19-00000391

**ME NO.:** ME18-1164

**DATE:** 11/30/18

MS: Today's date is November 30, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office 5th Judicial District interviewing Albert Dean Tillie. The interview is taking place at the Grenada District Attorney's Office and the interview is regarding the death investigation of Robert Loggins which occurred on 11/29/2018 in Grenada, MS.

Mr. Tillie, would you state your date of birth and social security number, please?

AT: ▇▇▇▇▇▇▇. Social is ▇▇▇▇▇▇▇.

MS: Mr. Tillie, prior to this interview, you were provided a Miranda Rights which you read aloud, understood and signed; is that correct?

AT: Yes, sir.

MS: Have you been threatened or coerced to make this statement?

AT: No, sir.

MS: Mr. Tillie, how are you employed? Are you a police officer?

AT: Yes, sir.

MS: With what city?

AT: Grenada Police Department.

MS: And how long have you been there?

AT: A little bit over a year.

MS: Okay. Are you certified to the minimum standards?

AT: Yes, sir.

MS: Prior to working for Grenada Police Department, did you have any prior law enforcement experience?

AT: No, sir.

MS: Were you employed as a police officer on November 29, 2018?

AT: Yes, sir.

MS: And did you happen to be involved in the situation in the vicinity of 60 West Govan Street about 5:00 a.m. on that date?

AT: Yes, sir.

MS: Okay. Can you tell me what the nature of the call was and how you responded and what you did once you got there?

AT: We got a call in the area of 50 West Govan, caller from 50 West Govan said that she could hear somebody screaming for help. We, myself and other officers, responded. When we arrived in the area, my sergeant advised me and Corporal Merriman to go to Bledsoe because he stated that it sounded like it was coming towards Bledsoe. While going towards Bledsoe, I made contact with one of the neighbors who stated that he also believed this noise was coming from Bledsoe. Myself and Corporal Merriman got out on Bledsoe. We could hear somebody hollering. At first we couldn't really tell what they were saying, couldn't make it out. We located the noise. I don't know the exact address on Bledsoe. It was actually in the backyard of the house on Govan. We come up to a fence, I could hear him but I could not see him. I was talking to him and talking to him, and he was saying stuff that didn't make sense, just talking about – couldn't really understand what he was saying. I continued to ask him what his name was, who he was. He finally did tell me his name was Robert Loggins. I asked Mr. Loggins if he would please stand up so I could see his hands and where I could see him physically, and he stated that he was not going to, he did not want to. At that time, my sergeant, my captain and another officer were trying to find out where we were. They were trying to come off Govan and get to where we were. At this point, I'm still on the other side of the fence just talking to him on the other side of the fence. Once my captain, sergeant and another officer got into the backyard to where they could see him, I then started going over the fence. Before I made it Mr. Loggins, I heard the taser deployed. I heard Captain Gammage ask him numerous times to get his hands out from under him, and he would not. He kept on just talking stuff you couldn't understand. It didn't make sense. Once we made contact with him, he continued to keep his hands clenched – his arms clenched up underneath his body. We tried for several moments trying to get his arms out from under his body. He actually bit me while we were trying to do that. After several minutes of struggling with him, we finally got him in cuffs and we took him out of the backyard. We already had EMS standing by. EMS come over there to where we were with him, checked him out and said he was fine. They pulled the taser prongs out of his back – out of the jacket. The prongs didn't go all the way through. The taser had no effect on him. Once they did that, we put him in the police car, and he was transported to the jail.

MS: Did you have any contact with Loggins once you got to the jail?

AT: When I got there, he was already inside. We got inside, he sat there in jail for a couple of minutes. I told the jailers I needed to go get my handcuffs. We swapped cuffs, and when we left, Mr. Loggins was still sitting there hollering stuff you couldn't understand.

MS: Okay. Let's back up to the initial call, and I just kind of want to go through and ask you some questions about that, okay?

AT: Okay.

MS: First thing I want to ask you, when you go on duty every day, what is your normal equipment that you have?

AT: I have my Glock 40 caliber. I have my taser. I have my handcuffs, radio and that's pretty much about it.

MS: Okay. Do you carry an impact weapon?

AT: No, sir.

MS: Did you have all of that equipment with you on this date?

AT: Yes, sir.

MS: And it was night so I'm assuming that you had some type of lighting device; is that right?

AT: I had a flashlight that was inside the car. They keep flashlights in the car, and I grabbed it before I got out of the car.

MS: Okay. When you first made contact with Loggins, did you know who he was?

AT: He had stated to me that he was Robert Loggins. But, me, I don't ever remember having ever made contact with him before this incident. So I've only heard about him from what other officers have said when they've come in contact with him, but I don't ever remember before this making contact with him so I couldn't – I just was going by what he said. He said he was Robert Loggins.

MS: What had you been told about Robert Loggins' conduct with police officers?

AT: Just that he had – when, you know, when they would come in contact with him, sometimes he like to cause a scene sometimes. Just stuff like that. Nothing really too specific.

MS: Okay. Whenever you saw Robert Loggins, was he standing up or laying down?

AT: He was laying face down into the ground.

MS: Okay. Did he – did you see any weapons or anything?

AT: No, sir. I could not.

MS: Was he being verbally abusive or shouting out verbal threats or anything like that?

AT: He was shouting stuff that just didn't make sense.

MS: Like what?

AT: Like, "Jesus, I got your power," and it was just stuff that I don't really know too much specific, but a lot of it just didn't make sense. It was just off the wall stuff.

MS: Did you give Loggins any type of verbal commands?

AT: Yes, sir. Before I reached him, I had asked him numerous times to please show me his hands, please stand up to where I could see him. When we got to him, I then asked him to please move his hands out from under him and put his hands behind his back and so did the other officers.

MS: Did he comply with that?

AT: No, sir.

MS: So you were on one side of the fence and he was on another, and from what I understand he was inside of this little heavily grassy – it was with thick vegetation, laying down; is that right?

AT: Yes, sir.

MS: So while you were there looking at him, did other officers approach him from a different angle?

AT: Yes, sir. My sergeant, captain and the other officer came in from a gate around the front side of the house while I was sitting there talking to him.

MS: Who were those officers?

AT: Captain Gammage, Sergeant Reggie Woodall and Officer Mike Jones.

MS: And so when they came in the gate, what happened then?

AT: They came in and they had trouble at first locating him and I was shining my light on what sounded like where he was at. Once they located him and Captain Gammage asked him numerous times to put his hands behind his back to show his hands and he would not, then Captain Gammage tased him once. It seemed like it had no effect. He just still had his hands clenched out under him, and that's when I went over the fence and went to go assist them.

MS: Did Loggins threaten the officers, those three officers that were coming in, did he threaten them in any way?

AT: I didn't hear him threaten them.

MS: Did you see him assault them or anything?

AT: I mean, as far as just trying to fight back and kind of kicking at us with his feet and stuff, and besides him biting me.

MS: So once Officer Gammage tased him, at that point in time, you ran around the fence and came in?

AT: I jumped over the fence into the yard where they were and went and assisted them.

MS: Now how was the situation where he bit you? How did that go down?

AT: We were trying to get his arms back behind his back, and, like I say, he wouldn't do it. I went down to go reach under him to grab his arms and he bit down on my hand, and I yanked back, and I stepped back for a few minutes because I was stunned. I didn't know what it was, and then I assisted again trying to get his arms behind his back.

MS: Okay. So he was physically resisting then?

AT: Yes, sir.

MS: And so basically it just took muscling him to get his hands behind him?

AT: Yes, sir.

MS: In your law enforcement service, have you arrested people that resisted arrest before?

AT: Yes, sir. But I've never had somebody resist like that. He just seemed like, I don't know, he had some super strength or something. I don't know. I've never had somebody resist like that.

MS: In your law enforcement service, have you ever gotten calls from people in the community where there may have been somebody on their property and they wanted them removed?

AT: Yes, sir.

MS: And when you got there, did you make them leave or arrest them?

AT: It was all depending on the situation. If they wanted to file charges for trespassing, if they had already been warned, you know, you can't come over here, you're trespassing, we probably did arrest them. But if it was just something where they come to agreement, hey, just don't come back, you know, we let them go.

MS: During the course of trying to subdue Mr. Loggins, do you know if Mr. Loggins was struck by any officers on the scene?

AT: I do not. I did not strike him, and I do not remember any other officer striking him.

MS: So you're saying that you didn't hear anybody or see anybody hit him with a flashlight or hit him with a weapon or taser? Other than shooting him with the taser, you didn't see him get hit anywhere on his body?

RL00057

AT: Not with a flashlight. He was drive stung with the taser numerous times, but I never saw anybody hit him with any flashlight or any other object for that matter.

MS: Was he hit – was he hit – did any officers strike him with their hands or anything like that?

AT: No, sir, not that I saw.

MS: Was all of your equipment recovered from the scene?

AT: The only thing, the flashlight in the car, I never got back to my car.

MS: So you lost your light at the scene, right?

AT: Yes, sir.

MS: Did you strike Mr. Loggins with your flashlight at any time?

AT: No, sir.

MS: If you struck Mr. Loggins, I'm not saying that it's wrong, we just need to know.

AT: I did not. I did not. I would tell you if I did. I'm not going to lie.

MS: Did anybody strike Mr. Loggins with your light?

AT: No, sir.

MS: Did anybody strike Mr. Loggins at all with any flashlight?

AT: No, sir.

MS: So if Mr. Loggins' light is processed for DNA – I mean, if your light is processed for DNA, then Mr. Loggins's DNA should not be on that light; would that be right?

AT: Not to my recollection. Not to me seeing anybody striking him, no, sir, I did not see anybody strike him.

MS: As far as hitting him in the head or in the mouth, did you see any of that?

AT: No, sir. I saw nobody hitting him in the mouth, the head. I was solely focused on trying to get his arm out from under him, and I did not see any other officers do any of that.

MS: Based on what you saw, would you think that a reasonable amount of force was used to subdue Mr. Loggins?

AT: Yes, sir. I think we did everything that we could.

MS: Do you think that he was abused or mistreated in any way?

AT: No, sir. I do not.

MS: So once Mr. Loggins was subdued and handcuffed, he was carried out of that field to the patrol car; is that right?

RL00058

AT: He was carried out of the field to a carport of the house we were behind. EMS was already on the road, on Govan, and the sergeant asked them to come up there to check him out. They came up there, and they said that he looked fine and said that he was okay for us to take him to the jail. We got down there to put him in the car, they took the prongs out of his jacket, and we put him in the patrol car.

MS: Did EMS personnel, did they look at him, kind of evaluate his status and make sure he was okay or anything?

AT: They looked at him, and they said that he was fine.

MS: Did they talk to him?

AT: They asked him how he felt, and he just gave an off the wall thing and they said he was fine.

MS: When you say gave an off the wall thing, what do you mean?

AT: He was just talking about something again about Jesus and I got the power and all kind of stuff that just didn't make sense.

MS: And so based on that, do you think that he may have been under the influence of something?

AT: Yes, sir. With my little bit of experience in law enforcement, I do believe he was under the influence of something.

MS: Okay. So at that point, once the EMTs said that he was okay, then he was transported to the Grenada County Jail; is that right?

AT: Yes, sir.

MS: And who transported him to Grenada County Jail?

AT: Officer Mike Jones.

MS: Did anybody follow Officer Jones to the jail?

AT: Officer Merriman and myself did.

MS: On the way to the jail, did y'all make any stops?

AT: No, sir.

MS: Y'all went completely straight to the jail, right?

AT: Yes, sir.

MS: Once you pulled into the sally port, who got Loggins out of the car?

AT: When I got into the jail, he was already out of the car. So I'm assuming Officer Mike Jones and I guess the jail man got him out, but I was not in the sally port when they got

him out. Myself and Officer Merriman were just pulling up, and he was already taken into the jail.

MS: Did you see Loggins resist at any time at the jail?

AT: We were trying to – we had to swap the cuffs. They had to put their cuffs on him, and he resisted and kept on trying to pull his arms away and stuff.

MS: He was handcuffed, though, right?

AT: Yes, sir.

MS: So you're talking about once those handcuffs were removed?

AT: Right. And we were putting the other ones on, he kept trying to pull his arms away.

MS: At the time that the handcuffs were being removed in order to change handcuffs, did anybody strike Mr. Loggins?

AT: No, sir.

MS: Did anybody kick Mr. Loggins?

AT: No, sir.

MS: Did you see any jail staff from Grenada County Jail kick or strike Mr. Loggins?

AT: I did not. No, sir. I did not see anybody do that.

MS: Did anybody – where were you at during the course of changing those cuffs out?

AT: I was trying to get the cuffs off. I was off to the side of him, and I was trying to undo the cuffs.

MS: Were you sitting on Mr. Loggins?

AT: No, sir.

MS: Was your knee on his neck or his head?

AT: Not to my recollection, no, sir. I don't believe it was.

MS: When you say you don't believe, either you were or you were not.

AT: No, sir. I was not. I was not on his head.

MS: Was there anybody else on his head?

AT: Not that I can remember. No, sir.

MS: And you didn't see anybody kick him?

AT: No, sir.

MS: Did anybody roll Mr. Loggins over with their foot?

AT: No, sir, not that I remember.

MS: William, do you have anything?

WB: Yes, sir.

How did you get your hand back from Loggins when he bit you?

AT: I yanked it back.

WB: Can I see your hand?

AT: Yes, sir.

WB: So where did he bite you?

AT: Right there.

WB: How did you lose your flashlight in a dark area like that?

AT: We were – when we went to go put hands on with him, I went to go put it in my back pocket, and it didn't make it to my back pocket.

WB: It was dark out there, right?

AT: Yes, sir.

WB: So maybe we didn't ask you the right question. If it was dark out there, did you hear anybody hit Loggins? Did you hear the sounds of somebody being hit?

AT: No, sir. I did not. I did not hear the sounds of anybody being hit.

WB: How long of a transport is it from Govan Street to the jail?

AT: Five minutes, six minutes tops. Maybe three to five.

WB: How long did it take you to get back? You didn't transport him, Mike did.

AT: Right.

WB: How long did it take you to get back?

AT: About four minutes, three or four minutes.

WB: Did you help get Loggins out of the car?

AT: No, sir. I did not.

WB: Let me go back on something. When you were in the back yard and you actually got Loggins subdued, you and the other officers, was he able to walk? Did he walk?

AT: No, sir. He did not walk.

WB: How did you get him from back there?

AT: Sergeant Woodall and Officer Mike carried him. They were each on his shoulder and carried him up there to the front when EMS checked him out.

WB: When EMS checked him out, was he on the ground or was he standing?

AT: He was sitting on the ground.

WB: He was sitting on the ground?

AT: Yes, sir.

WB: How did he get from where EMS checked him out to the patrol car?

AT: They carried him to the patrol car.

WB: Did he stand at that point at any point?

AT: I did not see him stand. No, sir.

WB: When you put him in the patrol car, what happened then?

AT: Mike Jones drove off and took him to the jail.

WB: Let's say for example, a person didn't resist you and it was just a regular arrest, do you normally seatbelt people into your car when you arrest them?

AT: No, sir.

WB: When Loggins left the scene, was he sitting up like a regular person would or what was his position in the back seat of the car?

AT: He was laying in the back seat.

WB: He was laying in the back seat?

AT: Yes, sir.

WB: On his back, face down?

AT: I don't know. I didn't see. I just saw that when he drove off, he was not sitting up. I did not help them put him in the car is what I'm saying.

WB: Are you the arresting officer?

AT: No, sir.

WB: Who is the arresting officer?

AT: Mike Jones was the arresting officer.

WB: Mike Jones was the arresting officer? But it was your handcuffs that was on him?

AT: Yes, sir, because I had my handcuffs out, and I was the only one that could get cuffs on him.

RL00062

WB: Do you remember speaking to or hearing Sergeant Clark say something to you about anything about the prisoner you brought in, about Loggins? Did she tell you anything?

AT: Sergeant Clark? Who is that?

WB: Sergeant Clark from the jail.

AT: The female?

WB: Yes, sir.

AT: At first she just was talking to him, asking him why he did this and then she said that she did not want to accept him. She wanted him to get medically checked out and that she was going to call the ambulance over there to get him checked out.

WB: So when Sergeant Clark, you know, the person at the jail that's going to take the prisoner or not take the prisoner, tells you that she is not taking the prisoner, what happened then?

AT: That was up to our corporal. He said just to get my cuffs off of him and let's go. That was up to our corporal.

WB: Did you see any blood coming from Loggins' mouth? Did you see any blood coming from him from anywhere?

AT: No, sir. I did not. I did not see any blood coming from him?

WB: Did he complain of pain? Did he say, "You hurt me," or did he ever make any comments like that?

AT: No, sir. I never heard him make any comments like that.

WB: Did you fill out a report about missing equipment?

AT: No, sir. I did not.

MS: Officer Tillie, if you struck Loggins, just admit that you did or if you saw anybody else because here's the situation. We have reported injuries of Mr. Loggins that doesn't add up to the situation.

AT: Yes, sir.

MS: And it's forcing us to – we've got to know what happened to him. You as an officer, me as an officer, Officer William, you have that authority to use the amount of force necessary to effect an arrest. I understand that. And I'm not saying you're wrong if you did. I'm just saying that we have to know what exactly happened so we can justify and say, well, he had a missing tooth or he had a knot on his head because this man passed away at the jail. Now whether he had overdosed or what, you know, the general public they don't look at it quite like that. They look at it that he died in police custody, and they did something to him. And so we're not saying you're wrong. We're not saying

RL00063

any of the other officers are wrong. I'm saying that – and I am telling you this, that if you lie about anything that happened out there, now that is illegal.

AT: Yes, sir.

MS: That is a felony.

WB: If you don't tell us something happened, it's the same thing.

AT: Yes, sir.

WB: That you know that happened.

MS: You can be right in what you did out there even if you did hit him, but you would be wrong if you lied about it.

AT: I did not, and I promise to you, I did not hit Mr. Robert Loggins with my flashlight, any other flashlight at all. I'm not going to lie about that. I have nothing to lie about. I did not hit him with that flashlight or with any flashlight. I lost that flashlight when I went to go put it in my back pocket because there was already light on him and I went to go grab his arm, and I went to go put the flashlight in my back pocket. I did not strike Mr. Loggins with a flashlight. I promise to y'all I did not strike that man with a flashlight.

MS: Did any other officer strike him? Tell me the truth.

AT: I'm trying to think.

WB: It's dark out there so we want you to use your senses. You either heard it, you saw it.

MS: Tell the truth.

AT: Yes, sir. I'm trying to think because I don't want to lie because I don't want to be in any trouble because I did nothing wrong. I know that for a fact. I did nothing wrong. I did not hit him with a flashlight. I would never hit anybody with the flashlight or anything like that. We have so much other equipment to use besides hitting somebody with a flashlight or a blunt object. So that's why I'm trying to think.

MS: Did you see anybody else hit him?

WB: Let's be more specific about it. Okay. Did you see or hear or any of the other senses that would have notified you that Loggins was being hit when you were trying to get his arm from behind his back, from under his bottom, from under his chest, behind his back?

AT: Yes, sir. I believe Sergeant Woodall was trying to get the nerve on his elbow to get him to release his arm from behind his back.

WB: How many strikes did you hear?

AT: Two or three.

MS: And what was those strikes? Were they with a hand or were they with an object?

AT: Honestly, I could not tell.

MS: What do you feel that they were?

AT: With an object. With the flashlight.

MS: Did you see it?

AT: Yes, sir. I saw him hit him in the elbow with the flashlight. I'm not going to lie to y'all. I have nothing to lie to y'all about.

MS: So why has it taken this much to get you to admit it? Are you afraid?

AT: I just didn't want him to get in trouble. I'm not trying to cover anything up. I'm not trying to, you know –

WB: A man's dead. Don't – tell it like it is.

AT: I know. And I'm not lying to y'all. I did not hit that man with the flashlight. What I saw is Sergeant Woodall three or four times with a flashlight to get him to release his arm.

MS: Okay. And I appreciate your honesty. Okay. And like I told you, as police officers, you have to do things. You have the authority to use the amount of force necessary to effect the arrest. Okay.

AT: Yes, sir.

MS: I'm for that. The whole thing here is like I told you, we have to be able to say, okay, well, if this man has a broke arm, how did he get a broke arm. I'm not saying that you're wrong in doing that. I'm just saying we've got to know exactly what happened in order for him to have sustained that particular injury. Do you understand what I'm saying?

AT: Yes, sir. I understand.

MS: And so by you being honest, you did the right thing. But you were going down the wrong road because you were trying to keep Officer Woodall from getting in trouble. And I'm not saying that he's in trouble for that, but we have to know, you know, exactly the amount of force that was used. Do you see what I'm saying?

AT: Yes, sir. I understand.

MS: Okay. Is that the only, Officer Woodall striking him in the elbow with the flashlight, is that the only thing that you saw?

AT: Yes, sir. That is the only thing I saw.

MS: Did you see Loggins hit in the mouth or in the head?

AT: No, sir. I did not. I did not see Mr. Loggins hit in the mouth or the head.

MS: Do you have anything else, William?

RL00065

WB: Did you see him hit in the mouth, any broken teeth?

AT: No, sir. I did not.

WB: The strikes Officer Woodall used on the elbow, how long after that did it take for Loggins to put his hands behind his back?

AT: Ten seconds.

WB: So it was three strikes within ten seconds or was it more than three?

AT: The most I saw was three strikes and then he put his hands behind his back.

WB: You know, ten seconds is a long time when you're fighting with this man?

AT: Yes, sir.

WB: You sure you only heard three?

AT: Yes, sir. I'm positive I only heard three.

WB: It was four officers around altogether?

AT: Yes, sir.

WB: Did you hear anybody else strike?

AT: No, sir. I did not hear anybody else strike Mr. Loggins.

MS: Okay. And I hope what you're saying is the total truth.

AT: Yes, sir. It is.

MS: Because if it's not, you'll be going back through this again, but it will be at a different speed next time. Okay?

AT: Yes, sir.

MS: And you have to understand, you're new starting out in law enforcement, that most of the time when law enforcement officers get in trouble is because they try to lie and cover up for something that they wouldn't have gotten in trouble with if they had just been honest about it. Do you see what I'm saying?

AT: Yes, sir.

MS: Because when you lie and try to cover up stuff, it makes it look like you had malicious intent.

AT: Yes, sir.

MS: You see?

AT: Yes, sir.

RL00066

MS: Do you have any questions for us?

AT: No, sir, not that I know of. No, sir. I just – I'm not lying. Okay.

WB: Let me ask you this: What was the temperature out there that night?

AT: Cold.

WB: Were you wearing gloves?

AT: No, sir.

WB: Okay.

MS: This concludes the interview. The interview ends at 9:39 a.m.

RL00067