# MISSISSIPPI BUREAU OF INVESTIGATION



**Incident Date:** November 29, 2018
**Incident Description:** Death Investigation
**County:** Grenada
**MBI Case Number:** M19-00000391
**ME Number:** ME18-1164
**Agent:** Mark Steed

**Details:** On November 29, 2018, Agent Mark Steed (Steed), Mississippi Bureau of Investigation (MBI), interviewed Edna Marie Clark, white female, date of birth ███████, Social Security Account number ████████, who resides at ████████████████ ███████████████. Said interview was regarding the above captioned matter. Said interview was recorded and transcribed. The transcribed interview is attached hereto and made part of the casefile.

_Mark Steed_
Mark Steed

**Exhibit O**

RL00124

## RECORDED STATEMENT OF EDNA CLARK

**ROBERT DEVON LOGGINS DEATH INVESTIGATION**

**MBI CASE NO.:** M19-00000391

**ME NO.:** ME18-1164

**DATE:** 11/29/18

MS: Today's date is November 29, 2018. Present today is Mark Steed, MBI; William Blackmon, Investigator, District Attorney's Office interviewing Ms. Edna Marie Clark. Ms. Clark, would you state your date of birth and social security number, please?

EC: [redacted] ; [redacted]

MS: Ms. Clark, how are you employed?

EC: I'm a sergeant at the Grenada County Jail.

MS: Do you work inside the jail?

EC: I do. Yes, sir.

MS: And how long have you been there?

EC: Seven years.

MS: And you understand what the interview is about today; is that right?

EC: I do. Yes, sir.

MS: The death investigation of Robert Loggins.

EC: Yes, sir.

MS: Can you tell me what happened this morning when all this transpired?

EC: I came to work this morning. I was in the process of doing my briefing with my shift, the oncoming shift, and the off going shift supervisor, Sgt. Johnson, come through the doors and said that there was a problem in admissions and needed my assistance with offender Robert Loggins.

I go through 38 and I didn't see Mr. Loggins. I saw several officers standing around him. I go around the counter. I look over and I see his condition, blood coming from his mouth. He had his pants down to his knees. His hands was restrained behind his back. He was sort of rolling from side to side. Looking at the young man, I told the officers, "Y'all are going to have to take him out of here. I'm not keeping him." They informed

RL00125

me that the EMTs had checked him out and they determined that he was okay to go to jail.

I stated again, "Y'all take him out of here. I'm not taking him." At that time, they started taking the restraints off of him. Mr. Dean Tillie – they were evidently his restraints, his handcuffs. So he come around. He was going to take the restraints off of him. And my officers got on each side of him and was holding his shoulders because Mr. Loggins was, you know, rolling from side to side, flopping and trying to – to me he was trying to gasp for breath because he couldn't breathe. At that point, Mr. Dean Tillie, the officer, put his knee right here on the back of Mr. Loggins' head. He was on his stomach and he put his knee right here, but the position that Mr. Tillie was in, he couldn't get the restraints off. So he actually stood up, turned around and sat down on his head to take the restraints off. I'm telling them again, "I'm not going to keep him. Y'all need to take him out of here. I'm not going to book him in." One of the other young officers waived me off like he was dismissing me. That young man's name was Michael Jones. Michael Jones, Hal Merriman and Dean Tillie, those were the three officers in there. The officers picked him up. Mr. Hankins and Mr. Hollis, they picked him up and was going to take him down and I looked at him because he was limp. He couldn't stand up.

WB: What were the two officers' names again?

EC: Hollis and Hankins. They were on my shift. They picked him up and I turned around and I said, "Uh-uh, y'all bring him back." The laid him down. And for several minutes, you know, the officers and all stood around him for several minutes. They went on out. I went around – I called 911. I called EOC and was getting an ambulance dispatched to the jail. The young lady I spoke with from EOC stated that he was cleared by the EMTs. I said, "No. I need an ambulance here." I stated that – and I did a few things around the front desk. I went back around and his eyes – I'm going to take my glasses off and I'll show you – his eyes were like this. They were open but they wasn't open all the way.

So I looked down at him, and at that time I could tell there was something wrong. I checked his pulse right here. I checked it again. I put my hand right here and then when I couldn't feel no breath, I raised his shirt up and put my hand on his stomach to see if there was any movement. There wasn't anything. I informed the off going shift sergeant that he wasn't breathing. At that time, we started our process of what we was taught in CPR. It wasn't maybe two minutes, we got his vest off of him, we cut his shirt off, we cut both his shirts off and we started all of our process. And it was maybe two minutes and the EMTs come in and they started working on him.

MS: At any time did Mr. Loggins say anything?

EC: He was just rolling back and forth, back and forth, back and forth and according to what the officers said to me, when they found him he was saying, "Somebody help me, please. Somebody, help me, please." But he was not verbally saying anything that I heard.

RL00126

MS: At the point that whenever the decision was made to take the handcuffs off of Mr. Loggins and there was several officers that kind of surrounded him in order to take these handcuffs off of him, did you see anybody that may have kicked Mr. Loggins?

EC: Not that I seen.

MS: Okay.

EC: Not that I seen.

MS: Have you heard that anybody may have kicked Mr. Loggins?

EC: No, sir, not that I seen and not that I heard. Mr. Loggins in the past, he's – we've had him over at the jail quite a few times and he wasn't all that bad of a – combative of an offender, but we've had problems. So in – with our experience with him and the way he was brought in, I actually asked the – they brought him like he was a sack of potatoes. I mean, just – we've had problems with him in the past but he didn't seem like that combative to me because he was just going from side to side, side to side. He wasn't screaming. He wasn't hollering like he used to do. I mean, he wasn't doing anything. He wasn't flouncing around, just going from back to side to side like he was trying to roll over. And when they picked him up, he couldn't get his legs under him and he was just limp.

MS: Okay. And you saw blood coming out of his mouth?

EC: I did.

MS: And did you see any other type of injuries on him?

EC: He had like a cut on his face. As I said, he had some teeth missing. And he had an injury on both his knees and they were bleeding.

WB: Now when you say he had teeth missing, has he come into the jail before and those same teeth were missing?

EC: He's had beautiful teeth. He had beautiful teeth.

WB: So this is the first time you've seen his teeth missing?

EC: Uh-huh (affirmative response).

WB: Okay.

EC: That was something – Rob Rob was very – I mean, Robert Loggins was very proud of was his teeth.

WB: What was his nickname?

EC: Rob Rob. As I said, we've had experiences with Robert -- with Mr. Loggins.

RL00127

MS: So did you hear anything from Mr. Loggins at any time at the jail say anything to the officers or the officers to him?

EC: He didn't say anything to the officers.

MS: Do you have anything else, William?

WB: No, sir.

MS: Ms. Clark, do you have anything else?

EC: No, sir. What I just told you is in my report, in the Incident Report of the day. Y'all are welcome to a copy of that, and I just finished it.

MS: Okay. The interview ends at 5:41 p.m.

RL00128