IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

RIKA JONES, As Administratrix of the Estate of
ROBERT LOGGINS; RIKA JONES, Individually
and on Behalf of the Wrongful Death Beneficiaries
of ROBERT LOGGINS, Deceased; and RIKA JONES,
As Mother and Next Friend of R.D.L., a Minor                    PLAINTIFFS

V.                                              CIVIL ACTION NO. 4:20-CV-220-SA-JMV

JUSTIN GAMMAGE, REGGIE WOODALL,
EDWIN MERRIMAN, MICHAEL JONES, and
ALBERT DEANA TILLEY, In Their Individual Capacities;
CITY OF GRENADA; MOBILE MEDIC AMBULANCE
SERVICE, INC. D/B/A AMR and AMERICAN
MEDICAL RESPONSE; JOHN WATSON; JENNIFER HOWELL;
and CORRECTIONS MANAGEMENT SERVICES, INC.                    DEFENDANTS

ORDER AND MEMORANDUM OPINION

This civil action stems from the November 29, 2018 death of Robert Loggins, which occurred in Grenada, Mississippi. On December 31, 2020, Rika Jones, individually and on behalf of Loggins' wrongful death beneficiaries and in her capacity as mother and next friend of R.D.L. (a minor) (collectively "the Plaintiffs"), brought suit against the City of Grenada; numerous Officers of the Grenada Police Department; American Medical Response ("AMR") and two of its employees (John Watson and Jennifer Howell); and Corrections Management Services, Inc. (the company responsible for administering and managing the Grenada County Jail and its employees at the time of the underlying events). After obtaining leave of Court, on March 3, 2022, the Plaintiffs filed their Fourth Amended Complaint [102], which is now the operative complaint. The Defendants filed various Motions [109, 111, 129], raising defenses and seeking dismissal of the respective claims asserted against them. The Plaintiffs filed a Motion to Strike [121] an exhibit

attached to one of those Motions. Each of these Motions [109, 111, 121, 129] has been fully briefed and is ripe for review.

*Relevant Factual and Procedural Background*

The events pertinent to this case began in the early morning hours of November 29, 2018. At approximately 5:00 that morning, the Grenada Police Department received a disturbance call concerning an individual yelling for help in a residential area. The caller stated: "Somebody's in the back of my house calling for help . . . Please hurry. Send someone." [115], Ex. 1 at 0:05-0:17. The following Officers of the Grenada Police Department were dispatched to the area: Captain Justin Gammage, Sergeant Reggie Woodall, Corporal Edwin Merriman, Patrolman Michael Jones, and Patrolman Albert Tilley.[1]

Corporal Merriman, Patrolman Jones, and Patrolman Tilley were the first Officers on the scene. Although Sergeant Woodall was a little later arriving at the scene, the Officers can be heard communicating with each other via radio on the video from both body cameras. As it was dark and there were fences and high vegetation in the area, it took the Officers some time to find the individual causing the disturbance. Ultimately, they located an individual lying face down with his hands tucked underneath him in tall vegetation. That individual was Robert Loggins. Loggins was, at that time, located in a backyard on the opposite side of a wooden fence from where the Officers were located.

On the footage from Corporal Merriman's body camera, Patrolman Tilley can be heard identifying himself as being with the Grenada Police Department and telling Loggins: "We're here

---

[1] Sergeant Woodall and Corporal Merriman were both wearing body cameras at the scene. The footage from their cameras has been attached to the Municipal Defendants' pending Motion [111]. *See* [111], Ex. 6 and 7.

to talk to you . . . trying to make sure you're okay." [111], Ex. 7 at 0:50-1:09.[2] One of the Officers—presumably Patrolman Tilley—can be heard on Corporal Merriman's radio saying that Loggins was "on something" around 90 seconds after making contact with Loggins. *Id*. at 2:15-2:19.

As Sergeant Woodall approached the backyard, one of the Officers can be heard telling Loggins to "stand up." [111], Ex. 6 at 11:25. Captain Gammage then asked Loggins repeatedly to show his hands. *Id*. at 11:25-11:45. Loggins did not comply and asked, "Why?" *Id*. at 11:43. Sergeant Woodall then tased him, and Loggins grunted as if in pain. *Id*. at 11:45.[3] After the Officers continued to direct Loggins to show his hands and Loggins continually refused to comply, Sergeant Woodall tased Loggins again—approximately 15 to 20 seconds after the first taser strike. *Id*. at 12:02. The Officers then directed Loggins to show his hands and to "turn over," stating that if he did not comply he was "going to get it again." *Id*. at 12:10-12:16. Loggins asked, "you gonna kill me?" *Id*. at 12:18.

The Officers attempted to grab Loggins' arm a few seconds later. *Id*. at 12:25. Sergeant Woodall engaged the taser several more times. *Id*. at 12:25-13:00. Loggins groaned as if to indicate he was in pain. *Id*. During this encounter, Patrolman Tilley can be briefly heard yelling in pain. *Id*. Although it cannot be seen on the video, Patrolman Tilley later stated to Mississippi Bureau of Investigation ("MBI") Agent Mark Steed that Loggins bit him. *See* [115], Ex. 11 at p. 6.[4]

---

[2] Before arriving at the location where the other Officers had found Loggins, Sergeant Woodall was notified via his radio that the individual was Robert Loggins. He responds by saying "Robert Loggins" as if he was aware of who Loggins was. [111], Ex. 6 at 8:39-8:50.

[3] The first taser strike and Loggins' subsequent grunt can be heard on Corporal Merriman's body camera footage. This occurred at the 5:15 mark on the video. Although much of the intervening conversation between Patrolman Tilley and Loggins from the time Patrolman Tilley arrived until the taser was deployed cannot be heard on Corporal Merriman's camera, for the sake of clarity, the Court notes that the first taser strike occurred a little over four minutes from the time of Patrolman Tilley's initial contact with Loggins.

[4] The Plaintiffs dispute this contention, arguing: "[T]he video shows Defendant Tilley's hands are not near Mr. Loggins' head, and it appears that he was shocked by the TASER and not bitten. Tilley's own testimony is more consistent with tasing than biting: 'I went down to go reach under him to grab his arms and he bit down on my hand, and I yanked back, and I stepped back for a few minutes *because I was stunned. I didn't know what it was* . . . .'" [116] at p. 6 (quoting [119], Ex. 11 at p. 6) (emphasis in original).

The Officers continued to tase Loggins, but he did not comply with their commands that he show his hands. [111], Ex. 6 at 12:40-12:55. Instead, Loggins remained face down in the tall vegetation, yelling "my soul belongs to Jesus Christ." *Id*. at 13:00. An Officer responded, "your ass belongs to us now." *Id*. at 13:03. Captain Gammage then took Patrolman Tilley's taser and drive stunned Loggins in his right arm continuously for several seconds. *Id*. at 13:05-13:38.

When Loggins still did not comply, Sergeant Woodall stated that he would do it "the old fashioned way" and that he is "sho' sho' gonna hate it." *Id*. at 13:41-13:46. The Officers then grabbed Loggins, and, according to the Plaintiffs, Sergeant Woodall, utilizing his flashlight, beat Loggins' arm and elbow "approximately nine times." *Id*. at 14:00-14:30; [120] at p. 6. The alleged strikes to Loggins' arm and elbow are not visible on the video (and Sergeant Woodall denies that he struck Loggins with his flashlight), but the sounds on the video are consistent with strikes to the body. The Officers continued to tell Loggins to place his hands behind his back throughout this time, all the while Loggins continued yelling incoherently. After further struggle trying to force Loggins' compliance, Sergeant Woodall again engaged the taser on Loggins in drive stun mode. [111], Ex. 6 at 15:33. The Officers handcuffed Loggins a few seconds later. *Id*. at 16:05. Before finally handcuffing Loggins, one of the Officers audibly stated, "he's on something." *Id*. at 15:40-15:43.

From the time Sergeant Woodall first tased Loggins until the Officers were ultimately able to handcuff him, a total of slightly more than four minutes lapsed.

After placing the handcuffs on him, the Officers told Loggins "get your ass up" and got him up on his feet. *Id*. at 16:00-16:20. Loggins continued to yell incoherently throughout this time. *Id*. The Officers walked Loggins to a nearby carport so that he could be checked by medical

responders on the scene—in particular, these individuals were John Watson and Jennifer Howell, EMTs who were employees of AMR. Loggins still continued to speak incoherently.

After briefly observing Loggins, Watson told the Officers: "We ain't got nothing to reverse what he's on." *Id*. at 19:20-19:22. Following the short stint in the carport, the Officers took Loggins toward Patrolman Jones' patrol car, which was located only a short distance away. *Id*. at 21:00. For a short moment while everyone was gathered in a driveway near the patrol car, Sergeant Woodall's body camera points toward Loggins, who was lying in the driveway face down with his pants around his ankles and various Officers and medical personnel surrounding him. *Id*. at 21:25-21:45. The Officers then forced Loggins into Patrolman Jones' patrol car. *Id*. at 23:20-23:30. Sergeant Woodall directed the Officers to "try to sit him up" and Patrolman Jones yelled at Loggins: "Sit your punk ass up. Tired of fucking with you." *Id*. at 23:30-23:38. Sergeant Woodall then told Patrolman Jones to "drive fast, move hard." *Id*. at 23:45. Loggins then left the scene in the back of Patrolman Jones' patrol car. *Id*. at 24:10. The total time between the first taser strike and Loggins leaving the scene in Patrolman Jones' patrol car was approximately thirteen minutes.

Patrolman Jones took Loggins to the Grenada County Jail. There are multiple videos from the Jail, one of which is a 1:59 video (without audio) from a camera located at the sally port where Patrolman Jones parked the patrol car. *See* [115], Ex. 5. After arriving at the sally port, Patrolman Jones pulled Loggins out of the back of the car and placed him on the ground. Loggins remained handcuffed and made no movement of any significance on his own. Two jailers (who were CMS employees) then picked him up (one on each end of Loggins' body) and carried him into the Jail.

At the end of the sally port video, Loggins and the jailers are out of sight. Loggins can next be seen on a video from a camera positioned in the booking room of the Jail. *See* [115], Ex. 6.[5]

---

[5] Although not necessarily legally relevant, for the sake of completeness, the Court notes that this video contains a time stamp. It was 5:59 A.M. when Loggins was carried into the booking room.

The two jailers, with the assistance of Patrolman Jones, carried Loggins into the booking room and placed him face down on the floor with his hands cuffed behind his back. *Id*. at 00:01-00:15. Patrolman Jones, Patrolman Tilley, and Corporal Merriman then stood around Loggins. Sergeant Edna Clark, who worked for CMS as a shift supervisor at the Jail, then assessed Loggins, who was rocking from side to side while remaining face down. According to Clark, she told the Officers at this time that, considering Loggins' condition, she would not accept him at the Jail but that they should take him to the hospital.[6] In her statement to MBI, Clark said that Loggins had "blood coming from his mouth" and that his pants were down to his knees. [115], Ex. 15 at p. 2. The video is not positioned close enough to see whether blood was coming from Loggins' mouth, but his pants are down between his ankles and knees. Loggins continued to struggle, rocking side to side on his stomach for several minutes while the Officers and Jail staff stood around him.

About five minutes after initially placing Loggins on the floor of the booking room, Patrolman Tilley, Patrolman Jones, and some of the jailers made physical contact with Loggins, apparently at the direction of Corporal Merriman in an attempt to retrieve Patrolman Tilley's handcuffs. *Id*. at 05:35. A separate video attached to the Plaintiffs' Response [115] provides a closer view of this interaction. *See* [115], Ex. 7. Although each individual's conduct is not clear on the video, it is clear that Patrolman Tilley placed his knee on Loggins' neck while one of the jailers placed leg irons around Loggins' ankles. *Id*. at 00:02. There were at least four (possibly five) total individuals involved with this "dogpile," including at least two (possibly three) jailers, Patrolman Tilley, and Patrolman Jones. Corporal Merriman and Clark stood nearby while it occurred. After exerting force on Loggins' body for around three minutes, Patrolmen Jones and Tilley and Corporal Merriman left the booking room at 6:08 A.M. Two jailers carried Loggins into

---

[6] While the video does not have audio, Clark and Corporal Merriman do appear to engage in a conversation shortly after Clark first observed Loggins' condition. [115], Ex. 6 at 02:13-02:45.

a nearby hallway. In her statement regarding the incident, Clark described Loggins' condition at this time as "limp," noting that he "couldn't stand up." [115], Ex. 15 at p. 3.

After only a short time, the jailers dragged Loggins back into the main booking room area and placed him on his back. Clark called 911 and requested an ambulance at the Jail—Loggins continued to lay on the floor without moving. Approximately six minutes after Patrolmen Tilley and Jones and Corporal Merriman left the booking room, Clark checked Loggins' pulse by touching his neck. [115], Ex. 6 at 15:24-15:52. According to Clark, Loggins was not breathing. Jail staff immediately cut off Loggins' shirt and began performing CPR. The EMTs arrived shortly thereafter. After rendering medical treatment to Loggins at the Jail for around sixteen minutes, the EMTs transported him to the hospital, where he was pronounced dead.[7]

The Plaintiffs initiated this lawsuit by filing their Complaint [1] on December 31, 2020. After various amendments and extensive motion practice, on February 28, 2022, the Court entered an Order [100] granting the Plaintiffs' request to amend their complaint for a fourth time. On March 3, 2022, the Plaintiffs filed their Fourth Amended Complaint [102], asserting numerous claims against the Defendants. In particular, they assert the following causes of action:

1)      Count One: Excessive force in violation of the Fourth Amendment against Captain Gammage, Sergeant Woodall, Corporal Merriman, Patrolman Jones, and Patrolman Tilley;

2)      Count Two: Denial of medical care in violation of the Fourth or Fourteenth Amendment against Corporal Merriman, Patrolman Jones, and Patrolman Tilley;

3)      Count Three: State law negligence and medical malpractice against AMR, Watson, and Howell;

---

[7] The Defendants attached to their Motion [111] a copy of a Pathological Examination prepared by the Mississippi State Examiner's Office, which indicates that the cause of Loggins' death was methamphetamine toxicity. [111], Ex. 11. Conversely, the Plaintiffs have submitted a declaration of Michael Arnall, a forensic pathologist, who opined that Loggins died "as a result of Suffocation due to Mechanical Asphyxia from compression of the thorax while holding the shoulders combined with smothering due to compression of the head and neck with facial occlusion." [115], Ex. 8 at p. 2.

4)      <u>Count Four</u>: State law negligence and negligence per se against CMS;

5)      <u>Count Five</u>: State law assault and battery against CMS;

6)      <u>Count Six</u>: State law assault and battery against the City of Grenada;

7)      <u>Count Seven</u>: State law assault and battery against Captain Gammage, Sergeant Woodall, Corporal Merriman, Patrolman Jones, and Patrolman Tilley; and

8)      <u>Count Eight</u>: *Monell* claims based upon violations of the Fourth and Fourteenth Amendments against the City of Grenada.

*See* [102] at p. 12-19.

Through their Joint Motion [111], the City of Grenada, Captain Gammage, Sergeant Woodall, Corporal Merriman, and Patrolman Jones (collectively "the Municipal Defendants") seek dismissal of all claims asserted against them. The Plaintiffs then filed a Motion to Strike [121], requesting that the Court strike Exhibit 3 to the Municipal Defendants' Joint Motion [111]. Patrolman Tilley filed his own Motion for Summary Judgment [109] as to all claims alleged against him. And CMS filed a Motion for Judgment on the Pleadings [129] concerning all claims asserted against it.

*Analysis and Discussion*

The Court will, to the extent possible, address each of the Motions [109, 111, 121, 129] separately. Because it impacts which evidence the Court will take into account in analyzing the underlying claims, the Court will first consider the Plaintiffs' Motion to Strike [121].

I.     *Plaintiffs' Motion to Strike [121]*

The Plaintiffs' Motion to Strike [121] specifically concerns Exhibit 3 to the Municipal Defendants' Motion for Judgment on the Pleadings [111]. The Exhibit itself consists of over 100

pages of documents reflecting Loggins' criminal history, such as arrest warrants, arrest reports, and witness statements—most (if not all) of which concerned Loggins' conduct while he was a minor. The Plaintiffs raise multiple arguments as to why the Exhibit should be stricken, such as it being unauthenticated and constituting inadmissible hearsay. The Municipal Defendants oppose the Plaintiffs' request.

### A.    Standard

Although the Plaintiffs do not cite the authority pursuant to which they seek that the Exhibit be stricken, the Court presumes their request is based upon Rule 56(c)(2). "Federal Rule of Civil Procedure 56(c)(2) permits a party to 'object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Nat'l Fed'n of Blind of Tex. Inc. v. City of Arlington, Tex.*, 2022 WL 2670256, at *2 (N.D. Tex. July 11, 2022) (quoting FED. R. CIV. P. 56(c)(2)). Importantly, "evidence relied upon need not be presented in admissible form, but it must be *capable* of being presented in a form that would be admissible in evidence." *Id.* (quoting *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018); *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)) (emphasis in original).

### B.    Analysis

As noted above, the Plaintiffs raise multiple bases for their Motion to Strike [121]. First, they contend that the documents are unauthenticated, specifically arguing that "no witness with knowledge or custodian of records attested to the completeness or genuineness of these documents under oath or affirmation[.]" [122] at p. 7.

This Court has recently noted that when a party objects to an unauthenticated exhibit "the burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Jones v. Anderson Road Oxford, LLC*, 2021 WL 24552, at *3

(N.D. Miss. Jan. 4, 2021) (quoting *Sharkey v. Humphreys Cnty., Miss.*, 2020 WL 96902, at *2 (N.D. Miss. Jan. 8, 2020)) (additional citation omitted). Arguing that they can satisfy their burden as to authentication here, the Municipal Defendants assert that they could come forward with "court or law enforcement personnel sponsoring the criminal records." [127] at p. 4.

The Court finds the Municipal Defendants' explanation to be sufficient for purposes of authentication. *See, e.g.*, *Nat'l Fed'n of Blind of Tex.*, at *2 ("By explaining their proposed method of authentication for each exhibit—witness testimony at trial—Plaintiffs have carried [their authentication] burden."). Testimony from personnel familiar with the documents would likely be sufficient to authenticate them at trial. Consequently, to the extent the Plaintiffs seek to strike the Exhibit on authentication grounds, the request is denied.

Next, the Plaintiffs contend that the documents constitute inadmissible hearsay. On this point, the Plaintiffs aver:

> Here, the Municipal Defendants readily admit the purpose of Exhibit [3] is to prove the decedent Mr. Loggins committed the acts related in the documents submitted to the Court in order to prove that he was a dangerous person and the individual defendant officers personally knew about these incidents and considered him dangerous. Unfortunately for the Municipal Defendants, Exhibit [3] constitutes rank hearsay[.]

[127] at p. 8.

The Municipal Defendants dispute this characterization of their intent in connection with the documents contained in the Exhibit. As framed by the Municipal Defendants, "[t]he records are not hearsay because they are not submitted as evidence of the truth of the matter asserted—whether or not Loggins was guilty of the criminal acts charged—but rather they are submitted for evidence of what the officers were aware of and could have reasonably believed regarding Loggins' violent tendencies at the time of the November 29, 2018 incident." [127] at p. 4.

As to this issue, the Court notes that the names of the Officers who are Defendants in this case are also listed on some of the documents contained in Exhibit 3. Thus, it cannot be seriously disputed, at least for purposes of this stage of the proceedings, that the Officers were at least somewhat familiar with Loggins and his prior conduct. For instance, on one occasion in 2008, Sergeant Woodall was in the process of serving a youth summons on Loggins while at the Grenada County Courthouse when he noticed that Loggins had a pocketknife in his pocket. *See* [111], Ex. 3 at p. 40. Loggins was charged with carrying a concealed weapon at the courthouse. And in 2010, Corporal Merriman arrested Loggins on a warrant for breaking and entering. *See* [111], Ex. 3 at p. 89.

Analyzing qualified immunity and excessive force in a slightly different context, the Fifth Circuit has taken into account police officers' knowledge of an arrestee's prior conduct when weighing whether they exerted excessive force. *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011). In *Rockwell*, Richard and Cindy Rockwell called 911 after their son, Scott, who suffered from bipolar disorder and schizophrenia and had been diagnosed as suicidal, had, in their opinion, "become a danger to himself and others." *Id*. at 988. The dispatcher dispatched two officers to the scene and, consistent with the information that the parents had shared, notified the officers "that Scott was bipolar, schizophrenic, off his medication, and that he was pounding the walls of his room and refusing to come out." *Id*. Similarly, when the officers arrived, "[Cindy] told the police that Scott had schizophrenia, was talking to himself, hadn't taken his medication for several days, refused to come out of his room, and that she believed Scott was taking illegal drugs." *Id*. at 989.

Ultimately, after Scott barricaded himself in his room and the officers reached the conclusion that he was a danger to himself, the officers breached the door. *Id*. The following events ensued:

11

> Once the door was breached, Scott, holding two eight-inch serrated knives, rushed towards Lt. Brown and attacked him with the knives. Officer Burleson saw the knives and yelled "knives" to warn his fellow officers. Lt. Brown began to fire multiple rounds at Scott with the pepperball gun. Lt. Brown was able to deflect a number of these attacks with his pepperball gun. During the scuffle, Scott pushed Lt. Brown back into the bathroom with enough force that the commode broke. Scott then turned and began to run after Officer Scicluna while still swinging his knives. Scott swung the knives at Officer Scicluna, injuring him. At about this time, the officers shot at Scott. . . At approximately 9:16, the Officers called for EMS and reported that Scott had been shot. Scott was pronounced dead at 10:04 p.m.

*Id*. at 989-90.

In analyzing whether the officers violated Scott's Fourth Amendment rights, the Fifth Circuit noted that "Scott was armed with two eight-inch knives; *the officers knew that he suffered from mental-health problems, had previously exhibited violent behavior*, and was pounding on the walls of his room and yelling obscenities at the officers; and when he was shot, Scott was not fleeing from the officers, but running toward them." *Id*. at 992 (emphasis added). Thus, the Fifth Circuit specifically considered, among other things, the officers' knowledge of Scott's prior propensities and conduct when analyzing whether the officers' conduct was reasonable.

Additionally, the District Court for the Northern District of Illinois has, at the motion *in limine* stage, held that "any of [the plaintiff's] convictions or other criminal history that [the officer] knew about when he arrested [the plaintiff] on May 27, 2011 are admissible to show the reasonableness of the force used in conducting the arrest—a central issue in any excessive force case." *Fisher v. Fapso*, 2015 WL 5692901, at *2 (N.D. Ill. Sept. 25, 2015).

This Court adopts the same reasoning. Although many of the records might very well be inadmissible at trial for various reasons, the documents which illustrate information of which the Officers had personal knowledge do seem to have some bearing on the analysis. As emphasized above, the Fifth Circuit in *Rockwell*, when analyzing excessive force, explicitly considered the

officers' prior knowledge about the decedent's mental health and their knowledge about his prior conduct. And the *Fisher* court reached the same conclusion, specifically in the context of criminal records. Similarly here, the Officers (at least some of them) had knowledge about Loggins well prior to November 29, 2018—at least two of them having effectuated his arrest in the past. In this Court's view, it would be inherently unrealistic and somewhat counterintuitive to completely divorce that knowledge in judging the reasonableness of the Officers' actions. *See*, *e.g.*, *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (noting, in the qualified immunity context, that "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). These arguments constitute legitimate reasons, other than the truth of the matter asserted, as to why the documents are relevant. Consequently, the Court will not strike Exhibit 3 on hearsay grounds.[8]

Furthermore, to the extent the Exhibit contains redundant and irrelevant material, the Court will give it the weight it deems appropriate and disregard portions of it as necessary, a practice in which this Court often engages. The Court's finding that the Exhibit should not be stricken should not be interpreted as a ruling that all the documents comprising the Exhibit are relevant and/or admissible at trial. Nevertheless, the Motion to Strike [121] is DENIED.

---

[8] The Plaintiffs also contend that the Exhibit should be stricken because the youth court records were "unlawfully disclosed" in violation of Mississippi privacy laws. [122] at p. 14. However, the Municipal Defendants counter with language from Mississippi Code Section 43-21-261(1), which provides that "[l]aw enforcement agencies may disclose information to the public concerning the taking of a child into custody for the commission of a delinquent act without the necessity of an order from the youth court." MISS. CODE ANN. § 43-21-261(1). The Court easily rejects the Plaintiffs' argument on this point.

II.     *Patrolman Tilley's Motion for Summary Judgment [109] and Municipal Defendants' Motion for Judgment on the Pleadings or, Alternatively, Motion for Summary Judgment [111]*

Because they involve several overlapping issues and legal standards, the Court will, to the extent possible, jointly analyze Patrolman Tilley's Motion [109] and the Municipal Defendants' Motion [111]. The Plaintiffs assert numerous claims against each of these Defendants, some of which arise from federal law and some arising under state law. The Defendants raise various defenses to each of these claims.[9]

A.      *Federal Claims against Officers*

Some of the Plaintiffs' federal claims concern conduct that occurred at the scene of the arrest while others concern conduct that occurred at the Grenada County Jail. Nevertheless, the Officers claim qualified immunity as to all federal claims.

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Waddell v. Voyles*, 2021 WL 1208497, at *4 (N.D. Miss. Mar. 30, 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009)). "The defense of qualified immunity may be successfully invoked by a police officer 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982);

---

[9] Although Patrolman Tilley's Motion [109] is styled as a request for summary judgment, the Municipal Defendants styled their Motion [111] as a request for judgment on the pleadings or, alternatively, for summary judgment. However, the parties have attached to their filings extensive documents which go beyond the pleadings, as well as body camera footage and jail camera footage. The Court will therefore apply the summary judgment standard. *See, e.g.*, *Boateng v. BP, PLC*, 779 F. App'x 217, 219 (5th Cir. 2019) (quoting Fed. R. Civ. P. 12(d)) ("A district court converts a Rule 12(b)(6) motion to dismiss into a summary judgment motion when 'matters outside of the pleadings are presented to and not excluded by the court.'").

*Cantu v. Rocha*, 77 F.3d 795, 805-06 (5th Cir. 1996)). "Once a defendant invokes qualified immunity, the burden shifts to the plaintiff to show that the defense is not available." *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010).

"To determine whether a public official is entitled to qualified immunity, [courts] decide '(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.'" *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quoting *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011)) (additional citation omitted). Notably, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008)). Although qualified immunity is "nominally an affirmative defense, the plaintiff has the burden to negate the defense once properly raised." *Id*. (quoting *Brumfield*, 551 F.3d at 326).

With that standard in mind, the Court turns to the Plaintiffs' specific federal claims.

i. *Fourth Amendment - Excessive Force*

The Fourth Amendment protects an individual's "right to be free from excessive force during a seizure[.]" *Poole*, 691 F.3d at 627. But the Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. Thus, the overarching consideration is "whether the force used to effect a particular seizure is 'reasonable,'" which "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. (quoting *U.S.*

15

*v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)) (additional citation and internal quotation marks omitted).

To prevail on an excessive force claim, a plaintiff must establish three elements: "(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Buchanan v. Gulfport Police Dep't*, 530 F. App'x 307, 312 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 433-34 (5th Cir. 1996)); *see also Bush v. Strain*, 513 F.3d 492, 500-01 (5th Cir. 2008) (listing same elements).

The reasonableness determination is "necessarily fact-intensive" and "depend[s] on the facts and circumstances of each particular case." *Poole*, 691 F.3d at 628 (quoting *Deville v. Marcantel*, 567 F.3d 156, 169 (5th Cir. 2009) (per curiam)). And the reviewing court "must evaluate an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The test is "not capable of precise definition or mechanical application." *Id.* at 627-28 (quoting *Graham*, 490 U.S. at 396). Nevertheless, the Supreme Court has articulated the following considerations which courts should take into account in this analysis:

> (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (quoting *Graham*, 490 U.S. at 396).

"In determining whether the use of force was clearly excessive and clearly unreasonable, [the court] evaluate[s] each officer's actions separately, to the extent possible." *Id.* at 628 (quoting *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007)).

### a. Scene of the Arrest

Consistent with the above-referenced authorities, the Court will, to the extent possible, evaluate each Officer's respective conduct separately.

### 1. Captain Gammage and Sergeant Woodall

In their Fourth Amended Complaint [102], the Plaintiffs assert that Captain Gammage and Sergeant Woodall should be held liable "for their excessive force exhibited at the scene of Mr. Loggins' arrest" which includes, "but [is] not limited to[,] the use of force against a passively resisting Mr. Loggins prior to being handcuffed[.]" [102] at p. 12-13.

The Court will begin by analyzing whether a constitutional violation occurred. *See, e.g.*, *Ramirez*, 716 F.3d at 375. In doing so, the Court first looks to the footage from the body cameras. The Fifth Circuit has explained, consistent with Supreme Court precedent, that "a plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is 'blatantly contradicted' and 'utterly discredited' by video recordings." *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). Thus, the body camera

footage is critical to the Court's analysis. Importantly though, "the standard imposed by the Supreme Court is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides *so much clarity that a reasonable jury could not believe his account*." *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 730 (5th Cir. 2018) (citation omitted) (emphasis added).

When Sergeant Woodall arrived at Loggins' location, Loggins can be seen laying on the ground and already surrounded by several Officers. Prior to fully analyzing Sergeant Woodall and

Captain Gammage's conduct, the Court again notes its cognizance of its duty to analyze each of the Officers' specific conduct separately, to the extent possible. *See Poole*, 691 F.3d at 628.

Attached to the Plaintiffs' Response [115] is a "Taser X26/M26 Exposure Report" of the Grenada Police Department. *See* [115], Ex. 22. That report, which relates to Sergeant Woodall's taser (that was used on Loggins by both Sergeant Woodall and Captain Gammage), indicates that the "approximation of range at which the unit was deployed" was five feet and that there were a total of eight "five second cycles" deployed on Loggins. *Id*. at p. 1. The report further indicates that the taser probes penetrated Loggins' skin and that the points of impact were the lower back and right side of his body. The report was signed by both Sergeant Woodall and Captain Gammage on November 29, 2018—the same day the events occurred. *Id*. at p. 2. Also attached to the Plaintiffs' Response [115] is a taser printout, which the Plaintiffs contend constitutes a summary of the deployments of Sergeant Woodall's taser. The Court notes that, although the above-referenced Grenada Police Department Report, which was completed by Sergeant Woodall and Captain Gammage, states that the taser was deployed eight times, this printout indicates that the taser was deployed nine times. *See* [115], Ex. 26 at p. 2. The printout also contains a summary of Patrolman Tilley's taser, which indicates that it was deployed twice on November 29, 2018, for a duration of five seconds each time. *Id*. at p. 5.

Importantly, although it is not disputed that both Captain Gammage and Sergeant Woodall tased Loggins, it is not clear how many of the total of the ten (possibly eleven) strikes is attributable to each of them. However, the Court notes that Captain Gammage and Sergeant Woodall are represented by the same counsel and make the same arguments in favor of dismissal. As to the alleged body strikes with the flashlight, the Court is cognizant that their occurrence is disputed but, to the extent they are considered, they are all attributable to Sergeant Woodall. *See* [120] at p.

6 ("The 'old fashioned way' started with *Defendant Woodall* beating Mr. Loggins' arm and elbow with his flashlight approximately nine times.") (emphasis added).

Framing their utilization of the tasers, Captain Gammage and Sergeant Woodall aver that "once the officers realized the taser was ineffective, they used physical maneuvers, including use of pressure points, to force Loggins to release his hands." [112] at p. 10-11. For their part, the Plaintiffs contend that the Officers' use of the tasers far exceeded the need—so much so that the conduct was objectively unreasonable.

The Court finds relevant the Fifth Circuit's 2013 decision in *Ramirez v. Martinez*, 716 F.3d 369. There, Deputy Martinez and others within his department, arrived at Ramirez's business to execute an arrest warrant on Ramirez's sister-in-law, Diana Flores. *Id*. at 372. Ramirez was not initially on site when the deputies arrived but later arrived and located Deputy Martinez. *Id*. The following events transpired:

> Ramirez located Deputy Martinez and asked Martinez what was happening and why the officers were there. The two exchanged profanities. Martinez yelled, "You shut your mouth or I will take you to jail!" Ramirez simultaneously yelled, "This is my business, ok?" twice. Martinez yelled, "Turn around and put your hands behind your back!" Ramirez did not comply. Martinez grabbed Ramirez's hand and told him to turn around, but Ramirez pulled his arm away. Martinez immediately tased Ramirez in the chest. Ramirez testified that he did not resist after he pulled his arm away.
>
> Martinez and several officers forced Ramirez to the ground. While doing so, an officer yelled at Ramirez, "Stop resisting!" and, Get on the ground!" Ramirez fell to his knees, and the officers forced him to the ground on his stomach and restrained him with handcuffs. Martinez tased Ramirez a second time while lying face-down on the ground in handcuffs. Martinez arrested Ramirez, who was charged with disorderly conduct. The charge was later dismissed.

*Id*. at 372-73.

In analyzing whether Martinez used excessive force, the Fifth Circuit applied the above-referenced *Graham* factors. As to the severity of the crime at issue, the Fifth Circuit noted: "Although Ramirez pulled his arm out of Martinez's grasp, the district court found there was a genuine issue of material fact as to any subsequent resistance up until Martinez tased him after subduing and handcuffing him." *Id*. at 378. Further, the court held that "a reasonable officer could not have concluded Ramirez posed an immediate threat to the safety of the officers by questioning their presence at his place of business or laying on the ground in handcuffs." *Id*. Lastly, "according to Ramirez the only resistance he offered was pulling his arm out of Martinez's grasp; he alleges several officers then forced him to the ground without resistance on his part." *Id*. The Fifth Circuit ultimately held that "[v]iewing the facts of this record in the light most favorable to Ramirez, any reasonable officer in Martinez's place would have recognized Martinez's conduct was objectively unreasonable under the *Graham* factors." *Id*.

Also instructive is the Fifth Circuit's 2009 decision in *Deville*, 567 F.3d 156 (5th Cir. 2009). There, Michell B. Deville, a 45-year-old female, was driving with her two-year-old granddaughter when Officer Tarver of the Turkey Creek Police Department in Turkey Creek, Louisiana, pulled her over for traveling 10 mph over the speed limit. *Id*. at 161. After Deville denied that she was speeding and referred to the traffic stop as "bullshit," Officer Tarver asked her to exit the vehicle. *Id*. She declined and instead rolled up her window and called her family to advise them of the situation so that they could come to the scene and assist with her granddaughter. *Id*. Officer Tarver walked back to his vehicle and called Police Chief Louis Marcantel. *Id*. The Fifth Circuit, viewing the evidence in the light most favorable to Deville, explained the ensuing events as follows:

> Meanwhile, Chief Marcantel, who was off-duty that evening, arrived at the scene, spoke with Tarver, and then approached

Deville's driver's side window—which was still rolled up. Marcantel showed his badge and spoke first, telling Deville that she "needed to get the window down or he was going to break it." According to Deville, Marcantel did not ask her to exit the vehicle. Deville did not roll her window down, stating that she was waiting for her husband to arrive and "see about my baby." Deville recounted that Marcantel began hitting the window and her car with a black stick (said to be a heavy flashlight) and, even though she began to roll down the window, the glass broke before she was able to do so. Notably, Deville contends that she never saw a ticket, nor was she ever asked to sign one. The officers contend that they presented a ticket to her, but that she refused to sign it.

According to Deville, at that point Marcantel grabbed her through the window and opened the door, and "they" (presumably referring to Marcantel and Tarver) pulled her out of the vehicle. The officers did not hit her, although they threw her up against the vehicle, resulting in a blow to her abdomen area. She was placed in handcuffs and led towards the police cruiser. Deville fell to the ground on the way to the cruiser complaining of pain in her abdomen. The officers lifted Deville up and placed her in the back of the cruiser; her husband arrived shortly thereafter and took custody of the child.

Deville was taken to the Evangeline Parish Sheriff's Office. One of the officers had called an ambulance to meet them at the Sheriff's Office, and Deville initially refused medical treatment. Deville later requested treatment when she noticed that she was bleeding from her head, and the ambulance returned and transported Deville to the hospital. . .

*Id*. at 161-62.

Analyzing Deville's excessive force claim, the Fifth Circuit concluded that the *Graham* factors weighed in her favor. The court specifically noted that the initial reason for the stop was a minor traffic violation, "making the need for force substantially lower than if she had been suspected of a serious crime." *Id*. at 167. After emphasizing that she did not attempt to flee, the Fifth Circuit explained that "[m]ost importantly, there is a factual dispute over the nature of Deville's resistance. According to Deville's version of events, her resistance was, at most, passive in that she merely refused to leave her grandchild and exit the vehicle until Mr. Deville came to

get the child—not that she affirmatively, physically resisted as the officers contend." *Id*. The Fifth Circuit concluded that "[t]aking the facts in the light most favorable to plaintiffs, a jury could reasonably find that the *degree* of force the officers used in this case was not justifiable under the circumstances." *Id*. at 167-68 (emphasis in original).

As the Fifth Circuit did in each of these cases, this Court looks to the *Graham* factors. First, the Court looks to the severity of the crime at issue. *See*, *e.g.*, *Poole*, 691 F.3d at 627. Loggins was likely guilty of trespassing and disturbing the peace. Although not completely insignificant offenses, the Court finds that they do fall on the lower end of the scale of severity. This factor weighs in the Plaintiffs' favor.

Next, the Court looks to whether Loggins posed an immediate threat to the safety of officers and others. *Id*. The Court finds that a reasonable officer could have initially feared that Loggins posed a threat to their safety. As emphasized above, the Officers were faced with several unknowns, including but not limited to: where Loggins was actually located, whether he had a weapon, and whether he had other individuals with him. It is also not insignificant that these events occurred at around 5:00 A.M. However, any fears that the Officers may have had must have subsided very quickly. Loggins was screaming incoherently, never attempted to exert any force against them, never brandished a weapon, and never even threatened to harm them.[10] In fact, based on their own comments that Loggins was "on something," the Officers themselves seemed to realize that they were dealing with an individual who was under the influence of some sort of drug and was in a fragile mental state. Therefore, although this factor may have initially weighed in favor of the Officers, it ultimately weighs more in favor of the Plaintiffs.

---

[10] The Court again notes that Patrolman Tilley alleges that Loggins bit him. But the Plaintiffs dispute that contention and instead aver that Patrolman Tilley was actually tased by Sergeant Woodall, as opposed to being bitten. Because the body camera footage is not clear on this issue, the Court, for purposes of this stage of the proceedings, accepts the Plaintiffs' version as true. *See*, *e.g.*, *Darden*, 880 F.3d at 730.

The last factor concerns whether Loggins was actively resisting arrest or attempting to evade arrest by flight. *Id*. Loggins pulled his arm away from the Officers multiple times and refused to comply with their directive that he put his hands behind his back. But, other than that, he did not attempt to evade arrest, and he certainly did not attempt to flee the scene. In fact, Patrolman Tilley stated that he never saw Loggins stand up that night. *Se*e [111], Ex. 4 at p. 11. And the footage does not reveal him ever even attempting to do so. Although it cannot be disputed that Loggins refused to comply with the Officers' instructions, the Court, considering all of the circumstances, nevertheless finds that the third factor does not weigh heavily either way.

The *Graham* factors are non-exclusive, and the Court believes that other facts warrant consideration here. *See*, *e.g.*, *Danks v. Grayson*, 2022 WL 4119761, at *3 (E.D. La. Sept. 9, 2022) ("In *Graham v. Connor*, the Supreme Court enumerated three *non-exclusive* considerations for courts to examine when analyzing the reasonableness of the force used[.]") (emphasis added); *see also Drumgole v. Frumveller*, 2015 WL 2250134, at *8 (E.D. La. May 13, 2015) ("This list is not exclusive, however, and the Court may examine the totality of the circumstances."). First, the Court notes the extremely short period of time between Sergeant Woodall's arrival on the scene and his initial deployment of the taser. Based upon his body camera footage, the time between his arrival and first verbal command toward Loggins (though other Officers were already using verbal commands when he arrived) was only a matter of seconds. *See* [111], Ex. 6 at 11:24-11:45. The Fifth Circuit found that consideration to be relevant in *Deville*, specifically noting that "a reasonable jury could infer from [the plaintiff's] deposition testimony that [the defendant] engaged in *very little, if any*, negotiation with her—and find that he instead quickly resorted to breaking her driver's side window and dragging her out of the vehicle." *Deville*, 567 F.3d at 168 (emphasis added). This Court likewise finds it relevant here.

Additionally, this Court notes that, almost immediately following their arrival on the scene, the Officers became aware, and verbalized, that Loggins was "on something." In other words, they were aware that he was in an altered mental state (and perhaps unable to cooperate with their commands).[11] This certainly warrants consideration when analyzing the reasonableness of the Officers' conduct. And, viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable jury could find that the Officers' failure to engage in other methods of attempting to restrain Loggins—as opposed to immediately resorting to tasing him and hitting him with a flashlight multiple times—weighs in the Plaintiffs' favor.

Ultimately, although officers may consider a suspect's refusal to comply with instructions, the "officers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)). Here, while it cannot be seriously disputed that Loggins failed to comply with the Officers' directives that he put his hands behind his back, a reasonable jury could find that the amount of force which Captain Gammage and Sergeant Woodall exerted exceeded the need. As noted above, Loggins was tased at least ten (possibly eleven) times. Furthermore, Sergeant Woodall did it "the old fashioned way" and physically hit Loggins with his flashlight nine times. All of this occurred while Loggins (who was in an altered mental state) was lying face down, surrounded by multiple Officers, and neither attempting to flee nor engaging in any conduct which would otherwise indicate that he intended to be violent toward the Officers. In addition, similar to the facts of *Ramirez*, Loggins' only real resistance was jerking his arms away from the Officers' grasp—he did not threaten them, brandish a weapon, or strike them.

---

[11] The Court notes that neither Captain Gammage nor Sergeant Woodall themselves specifically stated that Loggins was "on something." However, other Officers on the scene had verbalized that observation.

For purposes of this stage of the proceedings, considering the totality of the circumstances, the Court finds that the Plaintiffs have shown the existence of a constitutional violation. That is, viewing the facts in the Plaintiffs' favor, a jury could reasonably find that the *degree* of force Captain Gammage and Sergeant Woodall used against Loggins—which included a total of at least ten taser strikes between the two of them and nine body strikes with a flashlight by Sergeant Woodall—was not justifiable under the circumstances. The first prong for overcoming qualified immunity is satisfied.

Having found that a reasonable jury *could* find that the Officers violated Loggins' Fourth Amendment right against the utilization of excessive force against him, the Court turns to the second prong of the qualified immunity analysis—whether the right at issue was clearly established. *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) (citing *Pearson*, 555 U.S. at 232). The Court emphasizes that this inquiry concerns the law *at the time of the challenged conduct*—which, in this case, is November 29, 2018. *Tucker v. City of Shreveport*, 998 F.3d 165, 173 (5th Cir. 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)) ("Because the focus is on whether the officer had fair notice that his conduct was unlawful, reasonableness is judged against the backdrop of the law *at the time of the conduct*.") (emphasis added).

The Fifth Circuit has defined this question as "a doozy." *Morrow*, 917 F.3d at 874. The plaintiff seeking to overcome qualified immunity bears the burden to show that the defense does not apply. *Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020) (citing *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). "[T]he burden is heavy: A right is clearly established only if relevant precedent 'has placed the . . . constitutional question beyond debate.'" *Morrow*, 917 F.3d at 874 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). "A

right is 'clearly established' only if it 'is sufficiently clear that every reasonable official would have understood what he is doing violates that right.'" *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015)). There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 12 (quoting *al-Kidd*, 563 U.S. at 741).

"The Supreme Court has repeatedly told courts . . . not to define clearly established law at [a] high level of generality. Rather, the dispositive question is whether the violative nature of *particular* conduct is clearly established. That is because qualified immunity is inappropriate only where the officer had 'fair notice' — in light of the specific context of the case, not as a broad general proposition — that his *particular* conduct was unlawful." *Morrow*, 917 F.3d at 875 (quoting *al-Kidd*, 563 U.S. at 742; *City of Escondido, Cal. v. Emmons*, --- U.S. ---, 139 S. Ct. 500, 503-04, 202 L. Ed. 2d 455 (2019); *Mullenix v. Luna*, 577 U.S. 12) (additional citations omitted; internal citations and quotation marks omitted; emphasis in original). The need to frame the constitutional question with specificity is critical because "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 613, 135 S. Ct. 1765, 191 L. Ed. 2d 856 (2015).

The Plaintiffs rely on the Fifth Circuit's analysis in *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319 (5th Cir. 2020). The underlying events in *Joseph* occurred on February 7, 2017. *Id.* at 326. On that day, the assistant principal of a middle school, after noticing a "strange guy" standing outside the gate of the school, contacted the school resource officers. *Id.* The assistant principal described the "strange guy" (later identified as Kendole Joseph) as "nervous and shaky" and also reported that he "was staring, not walking straight but rather weaving, talking

to himself, saying 'stuff she couldn't make out,' shaking his leg, and biting his nails." *Id.* (quotation marks omitted). The officers—Officer Thompson and Officer Morvant—approached Joseph and heard him yelling: "Help me from the police." *Id.* Joseph immediately began running away from the school and pulling on locked door handles of nearby cars. *Id.* Officer Morvant radioed other officers in the area to alert them of "a suspicious person who was fleeing." *Id.*

Officers Martin and Leduff heard Officer Morvant's alert, spotted Joseph near a convenience store, and began to pursue him. *Id.* Although these Officers gave Joseph verbal commands to stop and come to them, he entered the convenience store. *Id.* The Officers followed him. *Id.* Joseph did not comply with their commands to immediately get on the ground but instead jumped over the checkout counter and assumed the fetal position. *Id.* The Fifth Circuit provided a detailed explanation of the ensuing events but also repeated the district court's findings as to the underlying facts:

> The district court concluded that, construing all facts and inferences in favor of Plaintiffs, the record supports the following account: Once behind the counter, Joseph immediately dropped into the fetal position, with his hands over his face. The officers then pinned him to the floor, rendering him incapable of complying with orders to put his hands behind his back and roll over. Joseph did not strike, kick, or threaten any officer, nor did he try. He squirmed, wiggled, and flailed at times, and he gave no struggle at other times. No officer attempted to negotiate with Joseph or otherwise de-escalate the encounter. No officer attempted to intervene, despite seeing and hearing Officers Martin and Costa tase, jab, punch, and kick Joseph, while he was pinned to the ground and experiencing a mental-health crisis. Joseph died from his injuries.

*Id.* at 328.

At this juncture, the Court feels compelled to reiterate the extent to which *Joseph* is relevant here. Because it was decided in 2020—almost two years *after* Loggins' death—*Joseph* is irrelevant to the "clearly established" analysis in this case. To consider *Joseph* for that purpose would

27

completely undermine the "fair notice" rationale underlying qualified immunity and would also run afoul of Fifth Circuit precedent. *See*, *e.g.*, *Morrow*, 917 F.3d at 875; *Tucker*, 998 F.3d at 173.

This Court does, however, believe *Joseph* has some relevance here. In particular, the Court finds pertinent the Fifth Circuit's analysis of the state of the law in this area "as of February 7, 2017, the date of [the officers'] encounter with Joseph[.]" *Joseph*, 981 F.3d at 336. The Fifth Circuit ultimately held:

> Surveying the state of the law as of February 7, 2017, we conclude that analogous facts from *Newman v. Guedry*, *Ramirez v. Martinez*, and *Cooper v. Brown* provided notice to any reasonable officer that it was unconstitutional to tase and strike Joseph as Officers Martin and Costa did here.

*Id*. at 338.

Thus, the Fifth Circuit specifically held that the state of the law as of February 7, 2017, was sufficient to place the officers on notice that their conduct was unconstitutional. This Court finds the cases relied upon by the Fifth Circuit in *Joseph* to be relevant in the case *sub judice*.

The Court has already addressed *Ramirez* in detail above in connection with the first qualified immunity prong and will not repeat the underlying facts of that case here. The Court will, however, provide some explanation of the other two cases.

The Fifth Circuit decided *Newman v. Guedry* on December 21, 2012. *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012). There, after observing a vehicle fail to yield, Officer Jason Torres initiated a traffic stop of the vehicle. *Id*. at 759. Willie Cole was the driver of the vehicle, Derrick Newman was in the front passenger seat, and Mario Cole was in the backseat. *Id*. After collecting their identifications, Officer Torres became aware of an outstanding warrant for Mario's arrest. *Id*. Mario yelled and cursed, making it difficult for Officer Torres and Officer John Brown (who had

arrived on scene) to effectuate the arrest. *Id*. Willie and Newman got out of the vehicle to urge

Mario to comply with the Officers' commands. *Id*. The following events then transpired:

> Officer Charles Duchamp and his trainee, Guedry, arrived at the scene just as Torres and Brown were putting Mario into Torres's car. Duchamp approached Willie as Guedry walked up to Newman, taser drawn. Guedry reholstered his taser as he ordered Newman to the rear of the car; Newman complied, consenting to a protective pat-down search.
>
> The parties dispute how the pat-down unfolded. Newman alleges that after Guedry's hand remained on Newman's crotch for an uncomfortable length of time, he informed Guedry, "Ain't nothing there but nuts. You acting like you trying to get them." At that point, Newman alleges, Guedry shoved him in the back. Guedry contends that Newman grabbed Guedry's hand, placed it on his privates, and said "Get you some of that." Guedry further contends that Newman refused two commands to "let go of my hand," so Guedry pushed him forward. The videotapes neither contradict nor confirm either account.
>
> Seeing Guedry push Newman forward onto the car, Burke, who had arrived just after Guedry, strode toward Newman. Burke planted his left foot between Newman's feet, pushed Newman forward onto the car with his hip and forearm, and proceeded to strike Newman's arm with his baton. After five strikes at his upper right arm, Newman stepped back. Burke replanted his feet and struck Newman five more times on the arm. Newman's shorts fell down, and Burke hit him three more times on his exposed right thigh. Burke struck Newman a total of thirteen times in about nine seconds, during which, Newman alleges, neither officer gave him any command with which he failed to comply.
>
> Burke reholstered his baton as someone yelled, "taser, taser, taser." Guedry tased Newman, and tased him again before Newman fell to the ground. Guedry then tased Norman a third time. Newman rolled onto his stomach, yelling "ok, ok, I didn't do nothing, sir, I didn't do nothing." The officers then handcuffed Newman; Guedry dragged him by the arm to the sidewalk; Newman waited, lying prone with his shorts around his ankles, for emergency medical personnel to remove the taser barbs from his skin. Again, Newman alleges, he was not given any commands with which he failed to comply.

*Id*. at 759-60.

The Fifth Circuit applied the *Graham* factors. *Id*. at 762-63. As to the severity of the crime, the court noted that, viewing the evidence in the light most favorable to Newman, he did not engage in any crime at all. *Id*. at 762. The Fifth Circuit characterized the officers' argument that they were attempting to prevent serious injury or death to themselves as "severely overwrought." *Id*. The court continued: "[t]he videos do not show Newman attempting to strike either officer, holding a weapon, or even reaching for his waistband. The officers did not try to warn each other or the other officers that Newman had a weapon, which might be expected if either officer truly thought that at the time. The officers were obviously already behind Newman, pushing him down onto the trunk of the car, before Burke started swinging his baton. . . No one contends that Newman attempted to flee." *Id*. at 762-63. The Fifth Circuit ultimately found, not only that the officers violated Newman's Fourth Amendment rights, but also that their conduct violated clearly established law as of August 2007. *Id*. at 764.

The Fifth Circuit also affirmed the district court's denial of qualified immunity in *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). In that case, Jacob Cooper was pulled over by Officer Pressgrove on suspicion of DUI. *Id*. at 521. After Cooper fled on foot into a residential neighborhood, Officer Pressgrove radioed for backup, providing Cooper's description and explaining that he was a DUI suspect on foot. *Id*. Officer Brown responded to the area, arriving with his police dog Sunny, a Belgian Malinois. *Id*. The next events transpired as follows:

> Upon entering the residential neighborhood with Brown, Sunny discovered Cooper in his hiding place and bit him on the calf. The parties dispute whether Sunny initiated the attack or whether, instead, Brown ordered it. Nonetheless, the facts following the initial bite are undisputed: Sunny continued biting Cooper for one to two minutes. During that time, Cooper did not attempt to flee or to strike Sunny. Brown instructed Cooper to show his hands and to submit to him. At the time of that order, Cooper's hands were on Sunny's head. Brown testified that he could see Cooper's hands and could appreciate that he had no weapon. Brown then ordered Cooper

30

> to roll onto his stomach. He complied, and Brown handcuffed him. But he did not order Sunny to release the bite until after he had finished handcuffing Cooper. As a result of the bite, Cooper suffered years of severe pain from lower-leg injuries that required multiple surgeries, including reconstruction and skin grafts.

*Id*.

On appeal, the Fifth Circuit held that Officer Brown was not entitled to qualified immunity on Cooper's excessive force claim. *Id*. at 522. Applying the *Graham* factors, the Fifth Circuit noted that DUI constituted a serious offense, making the first factor weigh in Officer Brown's favor. *Id*. However, the court found that "[n]o reasonable officer could conclude that Cooper posed an immediate threat to Brown or others. Cooper was not suspected of committing a violent offense, and Brown testified that Pressgrove, when calling for backup had not warned that Cooper might be violent. Moreover, Brown could see Cooper's hands and knew he had no weapon." *Id*. at 522-23. As to the last factor, the Fifth Circuit emphasized that the only act of "resistance" was "Cooper's failure to show his hands because, although they were on Sunny's head and visible to Brown, Brown wanted Cooper to raise his hands. Given that Sunny was still latched onto Cooper's calf at the time, the failure to raise his hands can hardly be characterized as 'active resistance.'" *Id*. at 523. Ultimately, the Fifth Circuit concluded that "Brown subjected Cooper to a lengthy dog attack that inflicted serious injuries, even though he had no reason to believe that Cooper posed a threat, and without first attempting to negotiate. And he continued applying force even after Cooper was actively complying with his orders." *Id*. The court therefore concluded that Officer Brown's conduct was objectively unreasonable. *Id*. at 524.

Relying on these cases, this Court finds that the law was sufficiently clearly established such that Captain Gammage and Sergeant Woodall had "fair notice" that the force which they exerted against Loggins—numerous taser strikes (by each of them) and striking him repeatedly

31

with a flashlight (by Sergeant Woodall) while he was lying face down, not attempting to flee, and not threatening them—constituted excessive force under the circumstances.[12] Loggins was at all pertinent times lying face down while surrounded by numerous Officers. Taking as true the Plaintiffs' version of events which are not clearly contradicted by the body camera footage, although Loggins pulled his arms away from the Officers multiple times, he did not threaten them, did not brandish a weapon, and did not act in any way combative toward the Officers.

To the extent Captain Gammage and Sergeant Woodall rely on Loggins pulling his arm away from their grasp, the Fifth Circuit made clear in *Ramirez* that that conduct does not wholly preclude an excessive force claim. Likewise, *Newman* provided fair notice to Captain Gammage and Sergeant Woodall that resorting immediately to such intensive means of force when the suspect was not posing an imminent threat violates the Fourth Amendment. This Court reiterates the Fifth Circuit's reasoning in *Newman*: "The officers did not try to warn each other or the other officers that Newman had a weapon, which might be expected if either officer truly thought that at the time. The officers were obviously already behind Newman, pushing him down onto the trunk of the car, before Burke started swinging his baton. . . No one contends that Newman attempted to flee." *Newman*, 703 F.3d at 762-63. Similarly here, none of the Officers can be heard on the footage indicating that they believed Loggins had a weapon, "which might be expected if either officer truly thought that at the time." *Id*. at 763. Additionally, the Officers were standing over Loggins (and heavily outnumbered him), and there is no indication that he attempted to flee. It is also noteworthy, in this Court's view, that these cases did not involve as many taser engagements as Captain Gammage and Sergeant Woodall used against Loggins.

---

[12] Again, the Court does not rely on *Joseph* as a case which put Captain Gammage and Sergeant Woodall on notice. But *Joseph* is instructive to the extent it sets forth the state of the law as of February 7, 2017—nearly two years *prior* to the conduct at issue here.

In addition, *Cooper* provided a clear example of situation where an officer's need to exert force decreased when the suspect was cornered with no way to escape. As phrased by the Fifth Circuit in *Joseph*: "The pertinent fact in *Cooper* is that the officer encountered the suspect cornered, in a small 'cubbyhole' for storing trash bins. This location, combined with the dog physically keeping him from going anywhere, left the suspect with no meaningful way to evade police custody." *Joseph*, 981 F.3d at 340 (citing *Cooper*, 844 F.3d at 526). Similarly, Loggins was surrounded by numerous Officers. There was no plausible way for him to evade police custody and, based upon the body camera footage, there is no indication that he ever attempted to do so.[13]

This Court also finds pertinent another Fifth Circuit decision—*Darden v. City of Fort Worth, Tex.*, 880 F.3d 722 (5th Cir. 2018).[14] In *Darden*, a large team of heavily armed officers executed a no-knock warrant on a private residence on suspicion that cocaine was being sold from the residence. *Id*. at 725. Officer Snow was part of the team who entered the residence, and Officer Romero drove the van transporting the team to the residence and was assigned to stand guard near the front door while the other officers entered. *Id*. When the officers entered, "[a] large man, later identified as Darden, was kneeling on the seat of a couch near the door when the officers first entered, and he immediately raised his hands in the air." *Id*. Several other people were in the home—sitting and standing in the nearby dining room. *Id*. When Officer Snow entered the residence, he reached and ripped the shirt off Darden's back, apparently attempting to get Darden from the couch to the ground. *Id*. "According to witnesses for the plaintiff, Darden 'had no time

---

[13] Although the Fifth Circuit did not reference it in *Joseph*, this Court also finds *Deville*, which was addressed in detail above and which was decided in 2009, to have served as further "notice" that the Officers' conduct here did not comport with the Fourth Amendment.

[14] In *Joseph*, the Fifth Circuit did not rely on *Darden*. However, as noted multiple times above, the underlying facts in *Joseph* occurred on February 7, 2017—prior to the Fifth Circuit's issuance of its January 24, 2018 opinion in *Darden*. Thus, *Darden* could not properly be taken into account pursuant to the prevailing "clearly established" qualified immunity standard.

to react' before 'he was thrown on the ground' by the officers. Witnesses also testified that Darden never made any threatening gestures and did not resist arrest." *Id*. at 726. Then:

> One of the videos shows Darden lying on the ground face up. An officer in the front room yelled, "Roll over on your face," at which point, Darden appeared to follow directions and rolled over onto his stomach. The video then pans away from the scene and does not turn back for approximately fifteen seconds. The second video shows that Officer Romero then ran into the house to assist. However, in that video, much of the interaction between Darden and the officers is totally obscured by the couch. Although not captured by the video, eyewitnesses testified that Officer Romero proceeded to choke Darden and to repeatedly punch and kick Darden in the face.

> At one point, Darden's body appeared to come up off the ground for a moment, but it is not clear from the video footage whether he came up of his own volition or was pulled up by police. The officers then backed away, and Officer Snow used a Taser on Darden. Shortly thereafter, Darden rolled over onto his stomach and appeared to push himself up on his hands. He was immediately pushed back down into the ground by police. Throughout these events, other people in the house repeatedly yelled, "He's got asthma," and "He can't breathe." Eyewitnesses also testified that Darden himself told the officers he could not breathe.

> A few seconds later, the videos briefly show Darden on his knees, with his hands in the air, before Officer Snow tased him a second time. Darden fell to the ground and rolled onto his back, where he lay face up for a few seconds. Officer Romero then pushed Darden over onto his stomach and pressed his face into the ground. As Officer Romero tried to pull Darden's left arm behind his back, Darden seemed to pull his arm away. The officers then pushed Darden back into the ground, and one officer appeared to put him in a choke hold.

> At that point, other people in the residence were still yelling that Darden could not breathe. Nevertheless, several officers continued to push Darden's body into the ground face down, pressed his face and neck into the floor, and pulled his arms behind his back so that Officer Romero could handcuff him. As Officer Romero finished securing the handcuffs, Darden's body went limp. . . It was subsequently determined that Darden had suffered a heart attack and died.

*Id*.

34

Engaging in the excessive force analysis, the Fifth Circuit spent considerable time on the third *Graham* factor—whether Darden was resisting arrest. The court emphasized that "[b]ased on the evidence in the record, a jury could conclude that no reasonable officer on the scene would have thought that Darden was resisting arrest. The videos show that Darden raised his hands when the officers entered the residence, and it appears that he rolled over onto his face at one point after the officers instructed him to do so. Moreover, eyewitnesses testified that Darden was thrown to the ground before he could react, that he complied with the officers' commands, and that he did not resist arrest." *Id*. at 730. Importantly though, Darden later "pushed himself up on his hands, and eventually onto his knees, and he seemed to pull his arm away from the officers when they were trying to handcuff him. But those events occurred while other people in the house were loudly and repeatedly yelling that Darden had asthma and was trying to breathe. In addition, Darden allegedly told the officers he could not breathe." *Id*. When Officer Snow argued that a police officer should not be required to credit everything a suspect says, the Fifth Circuit rejected the argument, instead holding that "the issue of whether reasonable officers in this situation would have credited the warnings from Darden and the other suspects is a factual question that *must be decided by a jury*." *Id*. (emphasis added).

The Fifth Circuit ultimately held that Officer Snow was not entitled to qualified immunity and reversed the district court's holding to the contrary:

> In the present case, eyewitnesses claim that Darden put his hands in the air when the officers entered the residence, complied with the officers' commands, and did not resist arrest. Yet Officer Snow allegedly threw Darden to the ground and twice shocked him with a Taser while he was being beaten by Officer Romero. In light of our prior case law, Officer Snow should have known that he could not use that amount of force on an individual who was not resisting arrest.

> It is worth pointing out that a jury may ultimately conclude that Darden did not comply with the officers' commands and was actively resisting arrest. Under those facts, Officer Snow's decisions to force Darden to the ground and tase him might have been reasonable. . . However, on the record before us, there are genuine disputes of material fact as to whether Darden was actively resisting arrest and whether the force Officer Snow used was clearly excessive and clearly unreasonable.

*Id*. at 731-32.

The court also reversed the district court's grant of qualified immunity in favor of Officer Romero as to the excessive force claims against asserted against him. As an initial point regarding Officer Romero's conduct, the Fifth Circuit noted that "this was not a situation where an officer arrived at the scene with little or no information and had to make a split-second decision. Rather, Officer Romero acknowledges that he stood at his post near the front door for a while and observed the interaction between Darden and Officer Snow before running into the house to assist." *Id*. at 732. Stated differently, "Officer Romero saw whether Darden was resisting and saw how much force had already been used on Darden. *He needed to take those perceptions into account in assessing how much additional force, if any, was necessary*." *Id*. (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 413 (5th Cir. 2009)) (emphasis added).

Here, the Plaintiffs emphasize that Loggins was "screaming for help," as well as verbalizing fears that the Officers were going to kill him. [120] at p. 26. Although recognizing that Captain Gammage and Sergeant Woodall may not have perceived those comments as genuine, this Court finds *Darden* applicable. As emphasized above, the Fifth Circuit specifically indicated that that issue should be resolved *by a jury*. Similarly, the Court finds that this case—much like *Darden*—did not involve a split-second decision as to the necessary use of force. Captain Gammage and Sergeant Woodall were both on the scene for a period of time and were, at least plausibly, able to observe that Loggins was not posing a threat to their safety and was not

attempting to flee or evade arrest. In other words, the Court finds that *Darden* further provided "fair notice" to Captain Gammage and Sergeant Woodall.

Additionally, although the underlying facts are rather lengthy, the Court feels compelled to address the Fifth Circuit's decision in *Carroll v. Ellington*, 800 F.3d 154 (5th Cir. 2015)—a case which the parties spend time and effort discussing. There, on the afternoon of October 6, 2006, Herman Barnes, an individual who suffered from paranoid schizophrenia, stood outside his home next to the subdivision's community mailboxes when Deputy Sheriff Andy Viruette drove through the area while on patrol. *Id*. at 161. Deputy Viruette drove past Barnes initially but later turned around after becoming suspicious of Barnes' behavior. *Id*. at 162. Deputy Viruette eventually followed Barnes to his residence, parked his patrol car in front, and began asking Barnes some general questions. *Id*. After Barnes was unable to provide the address to his residence, Deputy Viruette became more suspicious. *Id*. At some point, Barnes turned and walked away from Deputy Viruette toward the house. *Id*. Deputy Viruette testified that he did not believe Barnes lived there. *Id*. at 163.

When Barnes attempted to open the door to the home, Deputy Viruette "physically grabbed Barnes's arm to prevent him from entering the residence. Viruette testified that he had been continually giving very loud verbal commands ordering Barnes to stop, but Barnes did not comply. Barnes pulled away from Viruette and entered into his home; Viruette followed. They immediately entered a large living room, and Deputy Viruette pulled out his Taser and ordered Barnes 'to get on the ground.' Barnes then sat down in a chair. While entering the house, Viruette radioed for backup." *Id*. Deputy Viruette was unsatisfied with Barnes sitting in the chair as opposed to getting down on the floor and deployed his taser on Barnes while he was seated in the chair. *Id*. After Barnes still did not comply, Deputy Viruette tased Barnes again, continued to give verbal

commands, and thereafter tried to gain compliance from Barnes through use of the taser in the drive stun mode three separate times, which Deputy Viruette stated had no impact on Barnes. *Id*. at 163-64. Barnes knocked the taser out of Deputy Viruette's hand and, at some point in the altercation, struck Deputy Viruette on the shoulder. *Id*. at 164. Deputy Viruette drew his firearm "while he delivered snap kicks to Barnes and ordered Barnes to get on the ground. Barnes still refused to go to the ground." *Id*.

Deputies Sims and Celestial arrived on the scene at this time, and, after Deputy Viruette advised them that he needed help getting Barnes handcuffed, Deputy Celestial struck Barnes five to seven times with a hickory baton in the thigh area, two on his right arm, and once in the back. *Id*. Deputy Sims kicked Barnes in the stomach—all while Barnes was still standing up. *Id*. Deputy Sims then tackled Barnes and drove him to the ground with his body weight (approximately 225 pounds). *Id*. The Fifth Circuit described the ensuing events as follows:

> Deputy Sims ended up on top of Barnes's back after the tackle and then moved to subdue his legs, and Deputy Viruette managed to get a handcuff on Barnes's left wrist. In an effort to get handcuffs on Barnes's right arm, which was under Barnes's body at the time, Deputy Celestial punched Barnes's brachial nerve (where the neck meets the shoulder) with a close fist (called a "brachial stun") five to eight times.
>
> At the time point, Deputy Ellington, arrived on the scene. With Barnes face-down, Deputy Sims on Barnes's legs, and deputies Viruette and Celestial on either side, Deputy Ellington reached over Sims's shoulder and applied his Taser using a drive-stun technique first to Barnes's right arm and then to Barnes's brachial nerve.
>
> . . .
>
> According to Deputy Sims, Barnes reacted to the Taser shot to his brachial nerve by "defecating on himself," and then, according to the deputies, Barnes "completely pushed up and threw all three of us off."

> Barnes was standing with stainless steel handcuffs around only one wrist, and Deputy Sims testified that the loose handcuff could be used as a weapon. Around this time, deputies Evans and Carter arrived on the scene. At least one Taser was then deployed when Barnes stood up. Deputies Evans and Ellington shot their Tasers conventionally, striking Barnes with the Taser probes. Deputy Hulsey then struck Barnes twice with a hickory stick.
>
> Barnes then "became rigid and fell" onto a glass table that broke into many pieces, and Barnes fell on the glass shards.
>
> . . .
>
> While on the ground, Barnes started low crawling toward the kitchen. Deputy Hulsey then rushed Barnes and strike him around his legs and ankles with the hickory stick four times. A Taser was then deployed multiple times—it is unclear by whom—and Barnes finally went limp in the kitchen.

*Id*. at 165.

Analyzing excessive force, the Fifth Circuit held that Deputy Viruette was entitled to qualified immunity. The court specifically noted that "Deputy Viruette first fired Taser probes at Barnes when Barnes was sitting in a wicker chair in his living room—and it is undisputed that Barnes's arms were in full view and that he was not brandishing any weapons. . . The ensuing struggle in the kitchen between Barnes and Viruette followed directly from the initial application of the Taser to the seated Barnes, and Barnes's active resistance at that point rendered Viruette's escalation of force—to include additional Taser applications and hand-to-hand strikes—objectively reasonable in the circumstances." *Id*. at 174. Although reaching this conclusion as to Deputy Viruette's use of force after Barnes actively resisted him—which, as noted above, included failure to comply with commands, knocking the taser out of Deputy Viruette's hand, and striking him on the shoulder—the Fifth Circuit analyzed the initial application of the taser differently. *Id*. Particularly, the court held "the initial application of the Taser to the seated and unarmed Barnes on suspicion of vandalism and trespass presents a difficult question whether a reasonable jury

could find this first use of force to be clearly and objectively excessive. We decline to reach the close constitutional question and instead decide the case on the second prong of qualified immunity." *Id*. The Fifth Circuit ultimately held that, as of 2006, the law was not clearly established that this conduct violated the Fourth Amendment and therefore found that qualified immunity was appropriate. *Id*.

The court then turned to Deputies Celestial's and Ellington's use of force to get Barnes to the ground and handcuffed. *Id*. at 176. In so doing, the court emphasized that "neither Celestial nor Sims had knowledge of the offense for which Viruette was attempted to make an arrest, just that Viruette could not get Barnes restrained and handcuffed. . . Because Barnes was actively resisting Deputy Viruette, deputies Celestial and Sims delivered nonlethal force: Deputy Celestial repeatedly struck Barnes in the leg and thigh area with a hickory stick, and Deputy Sims kicked Barnes in the stomach area. Finally, Sims tackled Barnes to the ground. . . At this point, Deputy Ellington arrived on the scene. Ellington applied his Taser several times in an effort to get Barnes to comply so that he could be detained and arrested." *Id*. Ultimately, the Fifth Circuit concluded that their conduct was "not unreasonable under the circumstances. By all accounts, after the initial Taser discharge, Barnes failed to comply with verbal task directions and actively resisted all attempts to subdue and detain him. We find it significant that only nonlethal force was used throughout this portion of the encounter." *Id*.

Considering the facts of *Carroll* alongside those of the case *sub judice*, this Court notes multiple contrasts. First, as to Deputy Viruette's initial application of the taser while Barnes was seated in the chair, this Court finds the Fifth Circuit's determination to be inapposite here because it was resolved on the issue of whether the law was clearly established at *that* time—over a decade prior to the events in question here. As to Deputy Viruette's application of force thereafter, the

Court finds distinguishable the resistance Barnes exerted. As emphasized previously, in addition to refusing to comply with Deputy Viruette's commands, Barnes hit Deputy Viruette's hand, causing him to drop the taser, as well as hitting him on the shoulder. Furthermore, Deputy Viruette was alone without any backup at this time.

Compare those facts to the conduct of Captain Gammage and Sergeant Woodall. The Officers on the scene far outnumbered Loggins at all times after they initially located him. Furthermore, although Loggins jerked his hands away from the Officers, he did not strike them or become combative toward them. This is, in this Court's view, critical.

This Court likewise finds that the Fifth Circuit's analysis as to Deputies Celestial and Ellington provides no cover for Captain Gammage and Sergeant Woodall. The Fifth Circuit specifically emphasized the fact that, upon arriving at Barnes' home, those Deputies were not privy to Barnes' underlying offense (if any) but instead simply saw Barnes and Deputy Viruette yelling and struggling. This is much different than the facts of this case, where all Officers were aware that Loggins had not committed any serious offense to endanger the well-being of others—his most serious offenses likely being trespassing or disturbing the peace.

For these reasons, the Court finds that the facts of *Carroll* are easily distinguishable such that Captain Gammage and Sergeant Woodall cannot rely on it as a basis for qualified immunity.

Ultimately, this Court finds that the totality of the above-referenced cases, including *Ramirez*, *Newman*, *Cooper*, and *Darden*, provided "fair notice" to the Captain Gammage and Sergeant Woodall that their conduct violated the Fourth Amendment.[15] Although the case before this Court is not factually identical to any of those cases in isolation, "[t]he law can be clearly

---

[15] Candidly, this Court struggles to see a way to conclude otherwise in light of the Fifth Circuit's conclusion in *Joseph* that the law was clearly established on these issues as of February 7, 2017. In other words, concluding otherwise would be difficult, if not impossible, to reconcile with the thorough analysis set forth in *Joseph*.

established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave *reasonable warning that the conduct then at issue violated constitutional rights*." *Cooper*, 844 F.3d at 542 (quoting *Newman*, 703 F.3d at 763) (additional citation omitted) (emphasis added). Such is the case here.

To the extent Captain Gammage and Sergeant Woodall seek qualified immunity as to the excessive force claims asserted against them at the scene of the arrest, their request is DENIED.

###### 2. Patrolman Jones and Patrolman Tilley

To be clear, the Plaintiffs do not contend that Patrolman Jones or Patrolman Tilley themselves exerted excessive force against Loggins at the scene of the arrest. Rather, the Plaintiffs assert that they should be held liable pursuant to the Fourth Amendment under a bystander theory of liability. *See* [102] at p. 13 ("These claims are asserted against Defendant Jones under bystander failure to intervene at the scene of Mr. Loggins' arrest. . . This claim is asserted against Defendant Tilley pursuant to a bystander theory of liability at the scene of Mr. Loggins' arrest[.]").

"Under Fifth Circuit precedent, a police officer may be held liable under a bystander-liability theory pursuant to Section 1983." *Durant v. Gretna City*, 2020 WL 263669, at *23 (E.D. La. Jan. 17, 2020) (citing *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013)). "Bystander liability may be established where an officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'" *Kitchens v. Dallas Cnty., Tex.*, 759 F.3d 468, 480 (5th Cir. 2014) (quoting *Whitley*, 726 F.3d at 646-47). Stated simply, "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (citations omitted).

Patrolmen Jones and Tilley first contend that the Plaintiffs' claim necessarily fails as a matter of law because there was no underlying constitutional violation. In other words, they contend that Captain Gammage and Sergeant Woodall did not exert excessive force against Loggins and that bystander liability cannot attach. This argument is consistent with Fifth Circuit precedent: "Bystander liability arises only where the plaintiff can allege and prove another officer's use of excessive force." *Buehler v. Dear*, 27 F.4th 969, 989 (5th Cir. 2022) (quoting *Windham v. Harris Cnty.*, 875 F.3d 229, 243 n. 19 (5th Cir. 2017); *Kitchen*, 759 F.3d at 481). However, relying on its analysis set forth above, the Court finds that the Plaintiffs *have* alleged plausible excessive force claims against Captain Gammage and Sergeant Woodall for their conduct at the scene of the arrest. Therefore, the Court rejects Patrolmen Jones and Tilley's request for dismissal on this ground.

Patrolman Jones next contends that he "was 'actively engaged' in subduing a resisting Loggins and did not have a reasonable opportunity to either realize that any force may be excessive or to stop it." [112] at p. 13. He directs this Court's attention to the Fifth Circuit's unpublished opinion in *Deshotels v. Marshall*, 454 F. App'x 262 (5th Cir. 2011).

In *Deshotels*, the Fifth Circuit analyzed bystander liability as to various Officers who failed to intervene while another Officer was deploying a taser against the plaintiff. *Id*. at 268. The Fifth Circuit ultimately resolved the issue on the second qualified immunity prong—that the law was not clearly established at the time of the underlying conduct (which was November 1, 2007). *Id*. at 268-69. In particular, the Fifth Circuit held:

> Thus, the inquiry is whether, under the law in effect at the time of the arrest, the officers could have reasonably believed that they were not required to intervene and prevent O'Rourke's alleged use of excessive force. The answer to that question is clearly "yes." The facts in *Hale* are significantly different from the facts in this case. In *Hale*, the plaintiff produced evidence that he was beaten by a police

43

> officer while the bystander office stood by and laughed, making no effort to intervene. *Hale*, 45 F.3d at 919. Nothing in *Hale* provided police officers "fair notice" that officers actively engaged in restraining a large, potentially dangerous suspect are required to intervene and prevent another officer's use of excessive force. . . Nor do Appellants provide any other authority, and we could not find any, supporting that proposition. Accordingly, the officers' actions were objectively reasonable in light of clearly established law and they are entitled to qualified immunity.

*Id*. at 269.

On the other hand, the Fifth Circuit in *Carroll* (addressed at length above) held that "[t]he law as of 2006 was clearly established that 'an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983.'" *Carroll*, 800 F.3d at 177. In another case, the Fifth Circuit remanded the bystander liability question to a district court on the following grounds:

> In the present case, the district court's opinion contains no summary judgment analysis of the individual Defendants-Appellees' bystander liability. Although Defendants-Appellees do not contest that these detention officers were at least present during the relevant events, such officers may or may not have had 'a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it' under *Hale*, 45 F.3d at 919.

*Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 481 (5th Cir. 2014), abrogated on other grounds by *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).[16]

Applying the standard set forth in *Carroll*, the Court finds that these claims must survive dismissal at this stage. It cannot be seriously disputed that the Patrolmen were on the scene and able to observe the force exerted on Loggins by Captain Gammage and Sergeant Woodall. There is, at a minimum, a factual question as to whether they had a reasonable opportunity to prevent the

---

[16] Explaining the standard in this context, the Fifth Circuit has relatively recently noted that the plaintiff must provide "sufficient facts showing that an officer knew that a fellow officer was violating the prisoner's constitutional rights; the officer had a reasonable opportunity to prevent the harm; and the officer chose not to act." *Cardona v. Taylor*, 828 F. App'x 198, 202-03 (5th Cir. 2020).

harm and chose not to act. Patrolman Jones contends that "[a]ll cases in which acquiescence has been found are cases in which the officers laughed about or made jokes above the violation." [125] at p. 10. But he cites no authority that doing so is a threshold requirement for a bystander liability claim. In the absence of any binding authority requiring it to do so, this Court will not impose such a heightened threshold requirement.

In his separate Memorandum [110], Patrolman Tilley, relying on a case from the District Court for the Southern District of Mississippi, argues: "[i]n *Hollins v. City of Columbia*, the Court found that the plaintiff had sufficiently plead bystander liability because she actually 'alleged that [the defendant officer] was present when [another officer] beat her, that she "yelled for help," and that [the defendant officer] "refused to come to her aid."'" [110] at p. 13 (quoting *Hollins v. City of Columbia*, 2019 WL 3307056, at *7 (S.D. Miss. July 23, 2019)). Patrolman Tilley contends that the allegations of the Plaintiffs' Fourth Amended Complaint [102] do not reach that same level. However, the Plaintiffs' allegations and the other documentation and video attached to the present filings actually do reveal that Loggins yelled for help and that multiple Officers (Captain Gammage and Sergeant Woodall) tased Loggins multiple times while he was lying on the ground face down and not attempting to flee. Whether Patrolman Tilley had a reasonable opportunity to realize the excessiveness of the force being utilized against Loggins and come to Loggins' aid is not a question for this Court to decide at this stage of the proceedings. But the Court has no trouble finding that the Plaintiffs have alleged plausible bystander liability claims.

Patrolmen Jones and Tilley are not entitled to qualified immunity on these bystander liability claims. To the extent they seek the same, their request is DENIED.

b.    *Grenada County Jail*

The Court will next turn to the conduct that occurred at the Grenada County Jail. Similar to their claims arising from conduct that occurred at the scene of the arrest, the Plaintiffs assert different claims against different Officers—depending on the manner of and extent of their respective involvement.

The Plaintiffs allege that Patrolman Jones and Patrolman Tilley applied excessive force against Loggins at the Jail. As to Patrolman Jones, they assert an alternative bystander liability theory. The Plaintiffs assert that Corporal Merriman should be held liable pursuant to a supervisory theory and a bystander theory.

As it did above in connection with the events which occurred at the scene of the arrest, the Court will analyze these claims separately, to the extent possible.

1.    *Patrolman Jones and Patrolman Tilley*

The Court begins with the Plaintiffs' contention that Patrolmen Jones and Tilley should be held liable for direct participation in the application of excessive force. To analyze those claims, the Court again looks to the *Graham* factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight.

The Court's analysis of the first factor remains the same as previously explained in connection with the use of force at the scene of the arrest. Although Loggins was likely guilty of trespassing and disturbing the peace, there is no real contention that he had committed any offense more serious than those. In fact, according to the call to Grenada Police Department, Loggins was screaming for help, which would undercut any argument that he was attempting to commit some

46

sort of serious crime under cover of night. *See*, *e.g.*, *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (explaining that a minor offense weighs against the utilization of force).

Next, the Court looks to whether Loggins posed an immediate threat to the safety of others. Any reasonable fear that Loggins posed a threat to the safety of others had long subsided by the time Patrolman Tilley and Patrolman Jones participated in the "dogpile" in the booking room. At that point, Loggins had been restrained lying face down in the booking room for several minutes. Although Loggins was still rocking back and forth on his stomach, his obviously altered mental state and his being significantly outnumbered certainly precluded any reasonable fear that he posed a threat to anyone in the booking room. He was unarmed and, partially, unclothed.

The last factor concerns whether Loggins was actively resisting arrest. At various points while in the booking room, Loggins moved erratically from side to side. However, he was already under arrest, and he had actually already been carried into the booking room by the Officers. There can be no serious dispute that Loggins was not actively resisting arrest at this point in time.

The Court again emphasizes that every single exertion of force during the "dogpile" is not visible on the video. Therefore, so long as the Plaintiffs' version of events is not "blatantly contradicted" or "utterly discredited" by the video recordings, the Court will take their version as true. *Curran*, 800 F.3d at 664. The Court does note that the video shows Patrolman Tilley place his knee on Loggins' neck area. And Clark and Jailer Raphael Harvey both provided statements that Patrolman Tilley put his knee on Loggins' neck. *See* [115], Ex. 15 at p. 3; [115], Ex. 17 at p. 3. The amount of force exerted and the amount of time he kept his knee in that position cannot be determined through the video. But Clark also stated that, during the "dogpile," Patrolman Tilley "stood up, turned around and sat down on [Loggins'] head to take the restraints off." [115], Ex. 15 at p. 3.

47

Similarly, all of Patrolman Jones' conduct during this time is unclear. But the Plaintiffs allege that, along with the jailers, Patrolman Jones was "on the side of Mr. Loggins' body" and "applied weight to Mr. Loggins to keep him in the prone position (notwithstanding training to the contrary) by holding down his legs, arms, and back, which further restricted and compromised Mr. Loggins' breathing." [120] at p. 16. Despite the video not revealing each and every one of Patrolman Jones' movements, these allegations certainly are not blatantly contradicted.

The Court also notes that Loggins was already in custody at this point, thereby greatly diminishing any justifiable reason to exert force upon him. *See*, *e.g.*, *Carroll*, 800 F.3d at 177 ("The law was clearly established at the time of the deputies' conduct that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive."). Although the Municipal Defendants contend that Loggins was still resisting by moving from side to side, this Court again finds instructive the Fifth Circuit's opinion in *Darden*. In particular, this Court, like the Fifth Circuit in *Darden*, finds that "[a] jury could conclude that all reasonable officers on the scene would have believed that Darden was merely trying to get into a position where he could breathe and was not resisting arrest." *Darden*, 880 F.3d at 730. Here, Loggins was moving erratically side to side before ever being approached by the Officers. At least for purposes of this stage of the proceedings, the Court finds that a jury *could* find that this did not constitute resistance at all—rendering the force exerted upon him excessive.

The Court additionally notes that the Patrolmen argue that Loggins was kicking during this time. However, as to that issue, the Court finds instructive the Fifth Circuit's 1990 decision in *Simpson v. Hines*, 903 F.2d 400 (5th Cir. 1990). There, after being involved in a confrontation with Officer Tom Yates, Kenneth Simpson was arrested and transported to the Cleveland, Texas city jail. *Id*. at 401. Upon arriving at the jail "in an evidently volatile, drug-affected state," Simpson

resisted being searched. *Id*. Once Simpson was placed in a cell, he brandished marijuana but still "could not be persuaded to surrender the contraband or his other personal effects[.]" *Id*. Ten officers then entered the cell, and the following events occurred:

> A struggle ensued, the details of which are in dispute. Defendants contend that Simpson violently resisted their efforts to search his pockets. To overcome his resistance, [Police Captain] Hines put his arm around Simpson's neck while the other officers grabbed Simpson's arms and legs. The officers forced Simpson to the floor and attempted to handcuff him while [Police Officer] Broussard, nicknamed "Beef" due to his large size, sat on Simpson's chest. Unable to restrain Simpson in this position, they rolled him on his stomach, cuffed his hands behind his back, and cuffed his legs.
>
> Plaintiffs maintain that Simpson was struggling in self defense. In a muffled tape recording of the incident made by the police Simpson can be heard alternately cursing, saying "all right, all right," asking the police to "lighten up," and then begging for help and screaming. He was silent, however, for several minutes before the police left the cell at about 12:30 a.m. Still double-cuffed, Simpson apparently lay motionless on the floor of the cell as the officers exited.

*Id*. at 402.

Simpson ultimately died "as a result of asphyxia due to trauma to the neck." *Id*. Ultimately, the Fifth Circuit held that the Officers were *not* entitled to qualified immunity:

> Defendants' own reports indicate that ten officers entered Simpson's cell and collectively used physical force against him. Captain Hines admittedly placed Simpson in a neckhold and exerted sufficient pressure to subdue him. Broussard admittedly sat "astraddle him;" an investigatory report by the Texas Rangers more precisely placed Broussard on Simpson's chest. The custodial death report states that Simpson died of asphyxia as a result of trauma to the neck sustained during this struggle; the medical examiner's report also attributed death to trauma to the neck. Alternatively, according to a physician's report submitted by plaintiffs, Simpson could have died of asphyxiation resulting from the pressure exerted when Broussard sat on his chest. Defendants claim that such force was necessary; plaintiffs counter that Simpson's screams and repeated cries for mercy are evident on the tape recording. Finally, the tape recording contains statements from which the trier-of-fact might infer malice. Viewing the record in the light most favorable to plaintiffs, we find

> ample evidence that the defendant officers who entered Simpson's cell reasonably should have known that in subduing and searching Simpson they maliciously used force which was grossly disproportionate to the need and was calculated to injure Simpson severely.

*Id*. at 403.[17]

Similarly here, the Court finds that, viewing the evidence in the light most favorable to the Plaintiffs, there is ample evidence that Patrolman Tilley and Patrolman Jones used force, including but not limited to placing a knee on Loggins' neck and then sitting on his neck (Patrolman Tilley) and applying weight to Loggins to keep him in the prone position (Patrolman Jones), which was grossly disproportionate to the need. This is particularly true considering that Loggins was already handcuffed and subdued and that all of this force was apparently exerted for the simple purpose of allowing Patrolman Tilley to retrieve his handcuffs. The Court finds that there is sufficient evidence that Patrolman Tilley and Patrolman Jones exerted excessive force on Loggins at the Grenada County Jail.

As noted above though, the inquiry does not end there; rather, in order for the Plaintiffs to overcome qualified immunity, the law must have also been clearly established at the time of the relevant conduct. *See*, *e.g.*, *Trammell*, 868 F.3d at 340.

First, the Court again emphasizes the *Carroll* holding, where the Fifth Circuit held that the law "was clearly established [as of October 2006] that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll*, 800 F.3d at 177.

---

[17] The Court notes that the conduct at issue in *Simpson* occurred in March 1988—prior to the Supreme Court's decision in *Graham* (which was decided on May 15, 1989)—thus, the Fifth Circuit did not apply the *Graham* factors in *Simpson* but instead analyzed the defendants' conduct pursuant to *Shillingford v. Holmes*, 634 F.2d 263, 265 (5th Cir. 1981), which was the standard applicable at the time of the relevant conduct. Nevertheless, the Court finds *Simpson* instructive to the extent that it provided notice that conduct of this nature constitutes excessive force.

Furthermore, the Court finds *Simpson* provided "fair notice" to the Patrolmen. In *Simpson*, there was evidence that the decedent was refusing to surrender contraband and that he struggled in self-defense, but the Fifth Circuit (nearly two decades prior to the alleged conduct in this case) nevertheless found that qualified immunity was not warranted. Here, there has been no contention that Loggins was refusing to surrender contraband. The video from the Jail shows Loggins moving from side to side prior to being approached by the Officers, but he certainly posed no real threat to them. Although the Court does note the distinction that there were not as many individuals involved in the "dogpile" when compared to the fact that there were ten officers involved in *Simpson*, the Court finds this distinction to be legally irrelevant for purposes of this analysis.

Considering *Carroll* and *Simpson*, the Court finds that Patrolmen Tilley and Jones had "fair notice" that their alleged conduct violated the Fourth Amendment. In other words, the Court finds that the law was clearly established.

Although not addressed in any detail by the parties, the Court also feels compelled to note that, even if the law was not clearly established, this would be a case where the "obviousness" exception, articulated by the Supreme Court in *Hope v. Pelzer*, would apply. *See Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). As previously noted by this Court, "[i]n subsequent decisions, the Supreme Court has explained *Hope* as standing for the proposition that a failure to cite federal appellate authority supporting a claim may be excused in cases where the constitutional violation is 'obvious.' In the 2004 decision of *Brosseau v. Haugen*, for example, the Supreme Court wrote that: 'Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.'" *Cooper v. Brown*, 156 F. Supp. 3d 818, 821 (N.D. Miss. Jan. 12, 2016) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 1999, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004); *Hope*, 536 U.S. at 738)).

This Court found the *Hope* exception to be applicable in *Cooper v. Brown* (the dog bite case addressed in detail above). *Id*. at 822. As previously noted, on appeal, the Fifth Circuit found that the law was clearly established such that Officer Brown had "fair notice" and affirmed the denial of qualified immunity on that basis. *See Cooper*, 844 F.3d at 524-25. Therefore, the Fifth Circuit did not address the applicability of the *Hope* exception. *Id*.

While this Court (for the reasons set forth above) believes that the law was clearly established such that Patrolmen Tilley and Jones had "fair notice" that their alleged conduct was unconstitutional, even if the law was not so clear, the Court would apply the *Hope* exception. Indeed, it is difficult to fathom a more obvious constitutional violation than employing force of this nature (including but not limited to Patrolmen Tilley placing his knee on Loggins' neck) on a restrained individual who was in an altered mental state and in no way posing a threat to the Officers—for the simple purpose of changing out handcuffs (which presumably could have been accomplished at a later time). This is an obvious constitutional violation.

Patrolmen Tilley and Jones are not entitled to qualified immunity as to their involvement in the "dogpile" at the Grenada County Jail. To the extent they seek dismissal of those claims, their respective requests are DENIED.

   *2.     Corporal Merriman*

The Plaintiffs allege that Corporal Merriman should be held liable pursuant to both a supervisory theory and a bystander theory of liability.

At the outset, Corporal Merriman contends that these claims must be dismissed because "[b]oth theories of liability require an underlying constitutional violation. Because Plaintiffs have not plausibly pled an underlying constitutional violation, they both fail." [112] at p. 15. The Court rejects this argument since, relying on its analysis set forth above, the Plaintiffs *have* plausibly

pled that a constitutional violation occurred at the Jail. The Court will therefore turn to the merits of these theories of liability against Corporal Merriman.

The Fifth Circuit has explained that supervisory liability can arise in two separate ways: (1) where the supervisor "affirmatively participates in the acts that cause the constitutional deprivation"; or (2) where the supervisor "implements unconstitutional policies that causally result in the constitutional injury." *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018) (quoting *Gates v. Tex. Dep't of Prot. & Reg. Servs.*, 537 F.3d 404, 435 (5th Cir. 2008)). "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor acted, or failed to act, with deliberate indifference to violations of others' constitutional rights committed by their subordinates." *Id.* (quoting *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011)) (emphasis omitted).

Arguing that Corporal Merriman should be held liable under this theory, the Plaintiffs allege: "[A]s Defendant Merriman was the supervising and highest ranking officer at the jail, he is liable for supervisory liability for his deliberate indifference in watching the dogpile escalate over the course of more than three minutes. He furthermore ordered the officers to unnecessarily exchange the handcuffs." [120] at p. 51.

The Court sees similarities in the case at bar and *Pena*, 879 F.3d 613. In that case, police intervened after observing an altercation between Pena and her father near their family car. *Id.* at 616. After Pena attempted to flee on foot, Lieutenant Jose Solis ordered Officer Rosa Salinas to tase Pena: "At Solis's order, Salinas fired her taser at Pena, and the barbs attached to Pena's back and scalp. She fell to the ground with injuries to her face and teeth." *Id.* In analyzing Pena's supervisory liability claim against Lieutenant Solis, the Fifth Circuit explained:

> Pena alleges that "Lt. Jose Solis gave the order to tase Maria Julissa Pena three (3) times." We infer from the inclusion of his title,

53

> "Lieutenant," and the use of "order," that Solis was in a position to direct Salinas to use the taser against Pena. *A superior officer issuing a direct order to a subordinate to use excessive force demonstrates both the necessary action and causality for a supervisor-liability claim.* Pena's proposed amended complaint thus stated a claim against Solis under this theory.

*Id*. at 620-21 (emphasis added).

Similarly here, the Court finds that the Plaintiffs have, at least for purposes of this stage of the proceedings, sufficiently alleged that Corporal Merriman directly ordered the subordinate Patrolmen to exert excessive force on Loggins. This is particularly true considering that there was, at least arguably, no need for any force whatsoever to be exerted upon Loggins by the time he was at the Jail. At this time, Loggins was in custody with no ability to flee and was clearly in an altered mental state (and, according to Clark, was bleeding from his mouth and in drastic need of medical care). Directing subordinate officers to exert force upon him at that point in time was, at least for purposes of this stage of the proceedings, sufficient to impose supervisory liability.[18]

Turning to the Plaintiffs' bystander liability claim, as noted above, bystander liability attaches where an officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Kitchens*, 759 F.3d at 480 (citation omitted).

Corporal Merriman is not entitled to dismissal of this claim. The video clearly depicts Corporal Merriman standing and observing the Patrolmen and the jailers engaging in a "dogpile" of Loggins—which included, but was not limited to, Patrolman Tilley placing his knee on Loggins' neck—all the while taking no action whatsoever to prevent the harm. The Court additionally notes

---

[18] The Court also notes that the Fifth Circuit decided *Pena* on January 12, 2018—approximately eleven months prior to Loggins' death. Thus, Corporal Merriman was on notice that directing a subordinate to use excessive force "demonstrate[d] both the necessary action and causality for a supervisor-liability claim." *Pena*, 879 F.3d at 621.

that, according to Patrolman Tilley, Corporal Merriman was the one who directed him to remove the handcuffs in the first place. The Court finds that the Plaintiffs have done enough to preclude dismissal of their bystander liability claim against Corporal Merriman at this time.

Furthermore, for the same reasons set forth above in connection with the bystander claims against Patrolman Jones and Patrolman Tilley at the scene of the arrest, the Court finds that the law was sufficiently clearly established such that Corporal Merriman was on notice that his failure to act under these circumstances constituted a Fourth Amendment violation.

For the reasons set forth above, Corporal Merriman is not entitled to dismissal of the Plaintiffs' Fourth Amendment claims asserted against him for his conduct at the Jail. To the extent the present Motion [111] seeks dismissal of those claims, it is DENIED.[19]

    *ii.*    *Fourteenth Amendment – Denial of Medical Care*

In addition to their Fourth Amendment excessive force claims, the Plaintiffs contend that various Officers are liable for denial of medical care under the Fourteenth Amendment. In particular, the Plaintiffs assert their Fourteenth Amendment claim against Corporal Merriman, Patrolman Tilley, and Patrolman Jones concerning conduct that occurred at the Jail. The Plaintiffs specifically aver:

> The individual defendants violated Mr. Loggins' clearly established right to adequate medical care by denying him necessary emergency medical care despite having objective and subjective indicia and awareness of a serious risk of harm to Mr. Loggins' health and safety from the denial of said medical care. Said violations by the individual defendants were the proximate cause of Mr. Loggins' suffering and death.

[102] at p. 14.

---

[19] The Court notes that the Plaintiffs have not asserted claims against Captain Gammage or Sergeant Woodall concerning the events that occurred at the Jail. In fact, the Fourth Amended Complaint [102] specifically admits that they "were not present at the jail." [102] at p. 13.

As clarified in their briefing, the Plaintiffs' claim against them in this regard "arises from their knowing refusal to provide or secure *any* medical attention from the moment Mr. Loggins arrived at the Grenada County Jail until they walked out of the jail leaving a lifeless Mr. Loggins on the floor of the jail to die." [120] at p. 55 (emphasis in original). Thus, the claim concerns their actions (or inactions) at the Jail—not at the scene of the arrest.

"[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)); *see also Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415, 419 (5th Cir. 2017) ("Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment."). "To succeed in a § 1983 action based on 'episodic acts or omissions' in violation of Fourteenth Amendment rights, a pretrial detainee must show subjective deliberate indifference by the defendants." *Alderson*, 848 F.3d at 419 (citing *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996)). Under that standard, "the plaintiff must show that the official knew of and disregarded a substantial risk of serious harm." *Id.* at 419-20 (citing *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001)). In order for liability to attach, the conduct must be more than merely negligent; instead, "[t]o reach the level of deliberate indifference, official conduct must be 'wanton,' which

is defined to mean 'reckless.'" *Id.* (citing *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999); *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985)).[20]

As to the facts of this case, the Plaintiffs emphasize that Clark specifically told the Officers that she would not accept Loggins at the Jail but that they should instead take him to the hospital. As stated by the Plaintiffs, these Officers "saw a gravely medically compromised Mr. Loggins and simply watched as he died and walked away while ignoring the calls of a fellow law enforcement officer to take Mr. Loggins to the hospital." [120] at p. 54.

In *Alderson*, the Fifth Circuit explained that "[a] plaintiff can show deliberate indifference by showing that an official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Alderson*, 848 F.3d at 422 (quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006)).

Against that backdrop, the Court looks to the facts of this case. After initially arresting Loggins, the Officers took him to a carport area, where he was assessed by medical personnel. They then transported him to the Jail and had to carry him into the booking room as he was unable to walk. During an interview shortly after the underlying events occurred, Patrolman Jones described his observation of Loggins at the sally port as follows:

> When I was getting Loggins out of the car, he was, you know, just started laying down, you know, grunting and moaning. I'm like this guy, something ain't right, you know what I'm saying? I'm like this guy – it's got to be more than, you know, Flakka or something. . .

---

[20] The Court notes that the Plaintiffs contend that an *objective* standard—as opposed to a *subjective* standard—should apply to this claim based upon the Supreme Court's 2015 decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015). However, the Plaintiffs (correctly) concede that the Fifth Circuit has distinguished *Kingsley* and continued to apply the subjective deliberate indifference standard in analyzing claims of this nature. This Court has previously recognized that distinction. *See Joyner v. Grenada Cnty.*, 458 F. Supp. 3d 486, 490-91 (N.D. Miss. 2020). As explained in *Joyner*, this Court is bound by the Fifth Circuit's interpretation of *Kingsley*. The Court will therefore apply the subjective deliberate indifference standard, as the Fifth Circuit did in *Alderson*.

[115], Ex. 12 at p. 14.[21]

One of the jailers, Frank Sanders, stated that, when Loggins was lying on the floor in the booking room, he "appeared to have a laceration to his head, knees, also blood coming out of his mouth, and he was breathing pretty heavy." [115], Ex. 13 at p. 3. After standing around for several minutes while Loggins struggled and having been told by Clark to take Loggins to the hospital, the Officers employed further force on Loggins to retrieve Patrolman Tilley's handcuffs. Concerning Loggins' physical status after the "dogpile," Sanders stated:

> And once the handcuffs were off, I advised them to take the handcuffs from behind his back because his breathing was abnormal. At this time, they completely took the handcuffs off and that's when Ms. Clark, the supervisor, Sergeant Clark stated, "I don't believe he's breathing." We advised the officers that the individual needed medical care.
>
> The officers turned and all three walked out of the lobby and got into their vehicles and left.

*Id*.

Thus, according to Sanders, Loggins' breathing was abnormal at this time, and the Officers were again advised that Loggins needed medical care. However, they did not call for medical assistance but simply left the Jail.

The Court finds that this conduct rises to the level of deliberate indifference. Clark, and apparently other Jail staff members, advised the Officers of Loggins' apparent need for medical treatment. This is in addition to the fact that Loggins, according to Sanders, had lacerations on his head and knees and was bleeding from his mouth (before the additional force was exerted). But the Officers still did not take Loggins to see a medical provider, nor did they call for medical

---

[21] For the sake of clarity, the Court notes that the reference to "Flakka" is a reference to a street drug. The parties do not expound upon it. The Court likewise sees no need to do so, as it has little to no legal relevance for purposes of the issues presently before the Court.

assistance. Instead, they simply left. Considering these facts and viewing them in the light most favorable to the Plaintiffs, the Court finds that Patrolman Tilley, Patrolmen Jones, and Corporal Merriman's conduct constituted more than a mere "negligent or even grossly negligent response to a substantial risk of serious harm." *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021) (quoting *Thompson*, 245 F.3d at 459).

The Defendants make much of the fact that Loggins was assessed by medical personnel in the carport after the initial arrest, specifically arguing that "[t]he EMTs' assessment of Loggins alone absolves the officers of liability on a medical care claim. The officers, simply put, were entitled to rely on the EMTs' medical assessment, even if, in hindsight, it was incorrect." [125] at p. 11-12. As a general proposition, this Court agrees, as it would certainly risk creating a slippery slope if officers could, as a general rule, be held liable for failing to second-guess the decision of a trained medical professional, such as an EMT.

But, considering the *specific* facts of this case, the Court finds particularly pertinent Corporal Merriman's statement regarding the medical assessment which was performed at that time:

> EM:  Then the medical folks were called, and they were supposed to check him out, *and they didn't check him out.*
>
> MS:  They did or did not?
>
> EM:  *Did not. They never put their hands on him. They didn't check no vitals. They said – the male EMT said, "He's good to go. Y'all can carry him on."*
>
> MS:  Okay.
>
> EM:  Because, you know, we have to call EMS when somebody's been tased.
>
> MS:  At the time that EMS came up there, what was Loggins doing?

59

EM:  He was laying – we had drug him up there under the carport, and he was laying on the ground.

MS:  Okay. Was he breathing?

EM:  Yes.

MS:  Okay. Was he talking or moving around?

EM:  Yes. Moving around, still being a little belligerent.

MS:  Okay. But the EMTs they said he was okay?

EM:  Yes.

[115], Ex. 14 at p. 5-6 (emphasis added).[22]

Thus, although it is accurate that EMTs were initially called to the scene and asked to assess Loggins, Corporal Merriman himself apparently did not believe that they actually examined him in any meaningful way. Furthermore, there is evidence that Loggins' symptoms were worsening upon arriving at the Jail, as he was bleeding from the mouth and breathing abnormally. In addition, the Officers exerted further force on Loggins, and he was not moving—at least not significantly—at the time they left the Jail.

Viewing this evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable jury *could* find that Patrolman Tilley, Patrolman Jones, and Corporal Merriman exhibited deliberate indifference to Loggins' serious medical needs.

The Plaintiffs must also show that the law in this area was clearly established such that the Officers had "fair notice" that their conduct was unlawful. *See*, *e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004). It was.

---

[22] Corporal Merriman made the statement on November 29, 2018, as part of an investigation by the Mississippi Bureau of Investigation. The "MS" initials stand for MBI Agent Mark Steed, and Corporal Merriman's responses are denoted by the "EM" initials.

60

In *Alderson*, the Fifth Circuit, citing numerous prior decisions, held that a pretrial detainee, Alderson, properly stated a Fourteenth Amendment failure to provide medical care claim against Lieutenant Harvey Barnes. 848 F.3d at 418. There, Alderson was attacked by two inmates and made numerous complaints to staff members, including Bryant, but Bryant delayed significantly in calling medical assistance to evaluate Alderson. *Id*. The Fifth Circuit held:

> To establish liability based on a delay in medical treatment, a plaintiff must show deliberate indifference to serious medical needs that resulted in substantial harm. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006). A plaintiff can show deliberate indifference by showing that an official 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.' *Id*. . .
>
> The district court determined that Alderson failed to allege facts supporting an inference of deliberate indifference by any of the defendants. Alderson alleges that Bryant delayed his medical treatment in two ways. First, Alderson alleges that Bryant delayed his medical treatment by placing him in lockdown upon learning of his condition, waiting until numerous complaints had been made by Alderson and his family before taking further action, and then leaving Alderson for another hour before taking him to the hospital. This is an allegation that Bryant's initial response to Alderson's medical needs was to refuse treatment and ignore his complaints, which constitutes deliberate indifference. Second, Alderson alleges that Bryant further delayed his treatment when he responded to Alderson's request for his prescription medications by telling him to 'man up,' ignoring Alderson's complaints and evincing wanton disregard for his serious medical needs. These allegations, if true, could support an inference of deliberate indifference on the part of Bryant.

*Id*. at 422.

*Alderson* made clear that delaying in medical treatment for a detainee can constitute a Fourteenth Amendment violation. Here, Patrolman Tilley, Patrolman Jones, and Corporal Merriman did not merely delay in rendering medical treatment or calling for medical assistance but instead altogether refused to seek treatment for Loggins—completely leaving the Jail. They

had "fair notice" that ignoring an individual's obvious medical needs constitutes a Fourteenth Amendment violation.

To the extent Patrolman Tilley, Patrolman Jones, and Corporal Merriman seek qualified immunity as to the Plaintiffs' denial of medical care claim, their request is DENIED.

B.      *Federal Claims Against City of Grenada*

In Count Eight of their Fourth Amended Complaint [102], the Plaintiffs allege that the City of Grenada maintained constitutionally deficient practices or customs and constitutionally deficient training regarding: (1) Officers employing excessive force through the use of tasers and impact weapons (in violation of the Fourth Amendment); (2) Officers applying excessive force to the neck, head, or back of arrestees and the placement of arrestees in the maximal prone position (in violation of the Fourth Amendment); and (3) Officers denying adequate medical care to arrestees (in violation of the Fourteenth Amendment). Furthermore, the Plaintiffs contend that the City maintained a practice of failing to discipline its Officers for unconstitutional conduct.

The City contends that these claims should be dismissed. The Plaintiffs counter by relying on Rule 56(d). They ask that the Court defer ruling on the City's request. Rule 56(d) provides:

> (d) WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT. If a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

FED. R. CIV. P. 56(d).

To support their Rule 56(d) request, the Plaintiffs attached to their Response [119] an affidavit of one of their attorneys, Victor Fleitas, Esq., which sets forth the following areas of inquiry which the Plaintiffs believe are necessary to learn facts essential to justify their opposition to the City's request:

      a.      The Defendant Grenada's formal and informal policies and practices regarding use of a TASER and impact weapons;

      b.      The individual defendants' training regarding use of a TASER and impact weapons;

      c.      Other instances of the individual defendants' and other officers' use of excessive force involving a TASER or impact weapon;

      d.      The Defendant Grenada's formal and informal policies and practices regarding the application of force to the neck, head, or back of arrestees, and the placement of arrestees in the maximal prone position;

      e.      The individual defendants' training regarding the application of force to the neck, head, or back of arrestees;

      f.      Other instances of the individual defendants' and other officers' use of excessive force in the application of force to the neck, head, and back of arrestees;

      g.      The Defendant Grenada's formal and informal policies and practices regarding providing any or adequate medical care to arrestees;

      h.      The individual defendants' training regarding providing any or adequate medical care to arrestees;

      i.      Other instances of the individual defendants' and other officers' failure to provide any or adequate medical care to arrestees;

      j.      Whether the Defendant Grenada disciplined any of the individual defendants for violation of any policy; and

k.  Whether the Defendant Grenada condoned and/or ratified the unconstitutional conduct of the individual defendants or other officers.

[119], Ex. 1 at p. 2-3.

Relying on this affidavit, the Plaintiffs contend that the Court should defer ruling until they are able to conduct discovery and meaningfully oppose the City's request.

The Court again looks to the allegations of the Fourth Amended Complaint [102]. The Court will quote the pertinent allegations in full. In the "Facts" section, the pertinent allegations state:

30.  The amount of times the individual defendant officers deployed the TASER against Mr. Loggins violated the express warnings issued by the manufacturer which prohibited the use of the TASER against an individual manifesting signs of impairment identical to Mr. Loggins, and prohibited its use as many times as the individual defendant officers used it against Mr. Loggins.

31.  Mr. Loggins constituted a susceptible individual as defined by the manufacturer warnings, which warns that the use of the taser against him can contribute to serious medical consequences. The use of the TASER against Mr. Loggins while he manifested signs of impairment readily ascertained by the individual defendant officers thus violated dire warnings and restrictions by the manufacturer deployed against Mr. Loggins and constituted an unreasonable use of force and the gratuitous infliction of pain. Officers Jones and Tilley failed to intervene to stop these unconstitutional acts.

32.  The City of Grenada failed to implement policies and training consistent with the manufacturer's warnings which would restrain its officers' use of the TASER in an unreasonable and excessive manner against an individual such as Mr. Loggins who due to their degree of impairment was incapable of modifying their behavior to comply with the requests of law enforcement officers.

33.  The failure of the City of Grenada to create or implement policies or to train its officers to refrain from the excessive and unreasonable use of force, including but not limited to

64

the use of impact weapons, maximal prone restraint, pressure to an arrestee's head, neck, or torso, and deployment of the TASER under circumstances where the manufacturer expressly warned against its use, caused in whole or in part the excessive and unreasonable use of force against Mr. Loggins, which amounted to a gratuitous infliction of pain, both at the scene of his arrest and at the jail.

[102] at p. 6.

In the "Causes of Action" section, Count Eight concerns the Plaintiffs' contentions against the City and specifically alleges:

> a.    The defendant City of Grenada maintained a practice or custom of its officers unconstitutionally excessive use of force through the use of the TASER and/or impact weapons, as demonstrated during the arrest of and death of Mr. Loggins and other arrestees or detainees. Defendant Woodall and other defendants misrepresented his use of an impact weapon on Mr. Loggins to MBI investigators, and Defendant Woodall stated that impact weapons was [sic] against written policy;
>
> b.    The Defendant City of Grenada maintained a practice or custom of unconstitutionally deficient training for its officers regarding use of a TASER and impact weapons as demonstrated in part by its use of city-authorized training that was beneath state standards;
>
> c.    The Defendant City of Grenada maintained a custom or practice of its officers unconstitutionally applying excessive force to the neck, head or back of arrestees, and the placement of arrestees in the maximal prone position as demonstrated by the arrest and death of Mr. Loggins and others, all of which were in violation of published DOJ guidelines dating as far back as 1995. Defendant Merriman told MBI that "I have been known to use my knee in restraining them.";
>
> d.    The Defendant City of Grenada maintained a practice or custom of unconstitutionally deficient training for its officers regarding the application of force to the neck, head, or back of arrestees as demonstrated in part by its use of city-authorized training that was beneath state standards;

e.      The Defendant City of Grenada [sic] formal and informal practices and customs of its officers unconstitutionally denying any or adequate medical care to arrestees, as is demonstrated by the failure of three officers to provide medical care to Mr. Loggins and others. Mr. Loggins exhibited bleeding from his mouth, eyes rolled in the back of his head, labored breathing, drug intoxication, incoherent speech, and unconsciousness, all of which Defendants Jones, Tilley, and Merriman observed and failed to address;

f.      The Defendant City of Grenada maintained a practice or custom of unconstitutionally deficient training for its officers regarding how to provide adequate medical care as demonstrated in part by its use of city-authorized training that was beneath state standards;

g.      The Defendant City of Grenada, which upon information and belief has not disciplined any of these individual officers for their unconstitutional acts and omissions towards Robert Loggins, maintained a practice or custom of unconstitutionally failing to discipline its officers for unconstitutional conduct;

h.      The Defendant City of Grenada maintained a practice or custom of unconstitutionality condoning and/or ratifying its officers' unconstitutional conduct;

The foregoing unconstitutional practices, customs, and/or policies were the moving force behind the constitutional violations that resulted in Mr. Loggins['] injuries and death.

[102] at p. 18-19.

With those allegations in mind, the Court turns to the applicable standards pertinent to the imposition of municipal liability.

"It is well-established that a city is not liable under § 1983 on the theory of respondeat superior." *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)). "A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is only liable for acts directly attributable to it 'through some official action or

imprimatur.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). To establish municipal liability, "a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Id.* (citing *Piotrowski*, 237 F.3d at 578); *see also World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 753 (5th Cir. 2009).

As to the first element, "[a] policy may be evidenced by 'a policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority;' or 'a persistent, widespread practice of City officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Jackson v. Valdez*, 852 F. App'x 129, 135 (5th Cir. 2021) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

A thorough review of the Fourth Amended Complaint [102] reveals no allegations as to an unconstitutional official policy. Rather, the Plaintiffs' claims are based upon the practices or customs of the City's officers. *See, e.g.*, [102] at p. 18 ("The defendant City of Grenada *maintained a practice or custom* of its officers unconstitutionally [sic] excessive use of force through the use of the TASER and/or impact weapons. . .") (emphasis added). Since the Plaintiffs have not alleged that the City maintained an unconstitutional official policy, the Court will instead only analyze whether they have adequately alleged an unofficial practices or custom claim.

"[M]unicipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690-91). "A customary policy consists of actions that have occurred for so long and with such frequency that

the course of conduct demonstrates the governing body's knowledge and acceptance of the disputed conduct." *Jackson*, 852 F. App'x at 135 (quoting *Zarnow*, 614 F.3d at 169) (emphasis added). Furthermore, "[t]o plausibly plead a practice 'so persistent and widespread as to practically have the force of law,' a plaintiff must do more than describe the incident that gave rise to his injury." *Id*. (quoting *Pena*, 879 F.3d at 622); *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)) (emphasis added). "A pattern requires similarity and specificity, as well as 'sufficiently numerous prior incidents' as opposed to 'isolated instances.'" *Id*. (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009)).

In a recent unpublished *per curiam* opinion, the Fifth Circuit affirmed a district court's Rule 12(b)(6) dismissal of a municipal liability claim. *Jackson*, 852 F. App'x at 130. In that case, Valerie Jackson, a transgender woman who "was assigned the sex of male at birth and had her gender legally changed to female prior to the events alleged in the instant case," was arrested in Dallas County, Texas, for unlawful possession of a weapon. *Id*. After becoming aware that she was a transgender woman, the officers at the jail forced Jackson to comply with a strip search— after she had expressed on multiple occasions her desire to not do so. *Id*. at 131. After the search, Jackson was eventually placed in her own cell, but she was later taken to the male locker room and she was continually treated as a male by various officers. *Id*. at 132. Jackson was arrested on two subsequent occasions, and both times she was held with the male inmates and forced to shower with male inmates. *Id*.

Jackson filed Section 1983 claims against Dallas County and the officers for violations of her Fourth, Fifth, and Fourteenth Amendment rights. *Id*. The district court dismissed her claims against the County under Rule 12(b)(6), and Jackson appealed. *Id*. at 135. On appeal, the Fifth

68

Circuit reasoned that, although Jackson identified another individual who was subjected to similar unconstitutional policies, she had not properly alleged an unofficial custom claim:

> Jackson alleged that she was forced to be examined in 2016 and was misclassified in 2016, 2017, and 2018; and that Dallas County officers forced another transgender female detainee named C.W. "to undress, spread her buttocks, show the bottom of her feet and then put on male jail attire" in 2013. . . We recognize that Jackson is without the benefit of discovery, and that we have no rigid rule regarding numerosity to prove a widespread pattern of unconstitutional acts. Though it is a close call, for a Rule 12(b)(6) dismissal, we cannot conclude that allegations of two incidents of strip searches and four incidents of sex-based classifications of two transgender people in a span of five years support the reasonable inference that a practice of strip searches and classifications of transgender detainees solely on their biological sex is "so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 61 . . . Such isolated violations "are not the persistent, often repeated, constant violations that constitute custom and policy." *Bennett*, 728 F.2d at 768 n. 3. We conclude that the district court properly dismissed Jackson's municipal liability claim based upon her "policy" theory.

*Id*. at 135-36 (internal citations omitted) (emphasis added).

Conversely, the Court also finds instructive a 2018 decision from the District Court for the Western District of Texas. *Ramirez v. Escajeda*, 298 F. Supp. 3d 933 (W.D. Tex. 2018). In that case, Daniel Ramirez's parents called 911 requesting immediate assistance because Ramirez was attempting to hang himself. *Id*. at 938. After arriving on the scene and observing Ramirez trying to hang himself from a basketball net, City of El Paso Police Officer Escajeda allegedly "deployed his taser on [Ramirez], striking him in the chest and abdomen, which caused his body to go limp." *Id*. Officer Escajeda removed Ramirez's body from the noose and engaged in CPR efforts—but to no avail. *Id*. Ramirez was transported to the local hospital, where he was pronounced dead. *Id*.

In addition to claims against Officer Escajeda, Ramirez's family sued the City of El Paso for "maintaining a policy or custom of excessive force by officers that is so common and

widespread as to constitute a custom that fairly represents municipal policy" and "maintaining a policy or custom of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy." *Id*. at 939. When the City of El Paso sought Rule 12(b)(6) dismissal of the plaintiffs' unofficial custom claims, the district court closely analyzed the allegations of the complaint and determined that the plaintiffs had adequately alleged their claims:

> As to the City of El Paso's contention that Plaintiffs have failed to offer a pattern sufficient to establish the "persistent, widespread practice" needed to prove a custom, Plaintiffs offered detailed accounts of eight other instances of the alleged use of excessive force against mentally ill persons from 2013 to 2016 and various statistics indicating that the use of force against the mentally ill is an issue for the City of El Paso. To establish a pattern, a plaintiff must offer similarity and specificity; "prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 382-83 (5th Cir. 2005). Further, "a pattern requires 'sufficiently numerous prior incidents,' as opposed to 'isolated instances.'" *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009). In the instant case, Plaintiffs have offered eight similar instances from 2013 to 2016 with specificity and statistics supporting their claims of a custom. This is sufficient to plausibly state a custom that satisfies the first element of the *Monell* claim.

*Id*. at 943 (additional internal citations omitted) (emphasis added).

Against this backdrop, the Court turns to the case *sub judice*. As noted above, the Court is faced with a competing request for dismissal by the City and a request for additional discovery from the Plaintiffs. As to the widespread nature of the use of excessive force, the Court finds particularly pertinent the Plaintiffs' contention that Corporal Merriman "told MBI that 'I have been known to use my knee in restraining them.'" [102] at p. 18. Although the underlying facts of each of those encounters to which Corporal Merriman was referring are unknown (and perhaps *may*

have been justified under the specific circumstances with which he was faced), the Court finds that purported admission as to previous encounters telling.

While the Plaintiffs have not specifically alleged by name other individuals who have been impacted by the customs of the City, they have alleged that the City "maintained a practice or custom of its officers [sic] unconstitutionally excessive use of force through the use of the TASER . . . as demonstrated during the arrest of and death of Mr. Loggins *and other arrestees or detainees*" and that the City "maintained a custom or practice of its officers unconstitutionally applying excessive force to the neck, head, or back of arrestees, and the placement of arrestees in the maximal prone position as demonstrated by the arrest and death of Mr. Loggins *and others*[.]" [102] at p. 18. They likewise allege that *others* were impacted by the unconstitutional failure to provide adequate medical care. *Id*. at p. 19.

Thus, the Plaintiffs have alleged that the City's customs have impacted others beyond Loggins. Although the specifics of those purported events have not been alleged, the Plaintiffs have not yet had the benefit of discovery to further develop those claims. As noted above, they request, pursuant to Rule 56(d), that they be permitted to conduct discovery prior to the Court considering the merits of those claims.

"Rule 56(d) allows for further discovery to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Culwell v. City of Fort Worth*, 468 F.3d 868, 871 (5th Cir. 2006)). The Fifth Circuit has recognized that motions of such nature "are broadly favored and should be liberally granted." *Id*.

Taking all of this into account, the Court finds that the Plaintiffs should be permitted to engage in discovery regarding the City's practices and customs. This will allow the Plaintiffs to

fully explore their theories of liability prior to the Court's consideration of the City's request for summary judgment.

In reaching this conclusion, the Court remains cognizant municipal liability should not be collapsed into respondeat superior liability. *See Peterson*, 588 F.3d at 847. This standard was articulated and applied by the Fifth Circuit in *Jackson* and by the District Court for the Western District of Texas in *Ramirez*, as explained above. This Court will apply that same rigorous standard when considering the merits of the City's request. If the Plaintiffs are unable, through discovery, to identify a pattern of similar and specific prior incidents, summary judgment in the City's favor will be appropriate. *Id*. In other words, in reaching this conclusion, the Court simply finds that the Plaintiffs are entitled to an opportunity to further develop their claims. It passes no judgment as to the Plaintiffs' potential success on those claims.

The same reasoning applies to the Plaintiffs' failure-to-train claims. "A failure-to-train action is a type of *Monell* claim. The 'failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement.'" *Hutcheson v. Dallas Cnty., Tex.*, 994 F.3d 477, 482 (5th Cir. 2021) (quoting *Peterson*, 588 F.3d at 849). On a failure-to-train claim, a plaintiff must establish that "(1) the city failed to train or supervise the officers involved; (2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiffs' rights; and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Id*. (quoting *Pena*, 879 F.3d at 623).

Reverting back to the Fourth Amended Complaint [102], the Plaintiffs allege that the City (1) "maintained a practice or custom of unconstitutionally deficient training for its officers regarding use of a TASER and impact weapons as demonstrated in party by its use of city-

authorized training that was beneath state standards;" (2) "maintained a practice or custom of unconstitutionally deficient training for its officers regarding the application of force to the neck, head, or back of arrestees as demonstrated in part by its use of city-authorized training that was beneath state standards;" and (3) "maintained a practice or custom of unconstitutionally deficient training for its officers regarding how to provide adequate medical care as demonstrated in part by its use of city-authorized training that was beneath state standards[.]" [102] at p. 18-19.

Thus, the Plaintiffs allege that the City has in place training that falls below State of Mississippi standards. They also contend that the City wrongfully failed to implement into its written policies the warnings of the taser manufacturer against the utilization of the taser against individuals who were impaired and unable to modify their behavior to comply with law enforcement. *See* [102] at p. 7 ("The City of Grenada failed to implement policies and training consistent with the manufacturer's warnings which would restrain its officers' use of the TASER in an unreasonable and excessive manner against an individual such as Mr. Loggins who due to their degree of impairment was incapable of modifying their behavior to comply with the requests of law enforcement officers.").

The City raises multiple arguments for dismissal. First, it alleges that the "there is no constitutional requirement that a city regurgitate the TASER manufacturer's guidelines." [112] at p. 38-39 (citing *Khansari v. City of Houston*, 2015 WL 6550832, *13-17 (S.D. Tex. Oct. 28, 2015)). Next, the City asserts that "Officers Gammage, Woodall, Merriman, Jones, and Tilley were all certified under Mississippi law" and "[f]urther, Gammage and Woodall both were certified taser instructors." *Id*. at p. 39. The City then attached to its Motion [111] numerous certifications earned by each of these Officers. *See generally* [111], Ex. 15.

73

The Plaintiffs counter by arguing that "Greanda attempts to lead the Court to believe these individual defendants were certified to operate the TASER pursuant to State standards. This is not true. For example, the Defendant Woodall's certificate provides that he: "has passed the requirements of the Grenada Police Department TASER X26 training program under the supervision of a Certified [] Instructor." [120] at p. 65 (citations omitted).

Weighing the parties' arguments, the Court again finds that the Plaintiffs should be permitted to engage in discovery on their claims. Again, while remaining well-aware of the high bar associated with the imposition of municipal liability, the Court finds that the Plaintiffs should get the opportunity to engage in discovery prior to being expected to adequately oppose the City's request for summary judgment.

To the extent the Municipal Defendants' Motion [111] seeks dismissal of the Plaintiffs' federal municipal liability claims, it is DENIED.

C.     *State Law Claims Against Officers and City of Grenada*

The Plaintiffs have asserted state law claims under the Mississippi Tort Claims Act ("MTCA") for negligence, negligence per se, assault, and battery. As to each claim, the Defendants raises arguments for dismissal—some procedural and some substantive.

The MTCA "provides the exclusive civil remedy against a governmental entity or its employee for acts or omissions which give rise to a tort suit." *Duncan ex rel. Duncan v. Chamblee*, 757 So.2d 946, 949 (Miss. 1999) (citing MISS. CODE ANN. § 11-46-7(1)). "Any tort claim filed against a governmental entity or its employee shall be brought only under the MTCA." *Id*. The MTCA contains a one-year limitations period. *See* MISS. CODE ANN. § 11-46-11(3)(a) ("All actions brought under this chapter shall be commenced within one (1) year next after the date of

the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based[.]").

The Defendants contend that the Plaintiffs failed to file their claims within one year, rendering their state law claims defective. The Plaintiffs disagree, arguing that Mississippi's minor's savings statute—Mississippi Code Section 15-1-59—is applicable. In relevant part, Section 15-1-59 provides:

> If any person entitled to bring any of the personal actions mentioned shall, at the time at which the cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the actions within the times in this chapter respectively limited, after his disability shall be removed as provided by law. . .

MISS. CODE ANN. § 15-1-59.

Because they are critical to the resolution of this issue, the Court will first clarify the underlying procedural facts. At the time of his death, Loggins was married to Rika Jones and had a son, R.D.L. (a minor). On January 9, 2019, the Chancery Court of Grenada County entered an Order appointing Jones as the administratrix of Loggins' estate. That Order specifically found that Loggins' estate "has no known substantial assets, except that an action for wrongful death as the result of negligent, willful, and wanton actions of third parties is believed to be among his assets. . . [Jones] is authorized to employ Tannehill, Carmean & McKenzie, PLLC, of Oxford, Mississippi as her counsel to represent the interest of the Estate in the cause of action for wrongful death to the Decedent and that the Employment Contract entered into between Tannehill, Carmean & McKenzie, PLLC and Rika Jones, on behalf of herself, the Estate, and her minor child be approved." [129], Ex. 3 at p. 2. Letters of administration were issued shortly thereafter on January 23, 2019. *See* [129], Ex. 4 at p. 1. On December 31, 2020, Jones initiated the present lawsuit "as the Administratrix of the Estate of Robert Loggins; individually and on behalf of the wrongful

death beneficiaries of Robert Loggins, deceased; and as the mother and next friend of R.D.L., a minor." [102] at p. 1.

Thus, there are several noteworthy dates: November 29, 2018 (the date of Loggins' death); January 9, 2019 (the date of the Chancery Court's Order); and December 31, 2020 (the date this lawsuit was initiated). Considering that a one-year limitations period is applicable and that the Plaintiffs did not file this lawsuit within one year of Loggins' death or the Chancery Court's Order, the applicability of the minor's saving statute is critical.

Mississippi law on this topic is not straightforward. In 1983, the Mississippi Supreme Court held that the minor's savings statute "does not apply to an action for wrongful death." *Arender v. Smith Cnty. Hosp.*, 431 So.2d 491, 493 (Miss. 1983). But the Mississippi Supreme Court reversed course in a 1999 case, holding that "[t]here is no question now that the savings clause, set out in § 15-1-59 of the Mississippi Code, applies to a wrongful death action." *Thiroux ex rel. Cruz v. Austin ex rel. Arceneaux*, 749 So.2d 1040, 1041 (Miss. 1999).

Three years later, the Mississippi Supreme Court decided *Curry v. Turner*, 832 So.2d 508 (Miss. 2002). In that case, the decedent, Everett Curry, was survived by his wife, Betty Curry, and two minor children. *Id.* at 509. Approximately six months after Everett's death, upon being appointed administratrix of Everett's estate, Betty filed a wrongful death action on behalf of the estate and all beneficiaries (herself and the two minor children). *Id.* at 510. Almost three years after the death, Betty sought to amend the complaint to add new parties. *Id.* Betty relied on the minor's savings statute to amend after the expiration of the statute of limitations. *Id.* at 514-15. The Mississippi Supreme Court ultimately held that "[a] common sense reading of the wrongful death statute indicates the statute of limitations runs against both the personal representative of the deceased and the deceased's children. Since the amended complaint was filed after the statute of

76

limitations had run, the children's claims, like the estate's and their mothers's, are barred by the statute of limitations." *Id.* at 517.

In another 2002 case (which was decided around nine months earlier than *Curry*), the Mississippi Supreme Court resolved a statute of limitations issue by looking to Mississippi Code Section 15-1-53. *USF&G Co. v. Conservatorship of Melson*, 809 So.2d 647, 653 (Miss. 2002). The underlying facts of *Melson* are distinguishable, but its holding is instructive. There, Melson was involved in a car accident and, due to her mental and physical incapacity, required appointment of a conservator. *Id.* at 649. Her husband was initially appointed as conservator but after they divorced, Thomas Tolliver, the Chancery Clerk of Wilkinson County, Mississippi, was appointed as temporary conservator. *Id.* At some point thereafter, Melson regained her mental capacity, but she still needed a conservator due to her physical incapacity. *Id.* Melson's uncle, Rance O'Quinn, later petitioned a court in Massachusetts to be appointed as Melson's conservator and, on October 8, 1991, O'Quinn "was appointed permanent conservator of Melson in Massachusetts based solely upon her physical incapacity." *Id.* at 650. O'Quinn, through counsel, then began writing letters to Tolliver, demanding that Tolliver provide an accounting. *Id.* After much delay, Tolliver ultimately filed an accounting in June 1992. *Id.* Thereafter, on May 30, 1995, O'Quinn, as Massachusetts conservator, filed suit against Tolliver in Wilkinson County, Mississippi, seeking "recovery of all funds spent by Tolliver without court approval." *Id.* O'Quinn also named USF & G as a defendant based upon its issuance of a public official's bond to Tolliver in his capacity as Chancery Clerk. *Id.* After O'Quinn obtained a judgment USF & G appealed, arguing, among other things, that O'Quinn's suit was time barred. *Id.*

O'Quinn attempted to rely on the minor's savings provision. *Id.* at 652. However, the Mississippi Supreme Court rejected that argument based on the plain language of the statute, which

tolls the limitations period as to persons "under the disability of infancy or unsoundness of mind[.]" *Id*. (quoting MISS. CODE ANN. § 15-1-59). Because Melson's disability was only for physical incapacity—not mental incapacity—the Supreme Court held that Section 15-1-59 was inapplicable. *Id*. at 653. The court continued: "[t]he purpose of the savings statute is to protect the legal rights of those who are unable to assert their own rights due to disability." *Id*. (quoting *Rockwell v. Preferred Risk Mut. Ins. Co.*, 710 So.2d 388, 391 (Miss. 1998)). USF & G argued that the court should apply another statute—Section 15-1-53—which provides:

> When the legal title to property or a right in action is in an executor, administrator, guardian, or other trustee, the time during which any statute of limitations runs against such trustee shall be computed against the person beneficially interested in such property or right in action, although such person may be under disability and within the saving of any statute of limitations; and may be availed of in any suit or actions by such person.

MISS. CODE ANN. § 15-1-53.

Although holding that O'Quinn complied with the statute of limitations because the lawsuit was filed less than three years after Tolliver filed his final accounting, the Supreme Court explained Section 15-1-53's applicability:

> Therefore, under Miss. Code Ann. § 15-1-53, if a person who is subject to infancy or unsoundness of mind does in fact have a guardian or conservator appointed for them, then the action may be brought in the name of that guardian or conservator, without the consideration of any savings clause. *Where a guardian or conservator has been court appointed for a ward, there is no logical or equitable reason to prevent the running of the statute of limitations inasmuch as that guardian or conservator is fully authorized to employ attorneys and bring actions on their behalf.*

*Melson*, 809 So.2d at 653-54 (citations omitted; emphasis added).

In 2017, the Supreme Court overruled *Curry*. *Pioneer Comm. Hosp. of Newton v. Roberts*, 214 So.3d 259 (Miss. 2017). In that case, minor beneficiaries (Tyteanna and Breanna, who were

the decedent's two children) had an aunt (Ellis) who was qualified to file suit as a wrongful death beneficiary, but Ellis never did so. *Id*. at 261. An order of guardianship was entered as to one of the children but was later dismissed after the aunt neglected to file an oath or letters of guardianship. *Id*. at 262. After Tyteanna turned 21, she initiated a wrongful death action. *Id*. at 264. The defendants, relying on Curry, argued that the lawsuit was time barred under the minor's savings statute because Ellis *could have* filed suit during Tyteanna's minority. *Id*. However, the Supreme Court rejected that argument and instead held that the minor's savings statute did toll the statute of limitations since Ellis "had been neither appointed guardian nor authorized by the chancery court to bring an action on [the children's] behalf." *Id*. at 266.

In the alternative, the defendants relied on *Melson* and Section 15-1-53. *Id*. Specifically, the defendants argued that when the chancery court entered the order of guardianship, Section 15-1-53 became applicable. *Id*. The Supreme Court rejected this argument:

> [The defendants'] alternate contention that the statute of limitations began to run on October 29, 2012, when the order was entered appointing Ellis guardian of Tyteanna, also fails. While this order expressly authorized Ellis to bring suit on Tyteanna's behalf, according to the chancery court' slater May 5, 2013 order, "no oath had been filed and no letters of guardianship had been entered"—resulting in the court's dismissal of Ellis's guardianship petition. Thus, Tyteanna did not "*in fact* have a guardian . . . appointed for her" who had the legal authority to bring a suit on her behalf. *Melson*, 809 So.2d at 654 (emphasis added). So the savings clause remained in operation, despite the October 29, 2012 order.

*Id*. (emphasis in original).

Yet another noteworthy case is the Mississippi Court of Appeals' decision in *Irby by and through Collins v. Madakasira*, 252 So.3d 614 (Miss. Ct. App. 2018). In *Irby*, "Graham Read Irby, by and through his mother, Karen Collins, filed a wrongful-death suit against the psychiatrist who treated his father, Stuart M. Irby, prior to [Stuart's] death by suicide. The suit alleged the

psychiatrist's intentional and negligent acts created an irresistible impulse in [Stuart] to commit suicide." *Id*. at 616. Stuart's death occurred on January 17, 2012, but the lawsuit was not filed until March 17, 2014—well beyond the one-year statute of limitations for the intentional tort claims. *Id*. at 617. Collins argued that the minor's savings statute was applicable and that the claims were therefore timely. *Id*. at 620. The Court of Appeals compared the fact of the case to *Pioneer*, explaining that "[t]here is no indication here that Collins had a legal *duty* to file suit on Graham's behalf. Collins did not appear as Graham's court-appointed guardian. Rather, she appeared as his mother and next friend. As Graham's mother, Collins had *standing* to file suit on his behalf. However, our decision hinges on whether Collins's status as his mother and next friend bestowed on her the *duty* to file suit within the statute of limitations." *Id*. (emphasis added). The Court of Appeals further reasoned: "Collins was not a qualified beneficiary under the wrongful-death statute, nor is there any evidence she had been court appointed to bring suit on Graham's behalf. Rather, she brought suit as Graham's mother and next friend. Applying *Pioneer*, we find that the minor's saving statute tolled the statute of limitations, making the suit timely under either the one- or two-year statute of limitations." *Id*. at 621.

The facts of this case are not squarely on point with any of the above-referenced cases. But the Court does find particularly pertinent the specific language of the Order entered by the Chancery Court of Grenada County. To reiterate, that Order stated:

> [Jones] is authorized to employ Tannehill, Carmean & McKenzie, PLLC, of Oxford, Mississippi as her counsel to represent the interest of the Estate in the cause of action for wrongful death to the Decedent and that the Employment Contract entered into between Tannehill, Carmean & McKenzie, PLLC and Rika Jones, on behalf of herself, the Estate, *and her minor child* be approved.

[129], Ex. 3 at p. 2 (emphasis added).

Therefore, the plain language of the Order clearly authorized and appointed Jones to pursue wrongful death claims on behalf of herself, Loggins' estate, *and* R.D.L. This fact distinguishes this case from *Pioneer*, where the Supreme Court found crucial the fact that Ellis was never actually authorized to bring suit on Tyteanna's behalf. Not so here. Furthermore, this Court finds *Irby* instructive, particularly to the extent that the Court of Appeals, in considering the applicability of *Pioneer*, took into account whether there was "any evidence [Collins] had been court appointed to bring suit on Graham's behalf." *Irby*, 252 So.3d at 621.

Taking into account that the Chancery Court of Grenada County specifically authorized Jones to pursue claims on R.D.L.'s behalf, the Court sees no reason why Section 15-1-53 should not apply. In other words, this Court finds that there is no logical or equitable reason to prevent the running of the statute of limitations. *See Melson*, 809 So.2d at 654 ("Where a guardian or conservator has been court appointed for a ward, there is no logical or equitable reason to prevent the running of the statute of limitations inasmuch as that guardian or conservator is fully authorized to employ attorneys and bring actions on their behalf.").

The Plaintiffs did not comply with the one-year statute of limitations for their state law claims against the Officers or the City of Grenada. The Plaintiffs' MTCA claims are therefore DISMISSED.

   III.    *CMS' Motion for Judgment on the Pleadings [129]*

The Plaintiffs have asserted four state law claims against CMS: negligence, negligence per se, assault, and battery. *See* [102] at p. 16. Through the present Motion [129] CMS seeks judgment on the pleadings in its favor on all claims, raising different arguments for each claim. The Court will analyze them in turn.

    *A.     Negligence*

The Plaintiffs specifically aver that:

> CMS, through the acts and omissions of its employees and agents[,]
> negligently, grossly negligently, and recklessly breached its duty to
> provide reasonable medical care for Mr. Loggins by failing to
> provide or seek any medical attention for Mr. Loggins despite
> obvious and serious signs of medical distress. Defendant CMS
> furthermore owed a duty to train and supervise its employees in such
> a manner as to protect from harm individuals like Robert Loggins
> and to ensure reasonable medical treatment.

[102] at p. 15.[23]

Under Mississippi law, there are four elements for a negligence claim: duty, breach,

causation and injury. *Sanderson Farms, Inc. v. McCullough*, 212 So.3d 69, 76 (Miss. 2017)

(citations omitted). CMS contends that the Plaintiffs' claim fails as to the second element,

specifically arguing that the Fourth Amended Complaint [102] "fails to set forth any facts

whatsoever indicating that CMS breached its duty to provide reasonable medical care for Mr.

Loggins by failing to provide or seek any medical attention for Mr. Loggins despite obvious and

serious signs of medical distress." [130] at p. 8 (internal quotation marks omitted). CMS further

emphasizes that Clark told the Officers multiple times that the Jail would not accept Loggins but

that they should instead take him to the hospital for medical treatment.

The Court rejects this argument. Despite CMS' contention, the Fourth Amended Complaint

[102] includes various allegations as to the ways in which the conduct of CMS' employees was

negligent. For example, they specifically allege that the jailers participated in the "dogpile." Also,

the Plaintiffs allege that, although Loggins was clearly in a dire medical condition, the CMS

---

[23] Although the Plaintiffs' negligence claim does involve medical care, the claim is specifically based upon
*general* negligence, as opposed to *medical* negligence. *See* [137] ("Defendants CMS's employees and
agents are not medical providers, and Plaintiffs do not claim CMS is liable for medical negligence, but
instead assert claims of negligence and negligence *per se*.").

employees did not themselves provide any medical care. Further, the Plaintiffs allege that the CMS employees negligently delayed in calling for medical assistance, specifically alleging that Clark called for an ambulance "after several minutes, during which Mr. Loggins lay unconscious on the floor of the lobby[.]" [102] at p. 11.[24]

The Court recognizes CMS' argument—that Clark acted reasonably under the circumstances—and CMS may ultimately prevail on that theory. However, the Court's role at this stage of the proceedings is simply to determine whether the Plaintiffs have stated a claim for relief. *See*, *e.g.*, *Mayhew v. Johnson*, 2022 WL 3271087, at *12 (N.D. Miss. Aug. 10, 2022). They have.

CMS' request for dismissal of the Plaintiffs' negligence claim is therefore DENIED.

B.    *Negligence Per Se*

CMS also seeks dismissal of the Plaintiffs' negligence per se claim asserted against it. "To establish negligence per se, a plaintiff must show: (1) the defendant breached a statute or ordinance; (2) the plaintiff was within the class protected by the statute or ordinance; and (3) the violation proximately caused his injury." *Faul v. Perlman*, 104 So.3d 148, 156 (Miss. Ct. App. 2012) (quoting *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So.2d 790, 796 (Miss. 1995)) (quotation marks omitted).

As to the first element, the Plaintiffs aver that CMS violated Mississippi Code Section 47-1-27. In pertinent part, that section provides:

> An official, or guard, or other employee, having the custody of any
> county prisoner, or any official or employee of the county having

---

[24] The Plaintiffs also specifically allege that CMS negligently failed to adequately train and supervise its employees. "In Mississippi, an employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Murphy v. William Carey Univ.*, 314 So.3d 112, 124 (Miss. Ct. App. 2020) (citations omitted). "A plaintiff must prove the defendant had either actual or constructive knowledge of an employee's incompetence or unfitness before the employer will become liable for negligent hiring or retention of an employee who injures a third party." *Id.* (citations omitted). The Plaintiffs have adequately alleged such a claim sufficient to preclude dismissal at this stage of the proceedings.

custody of any county prisoner, who shall maltreat or abuse any such
convict, or who shall knowingly permit the same to be done, or who
being under duty to provide sufficient and wholesome food,
clothing, shelter, bathing facilities, or medical attention to such
convict, shall wilfully fail to furnish the same to such convict, shall
be deemed guilty of a misdemeanor. . .

MISS. CODE ANN. § 41-1-27.

CMS contends that the statute cannot form the basis of a negligence per se claim against it
because the statute "clearly does not apply to a corporation like CMS or a city arrestee, like Mr.
Loggins, who was never even booked into the jail." [130] at p. 9. The Court notes, however, that
CMS cites no previous cases interpreting this statute to include these exclusions as it asks this
Court to now do.

Considering the broad language of the statute, the Court is not prepared, at this stage in the
proceedings, to preclude the Plaintiffs' potential recovery for that claim. The Court will address
this issue in greater detail at the summary judgment stage, assuming that CMS seeks summary
judgment on that issue after more facts have been developed.[25] To the extent CMS seeks dismissal
of the Plaintiffs' negligence per se claim, the request is DENIED.

C.     *Assault and Battery*

Finally, the Plaintiffs assert that CMS should be held liable "for the torts of assault and
battery arising from the exertion of force against the helpless, prone, and handcuffed Robert
Loggins." [102] at p. 16.

CMS first contends that these claims are barred by the applicable one-year statute of
limitations. *See* MISS. CODE ANN. § 15-1-35 ("All actions for assault, assault and battery, maiming

---

[25] CMS also argues that the Plaintiffs' negligence per se claim fails because they have not alleged that CMS
employees failed to provide him medical attention. This argument mirrors CMS' argument in connection
with the general negligence claim, which the Court has already rejected. The Court will not address it any
further but does note that this argument fails for the same reasons.

. . . shall be commenced within one (1) year next after the cause of such action accrued[.]"). The Plaintiffs' response to this argument relies on the minor's savings statute and mirrors their argument previously addressed in detail above. The Court sees no need to repeat that analysis but, for the same reasons, finds that Section 15-1-53 is applicable and that the Plaintiffs' assault and battery claims are time-barred. To the extent CMS seeks dismissal of those claims, the request is GRANTED. Those claims are DISMISSED.[26]

*Conclusion*

For the reasons set forth above, the Plaintiffs' Motion to Strike [121] is DENIED. Patrolman Tilley's Motion for Summary Judgment [109] and the Municipal Defendants' Motion for Judgment on the Pleadings or, Alternatively, for Summary Judgment [111] are both GRANTED IN PART and DENIED IN PART. The Plaintiffs' state law claims against those Defendants are dismissed *with prejudice*. CMS' Motion for Judgment on the Pleadings [129] is GRANTED IN PART and DENIED IN PART. The Plaintiffs' assault and battery claims against CMS are dismissed *with prejudice*.

The stay of this case is hereby immediately LIFTED. The Magistrate Judge will hold a case management conference in this case as soon as practical.

SO ORDERED, this the 1st day of February, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE

---

[26] For the sake of clarity, the Court notes that CMS (correctly) did not raise a statute of limitations argument in connection with the Plaintiffs' negligence and negligence per se claims against it since a three-year statute of limitations applies to those claims under Mississippi law. This is, of course, different than the negligence and negligence per se claims asserted against the City of Grenada and the Officers individually since the MTCA does not apply to CMS.